BORIS FELDMAN, State Bar No. 128838
Email: boris.feldman@wsgr.com
BENJAMIN M. CROSSON, State Bar No. 247560
Email: bcrosson@wsgr.com
CHERYL W. FOUNG, State Bar No. 108868
Email: cfoung@wsgr.com
STEPHEN B. STRAIN, State Bar No. 291572
Email: sstrain@wsgr.com
SAMUEL J. REED DIPPO, State Bar No. 310643
Email: sreeddippo@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100

Attorneys for Defendants Alphabet Inc., Google LLC,
Lawrence E. Page, Sundar Pichai,
Keith P. Enright and John Kent Walker, Jr.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | Master File No.:  4:18-CV-06245-JSW |
| | CLASS ACTION |
| This Document Relates To: | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| ALL ACTIONS. | |
| | **Hearing Date:  August 23, 2019** |
| | **Hearing Time: 9:00 a.m.** |
| | **Courtroom: 5** |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................................1

STATEMENT OF ISSUES (CIVIL L.R. 7-4(A)(3)).....................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................2

SUMMARY OF ARGUMENT .........................................................................................................2

STATEMENT OF FACTS.................................................................................................................3

APPLICABLE PLEADING STANDARDS....................................................................................6

ARGUMENT .......................................................................................................................................7

I.      THE CURRENT COMPLAINT FAILS TO PLEAD A MATERIALLY FALSE
        OR MISLEADING STATEMENT...........................................................................................7

        A.      The Form 10-Qs Filed on April 23 and July 23 Were Not Materially False
                or Misleading.................................................................................................................7

        B.      The Remaining Statements Are Not Materially False or Misleading ..................13

II.     THE CURRENT COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF
        SCIENTER.............................................................................................................................15

CONCLUSION ..................................................................................................................................18

1

2

**TABLE OF AUHORITIES**

3

**CASES**

4

*Applestein v. Medivation, Inc.*, 561 F. App'x 598 (9th Cir. 2014)....................................16

5

*Baker v. Seaworld Entm't, Inc*., No. 14 cv2129-MMA (KSC), 2016 WL 2993481
    (S.D. Cal. Mar. 31, 2016) ........................................................................................9, 18

6

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) ...........................8, 9, 12

7

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002) ...................................13

8

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
    964 F. Supp. 2d 1128 (N.D. Cal. 2013) ......................................................................14

9

10

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092,
    (E.D. Wash. 2013)....................................................................................................15, 16

11

*Colyer v. Acelrx Pharm., Inc*., No. 14-cv-04416-LHK, 2015 WL 7566809 (N.D.
    Cal. Nov. 25, 2015) ..................................................................................................9, 11

12

13

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ............................................................7

14

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd*., No. CV15-07952-CAS, 2017 WL
    114401 (C.D. Cal. Jan. 9, 2017)...................................................................................11

15

*In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833 (N.D. Cal. 2000) ..........................11

16

*In re Heartland Payment Sys., Inc. Sec. Liti*g., No. CIV. No. 09-1043, 2009 WL
    4798148 (D.N.J. Dec. 7, 2009) ...................................................................10, 11, 18

17

18

*In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 WL 966291 (N.D. Cal. Apr.
    29, 2004), *aff'd sub nom. Young v. Dreisbach*, 182 F. App'x 714 (9th Cir.
    2006)........................................................................................................................14, 15

19

*In re Netflix, Inc. Sec. Litig.*, No. 12-00225 SC, 2014 WL 212564 (N.D. Cal.
    Jan. 17, 2014), *aff'd*, 647 F. App'x 813 (9th Cir. 2016) .......................................15

20

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014)................................7, 10, 12, 17, 18

21

*In re Read-Rite Corp. Sec. Litig.*, No. C-03-03148 RMW, 2004 WL 2125883 (N.D.
    Cal. Sept. 22, 2004) ..................................................................................................9, 18

22

23

*In re Siebel Systems, Inc. Sec. Litig*., No. C 04-0983 CRB, 2005 WL 3555718
    (N.D. Cal. Dec. 28, 2005), *aff'd Wollrab v. Siebel Sys., Inc*., 261 F. App'x
    60 (9th Cir. 2007) ..........................................................................................................18

24

25

*In re Tesla Motors, Inc. Sec. Litig*., 75 F. Supp. 3d 1034 (N.D. Cal. 2014), *aff'd*,
    671 F. App'x 670 (9th Cir. 2016)....................................................................10, 11, 13

26

*Karam v. Corinthian Colleges, Inc*., No. CV10-6523-GHK, 2012 WL 8499135
    (C.D. Cal. Aug. 20, 2012) ............................................................................................14

27

28

*Kim v. Advanced Micro Devices, Inc.*, No. 18-cv-00321-EJD, 2019 WL 2232545
(N.D. Cal. May 23, 2019)..........................................................................................9

*Lipton v. Pathogenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002) ........................................15

*Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016)...............................................14

*Lloyd v. CVB Fin. Corp.*, No. CV 10-06256 MMM, 2012 WL 12883522 (C.D. Cal.
Jan. 12, 2012) .......................................................................................................9

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) ............6, 7

*Panther Partners, Inc., v. Ikanos Commns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y.
2008), *aff'd in relevant part, rev'd in part on other grounds*, 347 F. App'x
617 (2d Cir. 2009) ............................................................................................10, 11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir.
2014)...............................................................................................................11, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ...............6, 7, 15, 17

*Webb v. SolarCity Corp.*, 884 F.3d 844 (9th Cir. 2018) ...........................................7, 18

*Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029 (N.D. Cal. 2012) ...........................10

*Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2018 WL 1258108
(S.D. Cal. Mar. 12, 2018) .....................................................................................16

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009).............15, 16, 17, 18

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. § 78j(b) ..........................................................................................................1

15 U.S.C. § 78t(a) ...........................................................................................................1

15 U.S.C. § 78u-4(a) et seq. ...........................................................................................1

15 U.S.C. § 78u-4(b)(1)(B) .............................................................................................6

15 U.S.C. § 78u-4(b)(2)(A) .............................................................................................7

15 U.S.C. § 78u-4(b)(3)(A) .............................................................................................7

Cal. Civ. Code § 1798.81.5(d) .......................................................................................11

17 C.F.R. § 240.10b-5 .....................................................................................................1

17 C.F.R. § 240.10b-5(b) ............................................................................................6, 10

