BORIS FELDMAN, State Bar No. 128838
Email: boris.feldman@freshfields.com
DORU GAVRIL, State Bar No. 282309
Email: doru.gavril@freshfields.com
ELISE LOPEZ, State Bar No. 324199
Email: elise.lopez@freshfields.com
JON FOUGNER, State Bar No. 314097
Email: jon.fougner@freshfields.com
OLIVIA ROSEN, State Bar No. 340120
Email: olivia.rosen@freshfields.com
FRESHFIELDS BRUCKHAUS DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250

*Attorneys for Defendants*

Additional Counsel on Signature Page

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | Master File No.:  3:18-CV-06245-TLT |
| | **NOTICE REGARDING DECLARATION OF BORIS FELDMAN ON CAFA NOTICE COMPLIANCE** |
| | Hon. Trina L. Thompson |
| This Document Relates to: All Actions. | |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

Defendants Alphabet, Inc., Lawrence E. Page, Sundar Pichai, Google LLC, Keith P. Enright, and John Kent Walker, Jr. ("Defendants") hereby submit the Declaration of Boris Feldman on CAFA Notice Compliance, attached hereto as Exhibit A.

Dated: February 15, 2024          FRESHFIELDS BRUCKHAUS DERINGER US LLP

                                  By: */s/ Boris Feldman*
                                      Boris Feldman

                                  BORIS FELDMAN
                                  DORU GAVRIL
                                  ELISE LOPEZ
                                  JON FOUGNER
                                  OLIVIA ROSEN
                                  855 Main Street
                                  Redwood City, CA 94063
                                  Telephone: (650) 618-9250
                                  boris.feldman@freshfields.com
                                  doru.gavril@freshfields.com
                                  elise.lopez@freshfields.com
                                  jon.fougner@freshfields.com
                                  olivia.rosen@freshfields.com

                                  SWANSON & McNAMARA LLP
                                  MARY McNAMARA
                                  EDWARD SWANSON
                                  BRITT EVANGELIST
                                  CARLY BITTMAN
                                  300 Montgomery Street, Suite 1100
                                  San Francisco, CA 94104
                                  Telephone: (415) 477-3800
                                  mary@smllp.law
                                  ed@smllp.law
                                  britt@smllp.law
                                  carly@smllp.law

                                  WILSON SONSINI GOODRICH & ROSATI, P.C.
                                  IGNACIO E. SALCEDA
                                  BENJAMIN M. CROSSON

NOTICE RE FELDMAN DECL ON CAFA NOTICE COMPLIANCE
CASE NO. 3:18-cv-06245-TLT

STEPHEN B. STRAIN
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
isalceda@wsgr.com
bcrosson@wsgr.com
sstrain@wsgr.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | Master File No.:  3:18-CV-06245-TLT |
| | **DECLARATION OF BORIS FELDMAN ON CAFA NOTICE COMPLIANCE** |
| | Hon. Trina L. Thompson |

I, BORIS FELDMAN, hereby declare and state as follows:

1. I am duly admitted to practice in the State of California and an attorney with the law firm Freshfields Bruckhaus Deringer US LLP.

2. I am counsel of record for Defendants Alphabet, Inc., Lawrence E. Page, Sundar Pichai, Google LLC, Keith P. Enright, and John Kent Walker, Jr. ("Defendants") in the above captioned matter.

3. I have personal knowledge of the matters stated herein. If called as a witness, I could and would competently testify to the matters stated herein.

**CAFA NOTICE COMPLIANCE**

4. On February 13, 2024, Freshfields sent 57 CAFA Notice Packages ("Notice") pursuant to 28 U.S.C. § 1715. The Notice was mailed by certified mail to 57 officials, including the Attorneys General of each of the 50 states, the District of Columbia, the United States Territories, and the Attorney General of the United States. The CAFA Notice Service List (USPS Certified Mail) is included hereto as Attachment 1.

5. The materials sent to the officials included a cover letter, which provided notice of the proposed settlement of the above-captioned case. The cover letter is included hereto as Attachment 2.

6. The Notice enclosed a DVD, which included the cover letter and the documents required pursuant to 28 U.S.C. § 1715, filed into 3 subfolders: Exhibit 1, Exhibit 2, and Exhibit 3.

-1-

A screenshot of the DVD contents, and the contents of each subfolder, is included hereto as Attachment 3.

7.      The documents included as Exhibit 1, Exhibit 2, and Exhibit 3 in the DVD were also included in hard copy form and sent with the cover letter. The full documents are included hereto as Attachment 4.

I declare under penalty of perjury that the foregoing is true and correct. Executed on February 15, 2024 in Redwood City, CA.


Dated: February 15, 2024                    FRESHFIELDS BRUCKHAUS DERINGER US LLP

                                            By: */s/ Boris Feldman*
                                                Boris Feldman

-2-

Attachment 1

| NAME | ADDRESS | PHONE NUMBER |
|---|---|---|
| U.S. Attorney General Merrick B. Garland | U.S. Department of Justice<br>950 Pennsylvania Ave. NW<br>Washington, D.C. 20530 | DOJ Main Switchboard: 202-514-2000 |
| Alabama Attorney General Steve Marshall | 501 Washington Ave.<br>Montgomery, AL 36104 | 334-242-7300 |
| Alaska Attorney General Treg Taylor | 1031 West 4th Ave., Suite 200<br>Anchorage, AK 99501-1994 | 907-269-5100 |
| Arizona Attorney General Kris Mayes | 2005 N Central Ave.<br>Phoenix, AZ 85004 | 602-542-5025 |
| Arkansas Attorney General Tim Griffin | 323 Center St., Suite 200,<br>Little Rock, AR 72201 | 501-682-2007 |
| California Attorney General Rob Bonta | 1300 I St.<br>Sacramento, CA 95814 | 916-445-9555 |
| Colorado Attorney General Phil Weiser | Office of the Attorney General<br>Colorado Department of Law<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 | 720-508-6000 |
| Connecticut Attorney General William Tong | 55 Elm St.<br>Hartford, CT 06106 | 860-808-5318 |
| Delaware Attorney General Kathy Jennings | Delaware Department of Justice<br>Carvel State Building<br>820 N. French St.<br>Wilmington, DE 19801 | 302-577-8400 |
| D.C. Attorney General Brian Schwalb | Park Henry Building<br>400 6th St. NW<br>Washington, D.C. 20001 | 202-727-3400 |
| Florida Attorney General Ashley Moody | 400 S. Monroe St.<br>Tallahassee, FL 32399 | 850-414-3300 |
| Georgia Attorney General Chris Carr | 40 Capitol Square SW<br>Atlanta, GA 30334 | 404-458-3600 |
| Hawaii Attorney General Anne E. Lopez | Department of the Attorney General<br>425 Queen St.<br>Honolulu, HI 96813 | 808-586-1500 |
| Idaho Attorney General Raul R. Labrador | 700 W. Jefferson St., Suite 210<br>P.O. Box 83720<br>Boise, ID 83720 | 208-334-2400 |
| Illinois Attorney General Kwame Raoul | 500 South Second St.<br>Springfield, IL 62701 | 217-782-1090 |
| Indiana Attorney General Todd Rokita | 302 W. Washington St., 5th Floor<br>Indianapolis, IN 46204 | 317-232-6201 |
| Iowa Attorney General Brenna Bird | Hoover State Office Building<br>1305 E. Walnut St.<br>Des Moines, IA 50319 | 515-281-5164 |
| Kansas Attorney General Kris W. Kobach | 120 SW 10th Ave., 2nd Floor<br>Topeka, KS 66612 | 785-296-2215 |
| Kentucky Attorney General Russell Coleman | 700 Capital Ave., Suite 118<br>Frankfort, KY 40601 | 502-696-5300 |
| Louisiana Attorney General Liz Murrill | P.O. Box 94005<br>Baton Rouge, LA 70804 | 225-326-6079 |
| Maine Attorney General Aaron Frey | 6 State House Station<br>Augusta, ME 04333 | 207-626-8800 |
| Maryland Attorney General Anthony G. Brown | 200 St. Paul Place<br>Baltimore, MD 21202 | 410-576-6300 |
| Massachusetts Attorney General Andrea Campbell | 1 Ashburton Place, 20th Floor<br>Boston, MA 02108 | 617-727-2200 |
| Michigan Attorney General Dana Nessel | 525 W. Ottawa St.<br>Lansing, MI 48906 | 517-335-7622 |
| Minnesota Attorney General Keith Ellison | 445 Minnesota St., Suite 1400<br>St. Paul, MN 55101 | 651-296-3353 |
| Mississippi Attorney General Lynn Fitch | 550 High St., Suite 1200<br>Jackson, MS 39201 | 601-359-3680 |

| | | |
|---|---|---|
| Missouri Attorney General Andrew Bailey | Supreme Court Building<br>207 W. High St.<br>P.O. Box 899<br>Jefferson City, MO 65102 | 573-751-3321 |
| Montana Attorney General Austin Knudsen | 215 N Sanders, 3rd Floor<br>PO Box 201401<br>Helena, MT 59620 | 406-444-2026 |
| Nebraska Attorney General Mike Hilgers | 2115 State Capitol, P.O. Box 98920<br>Lincoln, NE 68509 | 402-471-2683 |
| Nevada Attorney General Aaron D. Ford | 100 North Carson St.,<br>Carson City, NV 89701 | 775-684-1100 |
| New Hampshire Attorney General John Formella | 1 Granite Place South<br>Concord, NH 03301 | 603-271-3658 |
| New Jersey Attorney General Matthew J. Platkin | Richard J. Hughes Justice Complex<br>25 Market St.<br>Trenton, NJ 08625 | office of constituent services: 609-984-5828 |
| New Mexico Attorney General Raul Torrez | Villagra Building<br>408 Galisteo St.<br>Santa Fe, NM 87501 | 505-490-4060 |
| New York Attorney General Letitia James | The Capitol<br>Washington Ave. & State St.<br>Albany, NY 12224-0341 | 800-771-7755 |
| North Carolina Attorney General Josh Stein | 9001 Mail Service Center<br>Raleigh, NC 27699-9001 | 919-716-0058 |
| North Dakota Attorney General Drew H. Wrigley | Office of Attorney General<br>600 East Boulevard Ave., Dept. 125<br>Bismarck, ND 58505-0040 | 701-328-2210 |
| Ohio Attorney General Dave Yost | 30 E. Broad St., 14th Floor<br>Columbus, OH 43215 | 800-282-0515 |
| Oklahoma Attorney General Gentner Drummond | 313 NE 21st St.<br>Oaklahoma City, OK 73105 | 405-521-3921 |
| Oregon Attorney General Ellen F. Rosenblum | Oregon Department of Justice<br>1162 Court St. NE<br>Salem, OR 97301-4096 | 503-378-4400 |
| Pennsylvania Attorney General Michelle A. Henry | Strawberry Square, 16th Floor<br>Harrisburg, PA 17120 | 717-787-3391 |
| Rhode Island Attorney General Peter Neronha | RI Office of the Attorney General<br>150 South Main St.<br>Providence, RI 02903 | 401-274-4400 |
| South Carolina Attorney General Alan Wilson | The Honorable Alan Wilson<br>P.O. Box 11549<br>Columbia, S.C. 29211 | 803-734-3970 |
| South Dakota Attorney General Marty Jackley | Office of the Attorney General 1302<br>E Hwy 14, Suite 1<br>Pierre, SD 57501-8501 | 605-773-4106 |
| Tennessee Attorney General Jonathan Skrmetti | Office of the Attrney General and Reporter<br>P.O. Box 20207<br>Nashville, TN 37202-0207 | 615-741-3491 |
| Texas Attorney General Ken Paxton | Office of the Attorney General<br>P.O. Box 12548<br>Austin, TX 78711-2548 | 512-463-2100 |
| Utah Attorney General Sean D. Reyes | 350 North State St., Suite 230<br>Salt Lake City, UT 84114-2320 | 801-366-0260 |
| Vermont Attorney General Charity R. Clark | 109 State St.<br>Montpelier, VT 05609 | 802-828-3171 |
| Virginia Attorney General Jason S. Miyares | 202 North Ninth St.<br>Richmond, VA 23219 | 804-786-2071 |
| Washington Attorney General Bob Ferguson | 1125 Washington St. SE<br>P.O. Box 40100<br>Olympia, WA 98504-0100 | 360-753-6200 |
| West Virginia Attorney General Patrick Morrisey | State Capitol Complex, Bldg. 1, Rm E-26<br>1900 Kanawha Blvd. E<br>Charleston, WV 25305 | 304-558-2021 |

| | | |
|---|---|---|
| Wisconsin Attorney General Josh Kaul | Wisconsin Department of Justice<br>P.O. Box 7857<br>Madison, WI 53707-7857 | 608-226-1221 |
| Wyoming Attorney General Bridget Hill | 109 State Capitol<br>200 W. 24th St.<br>Cheyenne, WY 82002 | 307-777-7841 |
| American Samoa Attorney General Fainu'ulelei Falefatu Ala'ilima-Utu | Department of Legal Affairs<br>Executive Office Building, 3rd Floor<br>P.O. Box 7<br>Utulei, AS 96799 | 684-633-4163 |
| Guam Attorney General Douglas Moylan | 590 S. Marine Corps Drive, Ste. 706<br>Tamuning, GU 96913 | 671-475-3324 |
| Northern Mariana Islands Attorney General Edward E. Manibusan | Caller Box 10007<br>Saipan, MP 96950 | 670-237-7500 |
| Puerto Rico Attorney General Domingo Emanuelli Hernandez | Torre Chardon, Suite 1201<br>350 Carlos Chardon St.<br>San Juan, PR 00918 | 787-766-5656 |
| U.S. Virgin Islands Attorney General Ariel M. Smith | Office of the Attorney General<br>3438 Krondprindsens<br>Gade GERS Building, 2nd Floor<br>St. Thomas, VI 00802 | 340-774-5666 |

Attachment 2



**Silicon Valley**

855 Main Street
Redwood City, CA  94063

**Doru Gavril**
**T** +1 (650) 618-9250
**T** +1 (650) 618-9252 (direct)
**E** doru.gavril@freshfields.com

**freshfields.us**

February 13, 2024

<u>**VIA MAIL**</u>

**TO: ALL ADDRESSES LISTED IN APPENDIX A**

**Re:     CAFA Notice of Proposed Class Action Settlement**
**        *In re Alphabet, Inc. Securities Litigation (3:18-cv-06245-TLT)***

Dear Sir or Madam,

Pursuant to Section 3 of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, you are hereby notified of a proposed settlement (the "Settlement") of the above-captioned class action lawsuit (the "Class Action") currently pending before the United States District Court for the Northern District of California (the "Court").

This notice is provided on behalf of the Defendants named in this Class Action: Alphabet, Inc., Lawrence E. Page, Sundar Pichai, Google LLC, Kieth P. Enright, and John Kent Walker, Jr. (the "Defendants"). This firm represents the Defendants. This notice and the accompanying materials are intended to satisfy any and all notification obligations that the Defendants have pursuant to CAFA with respect to the Class Action.

Pursuant to 28 U.S.C. § 1715(b), Defendants provide the following information about the Settlement and enclose a DVD containing the noted materials:

(1)     The Class Action Complaint, filed on October 11, 2018, the Consolidated Amended Complaint, filed on April 26, 2019, and the Supplement to the Consolidated Amended Complaint, filed on February 28, 2023, are included on the enclosed DVD in the folder labeled "Exhibit 1." These documents are also available on the Internet via the federal government's Pacer service at https://ecf.cand.uscourts.gov/cgi-bin/DktRpt.pl?333322. (Additional information about Pacer may be found at https://www.pacer.gov/login.html.)



Freshfields Bruckhaus Deringer is an international legal practice operating through Freshfields Bruckhaus Deringer US LLP, Freshfields Bruckhaus Deringer LLP, Freshfields Bruckhaus Deringer (a partnership registered in Hong Kong), Freshfields Bruckhaus Deringer Law office, Freshfields Bruckhaus Deringer Foreign Law Office, Studio Legale associato a Freshfields Bruckhaus Deringer, Freshfields Bruckhaus Deringer Rechtsanwälte Steuerberater PartG mbB, Freshfields Bruckhaus Deringer Rechtsanwälte PartG mbB and other associated entities and undertakings. For further regulatory information please refer to www.freshfields.com/support/legal-notice.

Privileged & Confidential

2|3

(2)     The Court has not yet scheduled a fairness hearing on the proposed settlement. Currently, an unspecified motion hearing is scheduled for March 5th, 2024 at 2:00 p.m. at the Phillip Burton Federal Building & United States Courthouse, Courtroom 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.

(3)     The proposed notices to class members, as submitted to the Court, are included on the enclosed DVD in the folder labeled "Exhibit 2."

(4)     The Stipulation of Settlement (the "Stipulation"), as filed with the Court on February 5, 2024, is included on the DVD in the folder labeled "Exhibit 3."

(5)     Lead Counsel and Defendants' Counsel have agreed that in the event that the aggregate number of shares of Alphabet Class A and Class C stock purchased or otherwise acquired during the Settlement Class Period by Persons who otherwise would be Settlement Class Members but who timely and validly request exclusion from the Settlement Class equals or exceeds the amount specified in a separate supplemental agreement between Lead Plaintiff and Defendants (the "Supplemental Agreement"), Defendants shall have the option (which must be exercised collectively) to withdraw from and terminate the Stipulation in accordance with the procedures set forth in the Supplemental Agreement. The Supplemental Agreement will not be filed with the Court unless otherwise ordered by the Court.

(6)     No final judgment or notice of dismissal has yet been entered.

(7)     The Settlement Class, as defined by the Stipulation, comprises all Persons that purchased or otherwise acquired Alphabet Class A and/or Class C stock during the period from April 23, 2018 through April 30, 2019, inclusive, subject to certain exclusions. The full definition of the class is found at pages 9-10 of the Stipulation. CAFA requires a defendant, "if feasible" to provide the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement," or if that is not feasible, to provide a "reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement." *See* 28 U.S.C. §1715(b)(7)(A)-(B). In this Class Action, the claim amount will not be known until after notice of the settlement is given and potential class members submit claim forms, so it is not feasible at this time to provide a reasonable estimate of the proportionate share of the claims of class members residing in each state to the entire settlement. Further, given that most class members held stock in "street name," meaning that the actual beneficial purchasers and owners remain anonymous, it is not possible to estimate the number of class members residing in particular states or to estimate the proportionate share of claims of such members to the entire settlement.

(8)     No written judicial opinions have been issued relating to the proposed Settlement as of this date.



**Privileged & Confidential**

3|3

       If you have any questions about this notice, the lawsuit or the enclosed materials, or if you did not receive any of the above-listed materials, please feel free to contact me.

Sincerely,

*/s/ Doru Gavril*
Doru Gavril



# APPENDIX 1

| NAME | ADDRESS | PHONE NUMBER |
|---|---|---|
| U.S. Attorney General, Merrick B. Garland | U.S. Department of Justice<br>950 Pennsylvania Avenue<br>NW Washington DC 20530 | DOJ Main Switchboard: 202-514-2000 |
| Alabama Attorney General, Steve Marshall | 501 Washington Ave.,<br>Montgomery, AL 36104 | 334-242-7300 |
| Alaska Attorney General, Treg Taylor | 1031 West 4th Ave., Suite 200,<br>Anchorage, AK 99501-1994 | 907-269-5100 |
| Arizona Attorney General, Kris Mayes | 2005 N Central Ave.,<br>Phoenix, AZ 85004 | 602-542-5025 |
| Arkansas Attorney General, Tim Griffin | 323 Center St., Suite 200,<br>Little Rock, AR 72201 | 501-682-2007 |
| California Attorney General, Rob Bonta | 1300 I St.,<br>Sacramento, CA 95814 | 916-445-9555 |
| Colorado Attorney General, Phil Weiser | Office of the Attorney General<br>Colorado Department of Law<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 | 720-508-6000 |
| Connecticut Attorney General, William Tong | 55 Elm St.,<br>Hartford, CT 06106 | 860-808-5318 |
| Delaware Attorney General, Kathy Jennings | Delaware Department of Justice<br>Carvel State Building<br>820 N. French St.<br>Wilmington, DE 19801 | 302-577-8400 |
| DC Attorney General, Brian Schwalb | Park Henry Building<br>400 6th St.,<br>NW Washington, DC 20001 | 202-727-3400 |
| Florida Attorney General, Ashley Moody | The Capital, PL-01, 400 S. Monroe St.<br>Tallahassee, FL 32399 | 850-414-3300 |
| Georgia Attorney General, Chris Carr | 40 Capitol Square, SW<br>Atlanta, GA 30334 | 404-458-3600 |
| Hawaii Attorney General, Anne E. Lopez | Department of the Attorney General<br>425 Queen Street<br>Honolulu, HI 96813 | 808-586-1500 |
| Idaho Attorney General, Raul R. Labrador | 700 W. Jefferson St., Suite 210,<br>P.O. Box 83720<br>Boise, ID 83720 | 208-334-2400 |
| Illinois Attorney General, Kwame Raoul | 500 South Second St.,<br>Springfield, IL 62701 | 217-782-1090 |
| Indiana Attorney General, Todd Rokita | 302 W. Washington St., 5th Floor,<br>Indianapolis, IN 46204 | 317-232-6201 |
| Iowa Attorney General, Brenna Bird | Hoover State Office Building<br>1305 E. Walnut St.,<br>Des Moines, IA 50319 | 515-281-5164 |
| Kansas Attorney General, Kris W. Kobach | 120 SW 10th Ave., 2nd Floor<br>Topeka, KS 66612 | 785-296-2215 |
| Kentucky Attorney General, Russell Coleman | 700 Capital Ave., Suite 118,<br>Frankfort, KY 40601 | 502-696-5300 |
| Louisiana Attorney General, Liz Murrill | P.O. Box 94005<br>Baton Rouge, LA 70804 | 225-326-6079 |
| Maine Attorney General, Aaron Frey | 6 State House Station,<br>Augusta, ME 04333 | 207-626-8800 |
| Maryland Attorney General, Anthony G. Brown | 200 St. Paul Place,<br>Baltimore MD 21202 | 410-576-6300 |
| Massachusetts Attorney General, Andrea Campbell | 1 Ashburton Place, 20th Floor<br>Boston, MA 02108 | 617-727-2200 |
| Michigan Attorney General, Dana Nessel | 525 W. Ottawa St.<br>Lansing, MI 48906 | 517-335-7622 |
| Minnesota Attorney General, Keith Ellison | 445 Minnesota St., Suite 1400,<br>St. Paul, MN 55101 | 651-296-3353 |
| Mississippi Attorney General, Lynn Fitch | 550 High St., Suite 1200,<br>Jackson, MS 39205 | 601-359-3680 |

| | | |
|---|---|---|
| Missouri Attorney General, Andrew Bailey | Supreme Court Building,<br>207 W. High St.<br>P.O. Box 899<br>Jefferson City, MO 65102 | 573-751-3321 |
| Montana Attorney General, Austin Knudsen | 215 N Sanders, 3rd Floor,<br>PO Box 201401<br>Helena, Mt 59620 | 406-444-2026 |
| Nebraska Attorney General, Mike Hilgers | 2115 State Capitol<br>Lincoln, NE 68509 | 402-471-2683 |
| Nevada Attorney General, Aaron D. Ford | 100 North Carson St.,<br>Carson City, NV 89701 | 775-684-1100 |
| New Hampshire Attorney General, John Formella | 1 Granite Place South<br>Concord, NH 03301 | 603-271-3658 |
| New Jersey Attorney General, Matthew J. Platkin | RJ Hughes Justice Complex<br>25 Market St., Box 080<br>Trenton, NJ 08625 | office of constituent services: 609-984-5828 |
| New Mexico Attorney General Raul Torrez | 408 Galisteo Street<br>Villagra Building<br>Santa Fe, NM 87501 | 505-490-4060 |
| New York Attorney General Letitia James | Office of the New York State Attorney General<br>The Capitol<br>Albany NY 12224-0341 | 800-771-7755 |
| North Carolina Attorney General Josh Stein | 9001 Mail Service Center<br>Raleigh, NC 27699-9001 | 919-716-0058 |
| North Dakota Attorney General Drew H. Wrigley | Office of Attorney General<br>600 East Boulevard Ave., Dept. 125<br>Bismarck, ND 58505-0040 | 701-328-2210 |
| Ohio Attorney General Dave Yost | 30 E. Broad St., 14th Floor<br>Columbus, OH 43215 | 800-282-0515 |
| Oklahoma Attorney General Gentner Drummond | 313 NE 21st St.,<br>Oaklahoma City, OK 73105 | 405-521-3921 |
| Oregon Attorney General Ellen F. Rosenblum | Oregon Department of Justice<br>1162 Court St. NE<br>Salem, OR 97301-4096 | 503-378-4400 |
| Pennsylvania Attorney General Michelle A. Henry | 16th Floor, Strawberry Square<br>Harrisburg, PA 17120 | 717-787-3391 |
| Rhode Island Attorney General Peter Neronha | RI Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903 | 401-274-4400 |
| South Carolina Attorney General Alan Wilson | The Honorable Alan Wilson<br>P.O. Box 11549<br>Columbia, S.C. 29211 | 803-734-3970 |
| South Dakota Attorney General Marty Jackley | Office of the Attorney General<br>1302 E Hwy 14<br>Suite 1<br>Pierre, SD 57501-8501 | 605-773-4106 |
| Tennessee Attorney General Jonathan Skrmetti | Office of the Attrney General and Reporter<br>P.O. Box 20207<br>Nashville, TN 37202-0207 | 615-741-3491 |
| Texas Attorney General Ken Paxton | Office of the Attorney General<br>P.O. Box 12548<br>Austin, TX 78711-2548 | 512-463-2100 |
| Utah Attorney General Sean D. Reyes | 350 North State St., Suite 230<br>Salt Lake City, UT 84114-2320 | 801-366-0260 |
| Vermont Attorney General Charity R. Clark | 109 State St.,<br>Montpelier, VT 05609 | 802-828-3171 |
| Virginia Attorney General Jason S. Miyares | 202 North Ninth St.<br>Richmond, VA 23219 | 804-786-2071 |
| Washington Attorney General Bob Ferguson | 1125 Washington St. SE<br>P.O. Box 40100<br>Olympia, WA 98504-0100 | 360-753-6200 |
| West Virginia Attorney General Patrick Morrisey | State Capitol Complex, Bldg. 1, Rm E-26<br>1900 Kanawha Blvd. E<br>Charleston, WV 25305 | 304-558-2021 |

| | | |
|---|---|---|
| Wisconsin Attorney General Josh Kaul | Wisconsin Department of Justice<br>P.O. Box 7857<br>Madison, WI 53707-7857 | 608-226-1221 |
| Wyoming Attorney General Bridget Hill | 109 State Capitol<br>200 W. 24th St.,<br>Cheyenne, WY 82002 | 307-777-7841 |
| American Samoa Attorney General Fainu'ulelei Falefatu Ala'ilima-Utu | Department of Legal Affairs<br>Executive Office Building, 3rd Floor<br>P.O. Box 7<br>Utulei, American Samoa 96799 | 684-633-4163 |
| Guam Attorney General Douglas Moylan | 590 S. Marine Corps Drive, Ste. 706<br>Tamuning, Guam USA 96913 | 671-475-3324 |
| Northern Mariana Islands Attorney General Edward E. Manibusan | Caller Box 10007<br>Saipan, MP 96950 | 670-237-7500 |
| Puerto Rico Attorney General Domingo Emanuelli Hernandez | Torre Chardon, Suite 1201<br>350 Carlos Chardon St.<br>San Juan, PR 00918 | 787-766-5656 |
| U.S. Virgin Islands Attorney General Ariel M. Smith | Office of the Attorney General<br>3438 Krondprindsens<br>Gade GERS Building, 2nd Floor<br>St. Thomas Virgin Islands 00802 | 340-774-5666 |

Attachment 3



# Attachment 4

Exhibit 1

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:     (818) 532-6499
E-mail: jpafiti@pomlaw.com

**Attorney for Plaintiff**
*- additional counsel on signature page -*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM WICKS, Individually and On Behalf of All Others Similarly Situated, | ) ) ) Case No. |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) **FOR VIOLATION OF FEDERAL** ) **SECURITIES LAWS** |
| ALPHABET, INC., LAWRENCE E. PAGE, SUNDAR PICHAI and RUTH M. PORAT, | ) ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) |

Plaintiff Adam Wicks ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Alphabet, Inc. ("Alphabet" or the "Company"),

1

analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Alphabet between April 23, 2018 and October 7, 2018, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.       Alphabet was incorporated in 2015 and is the parent company of its leading subsidiary Google Inc. ("Google"), among others.  Google was founded in 1998.  Alphabet and Google are headquartered in Mountain View, California.  The Company's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "GOOG."

3.       Alphabet, through its subsidiary Google, operates a social networking website called "Google+" that allows people to communicate with their family, friends, and coworkers. Google+ users ostensibly have the ability to share and restrict the sharing of personal information according to their preferences by changing privacy settings.

4.       Between 2015 and March 2018, a software glitch in the Google+ website permitted outside developers to access the personal profile data of Google+ members who had not opted to permit their data to be shared publicly.  Defendants discovered this glitch in March 2018, ran tests to determine the impact of the glitch, and determined that the data of nearly half of a million users had been exposed to third parties.  Google's legal and policy staff drafted a memorandum regarding the security failure and shared it with senior executives.  The

memorandum warned that disclosing the incident would likely trigger "immediate regulatory interest." Google's CEO, Defendant Pichai, was briefed on the plan not to notify users after an internal committee had reached that decision.

5. Throughout the Class Period, Defendants repeatedly made materially false and misleading statements regarding the security failure affecting users personal data. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's security measures had failed recently and massively, as Google had exposed the private data of hundreds of thousands of users of Google+ to third parties; (2) damage to the Company's reputation and operating results and loss of customers from this failure of the Company's security measures were imminent and inevitable; (3) the Company's security protections did not shield personal user data against theft and security breaches; and (4) the Company's security measures had been breached due to employee error, malfeasance, system errors or vulnerabilities.

6. On October 8, 2018, citing "people briefed on the incident and documents reviewed," *The Wall Street Journal* reported that in March 2018, Google discovered a software glitch in its Google+ social network that had exposed users' personal data to third parties, but "opted not to disclose the issue . . . in part because of fears that doing so would draw regulatory scrutiny and cause reputational damage." Following this news, Google's stock price fell $67.75 per share, or 5.9%, over the following two trading sessions, to close at $1,081.22 per share on October 10, 2018.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

10.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).  Alphabet is headquartered in this Judicial District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.    Plaintiff, as set forth in the accompanying Certification, purchased common shares of Alphabet at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

13.    Defendant Alphabet, Inc. is incorporated in Delaware, and the Company's principal executive offices are located at 1600 Amphitheatre Parkway Mountain View, CA 94043.  Alphabet's securities trade on the NASDAQ under the ticker symbol "GOOG."

14.    Defendant Lawrence E. Page ("Page") has served at all relevant times as the Company's Chief Executive Officer ("CEO").

15.    Defendant Sundar Pichai has served at all relevant times as Google's Chief Executive Officer ("CEO").

16.     Defendant Ruth M. Porat ("Porat") has served at all relevant times as the Company's CFO.

17.     Defendants Page, Pichai and Porat are sometimes referred to herein collectively as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of Alphabet's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.     Alphabet, through its subsidiary Google, operates a social networking website called "Google+" that allows people to communicate with their family, friends, and coworkers. Google+ users ostensibly have the ability to share and restrict the sharing of personal information according to their preferences by changing privacy settings.

20.     In developing Google+, Google created an application programming interface ("API") (a software intermediary that allows two applications to talk to each other) to help smartphone app developers to access profile information of users who, through their privacy settings, had permitted such information to be shared. This profile information included personal

1   and contact information of users, as well as information about the persons to whom the users are

2   connected on Google+.

3       21.   Between 2015 and March 2018, a software glitch in this Google+ API permitted

4   outside developers to access the personal profile data of Google+ members who had not opted to

5   permit their data to be shared publicly.  Indeed, the glitch permitted third parties to access the

6   personal data of users that the users had expressly marked as nonpublic in the Google+ privacy

7   settings.

8

9       22.   In March 2018, Googled discovered this glitch in the API.  Google ran tests for

10  two weeks to determine the impact of the glitch, and found that the personal data of 496, 951

11  users had been exposed to third parties.  The exposed user data included full names, email

12  addresses, birth dates, gender, profile photos, places lived, occupation and relationship status.

13  Some of the individuals whose data was exposed included paying users of Google's "G Suite," a

14  set of applications including Google Docs and Googe Drive, and these users include institutions

15  such as governments, businesses, and schools.  As many as 438 third-party applications had

16  access to the unauthorized Google+ data.

