ROBBINS GELLER RUDMAN
  & DOWD LLP
JASON A. FORGE (181542)
ELLEN GUSIKOFF STEWART (144892)
LAURA ANDRACCHIO (187773)
MICHAEL ALBERT (301120)
J. MARCO JANOSKI GRAY (306547)
TING H. LIU (307747)
KENNETH P. DOLITSKY (345400)
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
elleng@rgrdlaw.com
landracchio@rgrdlaw.com
malbert@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
kdolitsky@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | Master File No. 3:18-cv-06245-TLT |
| | CLASS ACTION |
| This Document Relates To: | RESPONSE TO COURT'S QUESTIONS FOR FINAL SETTLEMENT APPROVAL |
| ALL ACTIONS. | |

4880-8404-9077.v1

Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island") respectfully provides this additional information in response to the Court's Order Granting Preliminary Approval of Class Action Settlement and Setting Deadlines for Notice, Request for Additional Information, Objection, Exclusion, Questions for the Final Hearing, and Final Fairness Hearing (the "April 2 Order") (ECF 228), and in response to the additional questions posed by the Court on April 8, 2024 (ECF 229). This submission is unopposed by Defendants.

## I.  QUESTIONS FOR THE FINAL SETTLEMENT APPROVAL

On April 5, 2024, the Court posed the following questions to counsel.

1.  What is the breakdown of the projected Administration costs? Total estimate is $1,425,000.00. Can you break this down?

   (a)   Administrator fee?

   (b)   Processing costs?

   (c)   And ancillary expenses? Please indicate, specifically, what are these anticipated expenses.

> The $1,425,000 projected Administration costs represent Gilardi & Co's ("Gilardi") claims processing and administrative fees and expenses through the initial distribution of the Net Settlement Fund. *See* ECF 222-3, ¶28. This estimate is an all-in number based on Gilardi's experience in similar large-scale administrations such as this one. This estimate, which calculates to approximately $3.75 per claim for the estimated number of submitted claims is based on Gilardi's experience in similar large-scale administrations such as this one, and represents Gilardi's professional services for project management for the claims process (including the laborious process of inputting and reviewing for accuracy all data provided by claimants); sending deficiency/rejection correspondence; communicating with claimants in an effort to verify/validate claims; telephone and email support; website set up and maintenance; and preparing and mailing initial distribution checks. This amount does not include broker and nominee holder expenses incurred for providing Gilardi with names and/or addresses of beneficial stockholders or for the postage incurred by those entities for providing notice.[1]

2.  With respect to the Notice costs and the projected number of notices, does this also

---

[1] Gilardi (and all claims administrators which work with Robbins Geller) provides monthly invoices which contain detailed information and backup for its out-of-pocket costs and expenses, such as broker and nominee costs. No fewer than three people at Robbins Geller review the invoices for reasonableness before they are paid from the Settlement Fund.

include:

    (a)    the (280) Nominee Holders,

    (b)    (4,450) Institutions (including the Employees Retirement System of Rhode Island), and

    (c)    Shareholders who had stock in their own name (which make up 5% of the class, ie. Adam Wick and Consolidated Plaintiff, Khaled El Mawardy?

    (d)    If so, is it correct that you anticipate 300,000 to 450,000 responses from the notices of which 70% will be valid with a projected number between 210,000 to 315,000?

> Yes, The costs of notice includes the cost of providing notice to the Nominee Holders, institutions, and shareholders who hold their shares in their own name, identified above. These costs include the costs of paper, printing, postage, and publication. Counsel and Gilardi expect a robust response from the Court-approved notice program.

3. With the exception of The Employees' Retirement System of Rhode Island (ERSRI), are you requesting incentive/service awards for the named plaintiffs, Adam Wick and Khaled El Mawardy?

> Neither Adam Wick nor Khaled El Mawardy (nor ERSRI) are seeking incentive/service awards.