Fed. R. Civ. P. 9(b) .........................................................................................................1

Fed. R. Civ. P. 12(b)(6) ...................................................................................................1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 23, 2019, at 9:00 a.m., before The Honorable Jeffrey S. White, United States District Court, Courtroom 5, 2d floor, Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, Defendants Alphabet Inc. ("Alphabet" or the "Company"), Google LLC, Lawrence E. Page, Sundar Pichai, Keith P. Enright, and John Kent Walker, Jr. (collectively "Defendants") will move to dismiss the Consolidated Amended Complaint for Violation of the Federal Securities Laws ("CAC" or "current Complaint") pursuant to the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4(a) et seq., and Fed. R. Civ. P. 9(b) and 12(b)(6).  This Motion is based on this Notice of Motion and Motion; Memorandum of Points and Authorities; Defendants' Request for Judicial Notice and Notice of Incorporation By Reference; the Declaration of Cheryl W. Foung and accompanying exhibits; the [Proposed] Order; the pleadings, records and papers on file; oral argument; and any other matters properly before the Court.

## STATEMENT OF ISSUES (CIVIL L.R. 7-4(a)(3))

1.      Should the claims asserted under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 (15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, respectively) be dismissed for failure to plead sufficiently that any Defendant made a materially false or misleading statement?

2.      Should the claims asserted under Section 10(b) and Rule 10b-5 be dismissed for failure to plead particularized factual allegations giving rise to a strong inference of scienter?

3.      Should the control person claim under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) be dismissed because the current Complaint fails to state a claim under Section 10(b)?

# MEMORANDUM OF POINTS AND AUTHORITIES

## SUMMARY OF ARGUMENT[1]

Despite an amended pleading, Plaintiff still fails to allege a misleading statement. Plaintiff's self-defeating allegation about the bug in the Google+ social network remains the same:  Google fixed the bug *before* any of the challenged statements were made.  Thus, while Plaintiff claims that the risk disclosed by those statements had already materialized, the claim is belied by Plaintiff's own allegation:  the problem of which the statements warned was *not* in existence when the statements were made.  That timing flaw disposes of Plaintiff's entire challenge to Google's statements.

Nor does the amended pleading show materiality.  Plaintiff never alleges that the user data made accessible by the bug contained sensitive information (such as social security numbers, financial or banking information, or health or medical records), or that user data were misused.  Plaintiff also does not allege that the bug materially affected Google's earnings.

Finally, Plaintiff's allegations fail to raise a strong inference of scienter.  Plaintiff has dropped all claims against the Company's CFO, Ruth Porat, and names two new Individual Defendants, but again fails to plead that any Defendant knew of facts belying Google's challenged statements.  Plaintiff also fails to allege motive:  despite allegations of stock ownership, Plaintiff does not cite a single instance of a suspicious stock sale.  And no Individual Defendant is alleged to have believed that consumer data had been misused.  That Google did not disclose the bug earlier, where the remediation was quick and where Google had no evidence of damage to consumers, does not amount to fraud.

---

[1] "Plaintiff" is Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island.  "Google" is Google LLC (formerly, Google Inc.), one of Alphabet's subsidiaries.  CAC ¶ 9.  Alphabet, Google, and "the Company" are used interchangeably for purposes of this Motion.  "Individual Defendants" are Lawrence E. Page (CAC ¶ 11, co-founder, former Google CEO, Alphabet CEO and director), Sundar Pichai (CAC ¶ 12, Google CEO and director), and newly-added Defendants John Kent Walker, Jr. (CAC ¶ 13, Google's Senior Vice President for Global Affairs, formerly Google's Vice President and General Counsel), and Kenneth P. Enright (CAC ¶ 10, Google's Chief Privacy Officer, formerly Legal Director of Privacy).  All emphasis is added unless otherwise noted.

This might have been a different case had Plaintiff alleged what it cannot—a data breach involving the actual misuse of users' data and material harm to the Company's business.  But Plaintiff's allegations come nowhere close to this.  Plaintiff alleges a bug (rather than a breach), potential access to data (but no harm to users or misuse of data), and no material harm to the Company's business.  Plaintiff also never alleges that the user data here contained sensitive (e.g., financial or medical/health-related) information, or that the Company was required by law to disclose the data exposure caused by the bug.  And Plaintiff alleges that the bug was found and fixed by the Company itself.  Under these circumstances, nothing in Google's conduct made its public statements materially misleading.  After two complaints, these allegations will not change.  This action should be dismissed with prejudice.

## STATEMENT OF FACTS

**The Wall Street Journal Article.**  On October 8, 2018, Google announced in a blog post that it would soon be closing down its Google+ social network.  Declaration of Cheryl W. Foung in Support of Defendants' Motion to Dismiss, Exhibit ("Ex.") 2 ("Google Blog Post") at 1-2, 4.[2] That same day, The Wall Street Journal ("WSJ") reported a software bug had affected a certain "application program interface" (or "API") used to access data from the Google+ service.  Ex. 1 ("WSJ Article") at 3.  An API is a software intermediary that allows two applications to talk to each other; the WSJ Article reported that the bug resulted from a "flaw in an API Google created to help app developers access an array of profile and contact information" about those who sign up to use their apps and about other Google+ users.  *Id*.

**How Google+ APIs Work.**  Google+ users were able to interact with third-party applications ("apps") that were built to interact with the Google+ platform.  *See* Ex. 1 (WSJ Article) at 2. To function, these apps sometimes needed to access user data—for example, a user's photo app may require access to photos the user had uploaded to the Google+ platform.  *See Id*.  An API allows authorized apps to access specified Google+ user data.  *Id*.  The Google+

---

[2] *See generally* Defendants' Request for Judicial Notice and Notice of Incorporation by Reference.  The Company stopped operating the consumer Google+ platform in April 2019. CAC ¶ 64.

1    API at issue allowed users to grant apps access to their profile information as well as the public

2    profile information of other users.  *See Id.* at 3.  Because of the software bug, apps were able to

3    access profile information that other Google+ users had shared with the authorizing user, but had

4    not necessarily shared with the public at large.  *See Id* at 3-4.