17

18      23.   Google's legal and policy staff drafted a memo regarding the security failure and

19  shared it with senior executives.  The memo warned that disclosing the incident would likely

20  trigger "immediate regulatory interest."  The memo further stated that the incident would likely

21  result "in us coming into the spotlight alongside or even instead of Facebook despite having

22  stayed under the radar throughout the Cambridge Analytica scandal," referring to the recent

23  scandal in which a British consulting firm acquired and used personal data from Facebook

24  without authorization.  The memo also noted that disclosure "almost guarantees Sundar [Pichai]

25  will testify before Congress."

26

27

28

24.     According to two individuals briefed on the matter, Google's CEO, Defendant Pichai, was briefed on the plan not to notify users after an internal committee had reached that decision.

**Materially False and Misleading Statements Issued During the Class Period**

25.     On February 1, 2018, the Company issued its SEC Annual Report on Form 10-K for the fiscal year ending December 31, 2017 (the "1Q 2017 10-K"), in which the Company stated, in Part I, Item 1A "Risk Factors":

> ***Privacy concerns relating to our technology could damage our reputation and deter current and potential users or customers from using our products and services. If our security measures are breached resulting in the improper use and disclosure of user data, or if our services are subject to attacks that degrade or deny the ability of users to access our products and services, our products and services may be perceived as not being secure, users and customers may curtail or stop using our products and services, and we may incur significant legal and financial exposure.***

> From time to time, concerns have been expressed about whether our products, services, or processes compromise the privacy of users, customers, and others. Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, even if unfounded, could damage our reputation and adversely affect our operating results.

> Our products and services involve the storage and transmission of users' and customers' proprietary information, and theft and security breaches expose us to a risk of loss of this information, improper use and disclosure of such information, litigation, and potential liability. Any systems failure or compromise of our security that results in the release of our users' data, or in our or our users' ability to access such data, could seriously harm our reputation and brand and, therefore, our business, and impair our ability to attract and retain users. We expect to continue to expend significant resources to maintain state-of-the-art security protections that shield against theft and security breaches.

> [. . .]

> Our security measures may also be breached due to employee error, malfeasance, system errors or vulnerabilities, including vulnerabilities of our vendors, suppliers, their products, or otherwise. Such breach or unauthorized access, increased government surveillance, or attempts by outside parties to fraudulently induce employees, users, or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data could result in significant legal and financial exposure, damage to our reputation, and a loss of confidence in the security of our products and services that could potentially have an adverse effect on our business.

7

[. . .]

If an actual or perceived breach of our security occurs, the market perception of the effectiveness of our security measures could be harmed and we could lose users and customers.

26.     On April 23, 2018, the Company issued its SEC Quarterly Report on Form 10-Q for the period ending March 31, 2018 (the "1Q 2018 10-Q"), in which the Company stated:

> Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common and capital stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017

27.     On July 23, 2018, the Company issued its SEC Quarterly Report on Form 10-Q for the period ending June 30, 2018 (the "2Q 2018 10-Q"), in which the Company stated:

> Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common and capital stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017

28.     The statements referenced in ¶¶ 25-27 above were materially false and/or misleading because:  (1) the statements failed to disclose that the Company's security measures already had failed recently and massively, as Google had exposed the private data of hundreds of thousands of users of Google+ to third parties; (2) damage to the Company's reputation and operating results and loss of customers from this failure of the Company's security measures were imminent and inevitable; (3) the Company did not maintain state-of-the-art security protections, and its protection did not shield personal user data against theft and security breaches; and (4) the Company's security measures already had been breached due to employee error, malfeasance, system errors or vulnerabilities.

29. The Q1 2018 10-Q and 2Q 2018 10-Q contained certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Page and Porat, stating that "the information contained in the [Q1 2018 10-Q and 2Q 2018 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company for the periods presented therein."

30. The statements referenced in ¶ 29 above were materially false and/or misleading because the Q1 2018 10-Q and 2Q 2018 10-Q did not fairly present, in all material respects, the financial condition and results of operations of the Company for the periods presented therein, for the reasons articulated above.

### The Truth Begins To Emerge

31. On October 8, 2018, citing "people briefed on the incident and documents reviewed," *The Wall Street Journal* reported that in March 2018, Alphabet's subsidiary Google discovered a software glitch in its Google+ social network that had exposed users' personal data to third parties, but "opted not to disclose the issue . . . in part because of fears that doing so would draw regulatory scrutiny and cause reputational damage." Following this news, Alphabet's stock price fell $67.75 per share, or 5.9%, over the following two trading sessions, to close at $1,081.22 per share on October 10, 2018.

32. Following revelation of the security breach, Google announced plans to shut down Google+.

33. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

34. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Alphabet common shares traded on the NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Alphabet common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Alphabet or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Alphabet;

- whether Defendants caused Alphabet to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Alphabet securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

39. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

40. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Alphabet common shares are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and

- Plaintiff and members of the Class purchased and/or sold Alphabet common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

41. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

42. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. This Count is asserted against Alphabet and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

45. During the Class Period, Alphabet and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

46.     Alphabet and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Alphabet common shares during the Class Period.

47.     Alphabet and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Alphabet were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of Alphabet, their control over, and/or receipt and/or modification of Alphabet allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Alphabet, participated in the fraudulent scheme alleged herein.

48.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Alphabet personnel to members of the investing public, including Plaintiff and the Class.

49.     As a result of the foregoing, the market price of Alphabet common shares was artificially inflated during the Class Period.  In ignorance of the falsity of Alphabet's and the

Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Alphabet common shares during the Class Period in purchasing Alphabet common shares at prices that were artificially inflated as a result of Alphabet's and the Individual Defendants' false and misleading statements.

50.    Had Plaintiff and the other members of the Class been aware that the market price of Alphabet common shares had been artificially and falsely inflated by Alphabet's and the Individual Defendants' misleading statements and by the material adverse information which Alphabet's and the Individual Defendants did not disclose, they would not have purchased Alphabet's common shares at the artificially inflated prices that they did, or at all.

51.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

52.    By reason of the foregoing, Alphabet and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Alphabet common shares during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### <u>Against The Individual Defendants</u>

53.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.    During the Class Period, the Individual Defendants participated in the operation and management of Alphabet, and conducted and participated, directly and indirectly, in the conduct of Alphabet's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's inadequate internal safeguards in data security protocols.

14

55.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Alphabet's financial condition and results of operations, and to correct promptly any public statements issued by Alphabet which had become materially false or misleading.

56.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Alphabet disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Alphabet to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Alphabet within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Alphabet common shares.

57.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Alphabet.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

# DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 11, 2018

Respectfully submitted,

**POMERANTZ LLP**

By: */s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: avan@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _____ *Adam Wicks* _____ , make this

declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities

Litigation Reform Act of 1995.

2. I have reviewed a Complaint against Alphabet Inc. ("Alphabet" or the "Company"), and authorize

the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire Alphabet securities at the direction of plaintiffs counsel or in order to

participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or

acquired Alphabet securities during the class period, including providing testimony at deposition and trial, if

necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in Alphabet

securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not

sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the class as set

forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses

directly relating to the representation of the class as ordered or approved by the Court.

{00296706;1 }

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed    10 / 11 / 2018
            **(Date)**

                           **(Signature)**

              Adam Wicks
              **(Type or Print Name)**

{00296706;1 }

**Alphabet. Inc. (GOOG)**                                                                            **Wicks, Adam**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 8/7/2018 | Purchase | 7 | $1,260.5000 |
| 8/20/2018 | Purchase | 1 | $1,212.8500 |

JS-CAND 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Adam Wicks, Individually and on Behalf of All Others Similarly Situated,

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jennifer Pafiti, POMERANTZ LLP, 468 North Camden Drive,
Beverly Hills, California 90210 Phone: 818-532-6499

**DEFENDANTS**

Alphabet, Inc., Lawrence E. Page, Sundar Pichai and Ruth M. Porat

County of Residence of First Listed Defendant    Santa Clara County, California
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

**II.    BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☒ 3   Federal Question *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)* |

**III.    CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                 *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.    NATURE OF SUIT** *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | | 710 Fair Labor Standards Act | 830 Patent | 430 Banks and Banking |
| | 340 Marine | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 751 Family and Medical Leave Act | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | 861 HIA (1395ff) | 480 Consumer Credit |
| 153 Recovery of Overpayment | 360 Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 862 Black Lung (923) | 490 Cable/Sat TV |
| of Veteran's Benefits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 160 Stockholders' Suits | | | **IMMIGRATION** | 864 SSID Title XVI | 890 Other Statutory Actions |
| 190 Other Contract | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 865 RSI (405(g)) | 891 Agricultural Matters |
| 195 Contract Product Liability | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 196 Franchise | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 220 Foreclosure | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 950 Constitutionality of State Statutes |
| 230 Rent Lease & Ejectment | 446 Amer. w/Disabilities–Other | **OTHER** | | | |
| 240 Torts to Land | 448 Education | 540 Mandamus & Other | | | |
| 245 Tort Product Liability | | 550 Civil Rights | | | |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

**V.    ORIGIN** *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer   ☐ 8 Multidistrict Litigation–Direct File |

**VI.    CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
(15 U.S.C. §§78j(b) and §78t(a)) and (17 C.F.R. §240.10b-5) and the PSLRA.

Brief description of cause:
Violations of the federal securities laws.

**VII.    REQUESTED IN COMPLAINT:**    ☑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.    DEMAND $    CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

**VIII.    RELATED CASE(S), IF ANY** *(See instructions):*    JUDGE _____    DOCKET NUMBER _____

**IX.    DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)**
(Place an "X" in One Box Only)    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

DATE    10/11/2018    SIGNATURE OF ATTORNEY OF RECORD    /s/ Jennifer Pafiti

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE (181542)
MICHAEL ALBERT (301120)
J. MARCO JANOSKI GRAY (306547)
TING H. LIU (307747)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
malbert@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | Master File No. 4:18-cv-06245-JSW |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |
| STATE OF RHODE ISLAND/OFFICE OF THE RHODE ISLAND TREASURER ON BEHALF OF THE EMPLOYEES' RETIREMENT SYSTEM OF RHODE ISLAND, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| vs. | |
| ALPHABET, INC., LAWRENCE E. PAGE, SUNDAR PICHAI, GOOGLE LLC, KEITH P. ENRIGHT, and JOHN KENT WALKER, JR. | |
| Defendants. | DEMAND FOR JURY TRIAL |

Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island ("Plaintiff"), on behalf of itself and the Class (as defined below) it seeks to represent, alleges the following upon knowledge as to its own acts and upon the investigation conducted by its counsel, which included, among other things, a review of: U.S. Securities and Exchange Commission ("SEC") filings by Alphabet; securities analysts' reports about Alphabet; press releases and other public statements issued by the Companies (as defined herein) and media reports about the Companies.

## INTRODUCTION

1.      This securities class action is brought on behalf of those who purchased or otherwise acquired securities of Alphabet, Inc. ("Alphabet") between April 23, 2018 and October 7, 2018, inclusive (the "Class Period"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      This case arises out of defendants' misleading statements relating to data security and management integrity.  Specifically, defendants learned of a three-year-long software glitch in the Google+ social media network that potentially exposed the private personal data of millions of Google+ users to third-parties, and led to the discovery of other systemic vulnerabilities that further compromised the data security of Google+ users.  Defendants knew of these data-security issues in March of 2018, but for months, they continued to stress to investors the importance of data security and simply warned investors about *risks* related to data-security issues and concerns, while concealing that these risks had already been realized and that defendants had such poor security controls and record keeping that they could not determine the scope of the data breach, identify all of the affected users, detect other data-security bugs, or protect the private personal data of the tens of millions of Google+ users.  The *Wall Street Journal* ("*WSJ*") led the exposure of defendants' scheme, triggering governmental investigations, Congressional hearings, the shutdown of the Google+ social media network, undermined confidence in the integrity of defendants' data security and management, and damaged investors.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW

- 1 -

**JURISDICTION AND VENUE**

3.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5.

4.      This Court has jurisdiction over the action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

5.      Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) as Alphabet and Google LLC are headquartered in this Judicial District.

6.      In connection with the acts and conduct alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate wire and telephone communications, and the facilities of a national securities exchange.

**THE PARTIES**

7.      Plaintiff, as set forth in the certification previously submitted and incorporated herein by reference, acquired Alphabet securities at an artificially inflated price during the Class Period and was damaged as a result of defendants' alleged misconduct. *See* ECF No. 19-3.

8.      Defendant Alphabet is a multinational conglomerate headquartered in Mountain View, California. Its ordinary shares trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "GOOG." As of January 31, 2019, there were 349,291,348 ordinary shares of Alphabet stock outstanding.

9.      Defendant Google LLC is a technology company that specializes in Internet-related services and products, which include online advertising technologies, search engine, cloud computing, software, and hardware. Alphabet was created after a corporate restructuring of Google, Inc. on October 2, 2015, where Alphabet became the parent company of Google, Inc. and several other Google, Inc. subsidiaries. As part of the Alphabet reorganization, Google, Inc. was converted

1    into a limited liability company in September 2017.[1]  Google is a wholly owned subsidiary of

2    Alphabet.

3           10.    Defendant Keith P. Enright ("Enright") was Google's Legal Director of Privacy from

4    2016 until September 2018, when he became Google's Chief Privacy Officer.  In addition, since

5    May 2018, Enright has been Google's "data protection officer" ("DPO") for the purpose of

6    compliance with the European Union's General Data Protection Regulation ("GDPR").

7           11.    Defendant Lawrence E. Page ("Page") is the co-founder of Google.  In 2001, Page

8    stepped aside as Google's CEO, only to resume the role in 2011.  Just four years later, Page became

9    the CEO of Alphabet.  Throughout the Class Period, Page sat on Alphabet's Board of Directors, and

10    was a member of the Board's three-person Executive Committee.

11           12.    Defendant Sundar Pichai ("Pichai") has served as Chief Executive Officer ("CEO")

12    of Google since 2015.  Pichai's involvement with Google began in 2004, when he joined as the head

13    of product management and development.  In 2008, after working on Google's own browser,

14    Chrome, Pichai was named Vice President of Product Development, and in 2012, he was named

15    Senior Vice President.  Thereafter, in 2014, Pichai was made product chief over both Google and the

16    Android smartphone operating system.  Throughout the Class Period, Pichai sat on Alphabet's Board

17    of Directors, and beginning in April 2018 became a member of the Board's three-person Executive

18    Committee.

19           13.    Defendant John Kent Walker, Jr. ("Walker") was Google's Vice President and

20    General Counsel from 2006 until August 2018, when he became Google's Senior Vice President for

21    Global Affairs.  As General Counsel, Walker was responsible for managing Google's global legal

22    team and advising the company's Board of Directors and management on legal issues and corporate

23    governance matters.

24           14.    The defendants referenced above in ¶¶10-13 are also referred to herein as the

25    "Individual Defendants."

26

27    ―――――――――――――
[1]    Google, Inc. and Google LLC are collectively referred to herein as "Google."  Google and

28    Alphabet are collectively referred to as "the Companies."

15.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Alphabet and/or Google, were privy to confidential and proprietary, non-public information concerning the Companies' operations and possessed the power and authority to control the contents of the Companies' public statements, including quarterly and annual reports, press releases, Congressional testimony, and presentations to securities analysts, money and portfolio managers, and institutional investors.  They either made or received the Companies' statements alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Companies, personal participation in the fraud as detailed herein, communications with other corporate officers and employees, including their attendance at management and Board of Directors meetings, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or disregarded with severe recklessness that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

16.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, Page and Pichai, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Companies to engage in the unlawful conduct complained of herein.  Because of their positions of control, Page and Pichai were able to, and did, directly or indirectly control the conduct of the Companies' business.

17.     As senior executive officers and/or directors of a publicly traded company whose stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Companies' security measures, data protections, operations, business, products, management, and earnings, and to correct any previously issued statements that had been materially misleading or untrue, so that the market price of Alphabet securities would be based upon truthful and accurate information.  The Individual Defendants' omissions during the Class Period violated these requirements and obligations.

**SUBSTANTIVE ALLEGATIONS**

**The Companies' Professed Commitment
to "Do[ing] the Right Thing"**

18.     Alphabet is essentially a holding company.  Its lifeblood is Google, and Google's lifeblood is technology and trust.  In just two decades, Google has grown to one of the world's most valuable companies based on technology that: (1) allows it to track and collect an unprecedented amount of personal information about people; and (2) enables it to use that information to help companies sell stuff to those people.  No matter what anyone does anywhere, Google is watching, or trying to watch.  Without tremendous trust in Google's technology and management, consumers and investors would condemn what Google does as not just an invasion of privacy, but the destruction of privacy.

19.     Google's founders, Sergey Brin and defendant Page, were acutely aware of the fine line between innovative assistance and insidious invasiveness.  Google's technology is inextricably intertwined with its trustworthiness because without extensive consumer buy-in and participation, Google would be worthless because it would not have a critical mass of personal data to mine and exploit.  This is why Google has always gone to great lengths to portray itself as uncommonly trustworthy.  The prospectus for its initial public offering memorialized this portrayal:

DON'T BE EVIL

> *Don't be evil.  We believe strongly that in the long term, we will be better served – as shareholders and in all other ways – by a company that does good things for the world even if we forgo some short term gains.  This is an important aspect of our culture and is broadly shared within the company*.  (Emphasis in original.)

                    *        *        *

MAKING THE WORLD A BETTER PLACE

> We aspire to make Google an institution that makes the world a better place. . . .  We know that some people have raised privacy concerns, primarily over Gmail's targeted ads, which could lead to negative perceptions about Google.  However, we believe Gmail protects a user's privacy.  By releasing services, such as Gmail, for free, we hope to help bridge the digital divide.  AdWords connects users and advertisers efficiently, helping both. . . .

SUMMARY AND CONCLUSION

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW                                                                                                         - 5 -

Google is not a conventional company.  Eric, Sergey and I intend to operate Google differently, applying the values it has developed as a private company to its future as a public company.  Our mission and business description are available in the rest of this prospectus; we encourage you to carefully read this information.  We will optimize for the long term rather than trying to produce smooth earnings for each quarter. . . .  We are conscious of our duty as fiduciaries for our shareholders, and we will fulfill those responsibilities. . . .  We will live up to our "don't be evil" principle by keeping user trust and not accepting payment for search results.

*     *     *

We have a strong commitment to our users worldwide, their communities, the web sites in our network, our advertisers, our investors, and of course our employees.  Sergey and I, and the team will do our best to make Google a long term success and the world a better place.

20.     In October 2013, Google's then-Executive Chairman, Eric Schmidt ("Schmidt"), made clear that if Google were to have a significant data breach "it would be devastating."  Schmidt emphasized that regardless of the succession plan at Google, when it comes to data breaches, "[w]e're always one mistake away.  It's inconceivable you could materially change that."  Schmidt reassured conference attendees that Google's focus on data privacy would remain constant because then-CEO Page "is so precisely wired on these issues, it is inconceivable that there would ever be a change" and Google's culture was so strongly fixed on data security that it would remain the focus of the company for the foreseeable future.

21.     Years later, when Google created its own parent, Alphabet, "don't be evil" became "do the right thing," but the message remained the same: you can trust us.

22.     Following the creation of Alphabet, the Companies continued to tout their leadership in data-use transparency and security, not only as a central pillar of the Companies' culture, but also as a competitive advantage for Google and Alphabet to succeed in new products and new markets.

23.     For example, at the November 17, 2016 Phocuswright Conference for travel industry leaders, Oliver Heckmann ("Heckmann"), Google's Vice President of Travel, assured investors that Google was uniquely well-positioned in the travel sector precisely because of its ability to leverage its strategy of data movement across its various services while keeping the trust of its customers by "giving the user full control and ownership of [her or his] data."  Heckmann stated that maintaining users' trust is essential to making users "more willing to have that data . . . used" across platforms, for example when allowing Google to analyze an air travel receipt from its user's Google Mail

(Gmail) account inbox and automatically importing those flight details into the user's Google Calendar account:

**Elizabeth Harz –Adara – President, Media & CMO**

So, as a consumer, I certainly see how my United flight data goes from Google Mail to my calendar and I would just love to get Google's perspective on data strategy – the collection, ownership, privacy. Many of those questions come up when you experience that kind of data movement.

**Oliver Heckmann – Google Inc – VP, Travel**

Yes, privacy is actually a topic that's important for us and as you know or might not know, there is something that's called the Google Dashboard that is creating transparency over the data that we have and the different services that Google has to the user, and it's using pretty clear language and it's giving the user full control and ownership of the data. ***And we feel that that's an important thing to do and as the user is in control and ownership of the data, he is more willing to have that data be used for us to create some delightful experiences***. If the user is not opting out of those services, what we can do is we can, from the email receipt in his inbox, for example, that's a new version of Gmail, we can show you your travel information more structured so you don't have to – you are landing in Paris; you are on roaming; you need to find your hotel and then the faster we can actually get you to that information, the more delightful and the less stressful your travel experience is going to be.

24.     At the February 14, 2017 Goldman Sachs Technology Conference, Diane Greene ("Greene"), Board Member of Alphabet and Senior Vice President of Google Cloud, touted Google's superior data security as enhancing its prospects in the cloud computing and financial-technology ("FinTech") industries:

***Security, Google's had security pretty much from day one because of the necessity to keep people's data private. I think we arguably have the most secure cloud on the planet, but we've also really hunkered down over the last 16 months to get all the compliance and regulatory so our large customers can prove to their customers and to their regulators that they are indeed secure. I mean security matters from the board on down to the individual user, IT worker at a company,*** it's so important and if you look at things like G Suite, our productivity suite built in the cloud completely in the secure cloud and you map that to the diskless Chromebook, you actually can run a workforce with an amazing level of security.

Google, when I say it's a privilege to be at Google, Google organizing the world's information, we've been inventing how to manage data for 16 years now, how to really quickly go through massive amounts of data.

*       *       *

**Unidentified Audience Member**

Could you talk a little more in detail about why FinTech has you so excited?

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW

- 7 -

**Diane Greene - Alphabet Inc - SVP, Google Cloud**

Oh, why does FinTech have me so excited? Well, it's a huge segment of the IT market, and we are like, there is a lot of data in FinTech, there's a lot of things just ripe for machine learning. ***And security is paramount there, it just seems so suited to our strengths and that's what we are seeing***. And also we're working with all the banks on projects and we can see how much there is to do. FinTech is, I mean, since my days at Sybase I've been working with FinTech, it's a big industry and there's a lot to do there.

25. At the September 7, 2017 Citi Global Technology Conference, Greene continued to highlight Google's focus on security and on being a "pioneer" in keeping "customers' data private." Greene began her speech with a nod to security, stating that it "is the most pervasive problem" facing any company because a "data breach is so expensive":

We've got – we run approximately 1/3 of the world's Internet traffic. And in over the last 3 years, we spent $29 billion in CapEx, continuing to build out, keeping up with the enormous growth we're seeing.

***So I want to start with security because I strongly believe that is the most pervasive problem every company has. The data breach is so expensive, I think, our health record is $400 a health record if you get breached. And so Google, with all the information we have and the need to keep our customers' data private, has had to be a pioneer, and we feel pretty good about where we are in security, not that we aren't vigilant with our 800-plus dedicated security engineers every day. But I would say, all of Google's some-30,000-plus engineers are kind of security engineers, and we've built security into every layer of the system***. From proprietary purpose-built chips like Titan that say that the hardware hasn't been tampered with and you're running a binary you think you are to every layer of the stack on up to the software that detects a phishing attack and then in your mail and then says if someone tries – if you gave the password and someone tries to use it, it says, "Are you sure this person should have your password or do you want to change your password?"

And we've also developed perimeter-less security, because if you just have a firewall protecting everything, if someone gets inside, you're kind of in trouble. And so we can look at what you're doing, where you're coming from and what call you're making, so that many, many of our services, Google services are just out there on the open Internet, because we can protect them much better than we could with a firewall.

And you take something like a Chromebook with its – the Chrome OS tiny attack surface updated in the Cloud constantly. You don't get a Ransomware attack then or something like Heartbleed a few years ago. Google had that patched before it was publicly announced.

26. Although he was not one of Google's founders, Google's CEO, Pichai, embraced and perpetuated this mantra, as he demonstrated in this January 24, 2018 statement:

I think today we always think we operate under the framework that users use Google because they trust us and it is something easy to lose if you are not good stewards of

it. So we work hard to earn the trust every day. You know one of the biggest concerns of data as you saw through last year is security of data. So for example, when you use G-mail we work hard to make sure we keep your e-mail safe from all kinds of attacks that's possible. And I think that's the framework by which we operate. But I think that I always think data belongs to the user and as companies we are only stewards of it.

27. Consistent with Pichai's statement, for years, the Companies acknowledged the risks of their intertwined dependence on technology and trust, including in the "Risk Factors" section of Alphabet's 2017 Annual Report on Form 10-K ("2017 10-K"), which assured investors that "we expect to continue to expend significant resources to maintain state-of-the-art security protections that shield against theft and security breaches," but warned of the following risks, among others:

(a) "***Privacy concerns relating to our technology could damage our reputation and deter current and potential users or customers from our products and services.***" (Emphasis in original.)

(b) "***If our security measures are breached resulting in the improper use and disclosure of user data, or if our services are subject to attacks that degrade or deny the ability of users to access our products and services, our products and services may be perceived as not being secure, users and customers may curtail or stop using our products and services, and we may incur significant legal and financial exposure.***" (Emphasis in original.)

(c) "Concerns about our practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters, even if unfounded, could damage our reputation and adversely affect our operating results."

(d) "Any systems failure or compromise of our security that results in the release of our users' data, or in our or our users' ability to access such data, could seriously harm our reputation and brand and, therefore, our business, and impair our ability to attract and retain users."

(e) "Our security measures may also be breached due to employee error, malfeasance, system errors or vulnerabilities, including vulnerabilities or our vendors, suppliers, their products, or otherwise."

(f) "Such breach or unauthorized access, increased government surveillance, or attempts by outside parties to fraudulently induce employees, users, or customers to disclose sensitive information in order to gain access to our data or our users' or customers' data could result in significant legal and financial exposure, damage to our reputation, and a loss of confidence in the security of our products and services that could potentially have an adverse effect on our business."

28. Beyond these risk warnings, Alphabet informed investors of the following realized risk: "We experience cyber attacks of varying degrees on a regular basis."

29. Echoing the importance of data security to the Companies at the February 13, 2018 Goldman Sachs Technology & Internet Conference, Greene stated that "security, first and foremost"

was Google's competitive advantage versus other cloud providers because of Google's sophistication at security matters and its history of discovering major vulnerabilities:

> **Heather Anne Bellini - Goldman Sachs Group Inc., Research Division - MD & Analyst**
>
> Right. So if you were sitting down with a CIO and they asked you, "What are your top 3 competitive advantages versus the other cloud providers?" What would be those 3 things?
>
> **Diane B. Greene - Alphabet Inc. – Director**
>
> Yes. Well, I'd say it's security, first and foremost, simply because I don't think anyone can afford not to be as secure as possible. And we've – not only do we discover these major problems, like the [Speck Hammer] or the Heartbleed and what have you, but we also – like with 1.4 billion Gmail accounts, we see everything. We can tell you, "Hey, someone – you just gave away your password. Are you sure you wanted to do it because we're not going to let them log in if you want to change your password?" And so we're even that sophisticated now. And so – and then what we're doing increasingly with GCP. So I say security and just because it's just so important. And then it's data analytics and machine learning and AI and . . . .

30.     Alphabet's Chief Financial Officer ("CFO"), Ruth Porat ("Porat"), told analysts at the February 26, 2018 Morgan Stanley Technology, Media & Telecom Conference that because of "all that's going on with security" and the fact that security is "clearly what we've built Google on," the continued monetization of Google's advertised focus on privacy and security would remain a key strategic priority of the Companies:

> And then in terms of the key strategic priorities, they are the ones that we've been talking about for quite some time, and they really play to our strengths. One of the most important is all that's going on with security. We believe we're a leader in security. It's clearly what we've built Google on. And we're continuing to raise the bar there, just the extraordinary engineers we have. We're now taking this to the next level. And one of the things that we talked about is through 2017, with the development of a proprietary security chip that really enables us to take identification and authentication into hardware. So it's not just about software, it's also about hardware.

**The Google+ Social Media Platform –**
**A "Social Layer" Across All Google Services**

31.     Google launched the Google+ platform in June 2011 in an attempt to make a social media network to rival that of Facebook and Twitter, and to join all users of Google services (*i.e.*, Search, Gmail, YouTube, Maps) into a single online identity. As explained in March 2012 by then-Senior Vice President of Social, Vic Gundotra, "'[a]t its simplest level, Google+ is a social layer

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW

across all of Google's services.'"  Pichai similarly admitted to *Forbes* in February 2015 that "'Google+ has always meant two things'" for the company:

> "There's the stream in the product that you see."  But Google+ also provided a way for the company to ensure users were signed in to its services with "a common identity across our products," he said.  "The second part was in many ways even more important than the first part.  That part has worked really well for us."

32.  Because the company initially viewed Google+ as "'the next version of Google,'" defendants integrated Google+ into every other Google service, with former CEO Page even tying employee bonuses to the success of the Google+ platform.  For instance, in late 2011.  Google changed the sign up process for Gmail, whereby creating a Google or Gmail account would automatically create a Google+ profile.  Google also released the Hangouts messaging app in 2011, which required a Google+ account to use.  In 2013, Google similarly announced that users would be required to log in to a Google+ account in order to leave comments on YouTube.  Even Google Search – the cornerstone of Google's business and one of the most frequented destinations on the Internet – was integrated into the Google+ platform with the "Search plus Your World" feature in 2012.

**In Early 2018, Google Faced Unprecedented Public and Regulatory Scrutiny for Its Data Collection and Privacy Practices**

33.  By the spring of 2018, the trustworthiness of technology and those who control it were under unprecedented scrutiny.  A pivotal moment was on March 17, 2018, when *The Observer* and the *New York Times* published reports alleging that research firm Cambridge Analytica improperly harvested data from Facebook users' profiles.  The immediate effects of these allegations were devastating to Facebook and its investors.  For example, in the week following the publication of these reports, Facebook's common stock suffered its third worst week in the company's history, declining more than 13% and losing approximately $75 billion of market capitalization.  Almost immediately, Congressional hearings into Facebook's leak of user information to third-party Cambridge Analytica were underway and threatened to turn to Google's data collection and privacy practices:

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW

1          (a)     On March 26, 2018, the *Washington Post* published an article titled "Congress

2 wants to drag Google and Twitter into Facebook's privacy crisis," which reported that:

> 3          The Senate Judiciary Committee's chairman, Republican Sen. Chuck Grassley (Iowa), on Monday scheduled an April 10 hearing on the "future of data privacy and social media" – and the panel said it would explore potential new "rules of the road" for those companies.

> \*       \*       \*

> [T]he Senate Judiciary Committee's hearing spells the first time that congressional lawmakers have expanded their scrutiny to include Zuckerberg's peers, Google CEO Sundar Pichai and Twitter CEO Jack Dorsey.  The result could be a hearing that exposes both of those tech giants – whose data is not known to have been taken by Cambridge Analytica – to uncomfortable questions about the extent to which they profit from their users' most personal data, too.

10          (b)     As later explained by Senator Charles Grassley, Google and Pichai "declined

11 to come before Congress and the American people" for the April 2018 hearings, "asserting that the

12 problems surrounding Facebook and Cambridge Analytica did not involve Google."

13          (c)     On April 10, 2018, Senator Grassley sent a letter to Pichai outlining the

14 Senate Judiciary Committee's "significant concerns regarding the data security practices of large

15 social media platforms and their interactions with third party developers and other commercials users

16 of such data," along with 14 questions to fully "understand how Google manages and monitors user

17 privacy for the significant amounts of data which it collects."

18          (d)     An April 13, 2018 article in *The New York Times* titled "Facebook Takes the

19 Punches While Rest of Silicon Valley Ducks" detailed the heightened concern at Google of

20 increased regulatory scrutiny following the Facebook/Cambridge Analytica hearings:

> 21          Mr. Zuckerberg was prepared to say that his company accounts for just a slice of the $650 billion advertising market and that it has plenty of competitors.  Google, for example, has an online advertising business more than twice the size of Facebook's.  And Google also collects vast amounts of information about the people who use its online services.

> \*       \*       \*

> "Outside of Facebook, there is probably no company paying more attention" than Google, said Jason Kint, a frequent critic of Google and Facebook and chief executive of Digital Content Next, a trade group that represents entertainment and news organizations, including The New York Times.  "They're absolutely ducking for cover while the heat is on Facebook.  They don't want to try to trip any alarms."

> \*       \*       \*

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS- 4:18-cv-06245-JSW

Over two days of hearings, Google was referenced 11 times by lawmakers.  Twitter was mentioned 10 times and Amazon once.  Apple was mentioned three times, mostly in passing.