4. Are you asking for a service award for the State of Rhode Island and the Office of the Rhode Island Treasurer (on behalf of the ERSRI)?

> Rhode Island is not seeking any award. Although Rhode Island's motion for preliminary approval referenced the possibility of it applying for an award pursuant to 15 U.S.C. §78u-4(a)(4), Rhode Island has decided not to make such an application.

5. How did the parties arrive at the amounts for Class A ($4.67 & $5.84) and Class C ($3.85 & $4.81)

> Lead Plaintiff's consulting damages expert calculated the figures cited by the Court ("the amounts for Class A ($4.67 & $5.84) and Class C ($3.85 & $4.81)") to reflect estimated amounts of artificial inflation per share. These figures were calculated by considering price changes in reaction to public announcements concerning Defendants' alleged omissions and scheme, and adjusting for case-assumptions developed by Lead Counsel's analysis of the relevant facts and discovery produced by Defendants and third parties at the time the Plan of Allocation was developed. All estimated amounts of artificial inflation per share (depending on the dates of

purchase and sale) are set forth in Tables 1 and 2 of the Plan of Allocation. ECF 222-4 at 30 of 55.

6. Why are lesser of amounts noted vs (purchase price minus sales price)?

For shares that were sold during the Settlement Class Period (or the 90-day-lookback period), the Plan of Allocation uses "lesser of" amounts so that a class members' Recognized Loss Amount cannot ever exceed their actual out-of-pocket loss (*i.e.* the "purchase price minus sales price") for those shares. Absent such a provision, the allocation could inequitably compensate class members more than they actually lost on a particular purchase and sale of shares.

7. Why opt in vs opt out? Do you have enough information to tell who is eligible to recover and how much based on the lesser of amounts notes v. purchase price minus sales price?

All Settlement Class Members are part of the Settlement Class unless they request to opt out. If a Settlement Class Member seeks to recover any portion of the Net Settlement Fund, however, they must submit a valid claim form, because their transactions are unknown to Lead Counsel, Gilardi or Alphabet.

8. Do you agree that the opt-in provision is burdensome upon non-institutional settlement class members after a six-year gap from 2018 to present?

In an ideal world, the parties would have access to all the information necessary to allocate and distribute money to class members on an automated basis, but as explained below in response to Question 10, there simply is no such centralized database, or group of databases, that compile such information. Lead Counsel strive to choose less-traveled paths, but we are stuck on this one due to the lack of information (to the best of our knowledge, the hundreds of Securities Exchange Act class action settlements in the nearly 30 years since the passage of the PSLRA have all required class members to submit their claims through some form of a claims process). The necessity of claims submissions presents an inconvenience that would not exist in an ideal world, but this inconvenience is not very burdensome because each individual class member should have access to the electronic records of their transactions through their brokerage account, searching for such transactions shouldn't take more than a minute or two for each individual, and all the information the Proof of Claim and Release form requires should be set forth in those records—transaction date(s), number of shares purchased/sold, and share price(s). The far greater burden is on the Claims Administrator, who must review these submissions for completeness and validity, which often entails flagging and investigating potentially fraudulent claims. Likewise, the Claims Administrator is required to work with Settlement Class Members who have only partial information in an effort to validate their claims, if at all possible.

9. What is the relevance October 8, 2018 (publication of the correction) and April 30, 2019 (the second publication of correction)?

Lead Plaintiff alleges that the publication of the corrections noted by the Court resulted in artificial inflation being removed from Alphabet's share prices. The Plan of Allocation (*see* Tables 1-2, ECF 222-4 at 30 of 55) provides that 80% of the

overall artificial inflation came out on October 8, 2018, and 20% came out on April 30, 2019, which split is based on the information obtained throughout this litigation. And according to Supreme Court precedent, securities class action plaintiffs generally cannot recover if they sell their shares before the relevant truth (*i.e.*, the corrections) is published or otherwise leaks out. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631, 151 L. Ed.2d 577 (2005). Therefore, the practical significance of these two dates is that, as set forth in Tables 1 and 2 of the Plan of Allocation, shares have to be purchased before those dates and held through those dates to be eligible for a Recognized "Loss in connection with that correction.