5         **The Bug's Limited Impact.**  The Google+ profile information potentially exposed by

6    the bug was information that is often shared and in certain cases is already public.  *See* CAC ¶ 37

7    (user data included profile information such as occupation); Ex. 2 (Google Blog Post) at 2 ("The

8    data is limited to static, optional Google+ Profile fields....  It *did not* include *any other data* you

9    may have posted or connected."); Ex. 1 (WSJ Article) at 2 ("The profile data that was exposed

10   included full names, email addresses, birth dates, gender, profile photos, places lived, occupation

11   and relationship status; it didn't include phone numbers, email messages, timeline posts, direct

12   messages or any other type of communication data").  This was not happenstance.  Google+

13   profile fields were designed to collect the sort of information people would want to share on a

14   social network, not sensitive information like social security numbers and financial information.

15   *See* Ex. 2 (Google Blog Post) at 2.

16        Nor was it happenstance that Google itself found and fixed the problem.  The Google+

17   bug was discovered as part of Google's own proactive attempt to review its policies and third

18   party developer access.  Ex. 2 (Google Blog Post) at 3.  The WSJ Article, which forms the

19   central basis for Plaintiff's claims, recognized Google's prompt remediation of the bug shortly

20   after it was discovered.  Ex. 1 (WSJ Article) at 1, 2; *see also* CAC ¶ 73.

21        The Article also belies Plaintiff's conclusory assertions that a "breach" occurred.  CAC

22   ¶¶ 38, 71, 77(a).  Not only did the Article's final version not suggest that hacking occurred, or

23   that information of a sensitive nature (e.g., social security numbers, or financial or medical

24   information) was exposed, but in a correction of an earlier version of the Article, the WSJ

25   expressly withdrew the term "breach," explaining:  "The phrase 'data breach' in a headline on an

26   earlier version of this article could be interpreted as suggesting that data were misused.  (Oct. 9,

27   2018)."  Ex. 1 (WSJ Article) at 7.  The Article further made clear that Google found no evidence

28   of data misuse.  Ex. 1 (WSJ Article) at 2.  In short, the Article undercuts Plaintiff's effort to

                                                    -4-

conflate "bug" (a software flaw, which in this case resulted in potential exposure of user data)

with a "breach" (i.e., a term generally defined by various state laws as unauthorized access to

certain types of sensitive or confidential data).

As to the timing of Google's disclosure of the bug, the Article acknowledged the basis on

which Google decided not to disclose the bug earlier (as explained to the WSJ by a Google

spokesperson):

> In weighing whether to disclose the incident, the company considered "whether we could accurately identify the users to inform, whether there was any evidence of misuse, and whether there were any actions a developer or user could take in response," he said. "None of these thresholds were met here."

Ex 1 (WSJ Article) at 2.

Google's self-remediation went far beyond fixing the bug. As the Article noted, Google

undertook a "broader review of privacy practices" and "announced a sweeping set of data

privacy measures." Ex. 1 (WSJ Article) at 1, 2. Referring to Google's October 8 Blog Post, the

Article also stated that Google planned to "clamp down" on certain data outside developers can

access through APIs. *Id*. at 3. Notably, the Article also referenced Google's decision to shut

down Google+ for consumers. *Id*. at 2.

**The Shareholder Litigation.** Days after the October 8 Blog Post and the WSJ Article

appeared, two securities class actions—*Wicks* and *El Mawardy*[3]—were filed. This Court

appointed Lead Plaintiff on January 25, 2019, and consolidated the actions. On February 14,

2019, Lead Plaintiff designated the 16-page "*Wicks* Complaint" as the operative complaint.[4] The

then-named defendants moved to dismiss the *Wicks* Complaint on March 22, 2019 (ECF No. 54)

("First MTD"). Tacitly admitting the failings of the *Wicks* Complaint, Lead Plaintiff did not

---

[3] *El Mawardy v. Alphabet, Inc*., No. 1:18-cv-05704 (E.D.N.Y. filed Oct. 11, 2018) ("*El Mawardy*").

[4] While the *El Mawardy* complaint mentions both that Google promptly repaired the software bug and that Google found no evidence of misuse of data, the *Wicks* Complaint makes no mention of either fact.

1   respond to or oppose that Motion and instead filed the current Complaint.  The alleged Class

2   Period runs from April 23, 2018 through October 7, 2018.  CAC ¶ 1.[5]

3        **What's New in the Current Complaint.**  Although the current Complaint is double the

4   size of its predecessor—with 51 added paragraphs—the causes of action remain unchanged:  one

5   claim under Section 10(b) of the Exchange Act and Rule 10b-5 (against all Defendants), and one

6   claim under Section 20(a) of the Exchange Act (against Defendants Alphabet, Google, Pichai,

7   and Page).  As to whether the added paragraphs support the claims, more is not better.  The only

8   new statements challenged comprise a handful of generalized public statements concerning

9   Google's values and focus on privacy.  The other new allegations fail to cure the pleading

10  defects identified in the First MTD.  In sum, the current Complaint adds no meaningful

11  allegations to substantiate Plaintiff's baseless allegations of securities fraud.[6]

12              **APPLICABLE PLEADING STANDARDS**

13       Plaintiff alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5, which

14  implements Section 10(b).  Rule 10b-5 makes it unlawful to "make any untrue statement of a

15  material fact or to omit to state a material fact necessary in order to make the statements

16  made...not misleading."  17 C.F.R. § 240.10b-5(b); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

17  551 U.S. 308, 318 (2007).  Plaintiff's claims are subject to the Reform Act's heightened pleading

18  requirements, which mandate that "the complaint shall specify each statement alleged to have

19  been misleading, the reason or reasons why the statement is misleading, and, if an allegation

20  regarding the statement or omission is made on information and belief, the complaint shall state

21  with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  These

---

22  [5] The current Complaint mentions that after the Class Period, Google+ experienced a different
23  software bug, which Defendants "disclosed...in a December 2018 blog post and began notifying
    the impacted users."  The current Complaint does not challenge this statement.  CAC ¶ 64.

24  [6] Tellingly, the current Complaint abandons the *Wicks* Complaint's allegation that Alphabet's
25  risk factors in its 2017 Form 10-K were false and misleading for failure "to disclose that the
    Company's security measures already had failed recently and massively."  *Wicks* Compl. ¶ 28.
    That abandonment is not surprising.  The First MTD showed the fatal flaw in that allegation:  the
26  Company discovered the glitch *after* the Form 10-K was filed on February 6, 2018 (*Wicks*
    Compl. ¶ 4; *see also* Ex. 1 (WSJ Article) at 1-2), and Plaintiff never explained how Alphabet
27  could have disclosed in the 2017 Form 10-K an event that it had not yet even discovered.  Thus,
    unlike the *Wicks* Complaint, which challenged the 10-K and the 10-Qs filed in April and July
28  2018, the current Complaint challenges only the 10-Qs.