Google employees said they had not received explicit orders from management to keep a low profile because most already understood the risk.  One employee, who spoke on the condition of anonymity because workers were not allowed to speak publicly on the issue, said there was an understanding inside Google that the company was the obvious next target.

In a statement, Aaron Stein, a Google spokesman, said the company was "completely focused on protecting our users' data" and "will take action" if it found evidence of "deceptive behavior or misuse of personal data."

34.     In addition to the heightened regulatory scrutiny on data collection and privacy issues in the United States, the spring of 2018 also saw the public's attention focused on the implementation of the GDPR, which went into effect in May 2018.  The GDPR is a new European Union framework that reformed data privacy protections in all member-states and has implications for businesses and individuals across Europe and beyond.  Under the terms of the GDPR, disclosure of data breaches is obligatory: "In the case of a personal data breach, the controller shall ***without undue delay*** and, where feasible, ***not later than 72 hours*** after having become aware of it, ***notify*** the personal data breach to the supervisory authority . . . ."  Failure to follow the GDPR's guidelines can result in fines "[u]p to €10 million, or 2% of the worldwide annual revenue of the prior financial year, whichever is higher."

35.     The public focus on the GDPR was not lost on Google.  Starting in May of 2017, Google began issuing several blogs on its official website, The Keyword, detailing the steps it was taking to fully comply with the GDPR.  In an August 8, 2017 blog post, William Malcolm ("Malcolm"), the Director of Privacy Legal EMEA, stressed that Google "is committed to complying with the GDPR across all of [its] services" and that its "aim is always to keep data private and safe."  Less than a year later, Malcom again reaffirmed Google's dedication to data privacy protections emphasizing that it had been working on GDPR compliance efforts for over 18 months, that "Google has built a strong global privacy compliance program," and that its "ambition is to have the highest possible standards [for] data security and privacy."

36.     Google was even more focused on data security issues because, in addition to the many universal issues, Google was operating under a Consent Order with the Federal Trade

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW

Commission ("FTC").  The order resulted from a complaint filed in 2011 against Google's social network Google Buzz, the predecessor to Google+.  The FTC concluded that Google violated its privacy promises and misrepresented to users of its email services how their information could be used, in some instances private information was shared publicly by default.  In the end, the Consent Order, the first decision of its kind, required Google to do the following (among other obligations):

    (a)    establish and implement a comprehensive privacy program;

    (b)    maintain privacy controls that are appropriate to its size and complexity, the nature and scope of its activities, and the sensitivity of covered information;

    (c)    maintain privacy controls that meet or exceed the protections required by the Consent Order; and

    (d)    demonstrate that its privacy controls are operating with sufficient effectiveness to provide reasonable assurance to protect the privacy of covered information and have so operated throughout each two-year reporting period through year 2031.

**As Public Pressure Mounted, Defendants Learned**
**of Major Data-Security Problems**

37.    In March 2018, Google learned that it had realized the risks it had been warning about for years.  Its data privacy protections were not as trustworthy as it had previously believed.  Specifically, it learned of a software glitch in its Google+ social networking site that gave hundreds of third-party developers potential access to the private user profile data for Google+ users (the "Three-Year Bug").  This private information included birth dates, photos, occupations, relationship status, email addresses, and home addresses.  Worse, Google's security controls were so inadequate that it failed to detect this Three-Year Bug for approximately 150 weeks, yet it could only identify two weeks' worth of users whose private profile information had been exposed.  Without sufficient record keeping, Google could only estimate that it exposed to third-parties the personal private data of hundreds of thousands of users, but this estimate was based on projections from less than 2% of the Three-Year Bug's lifespan, and Google had no way of determining how many third-parties had misused its users' personal private data.  Google did not call or otherwise contact a single third-party developer to investigate the fallout from the bug.

38.    A group of over 100 of Google's best and brightest engineers, product managers, and lawyers were responsible for uncovering the Three-Year Bug and fixing it, but they could not

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW     - 14 -

1   confirm the damage from it or determine the number of other bugs.  In or about early April 2018,

2   Google's legal and policy staff prepared a memo concerning this security breach, including the many

3   shortcomings in Google's security system and record keeping, which revealed previously unknown,

4   or unappreciated, security vulnerabilities that made additional data exposures virtually inevitable

5   (the Three-Year Bug and these additional vulnerabilities are collectively referred to as the "Privacy

6   Bug" and the memo discussing them, the "Privacy Bug Memo").  The Privacy Bug Memo warned

7   that disclosure of the Privacy Bug would likely trigger "'immediate regulatory interest'" and result

8   in defendants "'coming into the spotlight alongside or even instead of Facebook despite having

9   stayed under the radar throughout the Cambridge Analytica scandal.'"  The Privacy Bug Memo also

10  warned that disclosure "'almost guarantees Sundar [Pichai] will testify before Congress.'"

11      39.     Defendant Pichai and other senior Google executives received and read the Privacy

12  Bug Memo in or about early April 2018.

13  **Not Doing the Right Thing –
    Defendants Hid the Truth**

14

15      40.     Despite being fully briefed on the Privacy Bug, Pichai approved a plan to hide the

16  Privacy Bug from all users and everyone else outside of the Companies.  One of the reasons Pichai

17  approved this concealment plan was because he wanted to avoid any additional regulatory scrutiny,

18  including having to testify before Congress.

19      41.     This was such a significant breach and Google's faith in its security was so shaken,

20  the Privacy Bug led Pichai and Page to approve a plan to shutdown Google's Google+ social

21  networking site and service.  Put simply, Google no longer trusted itself.  At that time (spring 2018),

22  Google+ had 395 million monthly active users.  Putting this decision into context, at that same time,

23  Twitter and Snapchat had 330 and 301 million monthly active users, respectively, and corresponding

24  market capitalizations of over $20 billion each.

25      42.     Worse, defendants chose to continue making statements concerning data security,

26  related risks, and their trustworthiness, but these coordinated statements maintained the same

27  assurances and warnings as before the Privacy Bug's discovery, while concealing the Privacy Bug

28  itself.  In other words, they decided to do the wrong thing by warning investors of risks that had

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS- 4:18-cv-06245-JSW

already been realized, and concealing the new risks they had discovered and created by concealing these risks.

43.     On April 23, 2018, consistent with his understanding with Pichai, Page signed Alphabet's SEC Quarterly Report on Form 10-Q for the period ending March 31, 2018 (the "1Q 2018 10-Q"), which merely incorporated the identical risk disclosures from its 2017 10-K, without any mention of the Privacy Bug that defendants discovered after Alphabet had filed the 2017 10-K:

> Our operations and financial results are subject to various risks and uncertainties, including those described in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2017, which could adversely affect our business, financial condition, results of operations, cash flows, and the trading price of our common and capital stock. There have been no material changes to our risk factors since our Annual Report on Form 10-K for the year ended December 31, 2017.

44.     On April 23, 2018, Alphabet held an earnings call to discuss its 1Q 2018 results. The call began with Ellen West ("West"), Alphabet's Head of Investor Relations, referring investors to the 2017 10-K risk disclosures:

> Thank you. Good afternoon, everyone, and welcome to Alphabet's First Quarter 2018 earnings conference call. With us today are Ruth Porat and Sundar Pichai. Now I'll quickly cover the safe harbor.
>
> Some of the statements that we make today may be considered forward looking, including statements regarding our future investments, our long-term growth and innovation, the expected performance of our businesses and our expected level of capital expenditures. These statements involve a number of risks and uncertainties that could cause actual results to differ materially. For more information, please refer to the risk factors discussed in our Form 10-K for 2017 filed with the SEC.

45.     Without mentioning a word about the Privacy Bug, Pichai assured the public and investors that Google was prepared for the forthcoming GDPR, stressing that the company had "started working on GDPR compliance over 18 months ago and have been very, very engaged on it." Beyond mere GDPR compliance, Pichai emphasized that Google has a "very robust and strong privacy program."

46.     On April 25, 2018, Google's Vice President of Public Policy and Government Affairs, Susan Molinari ("Molinari"), responded to Senator Grassley's April 10, 2018 letter on behalf of Pichai. Making no mention of the recently-discovered Privacy Bug, Molinari stated that "Google has a longstanding commitment to ensuring both that our users share their data only with

1   developers they can trust, and that they understand how developers will use that data," and that the

2   company was "committed to protecting our users' data and prohibit developers from requesting

3   access to information they do not need."

4       47.   On April 27, 2018, Alphabet filed a Proxy Statement with the SEC pursuant to §14(a)

5   of the Exchange Act.   The voting matters for the June 6, 2018 Annual Meeting included

6   management's proposed election of 11 directors, including Page and Pichai.   Among the stockholder

7   proposals was a proposal regarding a report on content governance, which requested that Alphabet

8   "issue a report to shareholders at reasonable cost, omitting proprietary or legally privileged

9   information, reviewing the efficacy of its enforcement of Google's terms of service related to content

10  policies and assessing the risks posed by content management controversies, including election

11  interference, to the company's finances, operations, and reputation."   Alphabet opposed that stating

12  in relevant part that: "*We believe that we have a responsibility to combat the misuse of our*

13  *platforms and enforce our content policies.  And we understand our continuing responsibility to*

14  *update our users and stockholders on those efforts.  We will continue to remain vigilant in this*

15  *regard and plan to make regular public disclosures about our efforts, our results, and our future*

16  *plans*."   Alphabet also opposed a proposal requesting that it detail its policies and procedures

17  concerning its lobbying efforts.   Alphabet's statement in opposition stated, in relevant part: "*We are*

18  *committed to transparency in all areas of our business*, including our public policy activities and

19  lobbying expenditures.   *Google has long been a champion of disclosure and transparency*."

20      48.   On June 6, 2018, during Alphabet's Annual Shareholders Meeting, defendant Walker,

21  reassured shareholders that it had "long been one of the leading companies when it comes to privacy

22  and security of user data" and that "we are in great pains to make sure that people have great control

23  and notice over their data."   Walker made this statement while he and all others at the Companies

24  continued to conceal the Privacy Bug throughout June 2018.

25      49.   On July 23, 2018, consistent with his agreement with Pichai, Page signed Alphabet's

26  SEC Quarterly Report on Form 10-Q for the period ending June 30, 2018 (the "2Q 2018 10-Q"),

27  which merely incorporated the identical risk disclosures from its 2017 10-K, without any mention of

28  the Privacy Bug that defendants discovered after Alphabet had filed the 2017 10-K:

1    Our operations and financial results are subject to various risks and
2    uncertainties, including those described in Part I, Item 1A, "Risk Factors" in our
     Annual Report on Form 10-K for the year ended December 31, 2017, which could
3    adversely affect our business, financial condition, results of operations, cash flows,
     and the trading price of our common and capital stock. There have been no material
4    changes to our risk factors since our Annual Report on Form 10-K for the year ended
     December 31, 2017.

5    50.    That same day, at the outset of Alphabet's 2Q 2018 earnings call, West again referred

6    investors to the 2017 10-K risk factors with a statement substantively identical to ¶44, and Pichai

7    again highlighted that Google was "always . . . focused on user privacy" and security. West and

8    Pichai made these statements while Pichai and all others at the Companies continued to conceal the

9    Privacy Bug throughout July 2018.

10    51.    The custom and practice of a newspaper of the size and sophistication of the *WSJ*

11    would have meant that, by September, the *WSJ* would have directly or indirectly informed the

12    Companies that it was investigating the Privacy Bug and their concealment of it. Realizing that the

13    *WSJ* could soon expose the Privacy Bug and their concealment of it, Page and Pichai decided that

14    neither they nor any other representative from the Companies would accept an invitation to testify

15    before a Senate Intelligence Committee in September 2018. Representatives from the other two

16    invitees, Facebook and Twitter, appeared and testified – beside an empty chair for Google.

17    52.    On September 26, 2018, defendant Enright, Google's Chief Privacy Officer, provided

18    written testimony to the Senate Committee on Commerce, Science, and Transportation, which

19    included the following statements:

20    •    "The foundation of our business is the trust of people that use our services."

21    •    "With advertising, as with all our products, users trust us to keep their personal
22         information confidential and under their control."

23    •    "[A] healthy data ecosystem requires people feel comfortable that all entities who use
         personal information will be held accountable for protecting it."
24

25    53.    Enright echoed these statements in an official Google blog published just two days

26    earlier. In the blog, Enright highlighted that "users have long entrusted us to be responsible with

27    their data and we take that trust and responsibility very seriously." In addition, Enright reaffirmed

28    that "[p]eople deserve to feel comfortable that all entities that use personal information will be held

1 accountable for protecting it" and that their business model relies on personal data and their "work to

2 comply with evolving data protection laws around the world."

3      54.     Enright made these statements while he and the other defendants continued to conceal

4 the Privacy Bug throughout September 2018.

5      55.     The statements referenced in ¶¶43-53 above omitted to state material facts necessary

6 in order to make them not misleading. Specifically, these statements omitted that in March 2018,

7 Google learned that it had realized the risks it had been warning about for years; its data privacy

8 protections were not as trustworthy as it had previously represented and believed; a bug in its

9 Google+ social networking site had given hundreds of third-party developers potential access to the

10 private user profile data for millions of Google+ users (this private information included birth dates,

11 photos, occupations, relationship status, email addresses, and home addresses); its security controls

12 were so inadequate that it failed to detect this bug for approximately 150 weeks, yet it could only

13 identify two weeks' worth of users whose private profile information had been exposed; due to

14 insufficient record keeping, Google could only estimate that it exposed to third-parties the personal

15 private data of hundreds of thousands of users, and it had no way of determining how many third-

16 parties had misused its users' personal private data; that it had identified systemic security

17 deficiencies in its Google+ service that rendered additional bugs and data exposures virtually

18 inevitable; and that key officers and directors, including Alphabet's CEO, Google's CEO, Google's

19 General Counsel, and Google's Chief Privacy Officer, had decided to conceal all of this information

20 from everyone outside the Companies. In short, these statements omitted facts that revealed that

21 neither the Companies' technology nor its management was as trustworthy as they had led the

22 public, including investors, to believe. Defendants also concealed the inevitability of all the

23 foregoing risks materializing.

24      56.     The SEC requires that a registrant's Form 10-Q set forth any material changes from

25 risk factors as previously disclosed in the registrant's last Form 10-K. The 1Q 2018 10-Q and 2Q

26 2018 10-Q incorporated by reference the 2017 10-K risk disclosures and did not disclose any new

27 risks. Accordingly, the 1Q 2018 10-Q and 2Q 2018 10-Q were materially misleading because they

28 failed to disclose another category of risk: the risk that the concealment itself would be exposed,

1    which would trigger a host of immediate negative consequences, including reputational harm,

2    diminished trust, intense regulatory scrutiny, higher expenses (including increased legal, PR,

3    lobbying, and investigative expenses), just to name a few.  Indeed, defendants knew that they could

4    not keep the Privacy Bug concealed forever – too many people were aware of it, it was incendiary,

5    and it was the final straw for shutting down Google+ – so they knew that it and their concealment of

6    it would eventually be exposed, but they made the decision to buy time.  Defendants calculated that

7    the detrimental effects would be even worse if, at the time Facebook was getting pummeled in

8    Congress, in the public, and in the financial markets, Google announced that it simply had no

9    confidence in its data protections for hundreds of millions of users.

10       57.    On October 8, 2018, the *WSJ* revealed the Three-Year Bug and the Companies'

11   concealment of it.

12       58.    In a blog posted contemporaneously to the publication of the *WSJ* article, Google

13   admitted to the exposure of hundreds of thousands of users' private data and that it was shutting

14   down its Google+ social networking site and service for consumers because Google had failed to

15   develop a product consumers wanted to use, including one with adequate controls over Google+

16   users' private data, which the blog described as "significant challenges" that the authors of the

17   Privacy Bug Memo had "highlight[ed]."  Google's statements on the Three-Year Bug did not dispute

18   Pichai's reported receipt of the Privacy Bug Memo in or around early April 2018 or his involvement

19   in the decision to conceal the Privacy Bug from users, regulators, and everyone else outside of the

20   Companies.  In the months following the *WSJ* article's publication, and in multiple statements

21   relating to the Privacy Bug, none of defendants disputed a single fact from the article.

22       59.    On October 10, 2018, three Democratic Senators wrote to the FTC Chairman,

23   demanding an investigation into the Three-Year Bug, including Google's concealment of it.  The

24   letter highlighted the deceptiveness of Google's response to the *WSJ*'s article, including the

25   following:

26           Google has claimed that it "found no evidence that any developer was aware
         of this bug, or abusing the API . . . ."  These denials clash with the fact that Google
27       has insufficient records to determine whether a breach occurred.  According to its
         statement, the company only kept logs for two weeks.  Google can only account for
28       whether the vulnerability had been exploited in the weeks preceding its discovery.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS- 4:18-cv-06245-JSW                                                              - 20 -

As such, we may never know the full extent of the damage caused by the failure to provide adequate controls and protection to users.

60.     Google "'found no evidence'" because it barely looked – reviewing data from less than 2% of the Three-Year Bug's lifespan, and there is "no evidence" that Google so much as called or contacted a single third-party developer.  The Democratic Senators went on to explain how the revelation of Google's concealment of the Three-Year Bug revealed a corporate culture that bore no resemblance to one that "do[esn't] be evil" and "do[es] the right thing":  "The awareness and approval by Google management to not disclose represents a culture of concealment and opacity set from the top of the company."

61.     Google's scheme did manage to unite the country's two political parties.  On October 11, 2018, three Republican Senators wrote a letter to Pichai that read, in part, "[a]t the same time that Facebook was learning the important lesson that tech firms must be forthright with the public about privacy issues, Google apparently elected to withhold information about a relevant vulnerability for fear of public scrutiny."  The Republican Senators also confirmed the misleading nature of Enright's September 26, 2018 statements (*see* above):  "We are especially disappointed given that Google's chief privacy officer testified before the Senate Commerce Committee on the issue of privacy on September 26, 2018 – just two weeks ago – and did not take the opportunity to provide information regarding this very relevant issue to the Committee."

62.     On October 11, 2018, Senator Grassley wrote to Pichai regarding the "troubling reports" detailed in the *WSJ* article, and condemned Google's evasive responses to congressional inquiry earlier that year:

> Given your and Google's unwillingness to participate [in the April 10, 2018 Facebook/Cambridge Analytica hearing], I sent you a letter seeking information on Google's current data privacy policies, specifically as they relate to Google's third party developer APIs.   Your responses to my questions highlighted Google's application verification process, the continuous monitoring of applications through machine learning, and the use of manual audits, all to ensure robust protection of user data.
>
> Despite your contention that Google did not have the same data protection failures as Facebook, it appears from recent reports that Google+ had an almost identical feature to Facebook, which allowed third party developers to access information from users as well as private information of those users' connections. Moreover, it appears that you were aware of this issue at the time I invited you to participate in the hearing and sent you the letter regarding Google's policies.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW                                                                                   - 21 -

63. The *WSJ* article, Google's blog post, and the letters described in the preceding paragraphs contained enough information for investors to piece together that the Three-Year Bug was a symptom of the disease comprising the Privacy Bug.

64. As defendants had anticipated, just weeks after the *WSJ* revelations, defendants disclosed another Google+ bug had exposed user data from 52.5 million accounts. Defendants admitted that "users were impacted." Unlike the Three-Year Bug, which defendants deliberately concealed from users and the investing public, defendants disclosed this new bug in a December 10, 2018 blog post and began notifying the impacted users. Defendants also announced they were accelerating the shuttering of the consumer Google+ platform to April 2019 rather than August 2019, a further confirmation of Google's inability to protect users' personal and private information. Defendants' disclosure came just hours before Pichai was set to testify before the House Judiciary Committee.

65. Throughout the years, as discussed above, defendants repeatedly acknowledged that the Companies' success is largely dependent on maintaining consumers' trust such that users will continue to entrust Google with their private data, which Google can then monetize. As one media outlet put it: "Google has a strong incentive to position itself as a trustworthy guardian of personal information because, like Facebook, its financial success hinges on its success to learn about the interests, habits and location of its users in order to sell targeted ads." Fully aware of consumers' expectations that their private information will remain private, defendants repeatedly promised they would not only keep the information private but that they would notify users if their information was impacted.

66. The revelation that millions of users' data had been potentially exposed and that rather than notify users of the exposure, defendants chose to cover it up was a massive breach of consumers' trust, as well as a realization that Google had failed to develop adequate systems and controls to maintain the integrity of its users' private data. As one commentator put it: "Google's business model is based on trust, and hiding a potentially dangerous breach for six months is not the way to keep it." Another observed that through its "'digital coverup . . . Google has demonstrated that it cannot be relied on to protect privacy.'" Thus, the disclosure of the Privacy Bug and its

1   impact on users damaged Google's reputation and, thus, value.  Indeed, the *WSJ*'s investigation,

2   based on internal documents, revealed that in choosing to cover up the Privacy Bug, defendants

3   sought to avoid regulatory scrutiny and reputational damage.  Defendants were right to be

4   concerned.  Upon disclosure of the Privacy Bug and subsequent cover up, industry commentators

5   noted increased regulatory scrutiny and that regulatory investigations were sure to come.

6          67.    A *CNBC* article titled "Google learned the hard way it's better to be transparent about

7   privacy bugs than cover them up" noted "[c]onsumers and regulators have shown they will judge

8   companies far more harshly for covering up data security issues than for openly discussing them."

9   That same article drew similarities between Google's cover-up of the Three-Year Bug and Uber's

10  revelation of a data breach it had tried to cover up, noting the incident "was relatively minor except

11  for the cover-up."  As of October 2018, Uber has paid nearly $150 million in settlements related to

12  the revelation and is subject to increased monitoring by the FTC for 20 years.

13         68.    As predicted by *CNBC*, the very regulatory, legal, and reputational risks that the

14  Companies warned about while defendants covered up the Privacy Bug materialized.  For one thing,

15  German regulators in Hamburg, where Google has its German office, have initiated an investigation

16  into Google's handling of the Privacy Bug.  In addition, regulators in Ireland indicated they "'will be

17  seeking information on these issues from Google,'" referring to the Privacy Bug and Google's

18  response to it.  U.S. Senator Richard Blumenthal called for a full FTC investigation into the Privacy

19  Bug.  Several private lawsuits on behalf of consumers and shareholders have been filed against

20  Google as a result of the Privacy Bug.

21         69.    On November 2, 2018, Google announced that Molinari, the head of Google's

22  Americas policy who drafted Pichai's response to Senator Grassley's April 10, 2018 letter, was

23  stepping down from her role.

24         70.    With the Companies' scheme exposed, Pichai testified before Congress on December

25  11, 2018.  The ranking member's opening remarks specifically highlighted the Privacy Bug,

26  including Google's concealment of it.  As featured below, in neither his prepared opening remarks

27  nor during any portion of his testimony did Pichai deny his awareness of the Privacy Bug for months

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS- 4:18-cv-06245-JSW                                                                          - 23 -

1  before disclosure, nor his involvement in the decision to conceal the Privacy Bug until the *WSJ*

2  exposed it:

3         (a)    "We take privacy seriously.  The bugs you mentioned are bugs we found them

4  by either doing an audit . . . .";

5         (b)    "Building software inevitably has bugs associated as part of the process.  We

6  actually undertake a lot of efforts to find bugs, so we find it, [root it] out, and fix it, and that is how

7  we constantly make our systems better."

8         (c)    "The biggest area we see for our users is around security, that their account

9  gets hacked or something.  That is why we work hard."

10      71.    Pichai battled questions about the data breach from the House Committee while also

11  repeatedly emphasizing the Companies' aged mantra of trustworthiness through data protection:

12         (a)    "Protecting the privacy and security of our users has long been an essential

13  part of our mission."

14         (b)    "We have invested an enormous amount of work over the years to bring

15  choice, transparency, and control to our users.  These values are built into every product we make."

16         (c)    "Today, for any service we provide our users, we go to great lengths to protect

17  their privacy and we give them transparency, choice, and control."

18         (d)    "I am of the opinion we are better off with more of an overarching data

19  production framework."

20      72.    On February 5, 2019, Alphabet filed with the SEC its Form 10-K Annual Report for

21  2018, its first annual report since the revelation of the Privacy Bug, including the Companies'

22  concealment of it.  Unlike the 2017 "Risk Factors" that Alphabet had incorporated into its 1Q 2018

23  10-Q and its 2Q 2018 10-Q, the 2018 "Risk Factors" finally acknowledged that "*[b]ugs or defects in*

24  *our products and services have occurred and may occur in the future*." (Emphasis in original.)

25                   **ADDITIONAL SCIENTER ALLEGATIONS**

26      73.    The facts detailed in ¶¶38-40, establish that Pichai and senior Google executives had

27  actual knowledge of the Privacy Bug by early April 2018.  Specifically, in or about early April 2018,

28  senior Google executives, including Pichai, were personally notified that a bug in its Google+ social

1    networking site gave hundreds of third-party developers potential access to the private user profile

2    data for Google+ users (this private information included birth dates, photos, occupations,

3    relationship status, email addresses, and home addresses) who never intended to publicly share this

4    private data.  Pichai and senior Google executives received this information in the Privacy Bug

5    Memo, which was prepared by Google's legal and policy staff.  Given that Google failed to detect

6    the bug for approximately 150 weeks but only kept two-weeks' worth of activity logs necessary to

7    determine which users were affected and what types of data may potentially have been improperly

8    collected, the Privacy Bug Memo stated that Google had no way of determining how many third-

9    parties had misused the personal private data of a likewise unknown number of users.  Likewise, the

10   Privacy Bug Memo revealed systemic security deficiencies in Google's Google+ service that

11   rendered additional bugs and data exposures virtually inevitable.  Google admitted in its October 8,

12   2018 blog post that it discovered and remediated the lone Three-Year Bug in March 2018, but that

13   was just the tip of the iceberg.

14       74.   The facts detailed above, when viewed collectively and holistically with the other

15   allegations in this Complaint, establish a strong inference that each of the defendants knew or

16   recklessly disregarded that each of the statements set forth in ¶¶43-53 would be, and were,

17   misleading to investors at the time they were made.  This inference is far stronger than the

18   alternative:  that the 100-person task force, which discovered the largest data-security vulnerability

19   in the history of two Companies whose existence depends on data security, concealed it from the

20   Companies' CEOs, as well as Google's Chief Privacy Officer and General Counsel – who both had

21   primary responsibility for data-security issues at Google.

22       75.   Defendants' scienter can also be inferred from the ***cover-up*** of the Privacy Bug.

23   Specifically, the Companies' employees would not uniformly conceal the Privacy Bug without a

24   directive to do so from the Individual Defendants, who were the individuals most responsible for

25   responding to data-security issues.  The Individual Defendants would have to have been informed

26   and exercised their decision-making authority to conceal the Privacy Bug while persisting with the

27   same pre-discovery assurances and risk warnings when that decision was largely driven by the desire

28   to avoid regulatory scrutiny, Pichai's Congressional testimony, and reputational damage.  Indeed, the

Privacy Bug Memo expressly warned that disclosure of the Privacy Bug would likely trigger "'immediate regulatory interest'" and "'almost guarantees Sundar [Pichai] will testify before Congress.'" Accordingly, defendants covered up the Privacy Bug until the publication of the *WSJ* article.

76. Defendants' scienter can likewise be inferred from their immediate announcement of significant and extensive *remedial measures* on the day that the *WSJ* article was released, including the shuddering of Google+ – the world's fifth largest social media network. Also on October 8, 2018, Google announced a sweeping set of data privacy measures as part of its response to the events described in the *WSJ* article, including: (1) launching more granular Google Account permissions to give consumers "more fine-grained control over what account data they choose to share with each app"; (2) limiting the applications that may seek permission to access users' Gmail data; and (3) limiting the ability of applications to ask for permission to access information in users' telephones. In addition, Google pledged that "[i]n the coming months, we'll roll out additional controls and update policies across more of our APIs." These are the types of decisions that the Companies consider and study for months, not minutes, before making them.

77. Defendants' scienter may be further inferred from other facts alleged herein, including that:

(a) defendants had been repeatedly warned of and were aware of the significant, and potentially existential, risks to the Companies arising from the public discovering a data breach;

(b) defendants knew that providing truthful, accurate, and complete disclosures would threaten their business model, as it would expose them to regulatory scrutiny, reputational damage, and Pichai's testimony being sought by Congress;

(c) Google was subject to an FTC consent decree at the time the statements were made, providing defendants with heightened awareness of the risks of and their responsibilities with respect to violating user privacy rights;

(d) Pichai and Page's reluctance to testify before Congress at a time when Facebook was being pilloried for a data leak was a powerful incentive for defendants to approve Google's decision to cover up the Privacy Bug, as evidenced by their widely publicized refusal to

1   accept the United States Senate Select Committee on Intelligence's invitation to testify about

2   election interference in September 2018, and the Privacy Bug Memo's explicit warning that

3   disclosure "'almost guarantees Sundar [Pichai] will testify before Congress'"; and

4          (e)     the omissions at issue concerned one of the most significant issues and severe

5   risks that Alphabet faced.

6          78.     The below-listed defendants held high-level positions and had access to material,

7   adverse, non-public information concerning specific and imminent privacy risks facing Google,

8   including the Privacy Bug and the repercussions of disclosing it:

9          (a)     Page founded Google, was the chief operating decision maker of Alphabet and

10   was responsible for making, and did make, key operating decisions at Google.  Pichai directly

11   reported to, and was directly accountable to, and maintained regular contact with, Page.[2]  Page

12   received weekly reports of Google's operating results.

13          (b)     Enright was Google's Chief Privacy Officer since September 2018.  Prior to

14   that, he was the "Legal Director of Privacy" at Google since 2016.  In May of 2018, Enright was

15   named Google's DPO for the purpose of the GDPR, which requires Google to "ensure that the data

16   protection officer is involved, properly and *in a timely manner, in all issues which relate to the*

17   *protection of personal data*."  Enright's DPO responsibilities began on May 24, 2018.

18          (c)     Walker has been Google's General Counsel since 2006.  In providing written

19   testimony to the Senate in November 2017, Walker stated that he leads Google's "legal, policy, trust

20   and safety, and corporate philanthropy teams."  In August 2018, Walker became Google's Senior

21   Vice President for Global Affairs.

22          79.     Because of their positions, Enright and Walker: (1) comprise or oversee Google's

23   Privacy and Data Protection Office, the "council of top product executives who oversee key

24   decisions relating to privacy," which deliberated on whether to notify users of the Privacy Bug at or

25   shortly after the time it was discovered; and (2) comprise or oversee the "legal and policy staff" that

26   prepared the Privacy Bug Memo.

27

28

[2]     As Google's CEO, Pichai was responsible for making, and did make, key operating decisions at Google.  As set forth above, Pichai was a direct recipient of the Privacy Bug Memo.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW       - 27 -

80.     In connection with Alphabet's 1Q 2018 10-Q and 2Q 2018 10-Q, Page signed certifications pursuant to Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted pursuant to §302 of the Sarbanes-Oxley Act of 2002.  In these certifications, Page declared that he and Porat were responsible for establishing and maintaining disclosure controls (as defined in Exchange Act Rule 13a-15(e)), and that they "[d]esigned such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to [them] by others within those entities, particularly during the period in which this report is being prepared."  Page further certified that he and Porat "[e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report [their] conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."  Pursuant to the SEC's February 21, 2018, "Statement and Guidance on Public Company Cybersecurity Disclosures," Release Nos. 33-10459, 34-82746, any such certifications made pursuant to Exchange Act Rules 13a-14(a) and 15(d)-14(a) "*should take into account the adequacy of controls and procedures for identifying cybersecurity risks and incidents and for assessing and analyzing their impact*."  Therefore, prior to vouching for the accuracy of the statements made in Alphabet's 1Q 2018 10-Q and 2Q 2018 10-Q, Page was obligated to familiarize himself with the adequacy and controls for identifying cybersecurity risks and incidents and for assessing their impact.  Any such review would necessarily involve an analysis of the Privacy Bug, the Privacy Bug Memo, and the conscious decision to continue concealing it in the backdrop of Facebook receiving unprecedented criticism for the Cambridge Analytica data scandal.

**LOSS CAUSATION/ ECONOMIC LOSS**

81.     As a result of defendants' scheme, Alphabet was overvalued throughout the Class Period.  Put simply, the Companies' data security and management were less trustworthy than defendants had led the world to believe.  Accordingly, Alphabet's securities were riskier and thus were worth less than they appeared to be worth.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW                                                                                          - 28 -

1    82.    The revelation of the facts and circumstances that defendants had misleadingly

2    omitted exposed both defendants' scheme and the overvaluation from the scheme.  One measure of

3    that inflated value was Alphabet's stock price, which fell $11.91 on October 8, 2018, $10.75 on

4    October 9, 2018, and $53.01 on October 10, 2018.  These price drops were caused, in part, by the

5    market processing the implications of defendants' scheme.  The revelation of defendants' scheme

6    revealed that investors had paid more for Alphabet securities than they would have paid but for the

7    scheme.