10. What information is outstanding to determine who purchased and sold shares during these periods (between April 18, 2018 and April 30, 2019)?

Because securities transactions take place on stock exchanges, the identity of purchasers and sellers are anonymous at the market level; they are, however, known by the brokers or traders who direct or conduct the transactions. That is, a buyer or seller knows when they have directed or consummated a transaction and how many shares they bought or sold and at what price, but they do not know the identity of their counter-party. Therefore, the transacting party must submit a claim form to participate in the Settlement. If, however, a proof of claim is submitted with incomplete or questionable information, it is rejected unless and until any deficiencies can be cured by the transacting party or their representative(s).

11. Do you know the purchase and sales prices, along with the dates of purchase?

*See* Response to Question 10.

12. Do you know change of ownership dates?

*See* Response to Question 10.

13. Where did the parties get the per share amounts on page 17 of 55 "Statement of Recovery" paragraph?

The estimated per share recovery is $3.27 per Class A share and $2.85 per Class C share before the deduction of approved fees, costs, and expenses. In the Statement of Recovery in the Notice under the Plan of Allocation, undersigned counsel incorrectly calculated these figures as $6.41 and $5.90 by mistakenly applying the full settlement amount to each share class (as if the Class A shares received $350 million and the Class C shares received $350 million), as opposed to applying the settlement amount to both share classes combined. This mistake effectively doubled the estimated per-share recovery. Upon receiving this question from the Court, counsel realized the error and recalculated the estimated recovery with the assistance of its damages expert by: (1) estimating the distribution for each class of shares by taking the estimated inflation associated with that class of shares ($186 million for Class A and $176 million for Class C), and (2) dividing the estimated distribution amounts for each share class by the estimated number of damaged Class A and Class C shares (54.6 million and 59.25 million, respectively). However, although slightly fewer Class A shares were allegedly damaged, the alleged artificial inflation per Class A share was larger than that of Class C shares. Therefore, Class A shares account for

48.2% of damaged shares, but 51.4% of damages to be recovered. Counsel apologizes for the error.

14. Please confirm whether the attachment is correct?

The Court has asked whether its "Use of Funds" chart is accurate. The $1,750,000 attorneys' expenses category is a cap – it may well be a lower number. In addition, there will be no awards to Lead Plaintiff or any other plaintiff ($40,000). Finally, the Claims Administrator's estimates were made prior to any notice and claims administration taking place. It is, however, a cap, based on the assumption that 1.5 million notices are mailed or emailed.

15. Are there any conflicts between any of the parties with respect to the Cy Pres, Investor Protection Plus? Has any party served on the Board, worked with Investor Protection Plus, or have any friends or family members connected to Investor Protection Plus?

Lead Counsel has designated a beneficiary of any unclaimed funds following exhaustion of the claims administration process, when it is no longer economically feasible to re-distribute remaining settlement funds to Authorized Claimants, only because the District guidelines require such a designation. Neither side believes there will be any undistributed settlement funds for any beneficiary to receive. Lead Counsel designated the Investor Protection Trust ("IPT"), but has no connection to the IPT, and Lead Counsel would prefer to defer to the Court if the Court has a preferred designee on the off-chance that we end up with nominal residual funds.

Regarding the Court's specific questions about IPT, following an inquiry, Lead Counsel has no reason to believe there are any conflicts between counsel to any of the Parties and IPT. To Lead Counsel's knowledge and belief, no party has served on the Board, worked with IPT, or had any friends or family members connected to IPT.[2]

## II. RESPONSE TO QUESTIONS POSED IN THE PRELIMINARY APPROVAL ORDER

To the extent not addressed above, the parties provide the following information in response to questions posed by the Court in its April 2 Order. ECF 228.