---

1  requirements are "formidable" and "exacting." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*,

2  540 F.3d 1049, 1054-55, 1070 (9th Cir. 2008).

3      A plaintiff must also "state with particularity facts giving rise to a strong inference that

4  the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter

5  "refers to a mental state embracing intent to deceive, manipulate, or defraud." *In re NVIDIA*

6  *Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quoting *Ernst & Ernst v. Hochfelder*, 425

7  U.S. 185, 193 n.12 (1976)). Scienter requires deliberate recklessness or conscious misconduct.

8  *Id.* In weighing scienter, courts must "consider plausible, nonculpable explanations for the

9  defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24.

10  Factual allegations must be "compelling," "persuasive," "effective," and "powerful." *Id.* "A

11  complaint will survive…only if a reasonable person would deem the inference of scienter cogent

12  and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

13  at 324. The "bar set by *Tellabs* is not easy to satisfy." *Webb v. SolarCity Corp.*, 884 F.3d 844,

14  855 (9th Cir. 2018). In addition, courts consider scienter allegations holistically as well as

15  individually. *Id.* at 855. The Reform Act mandates that if a complaint fails to meet the pleading

16  requirements, the court "shall" dismiss the complaint. 15 U.S.C. § 78u-4(b)(3)(A).

17  **ARGUMENT**

18  I.   **THE CURRENT COMPLAINT FAILS TO PLEAD A MATERIALLY FALSE OR MISLEADING STATEMENT.**

19

20      A.   **The Form 10-Qs Filed on April 23 And July 23 Were Not Materially False or Misleading.**

21      Plaintiff challenges Alphabet's Form 10-Qs filed on April 23, 2018 and July 23, 2018.

22  These 10-Qs each incorporated the risk factors in Alphabet's Form 10-K for 2017, and stated that

23  there were no material changes to those risk factors. Plaintiff alleges that the incorporation and

24  statement were rendered misleading by the failure to disclose the Google+ bug. CAC ¶¶ 43-44,

25  49, 55. The risk factors at issue concerned data breaches and systems failures:

26      If our security measures are breached resulting in the improper use and disclosure of user
        data...our products and services may be perceived as not being secure...and customers
27      may curtail or stop using our products and services....

28      Any systems failure or compromise of our security that results in the release of our users'
        data...could seriously harm our reputation and...business.... We expect to continue to

1

2

expend significant resources to maintain state-of-the-art security protections that shield against theft and security breaches.

3

4

We experience cyber attacks of varying degrees on a regular basis.  Our security measures may also be breached due to...system errors or vulnerabilities....  Such breach...could result in significant legal and financial exposure...and a loss of confidence in the security of our products and services that could potentially have an adverse effect on our business.

5

*See also* Ex. 3 (2017 Form 10-K) at 10-11.

6

7

8

9

10

11

As shown by the First MTD's argument—which is unaddressed by the current Complaint—the challenged statements are not misleading, for the simple reason that the software bug had been remediated *before* those statements were made.  Thus, the problem at issue was *not* in existence when the statements were made.  That timing flaw disposes of Plaintiff's materialization-of-the-risk theory:  the statements meaningfully warned of something that, when each 10-Q was filed, was a potential, future problem rather than an actual, current problem.

12

13

14

Moreover, Plaintiff again fails to plead facts showing that the bug was material.  This failing is likewise fatal to Plaintiff's claims.

15

16

17

18

19

20

**The Bug Was Already Fixed Before the Form 10-Qs Were Filed.**  Plaintiff again ignores the uncontroverted fact that the bug was identified in March 2018, and that soon thereafter Google fixed the issue.  *See* Ex. 1 (WSJ Article) at 1, 2; CAC ¶ 73.  With the software bug already remediated *before* the April 23 and July 23 statements, Plaintiff fails again to explain how those statements could have been misleading.[7]  At the time the statements were made, *there was no bug or vulnerability to disclose*.  This fact dooms Plaintiff's claims.

21

22

23

24

Where, as here, a company warns that a problem may occur *in the future*, but does not disclose that the problem had actually occurred and was remediated *in the past*, the non-disclosure does not render the warning misleading.  As the Sixth Circuit has explained, "[r]isk disclosures...are inherently *prospective* in nature.  They warn an investor of what harms *may*

25

26

27

28

---

[7] The current Complaint alleges simply that Defendants "decided to do the wrong thing by warning investors of risks that had already been realized, and concealing the new risks they had discovered and created by concealing these risks."  CAC ¶ 42; *see* CAC ¶ 37 (there was a "realiz[ation of] the risk[]" that Google "had been warning about for years"); CAC ¶ 55 (Google "had realized the risks it had been warning about"; "Defendants [] concealed the inevitability of all the foregoing risks materializing").

come to their investment." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015).

Because *Bondali* held that reasonable readers are unlikely to infer from risk disclosures anything

about the *present*, (*id*.), the holding necessarily establishes that reasonable readers are unlikely to

infer from risk disclosures anything about the *past*.  That is, a problem that existed only in the

past and does not exist in the present cannot, if undisclosed, render risk disclosures misleading:

reasonable readers are unlikely to infer anything about the *past* from a statement "inherently"

about the *future*.  *Id*.[8]  *Bondali* disposes of any suggestion that non-disclosure of a past bug

somehow rendered the Company's risk disclosures misleading.[9]

**The Risk Factors Were Meaningful.**  The risk factors in the 2017 Form 10-K warned

that the Company's "security measures may also be breached due to employee error, [] system

errors or vulnerabilities...," and that "[p]rivacy concerns relating to our technology could damage

our reputation and deter current and potential users or customers from using our products and

services."  CAC ¶ 27(a) & (b).  It is hard to see how the above-quoted warnings did not

---

[8] In any event, Plaintiff's theory has no application where the bug indisputably was fixed before the risk factor was referenced.  *See Lloyd v. CVB Fin. Corp.*, No. CV 10-06256 MMM (PJWx), 2012 WL 12883522, at *19 (C.D. Cal. Jan. 12, 2012) (no facts indicating "that this risk factor was already affecting the Bank's portfolio"); *Baker v. Seaworld Entm't, Inc.*, No. 14 cv2129-MMA (KSC), 2016 WL 2993481, at *12 (S.D. Cal. Mar. 31, 2016) (IPO offering's risk disclosure of injury or adverse publicity was not false or misleading in absence of facts or data showing negative impact on performance*); see also Colyer v. Acelrx Pharm., Inc*., No. 14-cv-04416-LHK, 2015 WL 7566809, at *9 (N.D. Cal. Nov. 25, 2015) (risk disclosures not actionable; no knowledge that medical device "errors would necessarily translate into knowledge that [it] would face a significantly higher risk of rejection by the FDA"); *In re Read-Rite Corp. Sec. Litig.*, No. C-03-03148 RMW, 2004 WL 2125883, at *5 (N.D. Cal. Sept. 22, 2004) ("plaintiffs fail to even adequately allege the mere existence of...product defects which Read-Rite would not be able to overcome").