8                **ALPHABET SECURITIES TRADED IN AN EFFICIENT MARKET**

9    83.    The Class Period inflation in the price of Alphabet securities was eliminated when the

10   financial conditions, business risks, and other information concealed by defendants' fraud was

11   revealed to the market.

12   84.    At all relevant times, the market for Alphabet securities was an efficient market for

13   the following reasons, among others:

14          (a)    Alphabet securities met the requirements for listing, and were listed and

15   actively traded on the NASDAQ, a highly efficient and automated market;

16          (b)    during the Class Period, a high weekly volume of Alphabet securities traded

17   on the NASDAQ;

18          (c)    as a regulated issuer, Alphabet filed periodic public reports with the SEC and

19   NASDAQ;

20          (d)    throughout the Class Period, over a dozen different firms and dozens of

21   analysts covered Alphabet securities;

22          (e)    throughout the Class Period, Alphabet was eligible to file an SEC Registration

23   Form S-3;

24          (f)    Alphabet regularly communicated with investors via established market

25   communication mechanisms, including through regular disseminations of press releases on national

26   circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

27          (g)    unexpected material news about Alphabet was rapidly reflected in and

28   incorporated into its stock price.

85.     As a result of the foregoing, the market for Alphabet securities promptly digested current information regarding Alphabet from all publicly available sources and reflected such information in the prices of Alphabet securities.  Under these circumstances, all purchasers of Alphabet securities during the Class Period suffered similar injury when the revelation of defendants' scheme removed the artificial inflation that had been part of the price they paid when they purchased Alphabet securities.

86.     A class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on defendants' material omissions.  Because defendants omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, positive proof of reliance is not required.  All that is necessary is that the facts omitted be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period omissions set forth above, that requirement is satisfied here.

**CLASS ACTION ALLEGATIONS**

87.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Alphabet securities between April 23, 2018 and October 7, 2018, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are defendants, the officers and directors of the Companies, members of their immediate families and legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

88.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Alphabet securities were extensively traded on the NASDAQ.  As of January 31, 2019, Alphabet had 299,360,029 shares of Class A common stock outstanding, 46,535,019 shares of Class B common stock outstanding, and 349,291,348 shares of Class C capital stock outstanding.  The exact number of class members can be determined only by appropriate discovery, but Plaintiff believes that there are likely thousands of class members that are geographically dispersed, if not more.  Record owners and other members of the Class may be

1   identified from books and records maintained by Alphabet or its transfer agent.  Notice can be

2   provided to such record owners by a combination of published notice and first-class mail, using

3   techniques and a form of notice similar to those customarily used in class actions arising under the

4   federal securities laws.

5           89.     Plaintiff will fairly and adequately represent and protect the interests of the members

6   of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the

7   federal securities laws to further ensure such protection and intends to prosecute this action

8   vigorously.

9           90.     Plaintiff's claims are typical of the claims of the other members of the Class because

10  Plaintiff's and all the class members' damages arise from and were caused by the misleading

11  omissions made by or chargeable to defendants.  Plaintiff does not have any interests antagonistic to,

12  or in conflict with, the Class.

13          91.     A class action is superior to other available methods for the fair and efficient

14  adjudication of this controversy.  Since the damages suffered by individual class members may be

15  relatively small, the expense and burden of individual litigation make it virtually impossible for the

16  class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that

17  will be encountered in the management of this litigation that would preclude its maintenance as a

18  class action.

19          92.     Common questions of law and fact exist as to all members of the Class and

20  predominate over any questions solely affecting individual members of the Class.  Among the

21  questions of law and fact common to the Class are:

22          (a)     whether the federal securities laws were violated by defendants' acts as

23  alleged herein;

24          (b)     whether defendants' publicly disseminated statements to the investing public

25  during the Class Period omitted material facts;

26          (c)     whether defendants failed to convey material facts;

27          (d)     whether defendants acted knowingly or with severe recklessness in omitting

28  material facts;

1    (e)  whether the price of Alphabet securities was artificially inflated during the

2 Class Period; and

3    (f)  whether members of the Class have sustained damages, and, if so, the

4 appropriate measure of damages.

5          **CLAIMS FOR RELIEF**

6            **COUNT I**
   **For Violation of §10(b) of the Exchange Act and Rule 10b-5**
7          **(Against All Defendants)**

8   93.  Plaintiff incorporates ¶¶1-92 by reference.

9   94.  During the Class Period, defendants disseminated or approved the statements as

10 specified above in ¶¶43-53, which they knew or recklessly disregarded, and omitted material facts

11 necessary in order to make the statements made, in light of the circumstances under which they were

12 made, not misleading.

13   95.  Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

14    (a)  employed devices, schemes, and artifices to defraud;

15    (b)  omitted to state material facts necessary in order to make the statements made,

16 in light of the circumstances under which they were made, not misleading; or

17    (c)  engaged in acts, practices, and a course of business that operated as a fraud or

18 deceit upon Plaintiff and others similarly situated in connection with their purchase of Alphabet

19 securities during the Class Period.

20   96.  Defendants, individually and together, directly and indirectly, by the use of the means

21 and instrumentalities of interstate commerce and/or the mails, engaged and participated in a

22 continuous course of conduct to conceal the truth and/or adverse material information about

23 Alphabet's business and operations as specified herein.

24   97.  Defendants had actual knowledge of the omitted material facts set forth herein, or

25 recklessly disregarded the omitted material facts that were available to them.

26   98.  As a result of the dissemination of the misleading information and failure to disclose

27 material facts, as set forth above, the market price of Alphabet securities was artificially inflated

28 during the Class Period.  In ignorance of the fact that the market price of Alphabet securities was

1  artificially inflated, Plaintiff and other members of the Class purchased or otherwise acquired

2  Alphabet securities during the Class Period at artificially high prices and were damaged thereby.

3       99.     Plaintiff and the Class paid artificially inflated prices for Alphabet securities, and

4  suffered losses when the relevant facts were revealed.  Plaintiff and the Class would not have

5  purchased or otherwise acquired Alphabet securities at the prices they paid, or at all, if they had been

6  aware that the market prices had been artificially and falsely inflated by these defendants'

7  misleading statements.

8       100.    As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and

9  other members of the Class suffered damages in connection with their Class Period transactions in

10  Alphabet securities.

11       101.    By reason of the foregoing, defendants named in this Count have violated §10(b) of

12  the Exchange Act and SEC Rule 10b-5.

13                              **COUNT II**
                  **For Violation of §20(a) of the Exchange Act**
14          **(Against Defendants Alphabet, Google, Pichai, and Page)**

15       102.    Plaintiff incorporates ¶¶1-101 by reference.

16       103.    Defendants Pichai and Page were controlling persons of Alphabet and Google within

17  the meaning of §20(a) of the Exchange Act.  By virtue of their high-level positions as officers and/or

18  directors of the Companies, their ownership and contractual rights, participation in and awareness of

19  the Companies' operations, and intimate knowledge of the statements filed by Alphabet with the

20  SEC and/or disseminated to the investing public, these defendants had the power to influence and

21  control and did influence and control, directly or indirectly, the decision-making of the Companies,

22  including the content and dissemination of the allegedly false and misleading statements.

23       104.    In particular, each of these defendants had direct or supervisory responsibility over

24  the day-to-day operations of the Companies and, therefore, are presumed to have had the power to

25  control or influence the particular transactions and business practices giving rise to the securities

26  violations as alleged in Count I, and exercised that power.

27       105.    Alphabet controlled Google and the Individual Defendants, and is a controlling

28  person of those defendants within the meaning of §20(a) of the Exchange Act.

106. Google controlled all of its employees, including Pichai, Enright, and Walker, and is a controlling person of those defendants within the meaning of §20(a) of the Exchange Act.

107. As a direct and proximate result of these defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases and acquisitions of Alphabet securities during the Class Period when the relevant truth was revealed.

108. By reason of the foregoing, the defendants named in this Count violated §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the judgment as follows:

A. Determining that this action is a proper class action, certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff's reasonable costs and expenses, including attorneys' fees and expert fees; and

D. Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: April 26, 2019

ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE
MICHAEL ALBERT
J. MARCO JANOSKI GRAY
TING H. LIU

s/ JASON A. FORGE
JASON A. FORGE

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS- 4:18-cv-06245-JSW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lead Counsel for Plaintiff

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES
LAWS- 4:18-cv-06245-JSW

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 26, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<u>s/ JASON A. FORGE</u>
JASON A. FORGE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: jforge@rgrdlaw.com

1553457_1

# Mailing Information for a Case 4:18-cv-06245-JSW In re ALPHABET, INC. SECURITIES LITIGATION

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,7223240420@filings.docketbird.com

- **Adam Marc Apton**
  aapton@zlk.com

- **Austin P. Brane**
  abrane@rgrdlaw.com

- **Benjamin Matthew Crosson**
  bcrosson@wsgr.com,bgavin@wsgr.com,fgarcia@wsgr.com

- **Boris Feldman**
  boris.feldman@wsgr.com,ncarvalho@wsgr.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,abarbosa@pomlaw.com

- **Joseph Marco Janoski Gray**
  mjanoski@rgrdlaw.com,tdevries@rgrdlaw.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,3045517420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,disaacson@pomlaw.com,cgarcia@pomlaw.com,abarbosa@pomlaw.com

- **Samuel James Reed Dippo**
  sreeddippo@wsgr.com,srhodes@wsgr.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net

- **Stephen Bruce Strain**
  sstrain@wsgr.com,pmarquez@wsgr.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,1101510420@filings.docketbird.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

1
ROBBINS GELLER RUDMAN
  & DOWD LLP
2
JASON A. FORGE (181542)
MICHAEL ALBERT (301120)
3
J. MARCO JANOSKI GRAY (306547)
TING H. LIU (307747)
4
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
5
San Diego, CA 92101
Telephone: 619/231-1058
6
619/231-7423 (fax)
jforge@rgrdlaw.com
7
malbert@rgrdlaw.com
mjanoski@rgrdlaw.com
8
tliu@rgrdlaw.com
sfallon@rgrdlaw.com
9
Lead Counsel for Plaintiff
10

UNITED STATES DISTRICT COURT
11
NORTHERN DISTRICT OF CALIFORNIA
12
OAKLAND DIVISION
13

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | ) ) ) ) Master File No. 4:18-cv-06245-JSW |
| | ) CLASS ACTION |
| This Document Relates To: | ) ) SUPPLEMENT TO THE CONSOLIDATED |
| ALL ACTIONS. | ) AMENDED COMPLAINT FOR ) VIOLATIONS OF THE FEDERAL ) SECURITIES LAWS |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4874-1370-6323.v1

1        Pursuant to Federal Rule of Civil Procedure 15(d), Lead Plaintiff State of Rhode Island,

2  Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode

3  Island hereby supplements the Consolidated Amended Complaint for Violations of the Federal

4  Securities Laws (ECF 62) (the "Complaint").

5        Through this supplement, ¶82 of the Complaint is supplemented with the following

6  subparagraphs:

      (a) As explained above, defendants wanted to avoid Pichai being called before Congress in the spring of 2018 (*see, e.g.*, ¶¶38, 40), when the Facebook-Cambridge Analytica scandal was peaking, because legislators' questions would likely expose that Google's data security and management were less trustworthy than defendants had led the world to believe, including advertisers'/developers' overly broad access across all products and lax controls to guard against Cambridge Analytica-like misuse of Google's platforms. This would dramatically increase the risk that Congress would impose sweeping privacy and controls regulations along the lines of the European Union's GDPR and force Alphabet to dramatically strengthen its data collection, use, and content moderation policies to address the data misuse implications exposed by the Cambridge Analytica scandal. So defendants bought time and concealed everything until October 8, 2018, when they had no choice. *See* ¶¶56-57 above. By simultaneously announcing the shutdown of Google+ and extensive remediation plans across all other products (*see* ¶76 above), Google was able to avoid a GDPR-like mandate, but as defendants had warned in Alphabet's Form 10-K Annual Report for 2018 (*see* ¶72 above), "changes to our data privacy practices . . . may affect the type of ads and/or manner of advertising that we are able to provide which could have an adverse effect on our business."

      (b) By the end of the first financial quarter of 2019, the risks from the remedial measures related to the events described in the *WSJ* article (*see* ¶76 above) (of which the Google+ crisis was the tipping point) materialized. On April 29, 2019, the big news of Alphabet's first quarter financial results was that "product changes" had had an adverse effect on its business. An adverse effect on Alphabet's revenues was a materialization of the risks posed by the remedial measures related to the events described in the *WSJ* article. As described above in ¶76 and the Project Strobe October 8, 2018 blog post referenced therein, responsive product changes included stricter Google Account permissions to curtail advertisers'/developers' overly broad access to Android device and Google Account data, and "additional controls and update[d] policies across more of our APIs," all of which spanned the full spectrum of Google's products, including, but not limited to, Android, Google Maps, Google Photos, Google Reviews, Google Search, as well as the entire G Suite and YouTube. By the end of the first financial quarter of 2019, these belated remedial measures, including stricter permissions, controls, and policies enhanced users' data privacy and offered more protection against Cambridge Analytica-like platform misuse, but diminished the volume and effectiveness of advertisers' ads (for example, belated changes in controls/algorithms to avoid using extremist content to increase user engagement). This hurt advertising revenues, which were Alphabet's lifeblood, accounting for over 85% of revenues. Such responsive product changes also increased costs and hurt revenues, including by diverting engineering resources from revenue-enhancing product changes.

(c) On April 30, 2019, Alphabet's Class A and Class C shares fell $4.86 and $4.96 per share, respectively, which drops were caused, in whole or in part, by the revelation of the consequences of the remedial measures related to "the events described in the *WSJ* article." On May 1, 2019, as the market continued to absorb the consequences of these remedial measures, Alphabet's Class A and Class C shares declined $1.28 and $1.02 per share, respectively.

(d) Both on the day of the price drop and in the weeks that followed, analysts noted that privacy/controls-related product changes were hurting Google's business:

- "Shares of Alphabet dropped 7.5 percent after hours, setting them up for the biggest one-day drop since falling 8 percent in October 2012. They had closed Monday at a record-high of $1,296.20. . . . The company is facing continued pressure from advertisers to tighten controls on its fast-growing YouTube video service so that they not appear to be sponsoring adult or offensive content. . . . Expenses have surged faster than revenue for much of the past two years as it adds data centers, offices and YouTube content licenses, concerning some investors amid increased scrutiny on the company's privacy practices and the advertising restrictions at YouTube. More advertising controls are coming to YouTube in the coming weeks that could affect sales, Pichai said. . . . And Google's costs could jump further if governments globally follow through on threats to rein in the ability of apps to track users for advertising purposes. Other regulators have discussed forcing companies to step up monitoring of user content." Arjun Panchadar & Paresh Dave, *UPDATE 5 - Google parent's shares dive as YouTube changes, competition hurt revenue*, Reuters, Apr. 29, 2019.

- "Google typically launches 100+ newer ad products or changes per quarter; however, we note that some of these changes have been more privacy related and are creating a headwind in the business. . . . YouTube: Growth likely impacted by recommendation engine changes. YouTube's top priority is Responsibility, and as management takes a more strict view on what could violate its guidelines as it relates to video recommendations, this likely impacted 1Q19 results, in our opinion." Ronald V. Josey & David Yueh, *Alphabet Inc. (GOOGL)*, JMP Securities, Apr. 30, 2019.

- "'I think what we see here is investors sort of concern that in the future it seems like there's going to be more privacy constraints put on tech companies to limit their ability to track users and sell these really lucrative targeted ads. And there's going to be more pressure on the companies to really step up moderation of content on places like YouTube. All of that's going to increase costs. On the one side and push down revenues on the other side and investors are worried that this is the start of it.'" *Alphabet misses earnings estimates, stock plummets*, Reuters, Apr. 30, 2019.

- "James Lee, a Managing Director at Mizuho Securities, speculated that the product changes slowing growth likely came from YouTube – as the company has been working modifying its algorithms to remove harmful content. YouTube has been under fire as of late for its part in spreading misinformation and potentially dangerous content, especially after a *Bloomberg* report earlier this month cited former employees who said moderation at the company was sacrificed for higher product engagement." Nick Bastone, *Google's Q1 was a $70 billion disaster that analysts say is the reality-check it needs to finally make a big change*, Business Insider, Apr. 30, 2019.

- "1) Google Properties' paid clicks growth accelerated to 59% a year ago in 1Q18, we believe on YouTube product changes during that time, which created a tough comp for 1Q19 paid clicks, which increased 39%; 2) Google continues to make many (unspecified) product changes in 2019 across search & YouTube – around 100 per qtr – and their timing & impact can be lumpy; 3) YouTube has increased its focus on responsibility & safety, & it adjusted its algorithm in 1Q to reduce recommendations of content that comes close to violating guidelines or is misinformed or harmful. We believe the algo changes build on YT's efforts in 4Q18 when it removed 2.4M channels & 8.8M videos for violating YT Community Guidelines. All in, we don't think there's a single clear answer for Google's decel, but a number of factors are at work." Doug Anmuth, *et al.*, *Alphabet Inc., Revenue Slows to Sub-20% Growth, With Some Spending Moderation; Maintaining Overweight w/$1,310 PT*, J.P.Morgan, Apr. 30, 2019.

- "Privacy as a topic was well-covered last week at Google's developer conference I/O – one of the takeaways was to make it explicitly easier for users to update their privacy settings. While the downstream impact to Google's ad franchise and what its product-driven response as an offset was unclear at the time, it did highlight that it will look to serve contextual versus more personalized ads in those cases where the user has elected to opt out. Google has not explicitly disclosed any data around anticipated percentage points of impact from this move, but empirically this should result in a drag on ad price and in our view does partially explain management's commentary around revenue growth, as this will hinder the company's ability to serve more targeted ads." Stephen Ju, *et al.*, *Alphabet (GOOGL)*, Credit Suisse, May 14, 2019.

- "The changes with Drive and Chrome extensions came as part of what the company called 'Project Strobe,' which was born last year to review third-party developers access to Google and Android data. That effort prompted the shut down of Google's social network Google Plus – the company's hopeful competitor to Facebook – after it discovered a security vulnerability that exposed the private data of

SUPPLEMENT TO THE CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:18-cv-06245-JSW
4874-1370-6323.v1

- 3 -

up to 500,000 users. . . . These policies will make Google look like it is trying hard to care for users' data, yet provide few specifics – for instance, a term like 'the least amount of data' is open to interpretation." Jennifer Elias, *Under pressure, Google cracks down on platform privacy and safety*, CNBC (June 2, 2019), https://www.cnbc.com/2019/06/01/alphabets-google-cracks-down-on-privacy-and-safety.html.

DATED: February 28, 2023

ROBBINS GELLER RUDMAN
& DOWD LLP
JASON A. FORGE
MICHAEL ALBERT
J. MARCO JANOSKI GRAY
TING H. LIU
SARAH A. FALLON

s/ Jason A. Forge
JASON A. FORGE

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
malbert@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Plaintiff

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 28, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Jason A. Forge
JASON A. FORGE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

Email: jforge@rgrdlaw.com

4874-1370-6323.v1

# Mailing Information for a Case 4:18-cv-06245-JSW In re ALPHABET, INC. SECURITIES LITIGATION

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Carly Lee Bittman**
  Carly@smllp.law

- **Austin P. Brane**
  abrane@wcllp.com,pbradshaw@wcllp.com

- **Benjamin Matthew Crosson**
  bcrosson@wsgr.com,rlustan@wsgr.com

- **Britt H. Evangelist**
  bevangelist@swansonmcnamara.com,AmyMcGuigan@ecf.courtdrive.com,britt@smllp.law,britt@ecf.courtdrive.com

- **Sarah Fallon**
  sfallon@rgrdlaw.com

- **Boris Feldman**
  boris.feldman@freshfields.com,usmanagingattorneyteam@freshfields.com,jonathan.sampson@freshfields.com,6188914420@filings.docketbird,sheana.chandar@

- **Jason A. Forge**
  jforge@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Cheryl Weisbard Foung**
  cfoung@wsgr.com,lcardenas@wsgr.com

- **Doru Gavril**
  doru.gavril@freshfields.com,richard.rodriguez@freshfields.com,suzanne.alenick@freshfields.com,6188914420@filings.docketbird.com,anthony.denatale@freshfields

- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Joseph Marco Janoski Gray**
  mjanoski@rgrdlaw.com,msonney@rgrdlaw.com,tdevries@rgrdlaw.com

- **Phillip C Kim**
  pkim@rosenlegal.com,pkrosenlaw@ecf.courtdrive.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,fgravenson@pomlaw.com,ipareja@pomlaw.com

- **Drew Liming**
  drew.liming@freshfields.com,richard.rodriguez@freshfields.com,suzanne.alenick@freshfields.com,anthony.denatale@freshfields.com,abigail.west@freshfields.com,s

- **Ting Hsiang Liu**
  TLiu@rgrdlaw.com

- **Elise M Lopez**
  elise.lopez@freshfields.com,lisa.flegenheimer@freshfields.com,anthony.denatale@freshfields.com

- **Mary Geraldine McNamara**
  mary@smllp.law,AmyMcGuigan@ecf.courtdrive.com,mary@ecf.courtdrive.com,britt@ecf.courtdrive.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com,fgravenson@poml

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Ignacio Evaristo Salceda**
  isalceda@wsgr.com,rlustan@wsgr.com

- **Shane Palmesano Sanders**
  ssanders@robbinsllp.com,notice@robbinsllp.com

- **Stephen Bruce Strain**
  sstrain@wsgr.com,pmarquez@wsgr.com

- **Edward W. Swanson**
  ed@smllp.law,AmyMcGuigan@ecf.courtdrive.com,ed@ecf.courtdrive.com,britt@ecf.courtdrive.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# Exhibit 2

1   ROBBINS GELLER RUDMAN
        & DOWD LLP
2   JASON A. FORGE (181542)
    LAURA ANDRACCHIO (187773)
3   MICHAEL ALBERT (301120)
    J. MARCO JANOSKI GRAY (306547)
4   TING H. LIU (307747)
    KENNETH P. DOLITSKY (345400)
5   SARAH A. FALLON (345821)
    655 West Broadway, Suite 1900
6   San Diego, CA 92101
    Telephone: 619/231-1058
7   619/231-7423 (fax)
    jforge@rgrdlaw.com
8   landracchio@rgrdlaw.com
    malbert@rgrdlaw.com
9   mjanoski@rgrdlaw.com
    tliu@rgrdlaw.com
10  kdolitsky@rgrdlaw.com
    sfallon@rgrdlaw.com
11
    Lead Counsel for Plaintiff
12
                    UNITED STATES DISTRICT COURT
13
                    NORTHERN DISTRICT OF CALIFORNIA
14
                    SAN FRANCISCO DIVISION
15
    In re ALPHABET, INC. SECURITIES      )   Master File No. 3:18-cv-06245-TLT
16  LITIGATION                           )
    _____ )   CLASS ACTION
17                                        )
    This Document Relates To:            )   NOTICE OF PENDENCY AND PROPOSED
18                                        )   SETTLEMENT OF CLASS ACTION
            ALL ACTIONS.                 )
19  _____ )   EXHIBIT A-1
20
21
22
23
24
25
26
27
28

4861-1930-8698.v3

TO:   ALL PERSONS THAT PURCHASED OR OTHERWISE ACQUIRED ALPHABET, INC. ("ALPHABET") CLASS A AND/OR CLASS C STOCK DURING THE PERIOD FROM APRIL 23, 2018, THROUGH APRIL 30, 2019, INCLUSIVE, AND ARE NOT OTHERWISE EXCLUDED FROM THE SETTLEMENT CLASS (THE "SETTLEMENT CLASS")

PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY.  YOUR RIGHTS MAY BE AFFECTED BY PROCEEDINGS IN THIS ACTION.  PLEASE NOTE THAT IF YOU ARE A SETTLEMENT CLASS MEMBER, YOU MAY BE ENTITLED TO SHARE IN THE PROCEEDS OF THE SETTLEMENT DESCRIBED IN THIS NOTICE.  TO CLAIM YOUR SHARE OF THE SETTLEMENT PROCEEDS, YOU MUST SUBMIT A VALID PROOF OF CLAIM AND RELEASE FORM ("PROOF OF CLAIM") **POSTMARKED OR SUBMITTED ONLINE ON OR BEFORE _____, 2024**.

This Notice of Pendency and Proposed Settlement of Class Action ("Notice") has been provided pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Northern District of California (the "Court").  The purpose of this Notice is to inform you of the pendency of this class action (the "Action") between Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island" or "Lead Plaintiff") and Defendants Alphabet, Google LLC, Lawrence E. Page, Sundar Pichai, Keith P. Enright, and John Kent Walker, Jr., and the proposed $350,000,000.00 settlement reached therein (the "Settlement") and of the hearing to be held by the Court to consider the fairness, reasonableness, and adequacy of the Settlement as well as counsel's application for fees and expenses.  This Notice describes what steps you may take in relation to the Settlement and this class action.[1]

This Notice is not intended to be, and should not be construed as, an expression of any opinion by the Court with respect to the truth of the allegations in the Action as to any of the Defendants or the merits of the claims or defenses asserted by or against the Defendants.  This Notice is solely to advise you of the pendency and proposed Settlement of the Action and of your rights in connection therewith.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A PROOF OF CLAIM** | The only way to be eligible to receive a payment from the Settlement.  **Proof of Claims must be postmarked or submitted online on or before _____, 2024.** |
| **EXCLUDE YOURSELF** | Get no payment.  This is the only option that ***potentially*** allows you to ever be part of any other lawsuit against the Defendants or any other Released Defendant Parties about the legal claims being resolved by this Settlement.  Should you elect to exclude yourself from the Settlement Class you should understand that Defendants and the other Released Defendant Parties will have the right to assert any and all defenses they may have to any claims that you may seek to assert, including, without limitation, the defense that any such claims are untimely under applicable statutes of limitations and statutes of repose.  **Exclusions must be postmarked on or before _____, 2024.** |

---

[1]   All capitalized terms used in this Notice that are not otherwise defined herein shall have the meanings provided in the Stipulation of Settlement dated February 5, 2024 (the "Settlement Agreement" or "Stipulation"), which is available on the website www.AlphabetSecuritiesSettlement.com.

NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION
3:18-cv-06245-TLT                                                                  - 1 -
4861-1930-8698.v3

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **OBJECT** | Write to the Court about why you do not like the Settlement, the Plan of Allocation, and/or the request for attorneys' fees and expenses. You will still be a Settlement Class Member. **Objections must be filed with the Court no later than_____, 2024. If you submit a written objection, you may (but do not have to) attend the hearing.** |
| **GO TO THE HEARING ON _____, 2024** | Ask to speak in Court about the fairness, reasonableness, and adequacy of the Settlement. **Requests to speak must be filed with the Court no later than _____, 2024.** |
| **DO NOTHING** | Receive no payment. You will, however, still be a Settlement Class Member, which means that you give up your right to ever be part of any other lawsuit against the Defendants or any other Released Defendant Parties about the legal claims being resolved by this Settlement and you will be bound by any judgments or orders entered by the Court in the Action. |

## SUMMARY OF THIS NOTICE

**Statement of Recovery**

Pursuant to the Settlement described herein, a $350 million settlement fund has been established. Based on Lead Plaintiff's estimate of the number of Alphabet Class A and Class C shares eligible to recover under the Settlement, the average distribution per common share under the Plan of Allocation is approximately $6.41 per Class A share and $5.90 per Class C share before deduction of any taxes on the income earned on the Settlement Amount thereof, notice and administration costs, and the attorneys' fees and expenses as determined by the Court. **Settlement Class Members should note, however, that these are only estimates.** A Settlement Class Member's actual recovery will be a proportion of the Net Settlement Fund determined by that Claimant's allowed claim amount as compared to the total allowed claims of all Settlement Class Members who submit acceptable Proofs of Claim. An individual Settlement Class Member may receive more or less than these estimated average amounts. *See* Plan of Allocation set forth and discussed at pages ___ below for more information on the calculation of your claim.

**Statement of Potential Outcome of Case**

The Parties disagree on both liability and damages and do not agree on the amount of damages that would be recoverable if the Settlement Class prevailed on each claim alleged. Defendants deny that they are liable to the Settlement Class and deny that the Settlement Class has suffered any damages. The issues on which the parties disagree are many, but include: (1) whether Defendants engaged in conduct that would give rise to any liability to the Settlement Class under the federal securities laws, or any other laws; (2) whether Defendants have valid defenses to any such claims of liability; (3) the appropriate economic model for determining the amount by which the prices of Alphabet Class A and Class C stock were allegedly artificially inflated (if at all) during the Settlement Class Period; (4) the amount, if any, by which the prices of Alphabet Class A and Class C stock were allegedly artificially inflated (if at all) during the Settlement Class Period; (5) the effect of various market forces on the prices of Alphabet Class A and Class C stock at various times during the period from April 23, 2018 through and including April 30, 2019, inclusive (the "Settlement Class Period"); (6) the extent to which external factors influenced the prices of Alphabet Class A and Class C stock at various times during the Settlement Class Period; (7) the extent to which the various matters that Lead Plaintiff alleged were materially false or misleading influenced (if at all) the prices of Alphabet Class A and Class C stock at various times during the Settlement Class Period; and (8)

the extent to which the various allegedly adverse material facts that Lead Plaintiff alleged were omitted influenced (if at all) the prices of Alphabet Class A and Class C stock at various times during the Settlement Class Period.

**Statement of Attorneys' Fees and Expenses Sought**

Lead Counsel has expended considerable time and effort in the prosecution of this Action on a wholly contingent basis and has advanced the expenses of the Action in the expectation that if it was successful in obtaining a recovery for the Settlement Class, it would be paid from such recovery. Lead Counsel will apply to the Court for an award of attorneys' fees not to exceed nineteen percent (19%) of the Settlement Amount, plus expenses not to exceed $1,750,000, plus interest earned thereon. In addition, Lead Plaintiff may request for an award to Lead Plaintiff in connection with its representation of the Settlement Class. If the amounts requested are approved by the Court, the average cost per Alphabet Class A and Class C share will be approximately $1.25 and $1.15, respectively.

**Further Information**

For further information regarding the Action, this Notice or to review the Stipulation, please contact the Claims Administrator toll-free at ___-___-____ or visit the website www.AlphabetSecuritiesSettlement.com.

You may also contact a representative of counsel for the Settlement Class: Greg Wood, Shareholder Relations, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900, San Diego, CA 92101, 800-449-4900, settlementinfo@rgrdlaw.com.

**Please Do Not Call the Court or Defendants with Questions About the Settlement.**

**Reasons for the Settlement**

Lead Plaintiff's principal reason for entering into the Settlement is the benefit to the Settlement Class now, without further risk or the delays inherent in continued litigation. The cash benefit under the Settlement must be considered against the significant risk that a smaller recovery – or, indeed, no recovery at all – might be achieved after contested motions, trial, and likely appeals, a process that could last several years into the future. For the Defendants, who have denied and continue to deny all allegations of liability, fault, or wrongdoing whatsoever, the principal reason for entering into the Settlement is that further litigation could be protracted, burdensome, expensive, and distracting. Defendants also have taken into account the uncertainty, risks, and costs, inherent in any litigation, especially in complex cases such as this Action. Defendants have, therefore, determined that it is desirable and beneficial to them that the Action be fully, finally, and forever resolved, discharged and settled in the manner and upon the terms and conditions set forth in the Stipulation.

## BASIC INFORMATION

**1.      Why did I get this Notice package?**

This Notice is being provided to you pursuant to an Order of a U.S. District Court because you or someone in your family or an investment account for which you serve as custodian may have purchased or acquired Alphabet Class A and/or Class C stock shares during the Settlement Class Period.

This Notice explains the class action lawsuit, the Settlement, Settlement Class Members' legal rights in connection with the Settlement, what benefits are available, who is eligible for them, and how to get them.

NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION
3:18-cv-06245-TLT                                                                                           - 3 -
4861-1930-8698.v3

The Court in charge of the Action is the United States District Court for the Northern District of California, and the case is known as *In re Alphabet, Inc. Securities Litigation*, No. 3:18-cv-06245-TLT. The case has been assigned to the Honorable Trina L. Thompson. The institution representing the Class is the Lead Plaintiff, and the companies and individuals it sued and who have now settled are called the Defendants.

| **2.** | **What is this lawsuit about?** |
|---|---|

On October 11, 2018, an initial complaint in the Action was filed in the United States District Court for the Northern District of California and a substantially similar complaint was filed in the United States District Court for the Eastern District of New York. *Khaled El Mawardy v. Alphabet, Inc., et al.*, No. 1:18-cv-05704 (E.D.N.Y.). On November 7, 2018, the *El Mawardy* case was transferred to the Northern District of California.

On January 25, 2019, Judge Jeffrey S. White consolidated the two related cases, appointed Rhode Island as Lead Plaintiff and approved Rhode Island's selection of Robbins Geller Rudman & Dowd LLP as Lead Counsel.