1. **Identification of the Class Representative**: Lead Plaintiff Rhode Island seeks appointment as the only Class Representative in connection with the Settlement. *Compare*

---

[2] The following is Defendants' statement regarding IPT: After an inquiry, Defendants have not identified any Alphabet commercial relationship or investment in IPT. Defendants are unaware of any fact that would constitute a conflict with the selection of IPT as the recipient of any residual distribution of unclaimed funds. As to the Individual Defendants, Defendants believe that the Individual Defendants likewise have not served on the IPT Board or worked with the entity, or have other involvement that would conflict with the selection of IPT as the recipient of any residual distribution of unclaimed funds. Defendants are in the process of confirming that belief; if it is incorrect, Defendants will notify the Court promptly.

RESPONSE TO COURT'S QUESTIONS FOR FINAL SETTLEMENT APPROVAL - 3:18-cv-06245-TLT

- 5 -

4880-8404-9077.v1

[Proposed] Order Preliminarily Approving Settlement and Providing for Notice, ¶5 (seeking for Rhode Island to be appointed as the class representative) *with* ECF 228 ("Based on the foregoing, the Court conditionally certifies the class and provisionally appoints . . . **ADAM WICKS** as class representative(s).").

2. **Taxes**: Taxes owed by the Settlement Fund cannot be calculated at this time, as the amount of interest that will be earned on it while it is in escrow is unknown. However, the third-party tax accountant charges $2,200 per year to prepare and file quarterly and year-end tax documents.

3. **Clear Estimate of the Settlement Class Members**: Defendants will file a declaration from Alphabet, Inc. with an estimate of the number of holders of Class A and Class C shares.

4. **Other Agreements Between the Parties**: In response to the language in the April 2 Order that "[t]o date no [Rule 23(e)(3) agreements] have been identified" (ECF 228 at 8), out of an abundance of caution, the Parties wish to confirm the Court's awareness of the "blow provision" agreed to between the Parties that is described in the Stipulation of Settlement filed on February 5, 2024 (ECF 222-2). This provision governs the circumstances under which Defendants may terminate the Settlement if a certain threshold of opt-outs is received. *See* ECF 222 at 16. While the termination threshold is confidential, the existence of the agreement on the provision is not. *See* Stipulation, ¶7.3; ECF 222 at 16.

A revised [Proposed] Order Preliminarily Approving Settlement and Providing for Notice (and the exhibits thereto) which incorporates the dates and other information set forth in the April 2 Order is submitted herewith as Exhibit A, along with redlines of those documents identifying changes from the initially-submitted documents, submitted herewith as Exhibit B.

DATED:  April 8, 2024                              Respectfully submitted,

                                                                         s/ Ellen Gusikoff Stewart
                                                                         ELLEN GUSIKOFF STEWART

|   |   |
|---|---|
| | ROBBINS GELLER RUDMAN & DOWD LLP |
| | JASON A. FORGE |
| | ELLEN GUSIKOFF STEWART |
| | LAURA ANDRACCHIO |
| | MICHAEL ALBERT |
| | J. MARCO JANOSKI GRAY |
| | TING H. LIU |
| | KENNETH P. DOLITSKY |
| | SARAH A. FALLON |
| | 655 West Broadway, Suite 1900 |
| | San Diego, CA  92101 |
| | Telephone:  619/231-1058 |
| | 619/231-7423 (fax) |
| | jforge@rgrdlaw.com |
| | elleng@rgrdlaw.com |
| | landracchio@rgrdlaw.com |
| | malbert@rgrdlaw.com |
| | mjanoski@rgrdlaw.com |
| | tliu@rgrdlaw.com |
| | kdolitsky@rgrdlaw.com |
| | sfallon@rgrdlaw.com |

Lead Counsel for Plaintiff