[9] As noted *supra* at 3-5, and *infra* at 12, Plaintiff's substantive allegations allege a bug and *not* a breach.  But Google warned of both problems.  *See supra* at 7-8 (quoting Ex. 3 (2017 Form 10-K) at 10-11) and *infra* at 9 (quoting CAC ¶ 27).  To the extent Plaintiff's materialization-of-the-risk theory is intended to challenge both warnings, the theory fails because the bug was remediated before both warnings were made.  *See supra* at 7-9.  But there is an independent reason why the theory fails as to the warning of breach:  Plaintiff's substantive allegations never allege a breach—not even one purely in the past.  Thus, according to those allegations, there had never been any breach to disclose.  This was precisely the holding in *Kim v. Advanced Micro Devices, Inc.*, No. 18-cv-00321-EJD, 2019 WL 2232545, at *7-8 (N.D. Cal. May 23, 2019), where, as here, the company's risk disclosures warned of "breaches" resulting from "security vulnerabilities" (*see infra* at 9 (quoting CAC ¶ 27)), but the plaintiff alleged that, at the time of the risk disclosure, there was only a security vulnerability and not an actual breach.  Rejecting the materialization-of-the-risk theory, the Court held:  "[T]he potential risks disclosed in the SEC filings had not come to fruition when Defendants filed the challenged risk disclosures."  *Id*. at *7.

adequately warn investors, even without disclosure of the past bug.  Warning about potential

systems errors or vulnerabilities, and related privacy concerns, is meaningful.  *See In re*

*Heartland Payment Sys., Inc. Sec. Litig.*, No. CIV. No. 09-1043, 2009 WL 4798148, at *5,

(D.N.J. Dec. 7, 2009) (cautionary warnings of possibility of breach and consequences "make

clear that Heartland was not claiming that its security system was invulnerable"); *see also*

*NVIDIA*, 768 F.3d at 1057, 1065 (noting relevance of warning in determining absence of

scienter; "product flaws are very common in the semiconductor industry, and NVIDIA regularly

takes measures to account for this, as reflected in its disclosures").  Alphabet's litany of risk

factors in its Form 10-K, which the Form 10-Qs referenced continued to serve an important

function.  *Heartland*, 2009 WL 4798148, at *6 (risk factors did not state network was immune or

that no breach had ever occurred; "that a company has suffered a security breach does not

demonstrate that the company did not 'place significant emphasis on maintaining a high level of

security'").[10]  Given the specificity of these warnings, nothing in Plaintiff's allegations suggests

that the warnings misleadingly lulled investors into thinking that the risks were less significant

than was actually the case.

      **Plaintiff Pleads No Facts Showing That the Bug Was Material.**  Plaintiff again fails to

plead facts showing that the Google+ bug was actually *material.  See* 17 C.F.R. § 240.10b-5(b)

(liability arises from omission of "a *material* fact necessary in order to make the statements

made...not misleading").  Non-disclosure of a product defect, like the bug at issue here, cannot

create securities liability unless the defect is material.  *See Panther Partners, Inc.*, *v. Ikanos*

*Commns, Inc.*, 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008) ("failure to disclose that there was a

---

[10] *See Wozniak v. Align Tech.*, *Inc.*, 850 F. Supp. 2d 1029, 1040-41 (N.D. Cal. 2012) (dismissing claim based on nondisclosure of problems with software tools where statements did not create a misleading impression of tools' utility); *Tesla*, 75 F. Supp. 3d at 1043-44, 1046 (statements that no production battery ever caught fire and that Model S was "The Safest Car in America" were not materially misleading for failure to disclose that fires occurred in prototype batteries; statement in response to question about car fire in Washington was not false or misleading for failure to mention fire in Mexico).

1    defect does not amount to a basis for liability under the securities laws"), *aff'd in relevant part,*

2    *rev'd in part on other grounds*, 347 F. App'x 617 (2d Cir. 2009).[11]

3          Plaintiff still fails to plead that the data at issue here were of an inherently sensitive

4    nature, such as social security numbers, medical records, or bank account information.  *Compare*

5    CAC ¶ 37 (potential access was to *information such as* "birth dates, photos, occupations,

6    relationship status, [and] email addresses"),[12] *with Heartland*, 2009 WL 4798148, at *1 (hackers

7    used "malicious software" and stole 130 million credit card and debit card numbers); Cal. Civ.

8    Code § 1798.81.5(d) (duty to notify in event of disclosure of person's name together with social

9    security or driver's license number, financial, medical or health insurance information, or user

10   names plus passwords).[13]  To the contrary, Google+ profiles contain information that is often

11   shared and in certain cases is already public.

12         Plaintiff likewise fails to plead that the bug was material to Google's business or that it

13   materially affected earnings.[14]  *See Panther Partners*, 347 F. Appx. at 621 (no allegation that

14

---

15   [11] *See In re Tesla Motors, Inc. Sec. Litig.*, 75 F. Supp. 3d 1034, 1041 (N.D. Cal. 2014)

16   ("Disclosure is required...only when necessary 'to make...statements made, in the light of the circumstances under which they were made, not misleading.'"), *aff'd*, 671 F. App'x 670 (9th Cir. 2016).

17   [12] Plaintiff's characterizations of the WSJ Article take unsupported liberties.  For example,

18   Plaintiff inaccurately alleges that the data at issue included "home addresses" (as opposed to a general geographic area like "Oakland," California) or "photos" (as opposed to a user's profile or cover photo for their Google+ page).  CAC ¶ 37.  *See* Ex. 1 (WSJ Article) at 2.  *See Tesla*, 75 F.