On April 26, 2019, Lead Plaintiff filed the Consolidated Amended Complaint for Violation of the Federal Securities Laws, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against Defendants (the "Complaint"). Defendants moved to dismiss the Complaint on May 31, 2019. On February 5, 2020, Judge White granted Defendants' motion to dismiss the Complaint with leave to amend (the "Order"). Lead Plaintiff did not amend the Complaint, and on March 13, 2020, the Court entered judgment in Defendants' favor.

On April 9, 2020, Lead Plaintiff filed a notice of appeal of Judge White's Order and entry of judgment to the United States Court of Appeals for the Ninth Circuit (the "Appeal"). The Appeal was fully briefed on October 12, 2020 and oral argument was heard on February 4, 2021. *See In re State of Rhode Island v. Alphabet, Inc., et al.*, No. 20-15638 (9th Cir.). On June 16, 2021, the Ninth Circuit affirmed in part and reversed in part Judge White's motion to dismiss order, vacated the judgment, and remanded for further proceedings. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702 (9th Cir. 2021). On March 7, 2022, the United States Supreme Court denied Defendants' petition for *writ of certiorari. Alphabet, Inc., et al. v. Rhode Island*, 142 S. Ct. 1227, 212 L. Ed. 2d 233 (2022).

On June 21, 2022, in the backdrop of contentious discovery disputes and disagreements between the Parties regarding the scope of the Action, Rhode Island moved for class certification. Shortly thereafter, the Parties engaged the services of the Hon. Layn R. Phillips (Ret.), a nationally recognized mediator, to facilitate settlement negotiations. On August 5, 2022, the Parties engaged in an in-person mediation session. The mediation session was preceded by submission of mediation statements and exhibits by each party. The Parties engaged in arm's-length negotiations during the mediation session, but did not reach an agreement at that mediation.

On August 22, 2022, Defendants filed their opposition to Rhode Island's motion for class certification, which argued, *inter alia*, that Rhode Island's damages theory improperly relied on allegations regarding a share price decline on April 30, 2019 that post-dated the Complaint and was not within its scope. On August 29, 2022, the Court ordered briefing regarding the scope of the Action on remand. On September 8, 2022, Rhode Island sought leave to supplement the Complaint pursuant to Fed. R. Civ. P. 15(d). Following months of extensive briefing in connection with Rhode Island's motion to certify, motion to supplement, and the parties' scope disputes, Judge White entered an order on February 28, 2023 striking the motion for class certification and allowing Rhode Island to supplement the Complaint to include the April 2019 allegations in the Action. On February 28, 2023, Rhode Island filed the Supplement to the Consolidated Amended Complaint for Violations of the Federal Securities Laws and on March 14, 2023, Defendants' filed their Answer to the Supplement.

Rhode Island filed its renewed motion for class certification on May 2, 2023. Rhode Island's renewed motion for class certification gave rise to extensive and wide-ranging briefing, four expert reports, an attempted *amicus curiae* submission (and disputes related thereto) and the deposition of one of Rhode Island's experts. On July 25, 2023, this Action was reassigned to the Honorable Trina L. Thompson, following Judge White's recusal.

The Parties continued their settlement discussion through the Mediator following their initial mediation session, without success. On October 20, 2023, however, the Parties accepted the Mediator's proposal to resolve the Action. The agreement included, among other things, the Settling Parties' agreement to settle and release all claims that were asserted or could have been asserted in the Action in return for a cash payment of $350,000,000.00 to be paid by Alphabet on behalf of Defendants, for the benefit of the Settlement Class, subject to the negotiation of the terms of a Stipulation of Settlement and approval by the Court. The Stipulation (together with the Exhibits thereto) reflects the final and binding agreement between the Settling Parties.

Defendants deny each and all of the claims and contentions of wrongdoing alleged by Lead Plaintiff in the Action. They have expressly denied and continue to deny that they have violated the federal securities laws or any other laws, or have otherwise misled investors as alleged in the Action. Defendants have denied and continue to deny the allegations that any of the Defendants made any material misstatements or omissions or engaged in any fraudulent scheme, and that any member of the Settlement Class has suffered damages resulting from the conduct alleged in the Action. In addition, Defendants maintain that they have meritorious defenses to the claims alleged in the Action.

| **3.** | **Why is there a settlement?** |
|---|---|

The Court has not decided in favor of Defendants or the Lead Plaintiff. Instead, both sides agreed to the Settlement to avoid the distraction, costs, and risks of further litigation, and Lead Plaintiff agreed to the Settlement in order to ensure that Settlement Class Members will receive compensation.

## WHO IS IN THE SETTLEMENT

| **4.** | **How do I know if I am a member of the Settlement Class?** |
|---|---|

The Court directed that everyone who fits this description is a Settlement Class Member: all Persons that purchased or otherwise acquired Alphabet Class A and/or Class C stock during the period from April 23, 2018, through April 30, 2019, inclusive, except those Persons that are excluded.

Excluded from the Settlement Class are: Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded from the Settlement Class are those Persons who timely and validly exclude themselves therefrom by submitting a request for exclusion in accordance with the requirements set forth in question 11 below.

**Please Note**: Receipt of this Notice does not mean that you are a Settlement Class Member or that you will be entitled to receive a payment from the Settlement. If you are a Settlement Class Member and you wish to be eligible to participate in the distribution of proceeds from the Settlement, you are required to submit the Proof of Claim and the required supporting documentation as set forth therein postmarked or submitted online at www.AlphabetSecuritiesSettlement.com on or before _____, 2024.

**5.       What if I am still not sure if I am included?**

If you are still not sure whether you are included, you can ask for free help.  You can contact the Claims Administrator toll-free at \_\_\_-\_\_\_-\_\_\_\_, or you can fill out and return the Proof of Claim to see if you qualify.

### THE SETTLEMENT BENEFITS – WHAT YOU GET

**6.       What does the Settlement provide?**

The Settlement provides that, in exchange for the release of the Released Claims (defined below) and dismissal of the Action, Defendants have agreed to pay (or cause to be paid) $350 million to be distributed after Taxes, Tax Expenses, Notice and Administration Expenses, Court-awarded attorneys' fees and expenses, any Litigation Expenses awarded by the Court, and any other fees or expenses approved by the Court to Settlement Class Members who send in a valid Proof of Claim pursuant to the Court-approved Plan of Allocation.  The Plan of Allocation is described in more detail at the end of this Notice.

**7.       How much will my payment be?**

Your share of the Net Settlement Fund will depend on several things, including the total value of Alphabet Class A and/or Class C shares represented by the valid Proofs of Claim that Settlement Class Members send in, compared to the value of your claim, all as calculated under the Plan of Allocation discussed below.

### HOW YOU GET A PAYMENT – SUBMITTING A PROOF OF CLAIM

**8.       How can I get a payment?**

To be eligible to receive a payment from the Settlement, you must submit a Proof of Claim.  A Proof of Claim may be downloaded at www.AlphabetSecuritiesSettlement.com.  Read the instructions carefully, fill out the Proof of Claim, include all the documents the form asks for, sign it, and **mail or submit it online so that it is postmarked or received no later than _____, 2024.**  The Proof of Claim form may be submitted online at www.AlphabetSecuritiesSettlement.com.

**9.       When would I get my payment?**

**The Court will hold a Settlement Hearing on _____, 2024, at _____,** to decide whether to approve the Settlement.  If the Court approves the Settlement, there might be appeals.  It is always uncertain whether appeals can be resolved, and if so, how long it would take to resolve them.  It also takes time for all the Proofs of Claim to be processed.  Please be patient.

**10.      What am I giving up to get a payment or to stay in the Settlement Class?**

Unless you timely and validly exclude yourself, you are staying in the Settlement Class, and that means you cannot sue, continue to sue, or be part of any other lawsuit against Defendants or their "Related Persons" (as defined below) about the "Released Claims" (as defined below) in this case.  It also means that all of the Court's orders will apply to you and legally bind you.  If you remain a Settlement Class Member, and if the Settlement is approved, you will give up all Released Claims, including "Unknown Claims" (as defined below), against the "Released Defendant Parties" (as defined below):

- "Related Persons" means each and all of a Defendant's present and former subsidiaries, divisions, controlling persons, associates, entities, and affiliates, and each of all of their respective present and former employees, members, partners, principals, officers, directors, controlling shareholders, agents, attorneys, advisors (including financial or investment advisors), accountants, auditors, consultants, underwriters, investment bankers, commercial bankers, entities providing fairness opinions, general or limited partners or partnerships, limited liability companies, members, joint ventures, and insurers and reinsurers of each of them; as well as the predecessors, successors, assigns, immediate family members, spouses, heirs, executors, trusts, trustees, administrators, agents, legal or personal representatives, assigns, and assignees of each of them, in their capacity as such.

- "Released Claims" means any and all claims and causes of action of every nature and description, whether known or unknown, asserted or unasserted, accrued or unaccrued, fixed or contingent, liquidated or unliquidated, whether arising under federal, state, local, common or foreign law, or any other law, rule or regulation, whether class or individual in nature, based on, arising out of, or in connection with both: (i) the purchase or acquisition of Alphabet Class A and/or Class C common stock during the period from April 23, 2018 through April 30, 2019, inclusive, and (ii) the allegations, acts, facts, matters, occurrences, disclosures, filings, representations, statements, or omissions that were or could have been alleged by Lead Plaintiff and other members of the Settlement Class in the Action.  The definition of Released Claims includes, but is not limited to, claims arising out of Alphabet's results in the fourth quarter of 2018 or the first quarter of 2019. Notwithstanding the foregoing, "Released Claims" does not include claims relating to the enforcement of the Settlement.

- "Released Defendants' Claims" means any and all claims and causes of action of every nature and description, including both known claims and Unknown Claims, whether arising under federal, state, common or foreign law, or any other law, that Defendants could have asserted against any of the Released Plaintiff Parties, including Lead Counsel and Settlement Class Members, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims in the Action, except for claims relating to the enforcement of the Settlement.

- "Released Defendant Party" or "Released Defendant Parties" means each and all of the Defendants, and each of all of their Related Persons.

- "Unknown Claims" means any and all Released Claims of every nature and description against the Released Defendant Parties that Lead Plaintiff or any other Settlement Class Member does not know or suspect to exist in his, her, or its favor at the time of the release of the Released Defendant Parties, and any and all Released Defendants' Claims of every nature and description against the Released Plaintiff Parties that any Defendant does not know or suspect to exist in his, her or its favor at the time of the release of the Released Defendants' Claims, and including, without limitation, those that, if known by him, her or it, might have affected his, her or its decision to enter into this Settlement, execute the Stipulation, and agree to all the various releases set forth therein, or might have affected his, her or its decision not to

object to this Settlement or not exclude itself, herself or himself from the Settlement Class. Unknown Claims include, without limitation, those claims in which some or all of the facts composing the claim may be unsuspected, undisclosed, concealed, or hidden. With respect to any and all Released Claims and Released Defendants' Claims, the Released Parties stipulate and agree that, upon the Effective Date, Lead Plaintiff and Settlement Class Members (as regards the Released Claims) and the Defendants (as regards the Released Defendants' Claims) shall expressly waive and relinquish, and each Settlement Class Member shall be deemed to have and by operation of law and of the Judgment shall have, expressly waived and relinquished, to the fullest extent permitted by law, any and all provisions, rights and benefits conferred by California Civil Code §1542, or any law of any state or territory of the United States, or principle of common law or of international or foreign law, which is similar, comparable, or equivalent to Cal. Civ. Code §1542, which provides:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

The Released Parties may hereafter discover facts in addition to or different from those that he, she, or it now knows or believes to be true with respect to the subject matter of Released Claims or Released Defendants' Claims, but they stipulate and agree that, upon the Effective Date of the Settlement, the Released Parties shall expressly waive and by operation of the Judgment, or Alternative Judgment, if applicable, shall have, fully, finally, and forever settled and released, any and all Released Claims or Released Defendants' Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, that now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, intentional, with or without malice, or a breach of fiduciary duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Parties acknowledge, and each of the Settlement Class Members shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

## EXCLUDING YOURSELF FROM THE SETTLEMENT CLASS

If you do not want to participate in this Settlement, and you want to keep the right to potentially sue the Defendants and the other Released Defendant Parties, on your own, about the claims being released by the Settlement, then you must take steps to remove yourself from the Settlement. This is called excluding yourself – or is sometimes referred to as "opting out." If you are requesting exclusion because you want to bring your own lawsuit based on the matters alleged in this Action, you may want to consult an attorney and discuss whether any individual claim that you may wish to pursue would be time-barred by the applicable statutes of limitation or repose.

| 11. | How do I get out of the Settlement Class and the proposed Settlement? |
|-----|----------------------------------------------------------------------|

To exclude yourself from the Settlement Class and the Settlement, you must send a letter by First-Class Mail stating that you "request exclusion from the Settlement Class in the *Alphabet*

*Securities Settlement.*"  Your letter must include the number of Alphabet Class A and/or Class C shares that you (i) owned as of the opening of trading on April 23, 2018, and (ii) purchased, otherwise acquired and/or sold during the Settlement Class Period, including the number of shares, dates and prices for each such purchase, other acquisition and sale.  In addition, you must include your name, address, telephone number, and your signature.  You must submit your exclusion request so that it is **postmarked no later than _____, 2024** to:

*Alphabet Securities Settlement*
Claims Administrator
c/o Gilardi & Co. LLC_____
ATTN: EXCLUSIONS
P.O. Box ____
_____, __ _____-____

        If you ask to be excluded, you will not get any payment from the Settlement, and you cannot object to the Settlement.  You will not be legally bound by anything that happens in this Action, and you may be able to sue the Defendants and the other Released Defendant Parties about the Released Claims in the future.

| **12.     If I do not exclude myself, can I sue the Defendants and the other Released Defendant Parties for the same thing later?** |
| --- |

        No.  Unless you exclude yourself, you give up any rights you may potentially have to sue the Defendants and the other Released Defendant Parties for any and all Released Claims.  If you have a pending lawsuit against the Released Defendant Parties, speak to your lawyer in that case immediately.  You must exclude yourself from the Settlement Class in this Action to continue your own lawsuit.  Remember, the exclusion deadline is _____, 2024.

| **13.     If I exclude myself, can I get money from the proposed Settlement?** |
| --- |

        No.  If you exclude yourself, you should not send in a Proof of Claim to ask for any money.  But you may have the right to potentially sue or be part of a different lawsuit against the Defendants and the other Released Defendant Parties.

## THE LAWYERS REPRESENTING YOU

| **14.     Do I have a lawyer in this case?** |
| --- |

        The Court ordered that the law firm of Robbins Geller Rudman & Dowd LLP represents the Settlement Class Members, including you.  These lawyers are called Lead Counsel.  If you want to be represented by your own lawyer, you may hire one at your own expense.

| **15.     How will the lawyers be paid?** |
| --- |

        Lead Counsel will apply to the Court for an award of attorneys' fees not to exceed nineteen percent (19%) of the Settlement Amount and for expenses, costs and charges in an amount not to exceed $1,750,000 in connection with prosecuting the Action, plus interest on such fees and expenses at the same rate as earned by the Settlement Fund.  Lead Plaintiff may seek up to $10,000 for its time and expenses incurred in representing the Settlement Class pursuant to 15 U.S.C. §78u-4(a)(4).  Such sums as may be approved by the Court will be paid from the Settlement Fund.

# OBJECTING TO THE SETTLEMENT

You can tell the Court that you do not agree with the Settlement or any part of it.

## 16.     How do I tell the Court that I object to the proposed Settlement?

Any Settlement Class Member who does not request exclusion, may object to the Settlement, the Plan of Allocation, or Lead Counsel's request for an award of attorneys' fees and expenses. You can ask the Court to deny approval by filing an objection. You cannot ask the Court to order a different settlement; the Court can only approve or reject the Settlement. If the Court denies approval, no settlement payments will be sent out and the lawsuit will continue. If that is what you want to happen, you must object.

Any objection to the proposed Settlement must be in writing. You must include your name, address, email address, telephone number, and your signature. If you file a timely written objection, you may, but are not required to, appear at the Settlement Hearing, either in person or through your own attorney. If you appear through your own attorney, you are responsible for hiring and paying that attorney. All written objections and supporting papers must (a) clearly identify the case name and number (*In re Alphabet, Inc. Securities Litigation*, No. 3:18-cv-06245-TLT), (b) be submitted to the Court either by mailing them to the Clerk of the Court, United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, or by filing them in person at any location of the United States District Court for the Northern District of California, and (c) be filed or postmarked on or before _____, 2024.

The notice of objection must include documentation establishing the objecting Person's membership in the Settlement Class, including the number of shares of Alphabet Class A and/or Class C shares that the objecting Person (1) owned as of the opening of trading on April 23, 2018, and (2) purchased, acquired and/or sold during the Settlement Class Period, as well as the dates and prices for each such purchase, acquisition and sale, and contain a statement of reasons for the objection, copies of any papers, briefs, or other documents upon which the objection is based, a statement of whether the objector intends to appear at the Settlement Hearing, and the objector's signature, even if represented by counsel. The objection must state whether it applies only to the objector, to a specific subset of the Settlement Class, or to the entire Settlement Class. In addition, objecting shareholders must indicate whether the objector or their counsel have filed objections to any other class action settlements in the past two years. Objectors who desire to present evidence at the Settlement Hearing in support of their objection must include in their written objection or notice of appearance the identity of any witnesses they may call to testify and any exhibits they intend to introduce into evidence at the hearing.

You may file a written objection without having to appear at the Settlement Hearing. You may not appear at the Settlement Hearing to present your objection, however, unless you have first filed a written objection in accordance with the procedures described above, unless the Court orders otherwise.

## 17.     What is the difference between objecting and excluding?

Objecting is simply telling the Court that you do not like something about the Settlement. You can object **only** if you stay in the Settlement Class.

Excluding yourself is telling the Court that you do not want to recover money from the Settlement and do not want to release any claims you think you may have against Defendants and their Related Persons. If you exclude yourself, you cannot object to the Settlement because it does not affect you.

### THE COURT'S SETTLEMENT HEARING

The Court will hold a hearing to decide whether to approve the proposed Settlement. You may attend and you may ask to speak, but you do not have to.

**18. When and where will the Court decide whether to approve the proposed Settlement?**

The Court will hold a Settlement Hearing at **_:___ .m., on _____, 2024**, in the Courtroom of the Honorable Trina L. Thompson, at the United States District Court for the Northern District of California, Phillip Burton Federal Building & United States Courthouse, Courtroom 9 – 19th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102. At the hearing, the Court will consider whether the Settlement and the Plan of Allocation are fair, reasonable, and adequate. If there are objections, the Court will consider them, even if you do not ask to speak at the hearing. The Court will listen to people who have asked to speak at the hearing. The Court may also decide how much Lead Counsel will be paid and how much Lead Plaintiff will be awarded pursuant to 15 U.S.C. §78u-4(a)(4). After the Settlement Hearing, the Court will decide whether to approve the Settlement and the Plan of Allocation. We do not know how long these decisions will take. You should be aware that the Court may change the date and time of the Settlement Hearing without another notice being sent to Settlement Class Members. If you want to attend the hearing, you should check with Lead Counsel or the Settlement Website, www.AlphabetSecuritiesSettlement.com, beforehand to be sure that the date and/or time has not changed.

**19. Do I have to come to the hearing?**

No. Lead Counsel will answer questions the Court may have. But, you are welcome to come at your own expense. If you send an objection, you do not have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend, but it is not necessary. Settlement Class Members do not need to appear at the hearing or take any other action to indicate their approval.

**20. May I speak at the hearing?**

If you object to the Settlement, the Plan of Allocation, and/or the fee and expense application, you may ask the Court for permission to speak at the Settlement Hearing. To do so, you must include with your objection (*see* question 16 above) a statement saying that it is your "Notice of Intention to Appear in the *Alphabet Securities Settlement*." Persons who intend to object to the Settlement, the Plan of Allocation, and/or any awards to Lead Counsel or Lead Plaintiff and desire to present evidence at the Settlement Hearing must include in their written objections the identity of any witnesses they may call to testify and exhibits they intend to introduce into evidence at the Settlement Hearing. Your notice of intention to appear must be filed with the Court **no later than _____, 2024**.

You cannot speak at the hearing if you exclude yourself from the Settlement Class.

### IF YOU DO NOTHING

**21. What happens if I do nothing?**

If you do nothing, you will not receive any money from this Settlement. In addition, unless you exclude yourself, you will not be able to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against Defendants and their Related Persons about the Released Claims in this case.

**GETTING MORE INFORMATION**

| **22.    How do I get more information?** |
| --- |

This Notice contains only a summary of the terms of the proposed Settlement. For even more detailed information concerning the matters involved in this Action, you can obtain answers to common questions regarding the proposed Settlement by contacting the Claims Administrator toll-free at ___-___-____. Reference is also made to the Settlement Agreement, to the pleadings in support of the Settlement, to the Orders entered by the Court and to the other Settlement related papers filed in the Action, which are posted on the Settlement Website at www.AlphabetSecuritiesSettlement.com. This Notice summarizes the proposed Settlement. For the precise terms and conditions of the Settlement, please see the Settlement Agreement available at www.AlphabetSecuritiesSettlement.com, or by contacting Lead Counsel below. You may also access the Court docket in this case, for a fee, through the Court's Public Access to Court Electronic Records (PACER) system at https://ecf.cand.uscourts.gov, or by visiting the office of the Clerk of the Court for the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, between 9:00 a.m. and 1:00 p.m., Monday through Friday, excluding Court holidays. All inquiries concerning this Notice or the Proof of Claim should be directed to:

*Alphabet Securities Settlement*
c/o Gilardi & Co. LLC
P.O. Box _____
———————————
**-or-**

Ellen Gusikoff Stewart
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
800/449-4900
settlementinfo@rgrdlaw.com

*Lead Counsel*

**PLAN OF ALLOCATION OF NET SETTLEMENT FUND AMONG
SETTLEMENT CLASS MEMBERS**

The Settlement Amount of $350 million U.S. Dollars together with any interest earned thereon is the "Settlement Fund." The Settlement Fund, less all Taxes, Tax Expenses, Notice and Administration Expenses, Court-awarded attorneys' fees and expenses, any Litigation Expenses awarded by the Court, and any other fees or expenses approved by the Court (the "Net Settlement Fund") shall be distributed to Settlement Class Members who submit timely and valid Proof of Claims to the Claims Administrator ("Authorized Claimants"). The Plan of Allocation provides that you will be eligible to participate in the distribution of the Net Settlement Fund only if you have an overall net loss on all of your transactions in Alphabet Class A and/or Class C stock during the Settlement Class Period.

**PROPOSED PLAN OF ALLOCATION**

The objective of the Plan of Allocation is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a result of the alleged violations of the federal securities laws set forth in the Complaint and Supplement. The calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts

NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION
3:18-cv-06245-TLT
4861-1930-8698.v3

that Settlement Class Members might have been able to recover after a trial. Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. The computations under the Plan of Allocation are only a method to weigh the claims of Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

In developing the Plan of Allocation, Lead Plaintiff's consulting damages expert, based on assumptions provided by Lead Counsel, calculated the estimated amount of artificial inflation in the per-share closing price of Alphabet's Class A and Class C stock which allegedly was proximately caused by Defendants' alleged omissions and scheme.

In calculating the estimated artificial inflation allegedly caused by Defendants' alleged omissions and scheme, Lead Plaintiff's consulting damages expert considered price changes in Alphabet Class A and Class C stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged omissions and scheme, adjusting for assumptions related to the case provided by Lead Counsel.

In order to have recoverable damages, the disclosure of the allegedly misrepresented information must be the cause of the decline in the price of Alphabet Class A and Class C stock. Lead Plaintiff alleges that Defendants made material omissions and engaged in a scheme, which had the effect of artificially inflating the price of Alphabet Class A and Class C stock between April 23, 2018 and April 30, 2019, inclusive. Lead Plaintiff alleges revelatory information was released to the market on October 8, 2018 and April 29, 2019, which removed artificial inflation from the price of Alphabet Class A and Class C stock.

Recognized Loss Amounts are based primarily on the difference in the amount of alleged artificial inflation in the prices of Alphabet Class A and Class C stock at the time of purchase and at the time of sale or the difference between the actual purchase price and sale price. In order to have a Recognized Loss Amount under the Plan of Allocation, a Settlement Class Member who or which purchased Alphabet Class A or Class C stock prior to the first corrective disclosure, which occurred on October 8, 2018, must have held his, her or its shares of Alphabet Class A and Class C stock until at least 12:00 a.m. EDT on October 8, 2018. A Settlement Class Member who or which purchased Alphabet Class A or Class C stock from October 9, 2018 through and including the end of the day on April 29, 2019, must have held those shares through 12:00 a.m. on April 30, 2019.

## CALCULATION OF RECOGNIZED LOSS AMOUNTS

Based on the formula stated below, a "Recognized Loss Amount" will be calculated for each purchase of Alphabet Class A and Class C stock during the Settlement Class Period that is listed on the Claim Form and for which adequate documentation is provided. If a Recognized Loss Amount calculates to a negative number or zero under the formula below, that number will be zero.

For each share of Alphabet Class A or Class C stock purchased or otherwise acquired from April 23, 2018 through and including the close of trading on April 30, 2019, the Recognized Loss Amount will be determined as follows:[2]

        (a)      For each share of such Class A stock that is:

            (i)      Sold before October 8, 2018, the Recognized Loss Amount will be $0.00;

---

[2]     Dollar amounts in this document are not adjusted for Alphabet's 20-for-1 split, which was announced on July 15, 2022 (with record date July 1, 2022).

(ii)     Sold from October 8, 2018, through and including April 29, 2019, the Recognized Loss Amount will be *the lesser of*: (i) the inflation per share during the holding period (as presented in Table 1 below), and (ii) the purchase price *minus* the sale price;

(iii)     Sold from April 30, 2019 through and including the close of trading on July 26, 2019, the Recognized Loss Amount will be *the lesser of*: (i) the inflation per share during the holding period (as presented in Table 1 below), and (ii) the purchase price *minus* the sale price; and

(iv)     Held as of the close of trading on July 26, 2019, the Recognized Loss Amount will be *the least of*: (i) the inflation per share during the holding period (as presented in Table 1 below), (ii) the purchase price *minus* $1,128.33 ($1,128.33 was the average closing price for shares of Alphabet Class A common stock between April 30, 2019 and July 28, 2019 as shown in Table 3 below), or (iii) the purchase price *minus* the sale price.[3]

(b)     For each share of such Class C stock that is:

(i)     Sold before October 8, 2018, the Recognized Loss Amount will be $0.00;

(ii)     Sold from October 8, 2018, through and including April 29, 2019, the Recognized Loss Amount will be *the lesser of*: (i) the inflation per share during the holding period (as presented in Table 2 below), and (ii) the purchase price *minus* the sale price;

(iii)     Sold from April 30, 2019 through and including the close of trading on July 26, 2019, the Recognized Loss Amount will be *the lesser of*: (i) the inflation per share during the holding period (as presented in Table 2 below), and (ii) the purchase price *minus* the sale price; and

(iv)     Held as of the close of trading on July 26, 2019, the Recognized Loss Amount will be *the least of*: (i) the inflation per share during the holding period (as presented in Table 2 below), (ii) the purchase price *minus* $1,125.68 ($1,125.68 was the average closing price for shares of Alphabet Class C common stock between April 30, 2019 and July 28, 2019 as shown in Table 4 below), or (iii) the purchase price *minus* the sale price.[4]

---

[3]     Pursuant to Section 21(e)(1) of the Exchange Act, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." Consistent with the requirements of the Exchange Act, Recognized Loss Amounts are reduced to an appropriate extent by taking into account the closing prices of Alphabet Class A and Class C stock during the "90-day look-back period," April 30, 2019 through and including July 28, 2019. The mean (average) closing price for Alphabet Class A stock during this period was $1,128.33 per share.

[4]     The mean (average) closing price for Alphabet Class C stock during this period was $1,125.68 per share.

NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION
3:18-cv-06245-TLT                                                                                    - 14 -
4861-1930-8698.v3

**TABLE 1**

**Inflation Per Share by Date of Purchase and Date of Sale: Alphabet Class A Stock**

| Purchase Date | Sale Date | | | |
|---|---|---|---|---|
| | 4/23/2018-10/7/2018 | 10/8/2018-4/29/2019 | 4/30/2019-7/26/2019 | Retained beyond 7/26/2019 |
| 4/23/2018-10/8/2018 | 0 | $4.67 | $5.84 | $5.84 |
| 10/9/2018-4/29/2019 | 0 | 0 | $1.17 | $1.17 |

**TABLE 2**

**Inflation Per Share by Date of Purchase and Date of Sale: Alphabet Class C Stock**

| Purchase Date | Sale Date | | | |
|---|---|---|---|---|
| | 4/23/2018-10/7/2018 | 10/8/2018-4/29/2019 | 4/30/2019-7/26/2019 | Retained beyond 7/26/2019 |
| 4/23/2018-10/8/2018 | 0 | $3.85 | $4.81 | $4.81 |
| 10/9/2018-4/29/2019 | 0 | 0 | $0.96 | $0.96 |

**TABLE 3**

**Closing Price and Average Closing Price: Alphabet Class A Stock (GOOGL)**

| Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown | Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown |
|---|---|---|---|---|---|
| 4/30/2019 | $1,198.96 | $1,198.96 | 6/13/2019 | $1,091.01 | $1,131.46 |
| 5/1/2019 | $1,173.32 | $1,186.14 | 6/14/2019 | $1,086.30 | $1,130.09 |
| 5/2/2019 | $1,166.51 | $1,179.60 | 6/17/2019 | $1,093.89 | $1,129.03 |
| 5/3/2019 | $1,189.55 | $1,182.09 | 6/18/2019 | $1,105.24 | $1,128.35 |
| 5/6/2019 | $1,193.46 | $1,184.36 | 6/19/2019 | $1,104.51 | $1,127.69 |
| 5/7/2019 | $1,178.86 | $1,183.44 | 6/20/2019 | $1,113.20 | $1,127.30 |
| 5/8/2019 | $1,170.78 | $1,181.63 | 6/21/2019 | $1,125.37 | $1,127.24 |
| 5/9/2019 | $1,167.97 | $1,179.93 | 6/24/2019 | $1,116.70 | $1,126.97 |
| 5/10/2019 | $1,167.64 | $1,178.56 | 6/25/2019 | $1,087.58 | $1,125.99 |
| 5/13/2019 | $1,136.59 | $1,174.36 | 6/26/2019 | $1,080.32 | $1,124.88 |
| 5/14/2019 | $1,124.86 | $1,169.86 | 6/27/2019 | $1,076.63 | $1,123.73 |
| 5/15/2019 | $1,170.80 | $1,169.94 | 6/28/2019 | $1,082.80 | $1,122.78 |
| 5/16/2019 | $1,184.50 | $1,171.06 | 7/1/2019 | $1,100.00 | $1,122.26 |

| Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown | Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown |
|---|---|---|---|---|---|
| 5/17/2019 | $1,168.78 | $1,170.90 | 7/2/2019 | $1,112.60 | $1,122.04 |
| 5/20/2019 | $1,144.66 | $1,169.15 | 7/3/2019 | $1,122.99 | $1,122.06 |
| 5/21/2019 | $1,154.44 | $1,168.23 | 7/5/2019 | $1,132.67 | $1,122.29 |
| 5/22/2019 | $1,155.85 | $1,167.50 | 7/8/2019 | $1,116.79 | $1,122.17 |
| 5/23/2019 | $1,145.34 | $1,166.27 | 7/9/2019 | $1,124.29 | $1,122.22 |
| 5/24/2019 | $1,138.61 | $1,164.81 | 7/10/2019 | $1,140.91 | $1,122.59 |
| 5/28/2019 | $1,139.56 | $1,163.55 | 7/11/2019 | $1,144.08 | $1,123.01 |
| 5/29/2019 | $1,119.94 | $1,161.48 | 7/12/2019 | $1,145.34 | $1,123.44 |
| 5/30/2019 | $1,121.41 | $1,159.65 | 7/15/2019 | $1,150.51 | $1,123.95 |
| 5/31/2019 | $1,106.50 | $1,157.34 | 7/16/2019 | $1,153.46 | $1,124.50 |
| 6/3/2019 | $1,038.74 | $1,152.40 | 7/17/2019 | $1,146.74 | $1,124.90 |
| 6/4/2019 | $1,054.49 | $1,148.48 | 7/18/2019 | $1,147.24 | $1,125.30 |
| 6/5/2019 | $1,044.64 | $1,144.49 | 7/19/2019 | $1,131.55 | $1,125.41 |
| 6/6/2019 | $1,047.76 | $1,140.91 | 7/22/2019 | $1,139.21 | $1,125.65 |
| 6/7/2019 | $1,068.37 | $1,138.32 | 7/23/2019 | $1,148.05 | $1,126.03 |
| 6/10/2019 | $1,082.76 | $1,136.40 | 7/24/2019 | $1,139.73 | $1,126.26 |
| 6/11/2019 | $1,081.04 | $1,134.56 | 7/25/2019 | $1,135.94 | $1,126.42 |
| 6/12/2019 | $1,079.10 | $1,132.77 | 7/26/2019 | $1,245.22 | $1,128.33 |

## TABLE 4

## Closing Price and Average Closing Price: Alphabet Class C Stock (GOOG)

| Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown | Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown |
|---|---|---|---|---|---|
| 4/30/2019 | $1,188.48 | $1,188.48 | 6/13/2019 | $1,088.77 | $1,127.25 |
| 5/1/2019 | $1,168.08 | $1,178.28 | 6/14/2019 | $1,085.35 | $1,125.98 |
| 5/2/2019 | $1,162.61 | $1,173.06 | 6/17/2019 | $1,092.50 | $1,125.00 |
| 5/3/2019 | $1,185.40 | $1,176.14 | 6/18/2019 | $1,103.60 | $1,124.39 |
| 5/6/2019 | $1,189.39 | $1,178.79 | 6/19/2019 | $1,102.33 | $1,123.77 |
| 5/7/2019 | $1,174.10 | $1,178.01 | 6/20/2019 | $1,111.42 | $1,123.44 |
| 5/8/2019 | $1,166.27 | $1,176.33 | 6/21/2019 | $1,121.88 | $1,123.40 |
| 5/9/2019 | $1,162.38 | $1,174.59 | 6/24/2019 | $1,115.52 | $1,123.20 |
| 5/10/2019 | $1,164.27 | $1,173.44 | 6/25/2019 | $1,086.35 | $1,122.28 |
| 5/13/2019 | $1,132.03 | $1,169.30 | 6/26/2019 | $1,079.80 | $1,121.24 |
| 5/14/2019 | $1,120.44 | $1,164.86 | 6/27/2019 | $1,076.01 | $1,120.16 |

| Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown | Date | Closing price | Average Closing Price Between April 30, 2019 and Date Shown |
|---|---|---|---|---|---|
| 5/15/2019 | $1,164.21 | $1,164.81 | 6/28/2019 | $1,080.91 | $1,119.25 |
| 5/16/2019 | $1,178.98 | $1,165.90 | 7/1/2019 | $1,097.95 | $1,118.77 |
| 5/17/2019 | $1,162.30 | $1,165.64 | 7/2/2019 | $1,111.25 | $1,118.60 |
| 5/20/2019 | $1,138.85 | $1,163.85 | 7/3/2019 | $1,121.58 | $1,118.66 |
| 5/21/2019 | $1,149.63 | $1,162.96 | 7/5/2019 | $1,131.59 | $1,118.94 |
| 5/22/2019 | $1,151.42 | $1,162.28 | 7/8/2019 | $1,116.35 | $1,118.88 |
| 5/23/2019 | $1,140.77 | $1,161.09 | 7/9/2019 | $1,124.83 | $1,119.01 |
| 5/24/2019 | $1,133.47 | $1,159.64 | 7/10/2019 | $1,140.48 | $1,119.44 |
| 5/28/2019 | $1,134.15 | $1,158.36 | 7/11/2019 | $1,144.21 | $1,119.92 |
| 5/29/2019 | $1,116.46 | $1,156.37 | 7/12/2019 | $1,144.90 | $1,120.40 |
| 5/30/2019 | $1,117.95 | $1,154.62 | 7/15/2019 | $1,150.34 | $1,120.97 |
| 5/31/2019 | $1,103.63 | $1,152.40 | 7/16/2019 | $1,153.58 | $1,121.57 |
| 6/3/2019 | $1,036.23 | $1,147.56 | 7/17/2019 | $1,146.35 | $1,122.02 |
| 6/4/2019 | $1,053.05 | $1,143.78 | 7/18/2019 | $1,146.33 | $1,122.45 |
| 6/5/2019 | $1,042.22 | $1,139.88 | 7/19/2019 | $1,130.10 | $1,122.59 |
| 6/6/2019 | $1,044.34 | $1,136.34 | 7/22/2019 | $1,138.07 | $1,122.86 |
| 6/7/2019 | $1,066.04 | $1,133.83 | 7/23/2019 | $1,146.21 | $1,123.25 |
| 6/10/2019 | $1,080.38 | $1,131.98 | 7/24/2019 | $1,137.81 | $1,123.49 |
| 6/11/2019 | $1,078.72 | $1,130.21 | 7/25/2019 | $1,132.12 | $1,123.64 |
| 6/12/2019 | $1,077.03 | $1,128.49 | 7/26/2019 | $1,250.41 | $1,125.68 |

**ADDITIONAL PROVISIONS**

**Calculation of Claimant's "Recognized Claim"**: A Claimant's "Recognized Claim" will be the sum of his, her or its Recognized Loss Amounts as calculated above with respect to Alphabet Class A and Class C stock.

**FIFO Matching**: If a Settlement Class Member made more than one purchase or sale of Alphabet Class A and Class C stock during the relevant period, all purchases and sales will be matched on a First In, First Out ("FIFO") basis. Sales will be matched first against any holdings at the beginning of the Settlement Class Period, and then against purchases in chronological order, beginning with the earliest purchase made during the Settlement Class Period.

**"Purchase/Sale" Dates**: Purchases and sales of Alphabet Class A and Class C stock will be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. "Purchases" eligible under the Settlement and this Plan of Allocation include all purchases or other acquisitions of Alphabet Class A and Class C stock in exchange for value and are not limited to purchases made on or through a stock exchange, as long as the purchase is adequately documented. However, the receipt or grant by gift, inheritance, or operation of law of Alphabet Class A and Class C stock during the Settlement Class Period shall not be deemed a purchase or sale of Alphabet Class A and Class C stock for the calculation of a Claimant's Recognized Loss Amount, nor shall the receipt or grant be deemed an assignment of any claim relating to the purchase/sale of Alphabet Class A and Class C stock unless (i) the donor or decedent purchased the shares during the

NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION
3:18-cv-06245-TLT                                                                    - 17 -
4861-1930-8698.v3

Settlement Class Period; (ii) the instrument of gift or assignment specifically provides that it is intended to transfer such rights; and (iii) no Claim was submitted by or on behalf of the donor, on behalf of the decedent, or by anyone else with respect to those shares.

**Short Sales**: The date of covering a "short sale" is deemed to be the date of purchase of the Alphabet Class A and Class C stock. The date of a "short sale" is deemed to be the date of sale of the Alphabet Class A and Class C stock. In accordance with the Plan of Allocation, however, the Recognized Loss Amount on "short sales" and the purchases covering "short sales" is zero. In the event that a Claimant has an opening short position in Alphabet Class A and Class C stock, the earliest purchases of Alphabet Class A and Class C stock during the Settlement Class Period will be matched against such opening short position, and not be entitled to a recovery, until that short position is fully covered.

**Class A and Class C Stock Purchased/Sold Through the Exercise of Options**: Option contracts are not securities eligible to participate in the Settlement. With respect to Alphabet Class A and Class C stock purchased or sold through the exercise of an option, the purchase/sale date of the Class A and Class C stock is the exercise date of the option and the purchase/sale price is the exercise price of the option.

**Market Gains and Losses**: The Claims Administrator will determine if the Claimant had a "Market Gain" or a "Market Loss" with respect to his, her, or its overall transactions in Alphabet Class A and Class C stock during the Settlement Class Period. For purposes of making this calculation, the Claims Administrator shall determine the difference between (i) the Claimant's Total Purchase Amount[5] and (ii) the sum of the Claimant's Total Sales Proceeds[6] and the Claimant's Holding Value.[7] If the Claimant's Total Purchase Amount _minus_ the sum of the Claimant's Total Sales Proceeds and the Holding Value is a positive number, that number will be the Claimant's Market Loss; if the number is a negative number or zero, that number will be the Claimant's Market Gain.

If a Claimant had a Market Gain with respect to his, her, or its overall transactions in Alphabet Class A and Class C stock during the Settlement Class Period, the value of the Claimant's Recognized Claim will be zero, and the Claimant will in any event be bound by the Settlement and the Agreement. If a Claimant suffered an overall Market Loss with respect to his, her, or its overall transactions in Alphabet Class A and Class C stock during the Settlement Class Period but that Market Loss was less than the Claimant's Recognized Claim, then the Claimant's Recognized Claim will be limited to the amount of the Market Loss.

---

[5]     The "Total Purchase Amount" is the total amount the Claimant paid (excluding all fees, taxes and commissions) for all shares of Alphabet Class A and Class C stock purchased between April 23, 2018 and April 30, 2019, inclusive.

[6]     The Claims Administrator shall match any sales of Alphabet Class A and Class C stock between April 23, 2018 and April 30, 2019, inclusive first against the Claimant's opening position in Alphabet Class A and Class C stock, as appropriate by Class (the proceeds of those sales will not be considered for purposes of calculating market gains or losses). The total amount received (not deducting any fees, taxes and commissions) for sales of the remaining shares of Alphabet Class A and Class C stock sold between April 23, 2018 and April 30, 2019, inclusive is the "Total Sales Proceeds" for that class.

[7]     The Claims Administrator shall ascribe a "Holding Value" of $1,128.33 to each share of Alphabet Class A stock purchased between April 23, 2018 and April 30, 2019, inclusive that was still held as of the close of trading on July 26, 2019. The Claims Administrator shall ascribe a "Holding Value" of $1,125.68 to each share of Alphabet Class C stock purchased between April 23, 2018 and April 30, 2019, inclusive that was still held as of the close of trading on July 26, 2019.

**Determination of Distribution Amount**: If the sum total of Recognized Claims of all Authorized Claimants who are entitled to receive payment out of the Net Settlement Fund is greater than the Net Settlement Fund, each Authorized Claimant shall receive his, her, or its *pro rata* share of the Net Settlement Fund. The *pro rata* share or "Distribution Amount" will be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.

If the Net Settlement Fund exceeds the sum total amount of the Recognized Claims of all Authorized Claimants entitled to receive payment out of the Net Settlement Fund, the excess amount in the Net Settlement Fund will be distributed *pro rata* to all Authorized Claimants entitled to receive payment.

After the initial distribution of the Net Settlement Fund, the Claims Administrator will make reasonable and diligent efforts to have Authorized Claimants cash their distribution checks. To the extent any monies remain in the Net Settlement Fund nine (9) months after the initial distribution, if Lead Counsel, in consultation with its Claims Administrator, determines that it is cost-effective to do so, the Claims Administrator will conduct a re-distribution of the funds remaining after payment of any unpaid fees and expenses incurred in administering the Settlement, including for such re-distribution, to Authorized Claimants who have cashed their initial distributions and who would receive at least $10.00 from such re-distribution. Additional re-distributions to Authorized Claimants who have cashed their prior checks and who would receive at least $10.00 on such additional re-distributions may occur thereafter if Lead Counsel, in consultation with the Claims Administrator, determines that additional re-distributions, after the deduction of any additional fees and expenses incurred in administering the Settlement, including for such re-distributions, would be cost-effective. At such time as it is determined that the re-distribution of funds remaining in the Net Settlement Fund is not cost-effective, the remaining balance will be contributed to the Investor Protection Trust.

Payment pursuant to the Plan of Allocation, or such other plan of allocation as may be approved by the Court, will be conclusive against all Authorized Claimants. No person shall have any claim against Lead Plaintiff, Lead Counsel, Lead Plaintiff's consulting experts, Defendants, Defendants' Counsel, or any of the other Settlement Class Members or Released Defendant Parties, or the Claims Administrator or other agent designated by Lead Counsel arising from distributions made substantially in accordance with the Stipulation, the Plan of Allocation approved by the Court, or further orders of the Court. Lead Plaintiff, Defendants, and their respective counsel, and all other Released Defendant Parties, shall have no responsibility or liability whatsoever for the investment or distribution of the Settlement Fund or the Net Settlement Fund; the Plan of Allocation; the determination, administration, calculation, or payment of any claim or nonperformance of the Claims Administrator; the payment or withholding of Taxes; or any losses incurred in connection therewith.

The Plan of Allocation stated herein is the Plan that is being proposed to the Court for its approval by Lead Plaintiff, after consultation with its consulting damages expert. The Court may approve this Plan as proposed or it may modify the Plan of Allocation without further notice to the Class. Any Orders regarding any modification of the Plan of Allocation will be posted on the case website, www.AlphabetSecuritiesSettlement.com.

Distributions will be made to Authorized Claimants after all claims have been processed, after the Court has finally approved the Settlement, and after any appeals are resolved. If there is any balance remaining in the Net Settlement Fund after at least six (6) months from the initial date of distribution of the Net Settlement Fund (whether by reason of tax refunds, uncashed checks, or otherwise), the Claims Administrator shall, if feasible, reallocate such balance among Authorized Claimants in an equitable and economic fashion. These redistributions shall be repeated until the balance remaining in the Net Settlement Fund is no longer economically feasible to distribute to Settlement Class Members. Thereafter, any balance that still remains in the Net Settlement Fund shall be donated to the Investor Protection Trust.

Please contact the Claims Administrator or Lead Counsel if you disagree with any determinations made by the Claims Administrator regarding your Proof of Claim. If you are dissatisfied with the determinations, you may ask the Court, which retains jurisdiction over all Settlement Class Members and the claims administration process, to decide the issue by submitting a written request.

The Court has reserved jurisdiction to allow, disallow, or adjust the claim of any Settlement Class Member on equitable grounds.

Payment pursuant to the Plan of Allocation set forth above shall be conclusive against all Authorized Claimants. Defendants, Defendants' Counsel, and all other Released Defendant Parties will have no responsibility or liability whatsoever for the investment of the Settlement Fund, the distribution of the Net Settlement Fund, the Plan of Allocation, or the payment of any claim. No Person shall have any claim against Lead Plaintiff, Lead Counsel, the Claims Administrator, or other Person designated by Lead Counsel, Defendants, or Defendants' Counsel based on distributions made substantially in accordance with the Stipulation and the Settlement contained therein, the Plan of Allocation, or further orders of the Court. All Settlement Class Members who fail to complete and submit a valid and timely Proof of Claim shall be barred from participating in distributions from the Net Settlement Fund (unless otherwise ordered by the Court), but otherwise shall be bound by all of the terms of the Stipulation, including the terms of any Judgment entered and the releases given.

### SPECIAL NOTICE TO SECURITIES BROKERS AND OTHER NOMINEES

If you purchased or acquired Alphabet Class A and/or Class C stock during the Settlement Class Period for the beneficial interest of an individual or organization other than yourself, the Court has directed that, WITHIN SEVEN (7) CALENDAR DAYS OF YOUR RECEIPT OF THE SUMMARY NOTICE, you either (a) provide to the Claims Administrator the name and last known email or physical address of each person or organization for whom or which you purchased or acquired such Alphabet Class A and/or Class C stock during such time period, or (b) request additional copies of the Summary Notice which will be provided to you free of charge, and within seven (7) calendar days send via email or regular mail where an email address is not available, mail the Summary Notice a directly to the beneficial owners of the Alphabet Class A and/or Class C stock referred to herein. If you choose to follow alternative procedure (b), upon such mailing, you must send a statement to the Claims Administrator confirming that the email was sent or the mailing was made as directed and retain the names, email addresses or physical addresses for any future mailings to Settlement Class Members. You are entitled to reimbursement from the Settlement Fund of your reasonable expenses actually incurred in connection with the foregoing, including reimbursement of postage expense and the cost of ascertaining the names and addresses of beneficial owners. Reasonable out-of-pocket expenses actually incurred in connection with the foregoing includes up to $0.03 for providing names, addresses and email addresses to the Claim Administrator per record; up to a maximum of $0.03 per Summary Notice emailed or mailed by you, plus postage at the rate used by the Claims Administrator. Your reasonable expenses will be paid upon request and submission of appropriate supporting documentation. All communications concerning the foregoing should be addressed to the Claims Administrator at:

*Alphabet Securities Settlement*
Claims Administrator
c/o _____
P.O. _____
_____, ___ _____

---

1    DATED: _____

2                                 BY ORDER OF THE COURT
                                  UNITED STATES DISTRICT COURT
3                                 NORTHERN DISTRICT OF CALIFORNIA

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  ROBBINS GELLER RUDMAN
       & DOWD LLP
2  JASON A. FORGE (181542)
   LAURA ANDRACCHIO (187773)
3  MICHAEL ALBERT (301120)
   J. MARCO JANOSKI GRAY (306547)
4  TING H. LIU (307747)
   KENNETH P. DOLITSKY (345400)
5  SARAH A. FALLON (345821)
   655 West Broadway, Suite 1900
6  San Diego, CA  92101
   Telephone:  619/231-1058
7  619/231-7423 (fax)
   jforge@rgrdlaw.com
8  landracchio@rgrdlaw.com
   malbert@rgrdlaw.com
9  mjanoski@rgrdlaw.com
   tliu@rgrdlaw.com
10 kdolitsky@rgrdlaw.com
   sfallon@rgrdlaw.com
11
   Lead Counsel for Plaintiff
12
                    UNITED STATES DISTRICT COURT
13
                  NORTHERN DISTRICT OF CALIFORNIA
14
                      SAN FRANCISCO DIVISION
15

16 In re ALPHABET, INC. SECURITIES      )  Master File No. 3:18-cv-06245-TLT
   LITIGATION                           )
17 ─────────────────────────────────    )  CLASS ACTION
                                        )
18 This Document Relates To:            )  PROOF OF CLAIM AND RELEASE
                                        )
19     ALL ACTIONS.                      )  EXHIBIT A-2
   ─────────────────────────────────    )

20

21

22

23

24

25

26

27

28

4853-7970-9595.v3

**I.      GENERAL INSTRUCTIONS**

1.      To recover as a member of the Settlement Class based on your claims in the action *In re Alphabet, Inc. Securities Litigation*, No. 3:18-cv-06245-TLT (the "Action"), you must complete and, on page __ hereof, sign this Proof of Claim and Release ("Proof of Claim" or "Claim Form"). If you fail to submit a properly addressed (as set forth in paragraph 3 below) Claim Form, postmarked or received by the date shown below, your claim may be rejected and you may be precluded from any recovery from the Net Settlement Fund created in connection with the proposed settlement of the Action (the "Settlement").[1]

2.      Submission of this Claim Form, however, does not assure that you will share in the proceeds of the Settlement.

3.      YOU MUST MAIL OR SUBMIT ONLINE YOUR COMPLETED AND SIGNED CLAIM FORM, ACCOMPANIED BY COPIES OF THE DOCUMENTS REQUESTED HEREIN, NO LATER THAN _____, 2024, TO THE COURT-APPOINTED CLAIMS ADMINISTRATOR IN THIS CASE, AT THE FOLLOWING ADDRESS:

*Alphabet Securities Settlement*
Claims Administrator
c/o _Gilardi & Co. LLC
P.O. Box ____
_____, __ _____-____
Online Submissions: www.AlphabetSecuritiesSettlement.com

Do not mail or deliver your Claim Form to the Court, the Parties to the Action, or their counsel. Submit your Claim Form only to the Claims Administrator at the address set forth above.  If you are NOT a member of the Settlement Class (as defined below and in the Notice of Pendency and Proposed Settlement of Class Action (the "Notice")), DO NOT submit a Claim Form.

---

[1]      This Claim Form incorporates by reference the definitions in the Stipulation of Settlement ("Stipulation"), which can be obtained at www.AlphabetSecuritiesSettlement.com.

EX A-2 – PROOF OF CLAIM AND RELEASE
3:18-cv-06245-TLT
4853-7970-9595.v3

- 1 -

4. If you are a member of the Settlement Class and you do not request exclusion, you will be bound by the terms of any judgment entered in the Action, including the releases provided therein, WHETHER OR NOT YOU SUBMIT A CLAIM FORM.

5. It is important that you completely read and understand the Notice that is available at www.AlphabetSecuritiesSettlement.com, including the Plan of Allocation of the Net Settlement Fund set forth in the Notice. The Notice describes the proposed Settlement, how Settlement Class Members are affected by the Settlement, and the manner in which the Net Settlement Fund will be distributed if the Settlement and Plan of Allocation are approved by the Court. The Notice (as well as the Stipulation) also contains the definitions of many of the defined terms (which are indicated by initial capital letters) used in this Claim Form.

## II. CLAIMANT IDENTIFICATION

You are a member of the Settlement Class if you purchased or otherwise acquired Alphabet, Inc. ("Alphabet") Class A and/or Class C stock during the period from April 23, 2018, through April 30, 2019, inclusive (the "Settlement Class Period"). Excluded from the Settlement Class are Defendants and their families, the officers, directors and affiliates of Defendants, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded from the Settlement Class is any Person who would otherwise be a member of the Settlement Class but who validly and timely requests exclusion in accordance with the requirements set by the Court.

Use Part I of this Claim Form entitled "Claimant Identification" to identify each purchaser or acquirer of record ("nominee"), if different from the beneficial purchaser or acquirer of the Alphabet Class A or Class C stock which forms the basis of this claim. THIS CLAIM MUST BE FILED BY THE ACTUAL BENEFICIAL PURCHASER(S) OR ACQUIRER(S) OR THE LEGAL REPRESENTATIVE OF SUCH PURCHASER(S) OR ACQUIRER(S) OF THE ALPHABET CLASS A OR CLASS C STOCK UPON WHICH THIS CLAIM IS BASED.

All joint purchasers or acquirers must sign this Claim Form. Executors, administrators, guardians, conservators and trustees must complete and sign this Claim Form on behalf of persons represented by them and their authority must accompany this Claim Form and their titles or capacities must be stated. The last four digits of the Social Security number (or full taxpayer identification number) and telephone number of the beneficial owner may be used in verifying the claim. Failure to provide the foregoing information could delay verification of your claim or result in rejection of the claim.

If you are acting in a representative capacity on behalf of a Settlement Class Member (for example, as an executor, administrator, trustee, or other representative), you must submit evidence of your current authority to act on behalf of that Settlement Class Member. Such evidence would include, for example, letters testamentary, letters of administration, or a copy of the trust documents.

One Proof of Claim should be submitted for each separate legal entity. Separate Proof of Claim should be submitted for each separate legal entity (*e.g.*, a claim from joint owners should not include separate transactions of just one of the joint owners, and an individual should not combine his or her IRA transactions with transactions made solely in the individual's name). Conversely, a single Proof of Claim should be submitted on behalf of one legal entity, including all transactions made by that entity on one Proof of Claim, no matter how many separate accounts that entity has (*e.g.*, a corporation with multiple brokerage accounts should include all transactions made in all accounts on one Proof of Claim).

NOTICE REGARDING ELECTRONIC FILES: Certain Claimants with large numbers of transactions may request to, or may be requested to, submit information regarding their transactions in electronic files. All Claimants MUST submit a manually signed paper Proof of Claim listing all their transactions whether or not they also submit electronic copies. If you wish to file your Proof of Claim electronically, you must contact the Claims Administrator at _____ to obtain the mandatory file layout. Any file not in accordance with the required electronic filing format will be subject to rejection. Only one Proof of Claim should be submitted for each legal entity (*see* above) and the **complete** name of the beneficial owner(s) of the securities must be entered where called for. No electronic files will be considered to have been properly submitted unless the Claims

1  Administrator issues to the Claimant a written acknowledgement of receipt and acceptance of

2  electronically submitted data.  Do not assume that your file has been received until you receive this

3  notification.  If you do not receive such an email within 10 days of your submission you should

4  contact the electronic filing department at _____ to inquire about your file and

5  confirm it was received.

6  **III.    PROOF OF CLAIM**

7    Use Part II of this Proof of Claim "Schedule of Transactions in Alphabet Class A and/or

8  Class C stock," to supply all required details of your transaction(s) in Alphabet Class A and/or Class

9  C stock.  If you need more space or additional schedules, attach separate sheets giving all of the

10  required information in substantially the same form.  Sign and print or type your name on each

11  additional sheet.

12    On the schedules, provide all of the requested information with respect to **all** of your

13  holdings, purchases or acquisitions and **all** of your sales of Alphabet Class A and/or Class C stock,

14  whether such transactions resulted in a profit or a loss.  Failure to report all such transactions may

15  result in the rejection of your claim.

16    List these transactions separately and in chronological order, by trade date, beginning with

17  the earliest.  You must accurately provide the month, day and year of each transaction you list.

18    For short-sale transactions, the date of covering a "short sale" is deemed to be the date of

19  purchase of Alphabet stock, and the date of a "short sale" is deemed to be the date of sale of

20  Alphabet stock.

21    For each transaction, you must provide, together with this Proof of Claim, copies of

22  stockbroker confirmation slips, stockbroker statements, or other documents adequately evidencing

23  your transactions in Alphabet Class A and/or Class C stock.  If any such documents are not in your

24  possession, please obtain a copy or equivalent documents from your broker because these documents

25  are necessary to prove and process your claim.  Failure to provide this documentation could delay

26  verification of your claim or result in rejection of your claim.  **THE PARTIES DO NOT HAVE**

27  **INFORMATION ABOUT YOUR TRANSACTIONS IN ALPHABET STOCK**.

28

EX A-2 – PROOF OF CLAIM AND RELEASE
3:18-cv-06245-TLT
4853-7970-9595.v3

- 4 -

1    PLEASE NOTE:  As set forth in the Plan of Allocation, each Authorized Claimant shall

2    receive his, her or its *pro rata* share of the Net Settlement Fund.  If the prorated payment to any

3    Authorized Claimant calculates to less than $10.00, it will not be included in the calculation and no

4    distribution will be made to that Authorized Claimant.

5                              UNITED STATES DISTRICT COURT

6                              NORTHERN DISTRICT OF CALIFORNIA

7                              *In re Alphabet, Inc. Securities Litigation*

8                              Master File No. 3:18-cv-06245-TLT

9                              PROOF OF CLAIM AND RELEASE

10

11   Must Be Postmarked (if mailed) or Received (if submitted online) No Later Than:

12                              _____, 2024

13                              <u>Please Type or Print</u>

14        **REMEMBER TO ATTACH COPIES OF BROKER CONFIRMATIONS OR OTHER**

15   **DOCUMENTATION OF YOUR TRANSACTIONS IN ALPHABET CLASS A AND/OR**

16   **CLASS C STOCK.  FAILURE TO PROVIDE THIS DOCUMENTATION COULD DELAY**

17   **VERIFICATION OF YOUR CLAIM OR RESULT IN REJECTION OF YOUR CLAIM.**

18

19

20

21

22

23

24

25

26

27

28

PART I: CLAIMANT IDENTIFICATION

Last Name

M.I.

First Name

Last Name (Co-Beneficial Owner)

M.I.

First Name (Co-Beneficial Owner)

○ IRA        ○ Joint Tenancy        ○ Employee        ○ Individual        ○ Other____
                                                                                    (specify)
Company Name (Beneficial Owner - If Claimant is not an Individual) or Custodian Name if an IRA

Trustee/Asset Manager/Nominee/Record Owner's Name (If Different from Beneficial Owner Listed Above)

Account#/Fund# (Not Necessary for Individual Filers)

LAST 4 DIGITS OF
SOCIAL SECURITY NUMBER          or          Taxpayer Identification Number       —

Telephone Number (Primary Daytime)       —          —          Telephone Number (Alternate)       —

Email Address

MAILING INFORMATION

Address

Address

City                                                State          Zip Code

Foreign Province              Foreign Postal Code              Foreign Country Name/Abbreviation

PART II:     SCHEDULE OF TRANSACTIONS IN ALPHABET CLASS A AND/OR CLASS C
             STOCK

A.     Number of shares of Alphabet Class A stock held at the close of trading on
       April 22, 2018: _____

                                                              Proof Enclosed?
                                                              ○ Y
                                                              ○ N

B.     Number of shares of Alphabet Class C stock held at the close of trading on
       April 22, 2018:

                                                              Proof Enclosed?
                                                              ○ Y
                                                              ○ N

EX A-2 – PROOF OF CLAIM AND RELEASE
3:18-cv-06245-TLT
4853-7970-9595.v3

- 6 -

C.     Purchases or acquisitions of Alphabet Class A and/or Class C stock between April 23, 2018 and July 26, 2019, inclusive:[2]

| Trade Date Month Day Year | Number of Shares Purchased or Acquired | Class A or Class C | Total Purchase or Acquisition Price |
|---|---|---|---|
| 1. | 1. | | 1. |
| 2. | 2. | | 2. |
| 3. | 3. | | 3. |

D.     Sales of Alphabet Class A and/or Class C stock between April 23, 2018 and July 26, 2019, inclusive:



E.     Number of shares of Alphabet Class A stock held at the close of trading on April 30, 2019:

F.     Number of shares of Alphabet Class C stock held at the close of trading on April 30, 2019:

G.     Number of shares of Alphabet Class A stock held at the close of trading on July 26, 2019:

H.     Number of shares of Alphabet Class C stock held at the close of trading on July 26, 2019:

[2] Information requested about your purchases or acquisitions on May 1, 2019 through and including the close of trading on July 26, 2019 is needed only in order for the Claims Administrator to confirm that you have reported all relevant transactions. Purchases or acquisitions during this period are not eligible for a recovery because they were made outside the Settlement Class Period.

EX A-2 – PROOF OF CLAIM AND RELEASE
3:18-cv-06245-TLT
4853-7970-9595.v3

- 7 -

If you require additional space, attach extra schedules in the same format as above.  Sign and print your name on each additional page.

**YOU MUST READ AND SIGN THE RELEASE ON PAGE _____.  FAILURE TO SIGN THE RELEASE MAY RESULT IN A DELAY IN PROCESSING OR THE REJECTION OF YOUR CLAIM.**

**IV.   SUBMISSION TO JURISDICTION OF COURT AND ACKNOWLEDGMENTS**

I (We) submit this Proof of Claim under the terms of the Stipulation described in the Notice. I (We) also submit to the jurisdiction of the United States District Court for the Northern District of California with respect to my (our) claim as a Settlement Class Member and for purposes of enforcing the releases set forth herein.  I (We) further acknowledge that I am (we are) bound by and subject to the terms of the Stipulation and any judgment that may be entered in the Action, including the releases and the covenants set forth herein.  I (We) agree to furnish additional information to the Claims Administrator to support this claim if requested to do so.  I (We) have not submitted any other claim covering the same purchases, acquisitions or sales of Alphabet Class A and/or Class C stock during the Settlement Class Period and know of no other Person having done so on my (our) behalf.

**V.   RELEASES**

1.      I (We) hereby acknowledge full and complete satisfaction of, and do hereby fully, finally, and forever waive, compromise, settle, discharge, extinguish and release from the "Released Claims" (as defined below") each and all of the "Released Defendant Parties" (as defined below).

2.      "Released Claims" means any and all claims and causes of action of every nature and description, whether known or unknown, asserted or unasserted, accrued or unaccrued, fixed or contingent, liquidated or unliquidated, whether arising under federal, state, local, common or foreign law, or any other law, rule or regulation, whether class or individual in nature, based on, arising out of, or in connection with both: (i) the purchase or acquisition of Alphabet Class A and/or Class C common stock during the period from April 23, 2018 through April 30, 2019, inclusive, and (ii) the allegations, acts, facts, matters, occurrences, disclosures, filings, representations, statements, or

EX A-2 – PROOF OF CLAIM AND RELEASE
3:18-cv-06245-TLT                                                                                              - 8 -
4853-7970-9595.v3

omissions that were or could have been alleged by Lead Plaintiff and other members of the Settlement Class in the Action. The definition of Released Claims includes, but is not limited to, claims arising out of Alphabet's results in the fourth quarter of 2018 or the first quarter of 2019. Notwithstanding the foregoing, "Released Claims" does not include claims relating to the enforcement of the Settlement.

3. "Released Defendant Parties" means each and all of the Defendants, and each and all of their Related Persons.

4. "Released Defendants' Claims" means all claims and causes of action of every nature and description, including both known claims and Unknown Claims (as defined below), whether arising under federal, state, common or foreign law, or any other law, that Defendants could have asserted against any of the "Released Plaintiff Parties" (as defined below), including Lead Counsel and Settlement Class Members, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims in the Action, except for claims relating to the enforcement of the Settlement.

5. "Released Parties" means the Released Defendant Parties and the Released Plaintiff Parties.

6. "Released Plaintiff Parties" means the Lead Plaintiff, each and every Settlement Class Member, Lead Counsel, and each of their respective past or present trustees, officers, directors, partners, employees, contractors, auditors, principals, agents, attorneys, predecessors, successors, assigns, insurers, parents, subsidiaries, general or limited partners or partnerships, and limited liability companies; and the spouses, members of the immediate families, representatives, and heirs of any Released Plaintiff Party who is an individual, as well as any trust of which any Released Plaintiff Party is the settlor or which is for the benefit of any of their immediate family members. Released Plaintiff Parties does not include any Person who timely and validly seeks exclusion from the Settlement Class.