19   Supp. 3d at 1046 ("Court is 'not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint'") (citation omitted); *Colyer*, 2015 WL

20   7566809, at * 3 ("Plaintiffs cannot selectively quote from one part of a publicly-available

21   transcript and then object to Defendants' decision to provide the Court with the complete transcript.")

22   [13] *See Panther Partners*, 538 F. Supp. 2d at 673 (complaint is "silent about the rate at which chips were being returned as of that date, or the volume of the defect at that time"); *Guangyi Xu*

23   *v. ChinaCache Int'l Holdings Ltd.*, No. CV15-07952-CAS (RAOx), 2017 WL 114401, at *8

24   (C.D. Cal. Jan. 9, 2017) ("Allegations regarding undetermined technical problems are too vague to show the falsity [of the company's claim that transition to new cloud system] was an improvement"; plaintiff failed to identify "number of customers...facing undetermined technical

25   issues"); *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 840 (N.D. Cal. 2000) (complaint pleads "no facts regarding the specific nature of the bugs or the technical difficulties, or their

26   impact on product development"); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061-63 (9th Cir. 2014) (statement that "100% that hospitals were cutting back"

27   omits "how many hospitals were cutting back, how much and when").

28   [14] For the year ended December 31, 2018, Alphabet earned revenues of $136.8 billion and net income of $30.7 billion.  Ex. 4 (2018 Form 10-K) at 26, 47.

"company knew that the defect rates were unusually high and therefore could materially affect earnings"); *NVIDIA*, 768 F.3d at 1050 (company announced charge of $150-$200 million to cover costs from defect in chipsets); *Bondali*, 620 F. App'x at 491 ("[P]laintiffs have not alleged facts suggesting the issues with [suppliers] were so severe that they would have resulted in financial loss…. [Plaintiffs] allege neither the proportion of chicken possibly contaminated nor whether Liuhe and Yintai were two of a mere handful of suppliers or two of thousands of other suppliers").

As noted *supra* at 5, the Company considered whether it "could accurately identify the users to inform, whether there was any evidence of misuse, and whether there were any actions a developer or user could take in response," but found "[n]one of these thresholds were met in this instance."  Ex. 2 (Google Blog Post) at 2.  Plaintiff continues to gloss over these facts, hollowly asserting "[t]his was such a significant breach....  Google+ had 395 million monthly active users."  CAC ¶ 41.  But the number of users that regularly used Google+ does not establish a "significant breach," especially when there are no facts pleaded regarding how many users actually had data exposed.  In fact, the number of users establishes no "breach" at all:  despite the passage of many months and two complaints, *Plaintiff still fails to identify a single user whose Google+ profile information or data were actually misused.  See* CAC ¶ 2 ("software glitch...that *potentially* exposed the private personal data"); CAC ¶ 37 ("[Google] learned...of a software glitch in its Google+ social networking site that gave hundreds of third-party developers *potential access* to the private user profile data for Google+ users").[15]

Nonetheless, Plaintiff continues to mischaracterize the bug as a "security breach" and "data breach."  CAC ¶¶ 38, 71, 77(a); *see also* CAC ¶ 28 ("realized risk" was a "cyber attack[]").  These allegations do not square with reality, let alone with the current Complaint.  Indeed, the current Complaint makes clear that Google+ experienced a software bug that impacted Google+

---

[15] *See also* CAC ¶ 66 ("data had been *potentially* exposed"); CAC ¶ 73 ("potential access to the private user profile").  Interestingly, Plaintiff also accuses Google of "inadequate" "security controls" in that the Company "could only identify two weeks' worth of users whose private profile information had been exposed."  CAC ¶ 55.  Contrary to Plaintiff's suggestion, that Google maintained only two weeks of log data was entirely *consistent* with Google's privacy-minded policy of holding such user data for only a limited time.

APIs, not an attack from a third party actor stealing sensitive data for its pecuniary benefit. *See, e.g.*, CAC ¶¶ 37-38, 40-43, 45-46, 48-51, 54-60, 63-64, 66-68, 70, 72 (referencing a "bug").  As noted *supra* at 4, The Wall Street Journal initially reported a "data breach" in the headline of its print edition, but subsequently called out its error and withdrew the term.  Ex. 1 (WSJ Article) at 7; *Tesla*, 75 F. Supp.3d at 1046 (rejecting "conclusory allegations which are contradicted by documents referred to in the complaint").  Ultimately, Plaintiff pleads no facts meeting its obligation to demonstrate materiality and thus cannot establish any duty to disclose.  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (no duty to disclose all facts unless statement "affirmatively create[s] an impression of a state of affairs that differs in a *material* way from the one that actually exists.").

**B.      The Remaining Statements Are Not Materially False or Misleading.**

Instead of opposing the First MTD, Plaintiff opted to amend its Complaint.  Although Plaintiff had more than six months from the filing of the *Wicks* Complaint to conduct further factual investigation, Plaintiff's paltry "new" allegations do nothing to bolster its claims.  The current Complaint now alleges as false and misleading a handful of additional generalized statements that merely acknowledge the importance of privacy to users, along with the Company's commitment to transparency and protection of user data:

- CAC ¶ 45.  April 23, 2018 earnings call.  Mr. Pichai stated that Google has a "very robust and strong privacy program."

- CAC ¶ 46.  April 25, 2018 letter from Google, responding to U.S. Senator Grassley, stating, "Google has a longstanding commitment to ensuring both that our users share their data only with developers they can trust" and is "committed to protecting our users' data."

- CAC ¶ 47.  April 27, 2018 Proxy Statement, opposing stockholder proposal on "content governance" and stating, "We believe that we have a responsibility to combat the misuse of our platforms and enforce our content policies.  And we understand our continuing responsibility to update our users and stockholders on those efforts....  We are committed to transparency in all areas of our business.... Google has long been a champion of disclosure and transparency."

- CAC ¶¶ 49, 50.  July 23, 2018 earnings call, which referenced the Form 10-K risk factors.  Mr. Pichai stated that "Google was 'always...focused on user privacy.'"

- CAC ¶ 48.  June 6, 2018 Annual Shareholders Meeting, Mr. Walker stated that the Company "had 'long been one of the leading companies when it comes to privacy and security of user data'"; "we are in great pains to make sure that people have great control and notice over their data."