7.     "Unknown Claims" means any and all Released Claims of every nature and description against the Released Defendant Parties that Lead Plaintiff or any other Settlement Class Member does not know or suspect to exist in his, her, or its favor at the time of the release of the Released Defendant Parties, and any and all Released Defendants' Claims of every nature and description against the Released Plaintiff Parties that any Defendant does not know or suspect to exist in his, her or its favor at the time of the release of the Released Defendants' Claims, and including, without limitation, those that, if known by him, her or it, might have affected his, her or its decision to enter into this Settlement, execute the Stipulation, and agree to all the various releases set forth herein, or might have affected his, her or its decision not to object to this Settlement or not exclude itself, herself or himself from the Settlement Class.  Unknown Claims include, without limitation, those claims in which some or all of the facts composing the claim may be unsuspected, undisclosed, concealed, or hidden.  With respect to any and all Released Claims and Released Defendants' Claims, the Released Parties stipulate and agree that, upon the Effective Date, Lead Plaintiff and Settlement Class Members (as regards the Released Claims) and the Defendants (as regards the Released Defendants' Claims) shall expressly waive and relinquish, and each Settlement Class Member shall be deemed to have and by operation of law and of the Judgment shall have, expressly waived and relinquished, to the fullest extent permitted by law, any and all provisions, rights and benefits conferred by California Civil Code §1542, or any law of any state or territory of the United States, or principle of common law or of international or foreign law, which is similar, comparable, or equivalent to Cal. Civ. Code §1542, which provides:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

The Released Parties may hereafter discover facts in addition to or different from those that he, she, or it now knows or believes to be true with respect to the subject matter of Released Claims or Released Defendants' Claims, but they stipulate and agree that, upon the Effective Date of the Settlement, the Released Parties shall expressly waive and by operation of the Judgment, or Alternative Judgment, if applicable, shall have, fully, finally, and forever settled and released, any

and all Released Claims or Released Defendants' Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, that now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, intentional, with or without malice, or a breach of fiduciary duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts.  The Parties acknowledge, and each of the Settlement Class Members shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

8.     These releases shall be of no force or effect unless and until the Court approves the Stipulation and the Settlement becomes effective on the Effective Date.

9.     I (We) hereby warrant and represent that I (we) have not assigned or transferred or purported to assign or transfer, voluntarily or involuntarily, any claim or matter released pursuant to this release or any other part or portion thereof.

10.    I (We) hereby warrant and represent that I (we) have included information about all of my (our) purchases, acquisitions and sales of Alphabet Class A and/or Class C stock during the Settlement Class Period and the number of Alphabet Class A and/or Class C shares held by me (us) at the close of trading on April 22, 2018, April 30, 2020, and July 26, 2019.

I (We) declare under penalty of perjury under the laws of the United States of America that the foregoing information supplied by the undersigned is true and correct.

Executed this _____ day of _____ in _____

                                                  (Month/Year)                                  (City/State/Country)

_____      _____
(Sign your name here)                                   (Sign your name here)

_____      _____
(Type or print your name here)                     (Type or print your name here)

_____      _____
(Capacity of person(s) signing, *e.g.*,                 (Capacity of person(s) signing, *e.g.*,
Beneficial Purchaser, Executor or Administrator)    Beneficial Purchaser, Executor or Administrator)

### ACCURATE CLAIMS PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.
### THANK YOU FOR YOUR PATIENCE.

Reminder Checklist:

1. Please sign the above release and declaration.
2. If this Claim is being made on behalf of Joint Claimants, then both must sign.
3. Remember to attach copies of supporting documentation, if available.
4. **Do not send originals of certificates.**
5. Keep a copy of your claim form and all supporting documentation for your records.

6. If you desire an acknowledgment of receipt of your claim form please send it Certified Mail, Return Receipt Requested.
7. If you move, please send your new address to the address below.
8. **Do not use red pen or highlighter** on the Proof of Claim and Release form or supporting documentation.

**THIS PROOF OF CLAIM MUST BE SUBMITTED ONLINE OR MAILED NO LATER THAN ____ __, 2024, ADDRESSED AS FOLLOWS:**

*Alphabet Securities Settlement*
Claims Administrator
c/o _____
P.O. Box _____
Los Angeles, CA _____-____
www.AlphabetSecuritiesSettlement.com

EX A-2 – PROOF OF CLAIM AND RELEASE
3:18-cv-06245-TLT
4853-7970-9595.v3

- 12 -

1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  JASON A. FORGE (181542)
   LAURA ANDRACCHIO (187773)
3  MICHAEL ALBERT (301120)
   J. MARCO JANOSKI GRAY (306547)
4  TING H. LIU (307747)
   KENNETH P. DOLITSKY (345400)
5  SARAH A. FALLON (345821)
   655 West Broadway, Suite 1900
6  San Diego, CA  92101
   Telephone:  619/231-1058
7  619/231-7423 (fax)
   jforge@rgrdlaw.com
8  landracchio@rgrdlaw.com
   malbert@rgrdlaw.com
9  mjanoski@rgrdlaw.com
   tliu@rgrdlaw.com
10 kdolitsky@rgrdlaw.com
   sfallon@rgrdlaw.com
11
   Lead Counsel for Plaintiff
12
                  UNITED STATES DISTRICT COURT
13
                 NORTHERN DISTRICT OF CALIFORNIA
14
                    SAN FRANCISCO DIVISION
15

16 In re ALPHABET, INC. SECURITIES    )  Master File No. 3:18-cv-06245-TLT
   LITIGATION                         )
17 ─────────────────────────────────  )  CLASS ACTION
                                      )
18 This Document Relates To:          )  SUMMARY NOTICE OF PROPOSED
                                      )  SETTLEMENT OF CLASS ACTION
      ALL ACTIONS.                    )
19 ─────────────────────────────────  )  EXHIBIT A-3
20

21

22

23

24

25

26

27

28

1

TO:   ALL PERSONS WHO PURCHASED OR ACQUIRED ALPHABET, INC.
      ("ALPHABET") CLASS A AND/OR CLASS C STOCK DURING THE PERIOD
      FROM APRIL 23, 2018, THROUGH APRIL 30, 2019, INCLUSIVE ("SETTLEMENT
      CLASS" OR "SETTLEMENT CLASS MEMBERS")

2

3

4

THIS NOTICE WAS AUTHORIZED BY THE COURT.   IT IS NOT A LAWYER
SOLICITATION. PLEASE READ THIS NOTICE CAREFULLY AND IN ITS ENTIRETY.

5      YOU ARE HEREBY NOTIFIED that a hearing will be held on _____, 2024, at ___:___

6  _.m., before the Honorable Trina L. Thompson at the United States District Court, Northern District

7  of California, Phillip Burton Federal Building & United States Courthouse, Courtroom 9 – 19th

8  Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, to determine whether: (1) the proposed

9  settlement (the "Settlement") of the above-captioned action as set forth in the Stipulation of

10  Settlement ("Stipulation")[1] for $350,000,000 should be approved by the Court as fair, reasonable,

11  and adequate; (2) the Judgment as provided under the Stipulation should be entered dismissing the

12  Action with prejudice; (3) to award Lead Counsel attorneys' fees and expenses out of the Settlement

13  Fund (as defined in the Notice of Pendency and Proposed Settlement of Class Action ("Notice"),

14  which is discussed below) and to award Lead Plaintiff for its time and expenses pursuant to 15

15  U.S.C. §78u-4(a)(4) in connection with its representation of the Settlement Class, and, if so, in what

16  amounts; and (4) the Plan of Allocation should be approved by the Court as fair, reasonable, and

17  adequate.

18      IF YOU PURCHASED OR ACQUIRED ALPHABET CLASS A AND/OR CLASS C

19  STOCK FROM APRIL 23, 2018, THROUGH APRIL 30, 2019, INCLUSIVE, YOUR RIGHTS

20  MAY BE AFFECTED BY THE SETTLEMENT OF THIS ACTION.

21      To share in the distribution of the Settlement Fund, you must establish your rights by

22  submitting a Proof of Claim by mail **(postmarked no later than _____, 2024)** or

23  electronically **(no later than _____, 2024)**.  Your failure to submit your Proof of Claim by

24  _____, 2024, will subject your claim to rejection and preclude you from receiving any of the

25  recovery in connection with the Settlement of this Action.  If you purchased or acquired Alphabet

26  Class A and/or Class C stock from April 23, 2018 through April 30, 2019, inclusive, and do not

27

28
[1]     The Stipulation can be viewed and/or obtained at www.AlphabetSecuritiesSettlement.com.

1    request exclusion from the Settlement Class, you will be bound by the Settlement and any judgment

2    and release entered in the Action, including, but not limited to, the Judgment, whether or not you

3    submit a Proof of Claim.

4         You may review the Notice, which more completely describes the Settlement and your rights

5    thereunder (including your right to object to the Settlement), access the Proof of Claim, and find the

6    Stipulation (which, among other things, contains definitions for the defined terms used in this

7    Summary            Notice)          and          other          Settlement          documents,          online          at

8    www.AlphabetSecuritiesSettlement.com, or by writing to:

9                                    *Alphabet Securities Settlement*
                                     c/o Gilardi & Co. LLC
10                                   P.O. Box _____
                                     _____, ___ _____-____
11

12        Inquiries should NOT be directed to Defendants, the Court, or the Clerk of the Court.

13        Inquiries, other than requests for the Notice or for a Proof of Claim, may be made to Lead

14   Counsel:

15                       ROBBINS GELLER RUDMAN & DOWD LLP
                                 Ellen Gusikoff Stewart
16                             655 West Broadway, Suite 1900
                                  San Diego, CA 92101
17                             Telephone: 800/449-4900
                               settlementinfo@rgrdlaw.com

18        IF YOU DESIRE TO BE EXCLUDED FROM THE SETTLEMENT CLASS, YOU MUST

19   SUBMIT A REQUEST FOR EXCLUSION SUCH THAT IT IS **POSTMARKED BY _____,**

20   **2024**, IN THE MANNER AND FORM EXPLAINED IN THE NOTICE.  ALL SETTLEMENT

21   CLASS MEMBERS WILL BE BOUND BY THE SETTLEMENT EVEN IF THEY DO NOT

22   SUBMIT A TIMELY PROOF OF CLAIM.

23        IF YOU ARE A SETTLEMENT CLASS MEMBER, YOU HAVE THE RIGHT TO

24   OBJECT TO THE SETTLEMENT, THE PLAN OF ALLOCATION, THE REQUEST BY LEAD

25   COUNSEL FOR AN AWARD OF ATTORNEYS' FEES NOT TO EXCEED 19% OF THE

26   SETTLEMENT AMOUNT AND EXPENSES NOT TO EXCEED $1,750,000 AND AN AWARD

27   TO LEAD PLAINTIFF NOT TO EXCEED $10,000 IN CONNECTION WITH ITS

28   REPRESENTATION OF THE SETTLEMENT CLASS.  ANY OBJECTIONS MUST BE FILED

WITH THE COURT **BY _____, 2024**, IN THE MANNER AND FORM EXPLAINED IN

THE NOTICE.

DATED: _____          BY ORDER OF THE COURT
                                     UNITED STATES DISTRICT COURT
                                     NORTHERN DISTRICT OF CALIFORNIA

# Exhibit 3

ROBBINS GELLER RUDMAN
   & DOWD LLP
JASON A. FORGE (181542)
LAURA ANDRACCHIO (187773)
MICHAEL ALBERT (301120)
J. MARCO JANOSKI GRAY (306547)
TING H. LIU (307747)
KENNETH P. DOLITSKY (345400)
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
landracchio@rgrdlaw.com
malbert@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
kdolitsky@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | Master File No. 3:18-cv-06245-TLT |
| | CLASS ACTION |
| This Document Relates To: | STIPULATION OF SETTLEMENT |
| ALL ACTIONS. | |

This Stipulation of Settlement (the "Stipulation") is made and entered into by and between Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island" or "Lead Plaintiff"), on behalf of itself and the proposed Settlement Class (defined below), on the one hand, by and through its counsel of record in the Action (as defined herein), and Defendants Alphabet, Inc. ("Alphabet" or the "Company"), Google LLC, Lawrence E. Page, Sundar Pichai, Keith P. Enright, and John Kent Walker, Jr. (collectively, "Defendants" and together with Lead Plaintiff, the "Parties" or the "Settling Parties") on the other hand, by and through their counsel of record in the Action.

All words or terms used herein that are capitalized shall have the meanings ascribed to those words or terms as set forth herein and in ¶1 hereof entitled "Definitions."

I.      THE LITIGATION

On October 11, 2018, an initial complaint in the Action was filed in the United States District Court for the Northern District of California and a substantially similar complaint was filed in the United States District Court for the Eastern District of New York. *See* ECF 1; *Khaled El Mawardy v. Alphabet, Inc., et al.*, No. 1:18-cv-05704 (E.D.N.Y.). On November 7, 2018, the *El Mawardy* case was transferred to this District. ECF 14 at 5.

On January 25, 2019, Judge Jeffrey S. White consolidated the two related cases, appointed Rhode Island as Lead Plaintiff and approved Rhode Island's selection of Robbins Geller Rudman & Dowd LLP as Lead Counsel. ECF 44.

On April 26, 2019, Lead Plaintiff filed the Consolidated Amended Complaint for Violation of the Federal Securities Laws, alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against Defendants (the "Complaint"). ECF 62. Defendants moved to dismiss the Complaint on May 31, 2019. ECF 71. On February 5, 2020, Judge White granted Defendants' motion to dismiss the Complaint with leave to amend (the "Order"). ECF 82. Lead Plaintiff did not amend the Complaint, and on March 13, 2020, the Court entered judgment in Defendants' favor. ECF 84.

On April 9, 2020, Lead Plaintiff filed a notice of appeal of Judge White's Order and entry of judgment to the United States Court of Appeals for the Ninth Circuit (the "Appeal"). ECF 85. The

Appeal was fully briefed on October 12, 2020 and oral argument was heard on February 4, 2021. *See In re State of Rhode Island v. Alphabet, Inc., et al.*, No. 20-15638 (9th Cir.). On June 16, 2021, the Ninth Circuit affirmed in part and reversed in part Judge White's motion to dismiss order, vacated the judgment, and remanded for further proceedings. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 702 (9th Cir. 2021). On March 7, 2022, the United States Supreme Court denied Defendants' petition for *writ of certiorari*. *Alphabet, Inc., et al. v. Rhode Island*, 142 S. Ct. 1227, 212 L. Ed. 2d 233 (2022).

On June 21, 2022, in the backdrop of contentious discovery disputes and disagreements between the Parties regarding the scope of the Action, Rhode Island moved for class certification. ECF 103. Shortly thereafter, the Parties engaged the services of the Hon. Layn R. Phillips (Ret.), a nationally recognized mediator, to facilitate settlement negotiations. On August 5, 2022, the Parties engaged in an in-person mediation session. The mediation session was preceded by submission of mediation statements and exhibits by each party. The Parties engaged in arm's-length negotiations during the mediation session, but did not reach an agreement at that mediation.

On August 22, 2022, Defendants filed their opposition to Rhode Island's motion for class certification, which argued, *inter alia*, that Rhode Island's damages theory improperly relied on allegations regarding a share price decline on April 30, 2019 that post-dated the Complaint and was not within its scope. ECF 130. On August 29, 2022, the Court ordered briefing regarding the scope of the Action on remand. ECF 134. On September 8, 2022, Rhode Island sought leave to supplement the Complaint pursuant to Fed. R. Civ. P. 15(d). ECF 136. Following months of extensive briefing in connection with Rhode Island's motion to certify (ECF 130-131, 145, 148-149), motion to supplement (ECF 136, 138-139, 141-143), and the parties' scope disputes (ECF 128-129, 137, 140, 144), Judge White entered an order on February 28, 2023 striking the motion for class certification and allowing Rhode Island to supplement the Complaint to include the April 2019 allegations in the Action. ECF 153. On February 28, 2023, Rhode Island filed the Supplement to the Consolidated Amended Complaint for Violations of the Federal Securities Laws and on March 14, 2023, Defendants filed their Answer to the Supplement. ECF 154-155.

Rhode Island filed its renewed motion for class certification on May 2, 2023.  ECF 165. Rhode Island's renewed motion for class certification gave rise to extensive and wide-ranging briefing, four expert reports, an attempted *amicus curiae* submission (and disputes related thereto) and the deposition of one of Rhode Island's experts.  On July 25, 2023, this Action was reassigned to the Honorable Trina L. Thompson, following Judge White's recusal.  ECF 188-189.

The Parties continued their settlement discussion through the Mediator following their initial mediation session, without success.  On October 20, 2023, the Parties accepted the Mediator's proposal to resolve the Action.  The agreement included, among other things, the Settling Parties' agreement to settle and release all claims that were asserted or could have been asserted in the Action in return for a cash payment of $350,000,000.00 to be paid by Alphabet on behalf of Defendants, for the benefit of the Settlement Class, subject to the negotiation of the terms of a Stipulation of Settlement and approval by the Court.  This Stipulation (together with the Exhibits hereto) reflects the final and binding agreement between the Settling Parties.

## II.    LEAD PLAINTIFF'S CLAIMS AND BENEFITS OF SETTLEMENT

Lead Plaintiff believes that the claims asserted in the Action have merit and that the evidence developed to date supports the claims asserted.  However, Lead Plaintiff and Lead Counsel recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Action through discovery, summary judgment, and trial (and any possible appeals).  Lead Plaintiff and Lead Counsel also have taken into account the uncertain outcome and the risk of any litigation, especially in complex actions such as the Action, as well as the difficulties and delays inherent in such litigation, which are magnified under the unusual circumstances of this Action. Lead Counsel is mindful of the inherent problems of proof and the possible defenses to the claims alleged in the Action, including arguments that there are no provable damages here under conventional approaches (though Lead Plaintiff disagrees with such arguments, they are consistent with the assessments of multiple other plaintiffs' firms and experts).  Based on their evaluation, Lead Plaintiff and Lead Counsel believe that the Settlement set forth in this Stipulation confers substantial monetary benefits upon the Settlement Class and is in the best interests of the Settlement Class.

## III.     DEFENDANTS' DENIALS OF LIABILITY

Defendants deny each and all of the claims, contentions, and allegations made by Lead Plaintiff in the Action.  They have expressly denied and continue to deny that they have violated the federal securities laws or any other laws, or have otherwise misled investors as alleged in the Action. Defendants have denied and continue to deny the allegations that any of the Defendants made any material misstatements or omissions or engaged in any fraudulent scheme, and that any member of the Settlement Class has suffered damages resulting from the conduct alleged in the Action.  In addition, Defendants maintain that they have meritorious defenses to the claims alleged in the Action.

Nonetheless, Defendants have concluded that further litigation could be protracted, burdensome, expensive, and distracting.  Defendants also have taken into account the uncertainty, risks, and costs inherent in any litigation, especially in complex cases such as this Action. Defendants have, therefore, determined that it is desirable and beneficial to them that the Action be fully, finally, and forever resolved, discharged, and settled in the manner and upon the terms and conditions set forth in this Stipulation.

## IV.     TERMS OF THE STIPULATION AND AGREEMENT OF SETTLEMENT

NOW THEREFORE, without any concession by Lead Plaintiff that the Action lacks merit, and without any concession by Defendants of any liability or wrongdoing or truth as to the allegations of Lead Plaintiff or lack of merit in Defendants' defenses, it is hereby **STIPULATED AND AGREED**, by and among the Parties to this Stipulation, through their respective attorneys, subject to approval by the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, that, in consideration of the benefits flowing to the Parties hereto, all Released Claims (including Unknown Claims) and all Released Defendants' Claims (including Unknown Claims), as against all Released Parties, shall be fully, finally, and forever compromised, settled, released, discharged, and dismissed with prejudice, and without costs (except as provided in the Stipulation), upon and subject to the following terms and conditions:

### 1.     Definitions

As used in this Stipulation, the following terms shall have the meanings set forth below.

1.1 "Action" means the civil action captioned *In re Alphabet, Inc. Securities Litigation*, No. 3:18-cv-06245-TLT (N.D. Cal.), pending in the United States District Court for the Northern District of California before the Honorable Trina L. Thompson.

1.2 "Authorized Claimant" means a Class Member whose claim for recovery from the Settlement has been allowed pursuant to the terms of the Stipulation.

1.3 "Claimant" means a person or entity who or which submits a Proof of Claim to the Claims Administrator seeking to be eligible to share in the Net Settlement Fund.

1.4 "Claims Administrator" means the administrator retained by Lead Counsel, subject to the approval of the Court, to provide all notices approved by the Court to potential Settlement Class Members and to administer the Settlement. Defendants shall have no involvement in the retention of the Claims Administrator or any other claims administrator.

1.5 "Defendants" means Alphabet, Google LLC, Lawrence E. Page, Sundar Pichai, Keith P. Enright, and John Kent Walker, Jr.

1.6 "Defendants' Counsel" means Freshfields Bruckhaus Deringer US LLP, Swanson & McNamara LLP, and Wilson Sonsini Goodrich & Rosati, P.C.

1.7 "Effective Date" means the date upon which the Settlement shall have become effective, as set forth in ¶7.1, below.

1.8 "Escrow Account" means the separate escrow account designated and controlled by Lead Counsel into which the Settlement Amount will be deposited for the benefit of the Settlement Class.

1.9 "Escrow Agent" means Robbins Geller Rudman & Dowd LLP and its successor(s).

1.10 "Fee and Expense Application" means Lead Counsel's application for an award of attorneys' fees and Litigation Expenses.

1.11    "Final" means, with respect to any order of the Court, including, without limitation, the Judgment, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise.  Without limitation, an order becomes "Final" when: (i) no appeal has been filed and the prescribed time for commencing any appeal has expired; or (ii) an appeal has been filed and either (a) the appeal has been dismissed and the prescribed time, if any, for commencing any further appeal has expired, or (b) the order has been affirmed in all material respects and the prescribed time, if any, for commencing any further appeal has expired.  For purposes of this definition of "Final," an "appeal" includes any motion to alter or amend under Rule 52(b) or Rule 59(e) of the Federal Rules of Civil Procedure, any appeal as of right, discretionary appeal, interlocutory appeal, petition for writ of certiorari, or other proceeding involving writs of certiorari or mandamus, and any other proceedings of like kind.  However, any appeal or proceeding seeking subsequent judicial review pertaining solely to the Plan of Allocation, or to the Court's award of attorneys' fees or expenses, shall not in any way delay or affect the time set forth above for the Judgment to become Final or otherwise preclude the Judgment from becoming Final.

1.12    "Individual Defendants" means Lawrence E. Page, Sundar Pichai, Keith P. Enright, and John Kent Walker, Jr.

1.13    "Judgment" means the proposed judgment to be entered by the Court approving the Settlement, substantially in the form incorporated herein as Exhibit B.

1.14    "Lead Counsel" means Robbins Geller Rudman & Dowd LLP.

1.15    "Lead Plaintiff" means State of Rhode Island, Office of the Rhode Island Treasurer on Behalf of the Employees' Retirement System of Rhode Island.

1.16    "Litigation Expenses" means the costs and expenses incurred in connection with commencing, prosecuting, and settling the Action for which the Lead Counsel intends to apply to the Court for reimbursement from the Settlement Fund.

1.17    "Mediator" means the Honorable Layn R. Phillips (Ret.).

1.18    "Net Settlement Fund" means the Settlement Fund less: (i) Court-awarded attorneys' fees and expenses; (ii) Notice and Administration Expenses; (iii) Taxes and Tax Expenses; (iv) any Litigation Expenses awarded by the Court; and (v) any other fees or expenses approved by the Court.

1.19    "Notice" means the Notice of Pendency and Proposed Settlement of Class Action, which shall be substantially in the form incorporated herein as Exhibit A-1.

1.20    "Person(s)" means any individual, corporation (including all divisions and subsidiaries), general or limited partnership, limited liability partnership, domestic partnership, marital community, association, joint stock company, joint venture, or joint venturer, limited liability company, professional corporation, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any other business or legal entity.

1.21    "Plan of Allocation" means the plan for allocating the Net Settlement Fund as set forth in the Notice, or such other plan of allocation as the Court may approve.

1.22    "Preliminary Approval Order" means the proposed Order Preliminarily Approving Settlement and Providing for Notice, which shall be substantially in the form incorporated herein as Exhibit A.

1.23    "Proof of Claim" means the form, which shall be substantially in the form incorporated herein as Exhibit A-2, which a Claimant must complete and submit to the Claims Administrator in order to be eligible to share in a distribution of the Net Settlement Fund, provided, however, that such form has received the approval of the Court.

1.24    "Related Persons" means each and all of a Defendant's present and former subsidiaries, divisions, controlling persons, associates, entities, and affiliates, and each of all of their respective present and former employees, members, partners, principals, officers, directors, controlling shareholders, agents, attorneys, advisors (including financial or investment advisors), accountants, auditors, consultants, underwriters, investment bankers, commercial bankers, entities providing fairness opinions, general or limited partners or partnerships, limited liability companies, members, joint ventures, and insurers and reinsurers of each of them; as well as the predecessors, successors, assigns, immediate family members, spouses, heirs, executors, trusts, trustees, administrators, agents, legal or personal representatives, assigns, and assignees of each of them, in their capacity as such.

1.25    "Released Claims" means any and all claims and causes of action of every nature and description, whether known or unknown, asserted or unasserted, accrued or unaccrued, fixed or contingent, liquidated or unliquidated, whether arising under federal, state, local, common or foreign law, or any other law, rule or regulation, whether class or individual in nature, based on, arising out of, or in connection with both: (i) the purchase or acquisition of Alphabet Class A and/or Class C common stock during the period from April 23, 2018 through April 30, 2019, inclusive, and (ii) the allegations, acts, facts, matters, occurrences, disclosures, filings, representations, statements, or omissions that were or could have been alleged by Lead Plaintiff and other members of the Settlement Class in the Action.  The definition of Released Claims includes, but is not limited to, claims arising out of Alphabet's results in the fourth quarter of 2018 or the first quarter of 2019.  Notwithstanding the foregoing, "Released Claims" does not include claims relating to the enforcement of the Settlement.

1.26    "Released Defendant Parties" means each and all of the Defendants and each and all of their Related Persons.

1.27   "Released Defendants' Claims" means any and all claims and causes of action of every nature and description, including both known claims and Unknown Claims (as defined below), whether arising under federal, state, common or foreign law, or any other law, that Defendants could have asserted against any of the Released Plaintiff Parties (as defined below), including Lead Counsel and Settlement Class Members, that arise out of or relate in any way to the institution, prosecution, or settlement of the claims in the Action, except for claims relating to the enforcement of the Settlement.

1.28   "Released Parties" means the Released Defendant Parties and the Released Plaintiff Parties.

1.29   "Released Plaintiff Parties" means the Lead Plaintiff, each and every Settlement Class Member, Lead Counsel, and each of their respective past or present trustees, officers, directors, partners, employees, contractors, auditors, principals, agents, attorneys, predecessors, successors, assigns, insurers, parents, subsidiaries, general or limited partners or partnerships, and limited liability companies; and the spouses, members of the immediate families, representatives, and heirs of any Released Plaintiff Party who is an individual, as well as any trust of which any Released Plaintiff Party is the settlor or which is for the benefit of any of their immediate family members. Released Plaintiff Parties does not include any Person who timely and validly seeks exclusion from the Settlement Class.

1.30   "Settlement" means the resolution of the Action in accordance with the terms and provisions of the Stipulation.

1.31   "Settlement Amount" means Three Hundred Fifty Million U.S. Dollars ($350,000,000.00).

1.32   "Settlement Class" or "Settlement Class Member" means all Persons that purchased or otherwise acquired Alphabet Class A and/or Class C stock during the period from April 23, 2018,

through April 30, 2019, inclusive.  Excluded from the Settlement Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.  Also excluded from the Settlement Class is any Person who timely and validly seeks exclusion from the Settlement Class.

1.33    "Settlement Class Period" means the period from April 23, 2018, through April 30, 2019, inclusive.

1.34    "Settlement Fund" means the Settlement Amount and any interest earned thereon.

1.35    "Settlement Hearing" means the hearing to be held by the Court to determine whether (i) the Settlement is fair, reasonable, and adequate and should be approved; (ii) the Plan of Allocation is fair, reasonable, and adequate and should be approved; and (iii) Lead Counsel's request for an award of attorneys' fees and expenses and an award to Lead Plaintiff should be approved.

1.36    "Settlement Website" means the website developed for the Settlement, from which copies of the Notice and Proof of Claim can be downloaded.

1.37    "Settling Parties" or "Parties" means Lead Plaintiff, on behalf of itself and the Settlement Class, and Defendants.

1.38    "Stipulation" means this Stipulation of Settlement.

1.39    "Summary Notice" means the Summary Notice for publication, which shall be substantially in the form incorporated herein as Exhibit A-3.

1.40    "Tax Expenses" means expenses and costs incurred in connection with the calculation and payment of taxes or the preparation of tax returns and related documents, including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs relating to filing the returns described in ¶2.9.

1.41 "Taxes" means all taxes (including any estimated taxes, interest or penalties) arising with respect to the income earned by the Settlement Fund as described in ¶2.9.

1.42 "Unknown Claims" means any and all Released Claims of every nature and description against the Released Defendant Parties that Lead Plaintiff or any other Settlement Class Member does not know or suspect to exist in his, her, or its favor at the time of the release of the Released Defendant Parties, and any and all Released Defendants' Claims of every nature and description against the Released Plaintiff Parties that any Defendant does not know or suspect to exist in his, her or its favor at the time of the release of the Released Defendants' Claims, and including, without limitation, those that, if known by him, her or it, might have affected his, her or its decision to enter into this Settlement, execute this Stipulation, and agree to all the various releases set forth herein, or might have affected his, her or its decision not to object to this Settlement or not exclude itself, herself or himself from the Settlement Class. Unknown Claims include, without limitation, those claims in which some or all of the facts composing the claim may be unsuspected, undisclosed, concealed, or hidden. With respect to any and all Released Claims and Released Defendants' Claims, the Released Parties stipulate and agree that, upon the Effective Date, Lead Plaintiff and Settlement Class Members (as regards the Released Claims) and the Defendants (as regards the Released Defendants' Claims) shall expressly waive and relinquish, and each Settlement Class Member shall be deemed to have and by operation of law and of the Judgment shall have, expressly waived and relinquished, to the fullest extent permitted by law, any and all provisions, rights and benefits conferred by California Civil Code §1542, or any law of any state or territory of the United States, or principle of common law or of international or foreign law, which is similar, comparable, or equivalent to Cal. Civ. Code §1542, which provides:

> **A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.**

The Released Parties may hereafter discover facts in addition to or different from those that he, she, or it now knows or believes to be true with respect to the subject matter of Released Claims or Released Defendants' Claims, but they stipulate and agree that, upon the Effective Date of the Settlement, the Released Parties shall expressly waive and by operation of the Judgment, or Alternative Judgment, if applicable, shall have, fully, finally, and forever settled and released, any and all Released Claims or Released Defendants' Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, that now exist, or heretofore have existed, upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct that is negligent, intentional, with or without malice, or a breach of fiduciary duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Parties acknowledge, and each of the Settlement Class Members shall be deemed by operation of law to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the Settlement.

## 2.    The Settlement

### a.    The Settlement Fund

2.1     In full settlement of the Released Claims, Defendants caused the Settlement Amount to be transferred to an account controlled by the Escrow Agent on January 4, 2024 (the "Payment Date"). The Settlement Amount, together with any interest and income earned thereon once transferred, shall constitute the Settlement Fund.

2.2     If the entire Settlement Amount is not deposited into the Escrow Account by the Payment Date, Lead Plaintiff may terminate the Settlement but only if: (i) Lead Counsel has provided all necessary Payee Information to Defendants; (ii) Defendants have received from Lead Counsel written notice of Lead Plaintiff's intention to terminate the Settlement; and (iii) the entire Settlement Amount is not transferred to the Escrow Account within three (3) business days after Lead Counsel has provided such written notice.

2.3     Alphabet shall be responsible for the provision of notice pursuant to the Class Action Fairness Act, 28 U.S.C. §1715 ("CAFA"), and shall bear all costs and expenses of providing such notice.

**b.     The Escrow Agent**

2.4     The Escrow Agent shall invest the Settlement Fund deposited pursuant to ¶2.1 hereof in instruments backed by the full faith and credit of the United States Government or an agency thereof, or in money funds holding only instruments backed by the full faith and credit of the United States Government or fully insured by the United States government or an agency thereof, and shall reinvest the proceeds of these instruments as they mature in similar instruments at their then-current market rates.  All costs and risks related to the investment of the Settlement Fund in accordance with the guidelines set forth in this paragraph shall be borne by the Settlement Fund.