1

2
- CAC ¶ 52.  September 26, 2018 written testimony from Mr. Enright to Congress stating, "The foundation of our business is the trust of people that use our services…. [U]sers trust us to keep their personal information confidential and under their control."

3

4
- CAC ¶ 53.  September 24, 2018 Blog, Mr. Enright stated that "users have long entrusted us to be responsible with their data….  [P]eople deserve to feel comfortable that all entities that use personal information will be held accountable for protecting it ….,"[16]

5

6

7       As a threshold matter, these new allegations bear several of the fatal flaws that doomed

8   Plaintiff's attacks on the earlier statements.  As with Plaintiff's claims regarding the 10-Qs of

9   April 23, 2018 and July 23, 2018, all of these newly challenged statements (spanning April 23 to

10  September 24, 2018) were made *after* the bug was remediated.  *See supra* at 8-9.  Further, given

11  Plaintiff's failure to show that the bug was material, *see supra* at 10-13, any suggestion that these

12  generalized policy statements were rendered misleading by non-disclosure of the bug also fails.

13      These new allegations regarding Google's generalized statements about privacy

14  principles fail for an additional reason:  under clear Ninth Circuit law, they are too vague and

15  generalized to be actionable.  *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016)

16  (statement that "strong credit culture and underwriting integrity remain paramount" is

17  inactionable puffery); *Karam v. Corinthian Colleges, Inc.*, No. CV10-6523-GHK (PJWx), 2012

18  WL 8499135, at *10 (C.D. Cal. Aug. 20, 2012) (statement that "[c]ompliance for the

19  organization has really been job one" is "too generic and indefinite to serve as the basis of a

20  securities fraud claim"); *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett

21  Packard Co.*, 964 F. Supp. 2d 1128, 1138-1139 (N.D. Cal. 2013) (statements in standards of

22  business code are immaterial, inactionable puffery, not "capable of objective verification")

23  (citation omitted); *In re Metricom Sec. Litig.*, No. C 01-4085 PJH, 2004 WL 966291, at *30

24

25
[16] The current Complaint also challenges Mr. Pichai's statement, made during the April 23, 2018 call concerning 1Q18 earnings, that "[Google] started working on GDPR compliance over 18 months ago."  CAC ¶ 45.  The GDPR is the European Union's General Data Protection Regulation, under which "disclosure of data breaches is obligatory."  CAC ¶ 34.  The CAC fails to show how the GDPR is relevant to this suit at all, particularly where the statement was made (and the bug remediated) before the GDPR went into effect.  *See* CAC ¶¶ 10, 34 (GDPR only "went into effect in May 2018").  In any event, the CAC does not allege that Google did not "start[] working on GDPR compliance."  CAC ¶ 45.

26

27

28

1  (N.D. Cal. Apr. 29, 2004) (statements that "[w]e have launched the Ricochet network at a

2  tremendous pace" and "[o]ur roll-out plan is unmatched" "were little more than vague statements

3  of corporate optimism"), *aff'd sub nom. Young v. Dreisbach*, 182 F. App'x 714, 719 (9th Cir.

4  2006).  In sum, none of the challenged statements is false or misleading.

## II.     THE CURRENT COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER.

7         The Court need not reach scienter where, as here, Plaintiff fails to plead an actionable

8  statement.[17]  In any event, Plaintiff's scienter allegations fall short, lacking the "cogent and

9  compelling" force needed to raise a strong inference of scienter.  *Tellabs*, 551 U.S. at 324.

10        **No Motive Alleged.**  Plaintiff fails to articulate a coherent theory of, or any motive for,

11  fraud.  The current Complaint acknowledges that, as "a result of defendants' scheme, Alphabet

12  was overvalued" (CAC ¶ 81); the stock was artificially inflated (CAC ¶¶ 7, 85, 98, 99); and Mr.

13  Page—a co-founder of Google (CAC ¶ 19)—and Mr. Pichai have "ownership rights."  CAC ¶

14  103.  Conspicuously absent here are allegations of motive and opportunity that are based on

15  "suspicious" stock sales.  *See Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 1005 (9th

16  Cir. 2009).  Suspicion arises when an individual defendant made stock sales "dramatically out of

17  line with prior trading practices at times calculated to maximize personal benefit from

18  undisclosed inside information."  *See id.* (citation omitted).  By contrast, when an individual

19  defendant retains "'most of [his] [company's] stock and incur[s] the same large losses' as

20  plaintiffs," the retention *undermines scienter.  See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027,

21  1037 (9th Cir. 2002) (citation omitted).

22        **No Confidential Witnesses.**  Despite having over six months to investigate its claims,

23  Plaintiff fails to plead any allegations by confidential witnesses.  That failure undermines any

24  claim that the Individual Defendants believed the software bug was material to the Company and

25  had to be disclosed.  *See City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp.

---

[17] *See In re Netflix, Inc. Sec. Litig.*, No. 12-00225 SC, 2014 WL 212564, at *2 (N.D. Cal. Jan. 17, 2014) (dismissing for failure to plead falsity; "the Court did not need to address scienter because it found that Plaintiffs failed to allege a false statement"), *aff'd*, 647 F. App'x 813, 816 (9th Cir. 2016) (similar).

1  2d 1092, 1132 (E.D. Wash. 2013) ("No confidential witness has come forward to say that

2  Defendants were aware of secret, adverse financial information and failed to disclose it, much

3  less that such adverse information contradicted Defendants' public representations), *aff'd*, 691 F.

4  App'x 393 (9th Cir. 2017).[18]

5         **No Deliberate Wrongdoing.**  Although Plaintiff claims fraud, there is not even a hint of

6  dereliction or wrongdoing by any Defendant with respect to privacy and security measures.  To

7  the contrary, the current Complaint concedes that Google created a privacy task force consisting

8  of "over 100 of Google's best and brightest engineers, product managers, and lawyers" and that

9  this task force discovered the software bug during an audit.  CAC ¶ 38; *see also* Ex. 1 (WSJ

10  Article) at 3.[19]  Google undisputedly remediated the bug shortly after discovery.

11        **Reliance on SOX Certifications Fails.**  The current Complaint alleges that Mr. Page

12  signed certifications to the 10-Qs for 1Q 2018 and 2Q 2018 pursuant to the Sarbanes-Oxley

13  ("SOX") Act.  CAC ¶¶ 43, 49.  Courts routinely reject reliance on SOX certifications.  *See*

14  *Zucco*, 552 F.3d at 1003-04 (required certifications add nothing to scienter calculus) (collecting

15  cases).