2.5     The Escrow Agent shall not disburse the Settlement Fund except: (a) as provided in the Stipulation; (b) by an order of the Court; or (c) with the written agreement of counsel for the Parties.

2.6     Subject to further order(s) and/or directions as may be made by the Court, or as provided in the Stipulation, the Escrow Agent is authorized to execute such transactions as are provided for under the terms of the Stipulation.  The Released Parties shall have no responsibility for, interest in, or liability whatsoever with respect to, the actions of the Escrow Agent, or any transaction executed by the Escrow Agent (unless acting as the Escrow Agent).

2.7     All funds held by the Escrow Agent shall be deemed and considered to be in *custodia legis* of the Court, and shall remain subject to the jurisdiction of the Court, until such time as such funds shall be distributed pursuant to the Stipulation and/or further order(s) of the Court.

2.8     Notwithstanding that the Effective Date has not occurred, Lead Counsel may expend up to $1,000,000 from the Settlement Fund for the reasonable costs and expenses actually incurred in

connection with providing notice to the Settlement Class, locating Settlement Class Members, soliciting claims, assisting with the submission of claims, processing Proofs of Claim, administering and preparing for distributing the Net Settlement Fund to Authorized Claimants, and paying escrow fees and costs, if any ("Notice and Administration Expenses").  Following the Effective Date, Lead Counsel may pay all of the costs actually and reasonably incurred in connection with the administration of the Settlement without approval of Defendants or further order of the Court.

###### c.     Taxes

2.9     (a)     The Parties agree to treat the Settlement Fund as being at all times a "Qualified Settlement Fund" within the meaning of Treasury Regulation §1.468B-1.  In addition, the Escrow Agent shall timely make such elections as necessary or advisable to carry out the provisions of this ¶2.9, including the "relation-back election" (as defined in Treasury Regulation §1.468B-1) back to the earliest permitted date.  Such elections shall be made in compliance with the procedures and requirements contained in such regulations.  It shall be the responsibility of the Escrow Agent to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

(b)     For the purpose of §468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the "administrator" shall be the Escrow Agent.  The Escrow Agent shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund (including, without limitation, the returns described in Treasury Regulation §1.468B-2(k)).  Such returns (as well as the election described in ¶2.9(a) hereof) shall be consistent with this ¶2.9 and in all events shall reflect that all Taxes (including any estimated Taxes, interest, or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided in ¶2.9(c) hereof.

(c)     All (a) Taxes (including any estimated Taxes, interest, or penalties) arising with respect to the income earned by the Settlement Fund, including any Taxes or tax detriments that may be imposed upon the Released Defendant Parties or their counsel with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "Qualified Settlement Fund" for federal or state income tax purposes, and (b) Tax Expenses, including expenses and costs incurred in connection with the operation and implementation of this ¶2.9 (including, without limitation, expenses of tax attorneys and/or accountants and mailing and distribution costs and expenses relating to filing (or failing to file) the returns described in this ¶2.9), shall be paid out of the Settlement Fund; in all events the Released Defendant Parties and their counsel shall have no liability or responsibility for the Taxes or the Tax Expenses.  Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund and shall be timely paid by the Escrow Agent out of the Settlement Fund without prior order from the Court, and the Escrow Agent shall be obligated (notwithstanding anything herein to the contrary) to withhold from distribution to Authorized Claimants any funds necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that may be required to be withheld under Treasury Regulation §1.468B-2(I)(2)); neither the Released Defendant Parties nor their counsel are responsible nor shall they have any liability therefor.  The Settling Parties hereto agree to cooperate with the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this ¶2.9.

### d.     Termination of Settlement

2.10     In the event the Settlement is not approved or is terminated, canceled, or fails to become effective for any reason, including, without limitation, in the event the Stipulation is not approved or Judgment is reversed or vacated following any appeal taken therefrom, the Settlement Fund (including accrued interest), less expenses actually incurred or due and owing for Notice and

STIPULATION OF SETTLEMENT
3:18-cv-06245-TLT
4894-7457-5249.v3

- 15 -

Administration Expenses, Taxes or Tax Expenses pursuant to ¶¶2.8 or 2.9, shall be refunded pursuant to ¶¶6.2 and 7.4 and written instructions from Defendants' Counsel to any party, parties or insurers that paid the Settlement Amount within twenty-one (21) calendar days from the date of the notice from Defendants' Counsel pursuant to ¶7.4.  In the event that the Settlement is not approved, is otherwise validly terminated or canceled, or is reversed on appeal, then the Parties agree to tack on to the applicable statute of limitations and statute of repose that amount of time that has elapsed between acceptance of the Mediator's recommendation and the Court's order disapproving the Settlement.  The purpose of this provision is to preserve the status quo between the Parties as of the time of the potential acceptance of the Mediator's recommendation, without benefitting or favoring one side or the other.

### 3.    Preliminary Approval Order and Settlement Hearing

3.1    Not later than February 5, 2024, Lead Counsel shall submit the Stipulation together with its exhibits (the "Exhibits") to the Court and shall apply for entry of an order (the "Preliminary Approval Order"), requesting, *inter alia*, the preliminary approval of the Settlement set forth in the Stipulation, certification of the Settlement Class for settlement purposes only and appointment of Lead Counsel as counsel for the Settlement Class, and approval for the dissemination of the Notice and Proof of Claim and publication of the Summary Notice, in the forms of Exhibits A-1 through A-3, respectively, attached hereto.  The Notice shall contain the general terms of the Settlement set forth in the Stipulation, the proposed Plan of Allocation, the general terms of the Fee and Expense Application, and the date of the Settlement Hearing.

3.2    At the same time that Lead Counsel applies for entry of the Preliminary Approval Order, Lead Counsel shall request that the Court vacate all deadlines in the Action except for proceedings related to the Settlement.

3.3    Lead Counsel shall request that, after notice is given to the Settlement Class, the Court hold the Settlement Hearing and approve the Settlement of the Action as set forth herein.  At

or after the Settlement Hearing, Lead Counsel also shall request that the Court approve the proposed Plan of Allocation and the Fee and Expense Application.

**4.     Releases**

4.1     Upon the Effective Date, Lead Plaintiff and each of the Settlement Class Members (who have not validly opted out of the Settlement Class), on behalf of themselves, and their respective former and present officers, directors, employees, agents, affiliates, parents, subsidiaries, insurers, reinsurers, heirs, executors, administrators, predecessors, successors, and assigns in their capacities as such, shall be deemed to have, and by operation of law and of the Judgment shall have, fully, finally, and forever released, relinquished, waived, and discharged against the Released Defendant Parties (whether or not such Settlement Class Members execute and deliver the Proof of Claim) any and all Released Claims (including, without limitation, Unknown Claims).

4.2     Upon the Effective Date, Lead Plaintiff and each of the Settlement Class Members (who have not validly opted out of the Settlement Class), on behalf of themselves, and their respective former and present officers, directors, employees, agents, affiliates, parents, subsidiaries, insurers, reinsurers, heirs, executors, administrators, predecessors, successors, and assigns in their capacities as such, shall be permanently barred and enjoined from the institution, maintenance, prosecution, or enforcement against any Released Defendant Party, in any state or federal court or arbitral forum, or in the court of any foreign jurisdiction, of any and all Released Claims (including, without limitation, Unknown Claims).  The Court shall retain exclusive jurisdiction to interpret and enforce the permanent injunction described in this paragraph.

4.3     The Proof of Claim to be executed by Settlement Class Members shall release all Released Claims against the Released Defendant Parties and shall be substantially in the form contained in Exhibit A-2 incorporated herein; provided, however, that the failure of a Settlement Class Member to submit such Proof of Claim shall have no effect on the provisions of the foregoing

¶¶4.1 and 4.2, inclusive, which shall remain in full force and effect as to each of the Settlement Class Members (who have not validly opted out of the Settlement Class) irrespective of any lack of submission of a Proof of Claim.

4.4    Upon the Effective Date, each of the Released Defendant Parties, on behalf of themselves, and their respective former and present officers, directors, employees, agents, affiliates, parents, subsidiaries, insurers, reinsurers, heirs, executors, administrators, predecessors, successors, and assigns in their capacities as such, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged the Released Plaintiff Parties, including Lead Counsel, from all Released Defendants' Claims (including, without limitation, Unknown Claims).

**5.    Administration and Calculation of Claims, Final Awards, and Supervision and Distribution of the Settlement Fund**

5.1    The Claims Administrator, subject to such supervision and direction of the Court as may be necessary or as circumstances may require, shall provide notice of the Settlement to the Settlement Class, shall administer and calculate the claims submitted by Settlement Class Members, and shall oversee distribution of the Net Settlement Fund to Authorized Claimants.

5.2    Within a reasonable time after the Court enters the Preliminary Approval Order, Alphabet shall provide Lead Counsel or the Claims Administrator, without any charge to Lead Plaintiff or the Settlement Class, record shareholder lists, as appropriate for providing notice to the Settlement Class.  The Parties shall determine an appropriate electronic format for provision of this information.

5.3    In accordance with the schedule set forth in the Preliminary Approval Order, Lead Counsel will cause the Summary Notice, substantially in the form of Exhibit A-3 incorporated herein, to be emailed or mailed where email addresses are not available, by the Claims Administrator to all shareholders of record, or nominees.  The Notice and Proof of Claim, substantially in the forms

STIPULATION OF SETTLEMENT
3:18-cv-06245-TLT
4894-7457-5249.v3

- 18 -

of Exhibits A-1 and A-2 incorporated herein, shall also be posted on the Settlement Website.  In

accordance with the schedule set forth in the Preliminary Approval Order, the Summary Notice will

also be published once in the national edition of *The Wall Street Journal* and once over a national

newswire service.  The cost of providing such notice shall be paid out of the Settlement Fund.

5.4     Not later than seven (7) calendar days prior to the Settlement Hearing, Lead Counsel

shall serve on Defendants' Counsel and file with the Court proof, by affidavit or declaration, of such

emailing, mailing and publication.

5.5     The Settlement Fund shall be applied as follows:

(a)     to pay all Notice and Administration Expenses;

(b)     to pay all Taxes and Tax Expenses described in ¶2.9 hereof;

(c)     to pay Lead Counsel's attorneys' fees and expenses and any award to Lead

Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4) (the "Fee and Expense Award"), if and to the extent

allowed by the Court;

(d)     after the Effective Date, to distribute the Net Settlement Fund to Authorized

Claimants as allowed by the Stipulation, the Plan of Allocation, or the Court; and

(e)     Upon the Effective Date and thereafter, and in accordance with the terms of

the Stipulation, the Plan of Allocation, or such further approval and further order(s) of the Court as

may be necessary or as circumstances may require, the Net Settlement Fund shall be distributed to

Authorized Claimants, subject to and in accordance with ¶¶5.6-5.9 below.

5.6     Each Person claiming to be an Authorized Claimant shall be required to submit to the

Claims Administrator a completed Proof of Claim, substantially in the form of Exhibit A-2

incorporated herein, postmarked by no later than ninety (90) calendar days after the Notice Date (as

defined in the Preliminary Order), or such other time as may be set by the Court (the "Bar Date"),

signed under penalty of perjury and supported by such documents as are specified in the Proof of Claim and as are reasonably available to such Person.

5.7     Except as otherwise ordered by the Court, all Settlement Class Members who fail to submit a Proof of Claim by the Bar Date, or such other period as may be ordered by the Court, or who submit a Proof of Claim that is rejected, shall be forever barred from receiving any payments pursuant to the Stipulation and the Settlement set forth herein, but will in all other respects be subject to and bound by the provisions of the Stipulation, the releases contained herein, and the Judgment. Notwithstanding the foregoing, Lead Counsel shall have the discretion (but not the obligation) to accept late-submitted claims for processing so long as the distribution of the Net Settlement Fund to Authorized Claimants is not materially delayed thereby.

5.8     If any Claimant whose Proof of Claim has been rejected in whole or in part desires to contest such rejection, the Claimant must, within twenty (20) days after the date of mailing of the notice required in ¶5.3 above, serve upon the Claims Administrator a notice and statement of reasons indicating the Claimant's grounds for contesting the rejection along with any supporting documentation, and requesting a review thereof by the Court.  Failure to timely serve this notice, statement, and documentation shall be deemed a waiver of the ability to further contest any such rejection.  If a non-waived dispute concerning a contested rejected Proof of Claim cannot be otherwise resolved, Lead Counsel shall thereafter present the contested rejection to the Court for a determination as to whether the Claims Administrator's rejection was clearly erroneous.

5.9     The Claims Administrator shall calculate the claims of Authorized Claimants in accordance with the Plan of Allocation set forth in the Notice and approved by the Court.  Following the Effective Date, the Claims Administrator shall send to each Authorized Claimant his, her, or its *pro rata* share of the Net Settlement Fund, as long as the Authorized Claimant will receive at least $10.00.

5.10    Defendants shall not have a reversionary interest in the Net Settlement Fund.  If there is any balance remaining in the Net Settlement Fund after a reasonable amount of time following the date of the initial distribution of the Net Settlement Fund, Lead Counsel shall, if feasible, reallocate such balance among Authorized Claimants who negotiated the checks sent to them in the initial distribution and who would receive at least $10.00 in an equitable and economical fashion.  These reallocations shall be repeated until the balance remaining in the Net Settlement Fund is *de minimis* and such remaining balance shall then be donated to the Investor Protection Trust.

5.11    The Released Defendant Parties shall have no responsibility for, interest in, or liability whatsoever with respect to the processing, review, determination or calculation of any claims, the distribution of the Net Settlement Fund, the Plan of Allocation, the payment or withholding of Taxes, or any losses incurred in connection therewith.

5.12    Defendants shall take no position with respect to the Plan of Allocation or any other such plan as may be approved by the Court.

5.13    It is understood and agreed by the Settling Parties that any proposed Plan of Allocation of the Net Settlement Fund, including, but not limited to, any adjustments to an Authorized Claimant's claim set forth therein, is not a part of the Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement set forth in the Stipulation, and any order or proceeding relating to the Plan of Allocation shall not operate to terminate or cancel the Stipulation or affect the finality of the Court's Judgment approving the Stipulation and the Settlement set forth therein, or any other orders entered pursuant to the Stipulation.  Settlement Class Members and Defendants shall be bound by the terms of this Stipulation, irrespective of whether the Court disapproves or modifies the Plan of Allocation.

5.14    No Person shall have any claim against Lead Plaintiff, the Settlement Class, Lead Counsel, Released Defendant Parties, Defendants' Counsel, or the Claims Administrator based on

distributions of the Net Settlement Fund made substantially in accordance with the Settlement, the Stipulation, and the Plan of Allocation, or otherwise as further ordered by the Court.

### 6.    Lead Counsel's Attorneys' Fees and Expenses

6.1    Lead Counsel may submit an application or applications (the "Fee and Expense Application") for: (a) an award of attorneys' fees; (b) expenses or charges incurred in connection with prosecuting the Action; plus (c) any interest on such attorneys' fees and expenses at the same rate and for the same periods as earned by the Settlement Fund (until paid) as may be awarded by the Court.  Any and all such fees, expenses and costs awarded by the Court shall be payable solely out of the Settlement Fund.  An application for fees and expenses may include an amount to the Lead Plaintiff pursuant to 15 U.S.C. §78u-4(a)(4) in connection with its representation of the Settlement Class.  Defendants shall take no position on the Fee and Expense Application.

6.2    The attorneys' fees and expenses, as awarded by the Court, shall be paid to Lead Counsel from the Settlement Fund, as ordered, immediately upon entry of the Court's order awarding such fees and expenses.  This provision shall apply notwithstanding timely objection to, potential for appeal from, or collateral attack on, the Settlement or the award of fees and expenses. Any such awards shall be paid solely by the Settlement Fund.  In the event that the Judgment or the order awarding such fees and expenses paid to Lead Counsel pursuant to ¶6.1 and this ¶6.2 is reversed or modified, or if the Settlement is cancelled or terminated for any reason, then Lead Counsel shall, in an amount consistent with such reversal, modification, termination or cancellation, refund such fees or expenses to the Settlement Fund pursuant to ¶2.10, plus the interest earned thereon, within twenty-one (21) calendar days from receiving notice from Defendants' Counsel or from a court of competent jurisdiction.  Lead Counsel, as a condition of receiving such fees or expenses on behalf of itself and each partner and/or shareholder of it, agrees that it and its partners

and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing the provisions of this paragraph.

6.3     The procedure for and the allowance or disallowance by the Court of the Fee and Expense Application, or award to Lead Plaintiff, with all amounts to be paid out of the Settlement Fund, are not part of the Settlement set forth in the Stipulation, and any order or proceeding relating to the Fee and Expense Application, or any appeal from any order relating thereto or reversal or modification thereof, shall not operate to terminate or cancel the Stipulation, or affect or delay the finality of the Judgment approving the Stipulation and the Settlement of the Action.

6.4     Defendants shall not have any responsibility for any payment of attorneys' fees and expenses to Lead Counsel or any Settlement Class Member's counsel or any amount to Lead Plaintiff apart from payment of the Settlement Amount pursuant to ¶2.1.

**7.     Conditions of Settlement, Effect of Disapproval, Cancellation, or Termination**

7.1     The Effective Date of the Settlement shall be conditioned on the occurrence of all of the following events:

(a)     execution of the Stipulation and such other documents as may be required to obtain final Court approval of the Stipulation in a form satisfactory to the Parties;

(b)     the Settlement Amount has been deposited into the Escrow Account;

(c)     the Court has entered the Preliminary Approval Order, as required by ¶3.1 hereof;

(d)     Defendants have not exercised their option to terminate the Stipulation pursuant to ¶7.3 hereof;

(e)     the Court has entered the Judgment that, *inter alia*, dismisses with prejudice the Action, as to the Lead Plaintiff and other Settlement Class Members, and as against each of the Defendants, as set forth above; and

(f)     the Judgment has become Final, as defined in ¶1.11 hereof.

7.2     Upon the occurrence of all of the events referenced in ¶7.1 hereof, any and all remaining interest or right of Defendants in or to the Settlement Fund, if any, shall be absolutely and forever extinguished.  If any of the conditions specified in ¶7.1 hereof is unable to be met at the time the Effective Date would otherwise occur, then the Stipulation shall be canceled and terminated subject to ¶7.4 hereof unless Lead Counsel and Defendants' Counsel mutually agree in writing to proceed with the Settlement.

7.3     If, prior to the Settlement Hearing, Persons who otherwise would be members of the Settlement Class have timely and validly requested exclusion from the Settlement Class in accordance with the provisions of the Preliminary Approval Order and the Notice given pursuant thereto, and if those Persons collectively meet the criteria set forth in a separate Supplemental Agreement Regarding Requests for Exclusion ("Supplemental Agreement") executed between Lead Plaintiff and Defendants, then Defendants shall have the option to terminate this Stipulation and Settlement in accordance with the procedures set forth in the Supplemental Agreement.  The Supplemental Agreement will not be filed with the Court unless and until a dispute between Lead Plaintiff and Defendants concerning its interpretation or application arises.

7.4     Unless otherwise ordered by the Court, in the event the Stipulation shall terminate, or be canceled, or shall not become effective for any reason, within twenty-one (21) calendar days after written notification of such event is sent by Defendants' Counsel to the Escrow Agent, the Settlement Fund (including accrued interest), less expenses which have either been incurred or disbursed pursuant to ¶¶2.8 or 2.9 hereof, shall be refunded pursuant to written instructions from Defendants' Counsel to any Party, Parties or insurers that paid the Settlement Amount.  At the request of Defendants' Counsel, the Escrow Agent or its designee shall apply for any tax refund owed on the Settlement Fund and pay the proceeds, after deduction of any expenses incurred in

connection with such application(s) for refund, at the written direction of Defendants' Counsel to any Party, Parties or insurers that paid the Settlement Amount.

7.5     In the event that the Stipulation is not approved by the Court or the Settlement set forth in the Stipulation is terminated or fails to become effective in accordance with its terms, the Parties shall be restored to their respective positions in the Action as of October 20, 2023.  In such event, the terms and provisions of the Stipulation, with the exception of ¶¶1.1-1.42, 2.8-2.10, 7.2, and 8.3 hereof, shall have no further force and effect with respect to the Settling Parties and shall not be used in this Action or in any other proceeding for any purpose, and any Judgment or order entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated, *nunc pro tunc*, and the Parties shall be deemed to return to their status as of October 20, 2023.  No order of the Court or modification or reversal on appeal of any such order of the Court concerning the Plan of Allocation or the amount of any attorneys' fees and expenses, interest, or other payment awarded by the Court to Lead Counsel shall constitute grounds for cancellation or termination of the Stipulation.

**8.     Miscellaneous Provisions**

8.1     The Parties (a) acknowledge that it is their intent to consummate this Stipulation; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of the Stipulation and to exercise their best efforts to accomplish the foregoing terms and conditions of the Stipulation expeditiously.

8.2     The Parties intend this Settlement to be a final and complete resolution of all disputes between them with respect to the Action.  The Settlement shall not be deemed an admission by any Party or any of the Released Parties as to the merits of any claim or defense.  The Parties and their counsel agree that they shall not assert any claims of any violation of Rule 11 of the Federal Rules of Civil Procedure relating to the institution, prosecution, defense or settlement of the Action, and the Judgment shall contain a finding that all Parties and their counsel complied with the requirements of

Rule 11 with respect to the institution, prosecution, defense, and resolution of the Action. The Parties agree that the amount paid to the Settlement Fund and the other terms of the Settlement were negotiated in good faith at arm's length by the Settling Parties and reflect a settlement that was reached voluntarily after consultation with competent legal counsel. The Parties reserve their right to rebut, in a manner that such party determines to be appropriate, any contention made in any public forum regarding the Action, including that the Action was brought or defended in bad faith or without a reasonable basis or that the claims asserted were meritorious.

8.3     Neither the Stipulation nor the Settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Released Defendant Parties; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Defendant Parties; or (c) is or may be deemed to be or may be used as an admission or evidence that any claims asserted by Lead Plaintiff were not valid or that the amount recoverable was not greater than the Settlement Amount, in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. The Released Defendant Parties may file the Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

8.4     Whether or not the Stipulation is approved by the Court and whether or not the Stipulation is consummated, or the Effective Date occurs, the Parties and their counsel shall keep all negotiations, discussions, acts performed, agreements, drafts, documents signed and proceedings in connection with the Stipulation confidential.

8.5     All agreements made and orders entered during the course of the Action relating to the confidentiality of documents and information shall survive this Stipulation.

8.6     All of the Exhibits to the Stipulation are material and integral parts hereof and are fully incorporated herein by this reference.

8.7     The Stipulation may be amended or modified only by a written instrument signed by or on behalf of all Parties or their respective successors-in-interest.

8.8     No waiver of any term or provision of this Stipulation, or of any breach or default hereof or hereunder, shall be valid or effective unless in writing and signed by or on behalf of all Parties or their respective successors-in-interest.  No waiver of any term or provision of this Stipulation, or of any breach or default hereof or hereunder, shall be construed as a waiver of the same or any other term or provision or of any previous or subsequent breach thereof.

8.9     The Stipulation and the Exhibits incorporated herein (together with the Supplemental Agreement referred to in ¶7.3) hereto constitute the entire agreement among the Settling Parties and no representations, warranties, or inducements have been made to any Party concerning the Stipulation or its Exhibits other than the representations, warranties, and covenants contained and memorialized in such documents.  Except as otherwise provided herein each Party shall bear its own costs.

8.10    The Settlement is not conditioned upon the settlement or approval of settlement of any derivative lawsuits or other lawsuits.  Nor shall the Settlement be conditional upon the obtaining of any judicial approval of any releases between or among Defendants and/or any third parties.

8.11    This Stipulation shall be construed and interpreted to effectuate the intent of the Parties, which is to resolve completely those claims and disputes, including in the Action, and as more fully described herein.

8.12     Neither the Settlement Class Members nor Defendants shall be bound by the Stipulation if the Court modifies material terms thereof or of the proposed Judgment; provided, however, that it shall not be a basis for Settlement Class Members to terminate the Settlement if the Court modifies any proposed Plan of Allocation or criteria for allocation of the Net Settlement Fund amongst Authorized Claimants, or the Plan of Allocation is modified on appeal.  Nor shall it be a basis to terminate the Stipulation if the Court disapproves of or modifies the terms of this Stipulation with respect to attorneys' fees or expenses or the distribution of the Net Settlement Fund. Notwithstanding any such modification of the terms or Plan of Allocation or the Stipulation with respect to attorneys' fees or expenses, Defendants and Defendants' insurers shall be entitled to all benefits of the Settlement and shall not, under any circumstances, be called upon to contribute additional funds in addition to the Settlement Fund.

8.13     Lead Counsel, on behalf of the Settlement Class, is expressly authorized by Lead Plaintiff to take all appropriate action required or permitted to be taken by the Settlement Class pursuant to the Stipulation to effectuate its terms and also is expressly authorized to enter into any modifications or amendments to the Stipulation on behalf of the Class which it deems appropriate.

8.14     Each counsel or other Person executing the Stipulation or any of its Exhibits on behalf of any Settling Party hereby warrants that such Person has the full authority to do so.

8.15     All notices, requests, demands, claims, and other communications hereunder shall be in writing and shall be deemed duly given: (i) when delivered personally to the recipient; (ii) one (1) business day after being sent to the recipient by UPS (charges prepaid); or (iii) five (5) business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Lead Plaintiff or to Lead Counsel:

>       Ellen Gusikoff Stewart
>       Robbins Geller Rudman & Dowd LLP
>       655 West Broadway, Suite 1900
>       San Diego, CA 92101

If to Defendants or to Defendants' Counsel:

>       Doru Gavril
>       Freshfields Bruckhaus Deringer US LLP
>       855 Main Street
>       Redwood City, CA  94063

8.16    The Stipulation may be executed in one or more counterparts.   All executed counterparts and each of them shall be deemed to be one and the same instrument.  A complete set of executed counterparts shall be filed with the Court.

8.17    The Stipulation shall be binding upon, and inure to the benefit of, the heirs, successors, and assigns of the Settling Parties hereto.

8.18    The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation, and all Settling Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in the Stipulation.

8.19    If any disputes arise out of the finalization of the Settlement documentation or the Settlement itself prior to Lead Plaintiff filing a motion for preliminary approval of the Settlement as set forth in ¶3.1 above, those disputes (after good faith attempts at resolution between the Parties) will be resolved by the Mediator, first by way of expedited telephonic mediation and, if unsuccessful, then by final, binding, non-appealable resolution by the Mediator.

8.20    Pending approval of the Court of the Stipulation and its Exhibits, all proceedings in this Action shall be stayed, and all members of the Settlement Class shall be barred and enjoined from prosecuting any of the Released Claims against any of the Released Defendant Parties.

8.21    This Stipulation and the Exhibits incorporated herein shall be considered to have been negotiated, executed, and delivered, and to be wholly performed, in the State of California, and the

1   rights and obligations of the Parties to the Stipulation shall be construed and enforced in accordance

2   with, and governed by, the internal, substantive laws of the State of California, without giving effect

3   to that State's choice-of-law principles.

4       8.22    This Stipulation shall not be construed more strictly against one party than another

5   merely by virtue of the fact that it, or any part of it, may have been prepared by counsel for one of

6   the Settling Parties, it being recognized that it is the result of arm's-length negotiations between the

7   Settling Parties and the Settling Parties have contributed substantially and materially to the

8   preparation of this Stipulation.

9       IN WITNESS WHEREOF, the Settling Parties have caused this Stipulation to be executed,

10  by their duly authorized attorneys, on February 5, 2024.

                                ROBBINS GELLER RUDMAN
                                  & DOWD LLP
                                JASON A. FORGE
                                LAURA ANDRACCHIO
                                MICHAEL ALBERT
                                J. MARCO JANOSKI GRAY
                                TING H. LIU
                                KENNETH P. DOLITSKY
                                SARAH A. FALLON


                                _____
                                        JASON A. FORGE

                                655 West Broadway, Suite 1900
                                San Diego, CA  92101
                                Telephone:  619/231-1058
                                619/231-7423 (fax)
                                jforge@rgrdlaw.com
                                landracchio@rgrdlaw.com
                                malbert@rgrdlaw.com
                                mjanoski@rgrdlaw.com
                                tliu@rgrdlaw.com
                                kdolitsky@rgrdlaw.com
                                sfallon@rgrdlaw.com

                                Lead Counsel for Plaintiff

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FRESHFIELDS BRUCKHAUS
  DERINGER US LLP
BORIS FELDMAN
DORU GAVRIL
ELISE LOPEZ
JON FOUGNER
OLIVIA ROSEN

BORIS FELDMAN

855 Main Street
Redwood City, CA  94063
Telephone:  650/618-9250
boris.feldman@freshfields.com
doru.gavril@freshfields.com
elise.lopez@freshfields.com
jon.fougner@freshfields.com
olivia.rosen@freshfields.com

SWANSON & McNAMARA LLP
MARY McNAMARA
EDWARD SWANSON
BRITT EVANGELIST
CARLY BITTMAN
300 Montgomery Street, Suite 1100
San Francisco, CA  94104
Telephone:  415/477-3800
mary@smllp.law
ed@smllp.law
carly@smllp.law

WILSON SONSINI GOODRICH &
  ROSATI, P.C.
IGNACIO E. SALCEDA
BENJAMIN M. CROSSON
STEPHEN B. STRAIN
650 Page Mill Road
Palo Alto, CA  94304
Telephone:  650/493-9300
650/493-6811 (fax)
isalceda@wsgr.com
bcrosson@wsgr.com
sstrain@wsgr.com

Attorneys for Defendants

STIPULATION OF SETTLEMENT
3:18-cv-06245-TLT
4894-7457-5249.v3

- 31 -

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on February 15, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

By: */s/ Boris Feldman*_____
    Boris Feldman

FRESHFIELDS BRUCKHAUS DERINGER US LLP
855 Main Street
Redwood City, CA 94063
Telephone: (650) 618-9250
boris.feldman@freshfields.com

**Mailing Information for a Case 3:18-cv-06245-TLT In re ALPHABET, INC. SECURITIES LITIGATION**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com

- **Laura Marie Andracchio**
  landracchio@rgrdlaw.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Carly Lee Bittman**
  Carly@smllp.law

- **Austin P. Brane**
  abrane@wcllp.com,apriest@wcllp.com,pbradshaw@wcllp.com

- **Benjamin Matthew Crosson**
  bcrosson@wsgr.com,rlustan@wsgr.com

- **Kenneth P. Dolitsky**
  kdolitsky@rgrdlaw.com

- **Britt H. Evangelist**
  bevangelist@swansonmcnamara.com,AmyMcGuigan@ecf.courtdrive.com,britt@smllp.law,britt@ecf.courtdrive.com

- **Sarah Fallon**
  sfallon@rgrdlaw.com

- **Boris Feldman**
  boris.feldman@freshfields.com,filing_notice@freshfields.com,jonathan.sampson@freshfields.com,Jeannette.Smith@freshfields.com,6188914420@filings.docketbird.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,kmccormack@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Cheryl Weisbard Foung**
  cfoung@wsgr.com,lcardenas@wsgr.com

- **Doru Gavril**
  doru.gavril@freshfields.com,filing_notice@freshfields.com,shannon.brown@freshfields.com,6188914420@filings.docketbird.com,anthony.denatale@freshfields.com,sheana.chandar@freshfields.com

- **Ellen Anne Gusikoff-Stewart**
  elleng@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Joseph Marco Janoski Gray**
  mjanoski@rgrdlaw.com,msonney@rgrdlaw.com,tdevries@rgrdlaw.com

- **Phillip C Kim**
  pkim@rosenlegal.com,pkrosenlaw@ecf.courtdrive.com

- **Joshua Alexander Korr**
  josh@altolit.com,bahram@altolit.com,rachael@altolit.com,jim@altolit.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com

- **Ting Hsiang Liu**
  TLiu@rgrdlaw.com

- **Elise M Lopez**
  elise.lopez@freshfields.com,filing_notice@freshfields.com,6188914420@filings.docketbird.com,anthony.denatale@freshfields.com

- **Mary McNamara**
  mary@smllp.law,AmyMcGugian@ecf.courtdrive.com,mary@ecf.courtdrive.com,britt@ecf.courtdrive.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,kperez@pomlaw.com,ahood@pomlaw.com,tsayre@pomlaw.com,egoodman@pomlaw.com,jlopiano@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,mtjohnston@po

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Ignacio Evaristo Salceda**
  isalceda@wsgr.com,rlustan@wsgr.com

- **Shane Palmesano Sanders**
  ssanders@robbinsllp.com,notice@robbinsllp.com

- **Stephen Bruce Strain**
  sstrain@wsgr.com,pmarquez@wsgr.com

- **Edward W. Swanson**
  ed@smllp.law,AmyMcGugian@ecf.courtdrive.com,ed@ecf.courtdrive.com,britt@ecf.courtdrive.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)