16        **Alphabet's Reaction to Facebook's Cambridge Analytica Scandal Does Not Show**

17  **Scienter.**  Plaintiff alleges that scienter may be inferred because Defendants purportedly

18  "approved a plan to hide the Privacy Bug...to avoid any additional regulatory scrutiny, including

19  having to testify before Congress."  CAC ¶ 40.  Plaintiff here simply—and inaccurately—

20  conflates the Google+ API bug (which involved no evidence of data misuse) with the unrelated

21  Cambridge Analytica scandal, which affected Facebook around the same time in 2018.  CAC

22  ¶ 33(a).  That issue, in which "Cambridge Analytica improperly harvested data from Facebook

23  users' profiles" and transmitted user information to third parties for profit with the intent to

24

25  _____

   [18] *See also Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600-01 (9th Cir. 2014) (rejecting
26  scienter; "there is no allegation that any CW relayed [that the drug study was unblinded] to any
   defendant").

27  [19] *See Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2018 WL 1258108, at *10
   (S.D. Cal. Mar. 12, 2018) (plan to improve internal controls shows that "Defendant recognized
28  issues and attempted to correct them" and raises no inference of scienter).

profile U.S. voters, triggered substantial regulatory interest and Senate hearings on election interference. *Id.*

The scrutiny expanded to Google even though Google+'s data was "not known to have been taken by Cambridge Analytica" and was not known to have been misused. (CAC ¶¶ 33(a), 37.) In other words, there were significant differences between the Facebook situation and Google+'s software bug. *See* CAC ¶ 33(a) (Washington Post reported that "Congress wants to drag Google and Twitter into Facebook's privacy crisis."); CAC ¶ 33(b) ("the problems surrounding Facebook and Cambridge Analytica did not involve Google"). Accordingly, any attempted inference regarding Defendants' scienter arising out of Facebook's Cambridge Analytica situation simply falls flat. *Tellabs*, 551 U.S. at 323-24 (Courts must evaluate "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.").

**The Competing Inferences Undermine Scienter.** When holistically reviewing securities fraud allegations, courts should consider *all* inferences, including those "that could weigh against a finding of scienter." *Zucco*, 552 F.3d at 1006 (quoting *Tellabs*, 551 U.S. at 323). The decision in *NVIDIA* is instructive. NVIDIA allegedly knew as early as 2006 that semiconductor chips accounting for 80% of its revenue were cracking. NVIDIA disclosed receipt of some limited claims in May 2008 and ultimately announced in July that it was taking a charge of $150-$200 million because of the chip defects. Notwithstanding the CEO's stock sales, corporate attempts at remediation, and the plaintiff's reliance on 17 confidential witnesses, industry experts and other lawsuits, the Ninth Circuit affirmed dismissal on scienter grounds. The plaintiff failed to plead that the defendants had advance knowledge of the scope of financial liability and that the company "intentionally misled investors, or acted with deliberate recklessness, by not disclosing the problem sooner." *NVIDIA*, 768 F.3d at 1056-1057, 1059. The more compelling inference was that NVIDIA was "first investigating the root cause, and then the scope," of the problem and that, upon determining its "liability would exceed its normal reserves, NVIDIA disclosed the problem to investors." *Id.* at 1056.

The facts here pale in comparison to NVIDIA's long-known product defect, insufficient reserve, and $150-$200 million charge.  Here, Google, acting in good faith to proactively review Company policies and third-party developers' access to data, discovered the software bug and quickly fixed it.  *See Heartland*, 2009 WL 4798148, at *8 (no scienter; no facts that defendants "believed that Heartland's security systems were deficient or that any problems created by the SQL attack had not been addressed").  The current Complaint fails to allege that the data at issue contained sensitive information like financial or medical records, that there was an intentional breach by a bad or malicious actor, that data were misused, or that corporate earnings were materially impacted.  Nor is any Individual Defendant alleged to have believed that consumer data had been misused.  *See Seaworld*, 2016 WL 2993481, at *12 (no scienter based on risk disclosures; no plausible allegations that defendants "knew these actions were having any impact on attendance...especially as the first quarter 2013 attendance results had not been released yet").[20]  That Google did not disclose the event earlier, where the defect was quickly remediated and no damage to consumers was discovered, does not indicate fraud.  The Section 10(b) claim must be dismissed.[21]

## CONCLUSION

Despite an amended pleading, Plaintiff fails to allege a materially misleading statement or scienter.  Plaintiff still alleges an immaterial software bug that was fixed soon after discovery, without any allegation of motive for fraud.  The action should now be dismissed with prejudice.  *See Zucco*, 552 F.3d at 1007 (affirming dismissal where plaintiff "failed to correct these deficiencies in its Second Amended Complaint [which] is a 'strong indication that the plaintiffs have no additional facts to plead'") (citation omitted).

---

[20] *See Read-Rite*, 2004 WL 2125883, at *4 (allegation that defendants knew of insurmountable product defects based on attendance at meetings failed "to plead falsity or scienter with adequate specificity" in absence of "allegation of the magnitude or severity of the technical challenges existing at the time each statement was made"); *In re Siebel Systems, Inc. Sec. Litig.*, No. C 04-0983 CRB, 2005 WL 3555718, at *5 (N.D. Cal. Dec. 28, 2005) (no allegation that "a customer complained [to management] that Siebel 7 had an 'abnormally large number of bugs'"), *aff'd Wollrab v. Siebel Sys., Inc.*, 261 F. App'x 60 (9th Cir. 2007).

[21] The failure to state a claim under Section 10(b) requires dismissal under Section 20(a).  *See Intuitive*, 759 F.3d at 1064 n.6; *SolarCity*, 884 F.3d at 858 (same).

1    Dated: May 31, 2019                    Respectfully submitted,

2                                           WILSON SONSINI GOODRICH & ROSATI
                                            Professional Corporation
3

4                                           By: /s/ Boris Feldman
                                                    Boris Feldman
5
                                            Attorneys for Defendants Alphabet Inc.,
6                                           Google LLC, Lawrence E. Page, Sundar
                                            Pichai, Keith P. Enright and John Kent Walker,
7                                           Jr.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28