ROBBINS GELLER RUDMAN
   & DOWD LLP
JASON A. FORGE (181542)
ELLEN GUSIKOFF STEWART (144892)
LAURA ANDRACCHIO (187773)
MICHAEL ALBERT (301120)
J. MARCO JANOSKI GRAY (306547)
TING H. LIU (307747)
KENNETH P. DOLITSKY (345400)
SARAH A. FALLON (345821)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com
elleng@rgrdlaw.com
landracchio@rgrdlaw.com
malbert@rgrdlaw.com
mjanoski@rgrdlaw.com
tliu@rgrdlaw.com
kdolitsky@rgrdlaw.com
sfallon@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re ALPHABET, INC. SECURITIES LITIGATION | ) ) ) ) |
| | Master File No. 3:18-cv-06245-TLT |
| | CLASS ACTION |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) ) |
| | DECLARATION OF JASON A. FORGE IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION AND LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES |

4878-8827-5663.v3

I, JASON A. FORGE, declare as follows:

1. I am an attorney duly licensed to practice in the State of California and before this Court. I am a member of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), Court-appointed lead counsel for Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island ("Rhode Island" or "Lead Plaintiff") and the Settlement Class,[1] in the above-captioned action pending in this Court.[2] My knowledge of the matters stated herein is based on my active participation in all material aspects of the prosecution and settlement of this action (hereinafter, the "Litigation"), as well as my discussions and communications with other members of Lead Counsel's prosecution team. Unless otherwise noted, I could and would competently testify that the following facts are true and correct.

2. I submit this declaration in support of Rhode Island's motion for approval of: (a) the $350 million cash settlement on behalf of the Settlement Class (the "Settlement"); and (b) the proposed Plan of Allocation (the "Plan"). I also submit this declaration in support of Lead Counsel's motion for attorneys' fees and expenses.

## I.    PRELIMINARY STATEMENT

3. This declaration is not intended to detail every event that occurred since the commencement of this Litigation in 2018. Rather, it provides the Court with key highlights of the Litigation, Lead Counsel's successful appeal of the District Court's dismissal of all claims, the

---

[1] Pursuant to this Court's April 9, 2024 Order (ECF 232), for the purpose of effectuating the Settlement, the Settlement Class is defined as:

> [A]ll Persons that purchased or otherwise acquired Alphabet Class A and/or Class C stock during the period from April 23, 2018, through April 30, 2019, inclusive. Excluded from the Settlement Class are Defendants and their families, the officers, directors, and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest. Also excluded from the Settlement Class is any Person who timely and validly seeks exclusion from the Settlement Class.

[2] Capitalized terms not otherwise defined herein have the same meanings as those ascribed to them in the Stipulation of Settlement (ECF 222-2) ("Stipulation").

1    novel damages methodology developed by Lead Counsel and its experts, the extensive fact

2    discovery, Lead Counsel's unwavering preparation for trial, the events leading up to the Settlement,

3    and the bases upon which Lead Counsel and Rhode Island recommend the Settlement's approval.

4          4.    The $350 million proposed Settlement is the culmination of more than five years of

5    tireless, hard-fought litigation.  It represents the largest cybersecurity-related PSLRA settlement in

6    history, and the Ninth Circuit's largest securities class action recovery following a complete

7    dismissal of the case.  The recovery will rank within the top 60 largest securities class action

8    settlements of all time, and within the top five in the Northern District of California.  *See* ISS Sec.

9    Class Action Servs., The Top 100 U.S. Class Action Settlements of All-Time (as of December 31,

10   2023) at 6-9, attached hereto as Exhibit A.  The Settlement is nearly ***50 times*** larger than the $7.5

11   million consumer class action settlement arising out of the same two October 2018 and December

12   2018 data breaches that were at issue in this case.  *In re Google Plus Profile Litig.*, Case No. 5:18-

13   cv-06164-EJD (N.D. Cal.).

14         5.    The Settlement is an astounding result for a case where Defendants (and multiple

15   plaintiff's firms) credibly pressed their view that "***Damages Are Zero***."  ECF 130 at 2 (emphasis

16   added).  Indeed, under conventional methodologies, there were no damages in this case.  Even if

17   conventional norms were set aside to get a maximum reasonably recoverable damages estimate, it

18   would amount to $1.405 billion in total, and the $350 million recovery would amount to just under

19   25% of such a best-case scenario estimate.  By way of comparison, this is more than 12 times the

20   median percentage recovery for cases settled with estimated damages of $1 billion or more in 2023,

21   and nearly 10 times the median recovery (2.6%) of similar cases settled between 2014 and 2022.

22   *See, e.g.*, Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements: 2023 Review*

23   *and Analysis* at 6 (Cornerstone Research 2024), attached hereto as Exhibit B.  This percentage also

24   greatly exceeds the median settlement as a percentage of estimated damages in the Ninth Circuit

25   from 2014 through 2023 (4.6%).  *Id*. at 20.

26         6.    Lead Counsel zealously prosecuted Rhode Island's and the Settlement Class's

27   claims at every stage of the Litigation and defended these claims against Defendants' repeated

28   attacks, including in the Ninth Circuit Court of Appeals and the Supreme Court.  But as detailed

herein, achieving class certification and proceeding to summary judgment and a jury trial presented

substantial risks.  In agreeing to settle the Litigation, Rhode Island and Lead Counsel were fully

informed about the various strengths of their case, as well as the substantial risks they would face

at class certification, summary judgment, and trial.  In opting to settle, Rhode Island and Lead

Counsel concluded that settlement on the terms they obtained was in the Settlement Class's best

interest and in fact was a remarkable recovery for the Settlement Class.  Rhode Island remained

well-informed throughout the Litigation and settlement negotiations and ultimately approved the

Settlement.  *See* Declaration of Eileen Ki Cheng in Support of Rhode Island's Motion for Final

Approval of Settlement and Award of Attorneys' Fees and Expenses (ECF 235) ("Cheng Decl.").

7.     Lead Counsel achieved the proposed Settlement after more than five years of

litigation, during which time Lead Counsel, among other things:

- successfully moved for appointment of Rhode Island as Lead Plaintiff and Robbins Geller as Lead Counsel in January 2019, in addition to consolidation of the related action before this Court;

- conducted an extensive investigation, culminating in the filing of the Consolidated Amended Complaint for Violation of the Federal Securities Laws on April 26, 2019 (ECF 62);

- prepared extensive briefing and conducted oral argument culminating in an historic Ninth Circuit reversal of the District Court's Order Granting Motion to Dismiss;

- fended off Defendants' petition for a writ of certiorari, despite Defendants being supported by amicus briefs filed by the Chamber of Commerce of the United States and Washington Legal Foundation, leading to the Supreme Court's denial of Defendants' petition for a writ of certiorari;

- engaged in multiple lengthy and contentious discovery-related disputes concerning the scope of fact discovery and document production, depositions of Defendants themselves, Defendants' privilege log and assertions of privilege over various materials, and several other issues discussed below;

- developed additional key allegations pertaining to the Litigation and briefed a Motion to Supplement the Consolidated Amended Complaint (ECF 136), resulting in Judge White's order granting the motion and Rhode Island's filing of the Supplement to the Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF 154);

- fully briefed a motion to certify the class on two occasions, developing novel theories of statistical significance and damages; and

- conducted extensive party and third-party fact discovery, including: (a) review of over 270,000 pages (more than 63,000 documents) from over 100 Alphabet custodians; (b) taking two fact depositions (and preparing for tens more); (c) responding to Defendants' various discovery requests; and (d) issuing subpoenas to 15 third parties, which yielded the production of an additional 6,000 documents.

8. The substantial fact and expert discovery, motion practice, and appellate practice outlined herein informed Lead Counsel of the case's many strengths, but also potential weaknesses. Lead Counsel considered this information in determining the best course of action for the Settlement Class.

9. Lead Counsel prosecuted the Litigation on a wholly contingent and "at risk" basis, advancing and incurring substantial litigation expenses, charges, and costs over the years. Lead Counsel shouldered substantial risk in doing so, and, to date, have not received any compensation for its efforts. Accordingly, in consideration of Lead Counsel's extensive efforts on behalf of the Settlement Class, Lead Counsel is applying for an award of attorneys' fees in the amount of 19% of the Settlement Amount and an award of $1,540,059.57 in litigation expenses, and any interest on such amounts at the same rate and for the same period as earned by the Settlement Fund.

10. As set forth in the Memorandum of Points and Authorities in Support of Motion for an Award of Attorneys' Fees and Expenses (ECF 234) (the "Fee Memorandum"), the requested fee is within the range of fees awarded in large Private Securities Litigation Reform Act of 1995 ("PSLRA") securities class action settlements, is well below the Ninth Circuit's presumptively reasonable 25% benchmark rate, and is justified in light of the exceptional result achieved for the Settlement Class and the significant risks undertaken by Lead Counsel in this complex litigation. Lead Counsel submits that the fee application is fair to the Settlement Class, under all applicable standards, and warrants the Court's approval.

11. Lead Counsel also seeks an award in the amount of $1,540,059.57 (plus interest accrued thereon) for expenses, costs, and charges reasonably and necessarily committed to the prosecution of the Litigation over the last five years. These expenses include: (a) the substantial fees and expenses of experts and consultants whose services were required for the successful prosecution and resolution of this case; (b) photocopying, imaging, shipping, and managing a

1  database of over a half million pages of documents; (c) online factual and legal research; and

2  (d) mediation expenses.

3        12.    Rhode Island faced an unwavering opponent in one of the largest companies in the

4  world, Google.  With a market capitalization of about $2 ***trillion***, there was never a doubt that

5  Defendants would spare no expense defending this lawsuit.  Throughout the Litigation, Google

6  staffed their defense team with highly respected (and expensive) attorneys from renowned defense

7  firms Wilson Sonsini Goodrich & Rosati, P.C., Freshfields Bruckhaus Deringer US LLP, and

8  Swanson & McNamara LLP.  On appeal, Google brought in Supreme Court specialists at Hogan

9  Lovells.  At every step of this Litigation, Rhode Island faced staunch opposition.  The Settlement

10  was earned after more than five years of contentious litigation.

11        13.    Settlement was not reached until Lead Counsel had: (i) drafted and filed a detailed

12  Complaint; (ii) successfully appealed Judge White's decision to grant Defendants' motion to

13  dismiss the Complaint in its entirety; (iii) filed and fully briefed motions for class certification on

14  two separate occasions; (iv) engaged in extensive written discovery; (v) litigated multiple discovery

15  disputes; (vi) been denied the opportunity to depose the primary individual defendants without

16  unprecedented delays, restrictions, and conditions (including the six-month post-remand *sua sponte*

17  discovery stay); (vii) been denied the opportunity to conduct important discovery before moving

18  for class certification; and (viii) participated in a mediation process with Judge Phillips for over a

19  year, culminating in a mediator's proposal that both sides accepted.

20        14.    Rhode Island dedicated considerable time overseeing this Litigation, including time

21  spent discussing litigation strategy, case development, and settlement negotiations with Lead

22  Counsel.  Rhode Island actively monitored the Litigation and supervised Lead Counsel.  Rhode

23  Island also dedicated time and resources to discovery, which included gathering documents and

24  information responsive to Defendants' discovery requests.  Moreover, Rhode Island negotiated the

25  19% below-market fee agreement with Lead Counsel.   After detailed discussions with Lead

26  Counsel, Rhode Island approved the Settlement.  Rhode Island also approves Lead Counsel's fee

27  request.

28

II.     **PROCEDURAL HISTORY OF THE CASE**

   A.     **The Initiation of the Action and Rhode Island's Appointment as Lead Plaintiff**

   15.     This action commenced on October 11, 2018, with a lawsuit entitled *Wicks v. Alphabet, Inc., et al.*, No. 3:18-cv-06245-JSW, which was filed against Alphabet, Page, Pichai, and Google's CEO, Ruth Porat in the United States District Court for the Northern District of California. The action was assigned to Judge Jeffrey S. White.  Thereafter, an additional complaint was filed in the United States District Court for the Eastern District of New York based upon similar allegations, *El Mawardy v. Alphabet, Inc., et al.*, No. 1:18-cv-05704 (E.D.N.Y.).  On November 7, 2018, the *El Mawardy* action was transferred to this District.  ECF 14 at 5.

   16.     On December 10, 2018, Rhode Island moved the Court to consolidate the *Wicks* and *El Mawardy*-related actions, appoint Rhode Island as the lead plaintiff, and appoint Robbins Geller as lead counsel.  ECF 18.  As noted in its memorandum of law, Rhode Island claimed a substantial financial interest and otherwise satisfied the typicality and adequacy requirements of Rule 23 of the Federal Rules of Civil Procedure.  *Id.*  The other three individuals and funds that moved for appointment as lead plaintiff either withdrew or did not oppose Rhode Island's motion.  ECF 40.

   17.     On January 25, 2019, Judge White consolidated the *Wicks* and *El Mawardy* actions, appointed Rhode Island as lead plaintiff, and approved Rhode Island's selection of Robbins Geller as lead counsel.

   18.     On February 15, 2019, Rhode Island and Defendants filed their first Joint Case Management Statement.  Therein, Rhode Island detailed its position that "it is designating the complaint in the *Wicks* action to be the operative complaint in this matter, while expressly preserving its right to amend the complaint as a matter of course under Fed. R. Civ. P. 15(1)(B)." ECF 47 at 4.  On February 22, 2019, Lead Counsel and Defendants appeared for an Initial Case Management Conference where they discussed next steps for the Litigation, including the briefing schedule for the anticipated filing of Defendants' motion to dismiss.

**B.    Defendants' First Motion to Dismiss, Rhode Island's Investigation, Filing of the Consolidated Amended Complaint, and Briefing Defendants' Second Motion to Dismiss**

19.    Following Rhode Island's designation of the *Wicks* complaint as the operative complaint, on March 22, 2019, Defendants filed their first Motion to Dismiss Class Action Complaint for Violation of Federal Securities Laws.  ECF 54.  Defendants argued that the claims should be dismissed because: (1) "[t]he bug already had been remediated by the time the April and July 2018 Form 10-Qs were filed" thus rendering the alleged misleading risk disclosures not false or misleading; (2) "Plaintiff fails to allege materiality"; and (3) "[t]here are . . . no allegations of scienter."  *Id.*  All discovery in the matter was stayed pursuant to the PSLRA.  *See* 15 U.S.C. §78u-4(b)(3)(B).

20.    Rather than respond to Defendants' Motion to Dismiss, Rhode Island elected to amend the operative complaint.  Based on an analysis of the Company's SEC filings, public statements, media, analyst reports, and independent research and investigation, on April 26, 2019, Rhode Island filed the Consolidated Amended Complaint.  ECF 62.  The Consolidated Amended Complaint alleged violations of §§10(b) and 20(a) of the Exchange Act against Alphabet, Page, Pichai, Google LLC, Enright, and Walker.

21.

22.    A briefing schedule for motions to dismiss was established by order dated April 3, 2019.  ECF 58.  Following Rhode Island's April 26, 2019 submission of the Consolidated Amended Complaint, on May 31, 2019, Defendants filed their Motion to Dismiss the Consolidated Amended Complaint.  ECF 71.  On July 8, 2019, Rhode Island filed its opposition brief to the motion to dismiss.  ECF 76.  On August 9, 2019, Defendants filed their reply in support of the motion to dismiss.  ECF 78.  On August 19, 2019, the motion to dismiss hearing scheduled for August 23, 2019 was vacated.

23.    On February 5, 2020, Judge White issued an order dismissing the Consolidated Amended Complaint in its entirety.  Rhode Island was given until March 13, 2020 to file an amended complaint.

1   24.     On March 12, 2020, Rhode Island filed a notice informing the Court and Defendants

2   of "its decision not to amend the Consolidated Amended Complaint that was the subject of the

3   Court's February 5, 2020 Order Granting Motion to Dismiss" and that Rhode Island "intends to

4   pursue its appellate rights after the Court enters judgment."  ECF 83.

5   25.     On March 13, 2020, Judge White entered judgment "in favor of Defendants and

6   against Plaintiff."  ECF 84.

7   **C.      The Appeal**

8   26.     On April 9, 2020, Rhode Island provided notice of its appeal to the United States

9   Court of Appeals for the Ninth Circuit from:

10                  (a)     the March 13, 2020 Judgment (ECF 84, entered on March 13, 2020);

11                  (b)     the February 5, 2020 Order Granting Motion to Dismiss (ECF 82, entered

12   on February 5, 2020); and

13                  (c)     *See* ECF 85.  *In re Alphabet, Inc. Sec. Litig.*, No. 20-15638, Dkt. 1 (9th Cir.

14   Apr. 10, 2020).[3]

15   27.     Lead Counsel filed Rhode Island's 50-page opening brief on July 20, 2020.  Rhode

16   Island argued that: (i) Defendants failed to "challenge the adequacy of the allegations regarding the

17   rest of the iceberg – that is, the majority of the alleged scheme: the overarching Privacy Bug and

18   the shift from a professed policy of 'disclosure and transparency' to one of 'concealment and

19   opacity' (Dkt. 7 at 10); (ii) the District Court erroneously "accepted Defendants' narrative that the

20   [Consolidated Amended] Complaint solely alleged statement-based liability limited to the Three-

21   Year Bug" (*Id.* at 13); (iii) the District Court failed to "acknowledg[e] and accept[] the

22   [Consolidated Amended] Complaint's allegations as to the scheme itself . . . which led to a

23   correspondingly narrow materiality analysis" (*Id.* at 16); (iv) the District Court erred by "not

24   acknowledg[ing] the [Consolidated Amended] Complaint's allegations regarding the context and

25   motivation for the scheme," including the Consolidated Amended Complaint's allegations that in

26

27   ───────────────
     [3]       All "Dkt. __ " references are to the Ninth Circuit docket (*In re Alphabet, Inc. Sec. Litig.*, No.
28   20-15638 (9th Cir.)).

DECL OF JASON A. FORGE IN SUPPORT OF LEAD PLAINTIFF'S MOT FOR FINAL APPROVAL -
3:18-cv-06245-TLT                                                                                      - 8 -
4878-8827-5663.v3

1    the wake of Facebook's Cambridge Analytica scandal, "Google [was f]ac[ing] [u]nprecedented

2    [p]ublic and [r]egulatory [s]crutiny for [i]ts [d]ata [c]ollection and [p]rivacy [p]ractices," "Google

3    was also facing heightened scrutiny from the European Union and was operating under a Consent

4    Order with the Federal Trade Commission related to past violations of its privacy promises," "[o]ne

5    of the reasons Pichai approved this concealment plan was because he wanted to avoid any additional

6    regulatory scrutiny, including having to testify before Congress," other individual defendants had

7    direct knowledge and were involved in the scheme, and Defendants' memorialized their scienter in

8    a memorandum that was ultimately leaked to the *Wall Street Journal*.  *Id.* at 19-20.

9         28.    On September 21, 2020, Defendants filed their answering brief, arguing, among

10   other things: (i) the Consolidated Amended Complaint failed to plead materiality because the Three

11   Year Bug was found and fixed before Alphabet made the challenged risk statements, "Plaintiff

12   never alleged that the user data made accessible by the Bug contained sensitive information," and

13   "Plaintiff [did not] plead that the Bug materially affected Alphabet's earnings" (Dkt. 16 at 13-14);

14   and (ii) Rhode Island failed to allege scienter because the Cambridge Analytica "scandal did not

15   involve Google or Alphabet," "two Individual Defendants in fact provided testimony to Congress,"

16   and Plaintiff did not allege "suspicious stock sales or confidential witness statements."  *Id.* at 14-

17   15.

18        29.    On October 12, 2020, Rhode Island filed its reply brief, reiterating its opening

19   arguments and taking the opportunity to point out inconsistencies in Defendants' recasting of the

20   Consolidated Amended Complaint with the allegations in the Consolidated Amended Complaint

21   itself.  Dkt. 24.  Specifically, Rhode Island detailed the substantial scheme allegations in the

22   Consolidated Amended Complaint, contrary to Defendants' assertion that "no 'scheme' was alleged

23   or argued below."  *Id.* at 2-6.  As Rhode Island asserted (and Defendants fought hard to avoid), the

24   Consolidated Amended Complaint's allegations went well beyond the Three-Year Bug that affected

25   Google+.  Rhode Island stated:

26            After the removal of a single malignant tumor, it would be grossly misleading for
             doctors to report merely that they had discovered and successfully removed a tumor
27           while concealing that the cancer had metastasized and was terminal with a life
             expectancy under a year.  Yet, that is analogous to what Defendants did here, except
28           Defendants concealed the tumor (the Three-Year Bug) ***and*** the terminal illness (the

Privacy Bug) ***and*** the short life expectancy (the decision to shut down Google+), while simply persisting with the generic warnings that anyone can get cancer.

*Id.* at 8-9.

30.     In response to Rhode Island's reply brief, Defendants filed a "Notice of Errata in Answering Brief" on October 13, 2020, recanting their previous representation that "the only mention of the word 'scheme' in the Complaint was in ER21:¶95, where Plaintiff simply parroted the text of Rule 10b-5(a)-(c)." Dkt. 27 at 1.

31.     Oral argument was held on February 4, 2021, before Judges Sidney R. Thomas, Sandra S. Ikuta, and Jacqueline H. Nguyen.  I presented the argument on behalf of Rhode Island.

32.     On June 16, 2021, the Ninth Circuit issued its unanimous, published opinion reversing in part and affirming in part.  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687 (9th Cir. 2021). Specifically, the Ninth Circuit opinion found that the Consolidated Amended Complaint adequately alleged misleading omissions related to two risk statements made in Alphabet's April and July 10-Qs that "warned, among other things, that even unfounded concerns about Alphabet's 'practices with regard to the collection, use, disclosure, or security of personal information or other privacy related matters' could damage the company's 'reputation and adversely affect [its] operating results.'"  *Id.* at 702.

33.     The Ninth Circuit further held that the Consolidated Amended Complaint adequately alleged scienter, finding that "[t]he complaint alleges with particularity that the [Privacy Bug] memo informed senior executive leadership at Google of the scope of the problem, warned of the consequences of disclosure, and presented Google leadership with a clear decision on whether to disclose those problems."  *Id.* at 706.  The Consolidated Amended Complaint created a strong inference that "armed with this knowledge, Alphabet intentionally did not disclose the cybersecurity information to the public in order to avoid or delay the impacts disclosure could have on regulatory scrutiny, public criticism, and loss of consumer confidence.  The complaint also alleges that Pichai approved a cover-up to avoid regulatory scrutiny and testimony before Congress."  *Id.* at 706-07.

34.     The Ninth Circuit went on to revive Rhode Island's scheme liability claims, finding that "because Alphabet's motion to dismiss did not target Rhode Island's Rule 10b-5(a) and (c)

1   claims, Rhode Island did not waive those claims by failing to address them in opposition to the

2   motion to dismiss.  A party's failure to oppose an argument that was not made does not constitute

3   a waiver." *Id.* at 709.

4        35.     Finally, the Ninth Circuit also reversed the dismissal of Rhode Island's Section 20(a)

5   claims based on the April and July 2018 misleading risk statements and scheme liability claims.  *Id.*

6   at 707, 709.

7        36.     The Ninth Circuit's opinion was a huge success for Rhode Island and the Class.

8   Though the Ninth Circuit affirmed the District Court's judgment finding ten statements non-

9   actionable, the practical effect of the Ninth Circuit's opinion revived all counts against all

10  defendants alleged in the Consolidated Amended Complaint.  As discussed more below (*see infra*

11  §IV.A.1.), the Ninth Circuit's opinion in this case been influential for investors seeking to hold

12  public companies accountable for fraud.

13       37.     On June 30, 2021, Defendants filed a petition for rehearing and petition for rehearing

14  *en banc*.  Dkt. 45.  On July 23, 2021, the Ninth Circuit filed an order notifying parties that "[t]he

15  panel has unanimously voted to deny appellees' petition for rehearing.  The petition for rehearing

16  en banc was circulated to the judges of the court, and no judge requested a vote for en banc

17  consideration." Dkt. 46.

18       38.     On August 6, 2021, the Ninth Circuit filed an order staying the mandate to permit

19  Defendants to file a writ of certiorari to the Supreme Court (Dkt. 50) and on October 21, 2021,

20  Defendants filed a petition for a writ of certiorari in the Supreme Court.  Defendants enlisted the

21  help of Supreme Court appellate specialists at Hogan Lovells US LLP, led by Neal Katyal.

22       39.     On November 24, 2021, the Chamber of Commerce of the United States of America,

23  the Securities Industry and Financial Markets Association, and Business Roundtable filed an amicus

24  brief in support of Defendants' position that companies should not have to disclose "past events."

25  Then, on December 13, 2021, another amicus brief was filed in support of Defendants' position,

26  this time by Washington Legal Foundation.

27

28

40.     On February 2, 2022, Rhode Island filed its brief in opposition, employing the services of experienced Supreme Court litigation firm, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.  On February 16, 2022, Alphabet filed its reply brief.

41.     On March 7, 2022, the Supreme Court denied Defendants' petition for a writ of certiorari, thereby letting stand the Ninth Circuit's opinion and returning the case back to the District Court after nearly two years of appellate litigation.  *Alphabet, Inc., et al. v. Rhode Island*, 142 S. Ct. 1227, 212 L. Ed. 2d 233 (2022).

42.     On March 23, 2022, Defendants filed their answer to the Consolidated Amended Complaint, denying the allegations and asserting certain affirmative defenses thereto.  ECF 93.

**D.      First Motion to Certify Class**

43.     In accordance with the then-operative scheduling order (ECF 95), which the Court imposed over Rhode Island's objection, Rhode Island filed its Motion to Certify Class on June 21, 2022, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).  ECF 102.  Rhode Island moved to certify a class consisting of all persons and entities who purchased or otherwise acquired Class A and/or Class C stock of Alphabet during the Class Period and requested that the Court appoint it and Robbins Geller to serve as Class Representative and Class Counsel, respectively.  Rhode Island argued that the proposed class satisfied the requirements of Rule 23, including numerosity, commonality, typicality, and adequacy.  In support of its motion, Rhode Island submitted the expert report of Joseph R. Mason, Ph.D., which offered two alternative methodologies for the calculation of class wide damages: (1) the share price reaction method; and (2) the fundamental valuation method.

44.     Rhode Island's atypical use of the fundamental valuation method and its significance to the class as a method by which to measure class-wide damages cannot be overstated.  It would have allowed the class to assess damages without sole reliance on an event study, which dramatically increased the class's potential recovery.

45.     Defendants filed their Opposition to Plaintiff's Class Certification Motion on August 22, 2022.  ECF 130.  First, Defendants argued that the disclosures alleged in the Complaint had no impact on Alphabet's stock price and that damages were, in effect, zero.  Second, Defendants

disputed Rhode Island's assertion that the *Affiliated Ute* presumption of reliance applied to this case because, as Defendants argued, the Complaint is based on affirmative statements (as opposed to omissions).   Third, Defendants argued that Rhode Island could not satisfy Rule 23(b)(3)'s predominance requirement with its fundamental valuation method because it is not a reliable measure of damages on a class-wide basis in securities class actions.  With their motion, Defendants submitted the rebuttal report of Professor Allen Ferrell to support their assertion that damages in this case were zero.

46.     In its Reply Memorandum filed on October 6, 2022, Rhode Island submitted the rebuttal expert report of Professor Jonah B. Gelbach and the reply expert report of Joseph R. Mason, Ph.D., which: (1) rebutted Professor Ferrell's assertion that the omissions alleged in the Consolidated Amended Complaint did not impact Alphabet's stock price; and (2) reiterated that class-wide damages are capable of being measured under the share price reaction method or fundamental valuation method.

47.     Nearly three weeks after Rhode Island filed its reply, Defendants submitted the reply report of Professor Allen Ferrell on October 24, 2022.  ECF 148-1.  Professor Ferrell's report asserted that after reviewing Professor Gelbach's rebuttal report and Dr. Mason's reply report, his opinions had not changed.

48.     On October 25, 2022, Rhode Island objected to Defendants' supplementary material for violating Judge White's scheduling order and Local Rule 7-3(d).  ECF 149.

49.     While briefing on the motion to certify class was ongoing, on August 29, 2022, Judge White issued an order *sua sponte* staying discovery in the case "pending this Court's determination of the precise scope of the [Ninth Circuit] remand in this case."  ECF 134.  The dispute regarding scope is discussed below.  *See infra* §III.C.

50.     In the midst of ongoing briefing regarding the scope of discovery, on February 28, 2023, Judge White granted Rhode Island's motion to supplement the Consolidated Amended Complaint (discussed below) and struck Rhode Island's pending motion to certify the class.  ECF 153.

1        E.        **Supplementing the Consolidated Amended Complaint**

2        51.        On September 8, 2022, while briefing for the motion to certify the class and several

3    discovery disputes were ongoing, in response to Judge White's order staying all discovery in the

4    case to determine the scope of the case on remand (ECF 134; discussed *infra* §III.C), Rhode Island

5    filed its Motion to Supplement the Consolidated Amended Complaint.  ECF 136.  In its motion,

6    Rhode Island noted that supplementation of the complaint was proper under Rule 15(d) and that

7    "supplementing now will minimize any additional delays due to defendants' contrived questions

8    regarding the scope of the Complaint on remand."  *Id.*  Rhode Island sought to supplement the

9    Consolidated Amended Complaint with, among other things, allegations that: (1) on April 29, 2019

10   (three days after the filing of the Consolidated Amended Complaint), "Alphabet announced that

11   'product changes' had an adverse effect on its business"; (2) "[t]hese product changes and resulting

12   adverse effect on Alphabet's revenues were the direct result of the remedial measures related to 'the

13   events described in the *WSJ* article' (of which the Google+ disaster was the tipping point) to stave

14   off a legislative or regulatory response, which defendants announced on October 8, 2018 – but the

15   corresponding risks of these remedial measures did not materialize until after October 2018"; and

16   (3) "[o]n April 30, 2019, Alphabet's Class A and Class C shares fell $4.86 and $4.96 per share,

17   respectively, which drop was caused, in whole or in part, by the materialization of the risks posed

18   by the remedial measures related to 'the events described in the *WSJ* article,' led by the Google+

19   catastrophe.  On May 1, 2019, as the market continued to absorb the materialization of these risks,

20   Alphabet's Class A and Class C shares declined $1.28 and $1.02 per share, respectively."  *Id.*

21       52.        Defendants filed their opposition on September 22, 2022, arguing that Rhode

22   Island's "attempt to supplement is futile because no facts support it" and "is also untimely, and

23   granting it would prejudice Defendants."  ECF 138.  Defendants noted that after Judge White issued

24   the order staying discovery, they provided two declarations to Rhode Island which purportedly

25   made clear that "the product changes that were described by Ruth Porat in April 2019 as having

26   contributed to the slowdown in revenue growth had no connection to data privacy."  *Id.*  Defendants

27   finally argued that the April 2019 Alphabet stock drops had no connection to the "Google+ Bug or

28

1  with any of the Company's alleged privacy changes in other products" and thus "was not corrective

2  of the fraud that Plaintiff alleges." *Id.*

3      53.    On reply, Rhode Island reiterated that its motion to supplement satisfies the liberally

4  construed Rule 15(d).  ECF 142.  Rhode Island further noted that it "has consistently made clear

5  that the damages here result from both immediate ***and belated*** stock price declines," "Rhode

6  Island's motion for class certification expressly identified price drops on October 8-10, 2018 (the

7  immediate price drops) and another on April 30, 2019 (the belated price drop)," and "defendants'

8  biased and untested declarations lend no support to their bad-faith [(and futility)] argument." *Id.*

9      54.    On February 28, 2023, Judge White granted Rhode Island's motion to supplement

10  the Consolidated Amended Complaint, finding that there was no undue delay, the supplement was

11  not proposed in bad faith, was not futile, and Defendants' recently disclosed set of declarations

12  could not be considered by the Court when assessing the sufficiency of a complaint.  ECF 153.

13  Judge White's order also struck the pending motion to certify class and lifted the stay on discovery

14  that had been in place for nearly six months.  *Id.*

15      55.    On the same day, Rhode Island filed its supplement to the Consolidated Amended

16  Complaint.  ECF 154.  On March 14, 2023, Defendants answered the supplement, denying the

17  allegations.  ECF 155.

18      **F.    Second Motion to Certify Class**

19      56.    On March 31, 2023, over Rhode Island's objections, Judge White entered an order

20  setting the case schedule, including briefing on Rhode Island's second motion to certify class.  ECF

21  159.  Rhode Island's motion to certify class was due May 2, 2023, Defendants' opposition was due

22  June 30, 2023, and Rhode Island's reply was due August 14, 2023.  *Id.*  Judge White set the fact

23  discovery deadline for June 3, 2024, and trial for August 18, 2025.  *Id.*

24      57.    On May 2, 2023, Rhode Island filed its second Motion to Certify Class, pursuant to

25  Fed. R. Civ. P. 23(a) and 23(b)(3).  ECF 165.  Rhode Island also moved to appoint Rhode Island as

26  Class Representative and Robbins Geller as Class Counsel.  Rhode Island sought to certify a class

27  of all persons and entities who purchased or otherwise acquired Class A and/or Class C stock of

28  Alphabet during the period from April 23, 2018 through October 7, 2018, inclusive.  *Id.*  Rhode

Island argued that the proposed class satisfied the requirements of Rule 23, including numerosity, commonality, typicality, and adequacy.  In support of its motion, Rhode Island submitted the expert report of Professor Frank Partnoy, which established that the market for Alphabet Class A and Class C stock was efficient and offered two alternative methodologies for the calculation of class wide damages: (1) the event study method; and (2) the discounted cash flow ("DCF") method.  ECF 174.

58.     Like the development of the fundamental valuation method, the development of the DCF method was critical to the ultimate recovery in this case.  It allowed the Class to assess damages without consideration of whether alleged stock drops were statistically significant, greatly increasing the Class's potential recovery.  During the class-certification process, Lead Counsel undertook considerable efforts to prepare for and defend the deposition of Professor Partnoy.

59.     Rhode Island again argued that the Class was entitled to a presumption of reliance under *Affiliated Ute* because the Complaint, as the Ninth Circuit opinion agreed, was based entirely on material omissions.  ECF 165.

60.     Defendants filed their opposition on June 30, 2023, arguing that: (1) the Complaint challenged affirmative statements, not pure omissions, so Rhode Island could not rely on the *Affiliated Ute* presumption of reliance and would have to rely on the *Basic* presumption of reliance, which Defendants' argued could be rebutted by a showing of lack of price impact at class certification; (2) the April 2019 revenue decline and resulting stock drops were caused not by product changes related to data security and privacy, but due to the "lapping" of a previously introduced product called "Burpee," among several other purported product changes—a proposition that was supported by Defendants' expert, Anindya Ghose (ECF 181-6); (3) Rhode Island could not establish price impact, supported by the expert report of Professor Allen Ferrell (ECF 181-5); and (4) Rhode Island's damages model was not capable of measuring damages on a class-wide basis.  ECF 181.

61.     On July 24, 2023, Judge White issued an order recusing himself from the case.  ECF 188.  On July 25, 2023, the case was reassigned to the Honorable Trina L. Thompson.  ECF 189.  On August 1, 2023, the Court issued a case management scheduling order maintaining the

1    previously set briefing schedule on Rhode Island's second motion to certify class and setting fact

2    discovery cut-off for June 3, 2024 and trial for August 18, 2025.

3         62.    On August 14, 2023, Rhode Island filed its reply brief, arguing that it is entitled to

4    the *Affiliated Ute* presumption of reliance because the "statements" at issue were really omissions

5    (not affirmative misrepresentations); even if the *Basic* presumption applied, Defendants could not

6    prove a complete lack of price impact; and, both the event study model and DCF model are

7    universally accepted methodologies that are naturally applied on a classwide basis.  ECF 198.

8    Rhode Island submitted the rebuttal expert report of Professor Gelbach, which supported Rhode

9    Island's argument that Defendants failed to show a lack of price impact.  ECF 199-1.

10        63.    In his rebuttal report, Professor Gelbach utilized an innovative theory (developed

11   with Lead Counsel) to prove price impact.  In his rebuttal report, Professor Gelbach explains that

12   Professor Farrell's event study was flawed because he failed to address contamination bias that

13   resulted from bad news related to Alphabet's alleged privacy scheme which indicated that more

14   regulation and consumer backlash were headed towards companies besides Alphabet.  "[N]ews

15   related to Alphabet's alleged privacy scheme could be expected to affect not just Alphabet but also

16   most, if not all, other internet-related firms."  ECF 199-1.  To account for this bias, Professor

17   Gelbach utilized an index of "Non-Internet" companies.  Using that index, Professor Gelbach found

18   the alleged October 2018 drops were statistically significant.  Lead Counsel's utilization of this

19   method along with the addition of the April 2019 stock drops via the supplement added potentially

20   hundreds of millions of dollars in damages to this case.

21        64.    On August 23, 2023, Defendants sought leave to file supplemental memorandum on

22   the Second Circuit's decision in *Arkansas Teacher Retirement System v. Goldman Sachs Group,*

23   *Inc.*, 2023 WL 5112157 (2d Cir. Aug. 10, 2023), stating that "[t]he opinion provides persuasive

24   appellate authority on the meaning and operation of *Goldman I* — an issue on which most federal

25   circuits, including the Ninth Circuit, have not yet had occasion to opine."  ECF 201.

26        65.    On the same day, Rhode Island filed its opposition to Defendants' motion, noting

27   that Defendants' motion failed to provide new authority, and even if it did, Defendants' motion did

28   not comply with Local Rule 7-3(d)(2).  ECF 204.

66.     On August 24, 2023, the Court denied Defendants' motion to file a supplemental memorandum.  ECF 205.

67.     On October 3, 2023, Professor Joseph A. Grundfest, "among the most highly regarded and prominent securities and corporate law scholars, teachers, and practitioners in the nation," filed a motion seeking leave to file a brief as amicus curiae.  ECF 210.  Professor Grundfest, who had previously submitted an amicus brief on behalf of defendants in *Goldman Sachs Grp., Inc. v. Ark. Tchrs. Ret. Sys.*, 141 S. Ct. 1951 (2021), sought to introduce briefing to support the proposition that "[b]ecause the Alphabet mismatch is at least as significant as the *Goldman I* and *II* mismatch, and because that mismatch precluded certifying the *Goldman* class, this class, *a fortiori*, cannot be certified."  ECF 210-2.

68.     The next day, before Rhode Island had an opportunity to respond, the Court granted Professor Grundfest's motion seeking leave to file a brief as amicus curiae.  ECF 212.

69.     Rhode Island filed an objection to Professor Grundfest's motion, arguing that Professor Grundfest's motion was untimely under Local Rule 7-3(d).  ECF 213.  Rhode Island also attached an exhibit demonstrating "Joseph A. Grundfest's longstanding partnership with defendants' lawyers."  *Id.*; *see* ECF 213-1.

70.     On October 5, 2023, the Court issued an order rescinding its previous order granting Professor Grundfest's motion for leave to brief as amicus curiae.  ECF 216.  The Court explained, "Upon further review, docket 210 was untimely filed and did not comply with Civil Local Rule 7-3(d).  The Court rescinds the Order at 212 and will not consider supplemental brief 214."  *Id.*

71.     On October 20, 2023, the Court vacated the hearing on Rhode Island's second motion to certify class scheduled for October 24, 2023 at the request of counsel.  ECF 218.

72.     On February 4, 2024, before a ruling on Rhode Island's second motion to certify class, the parties announced they reached a settlement agreement.

## III.    PREPARING THE CASE FOR TRIAL

### A.    Case Management

73.     On May 10, 2022, the parties submitted competing proposals in a joint case management statement.  ECF 94.  Defendants argued that discovery should be bifurcated, focusing

first on issues only relevant to class certification. *Id.* Rhode Island argued that Defendants' request to bifurcate discovery had no basis because there is substantial overlap between merits discovery and class certification discovery and that bifurcating discovery would delay resolution of class certification or degrade judicial economy. *Id.* On May 11, 2022, the case schedule was set. ECF 95. Judge White did not bifurcate discovery between class certification and merits stages. *Id.* Rhode Island's class certification and expert reports was set for June 21, 2022. The fact discovery cut-off date was set for September 15, 2023. The Court set a trial date of October 28, 2024.

**B.     Discovery Efforts**

74.     Rhode Island formally initiated fact discovery shortly after Defendants answered the Consolidated Amended Complaint on March 23, 2022 (ECF 93) and continued earnestly pursuing discovery throughout this litigation. During that time, despite Defendants' repeated attempts to prevent Rhode Island's discovery efforts, Lead Counsel obtained, reviewed, and analyzed the electronic equivalent of more than 270,000 pages of documents from Defendants and over 3,000 pages of documents produced by six third parties (and were in discussions to obtain additional third party discovery when the Settlement was reached), took two fact depositions (and noticed, formed teams to prepare, and was preparing for more than a dozen additional fact depositions). Lead Counsel helped Rhode Island gather and produce over 136,000 pages of discovery.

75.     Months of negotiations and motion practice were necessary for Rhode Island to obtain documents responsive to its discovery requests. Lead Counsel undertook the substantial task of reviewing the electronic equivalent of over 400,000 pages of documents, organizing, and analyzing the documents in preparation for depositions, class certification, expert reports, summary judgment, and trial. This effort was critical to Rhode Island's ability to ready the case for trial.

**1.     Initial Disclosures**

76.     On May 6, 2022, all parties served their initial disclosures.

**2.     Protective Order for Confidential Documents and Testimony**

77.     Given the subject matter of the allegations in this case, the parties anticipated that document productions were likely to contain confidential, proprietary, and/or private information. Over the course of several weeks, the parties negotiated the terms of a proposed protective order to

1  govern the confidential treatment of evidence produced in the case.  The parties exchanged multiple

2  drafts of a proposed order and held telephonic meet and confer conferences concerning certain

3  disputed language, including language regarding the manner and timing of confidentiality

4  designations.  On July 15, 2022, the parties agreed to the Stipulated [Proposed] Protective Order,

5  which Judge Ryu approved on July 20, 2022.  ECF 109, 111.

6      78.      Due to the volume and complexity of the information at issue, Robbins Geller took

7  care to establish an effective and efficient method for searching and collecting electronically-stored

8  information ("ESI") in the parties' possession.  After an extensive meet and confer process, the

9  parties came to a final agreement regarding ESI on October 24, 2022 (the "ESI Protocol").  ECF

10  146.  The ESI Protocol contained configurations of appropriate search terms, document custodians,

11  date ranges, and other relevant data points to be used in the collection process for each subset of

12  information relevant to Defendants' alleged conduct.  The parties undertook enormous effort in

13  crafting this agreement to enable Rhode Island to meaningfully develop its claims without imposing

14  an undue burden on Defendants.  Judge Ryu entered the ESI Protocol on October 27, 2022.  ECF

15  150.

16      **3.      Requests for Production of Documents**

17      79.      Documents related to the various aspects of Alphabet's data security and

18  management and disclosure policies were critical evidence in this Litigation.

19      80.      Rhode Island served three sets of document requests on Defendants on April 26,

20  2022, May 16, 2022, and June 3, 2022, respectively.  Among other things, these requests sought

21  documents concerning: (1) Defendants' affirmative defenses; (2) identification of witnesses with

22  relevant information; (3) Alphabet's actions and policies regarding disclosures; (4) product changes

23  related to user privacy and safety; (5) Alphabet's actions regarding the decision not to disclose the

24  Three-Year Bug and shutdown Google+; and (6) the Privacy Bug Memo.

25      81.      On May 26, 2022, Defendants served their Responses and Objections to Plaintiff's

26  First Set of Requests for Production of Documents, objecting to every request, including on grounds

27  of relevance, overbreadth, and privilege.  Defendants refused to produce documents on the grounds

28  of attorney-client privilege and work product protection in response to Document Request No. 3

1   which sought "The Legal and Policy Staff Memorandum and all documents related thereto."  In

2   response to all other requests, Defendants stated they "will meet and confer with Plaintiff regarding

3   conducting a reasonable search that is proportional to the needs of the case in response to this

4   Request."

5          82.   On June 28, 2022, Defendants served their Corrected Responses and Objections to

6   Rhode Island's Second Set of Requests for Production of Documents, objecting to every request,

7   including on grounds of relevance, overbreadth, and privilege.  In response to each request,

8   Defendants stated they "will meet and confer with Plaintiff regarding conducting a reasonable

9   search that is proportional to the needs of the case in response to this Request."

10          83.   On July 5, 2022, Defendants served their Responses and Objections to Rhode

11   Island's Third Set of Requests for Production of Documents, objecting to every request, including

12   on grounds of relevance, overbreadth, and privilege.  In response to each request, Defendants stated

13   they "will meet and confer with Plaintiff regarding conducting a reasonable search that is

14   proportional to the needs of the case in response to this Request."

15          84.   Over the course of the first weeks of discovery, it became clear that gathering

16   responsive documents from Defendants was going to be a challenge.  Lead Counsel and Defendants

17   exchanged dozens of emails and held several meet and confers regarding, among other things, the

18   scope of discovery generally, Fed. R. Civ. P. 30(b)(6) depositions, depositions of defendants,

19   including Pichai and Page, and Defendants' assertion of privilege over certain documents identified

20   as responsive, leading to several discovery disputes being briefed before Judge Ryu.

21          85.   On March 24, 2023, Rhode Island served its Fourth Set of Requests for Production

22   of Documents.  This request sought documents and communications concerning Alphabet's policies

23   regarding litigation holds, the use of "history on" and "history off" chats and also sought documents

24   produced in concurrent litigation that Alphabet was involved in.

25          86.   On April 25, 2023, Defendants served their Responses and Objections to Rhode

26   Island's Fourth Set of Requests for Production of Documents, objecting to every request, including

27   on grounds of relevance, overbreadth, and privilege.  In response to each request, Defendants stated

28

1   they "will meet and confer with Plaintiff regarding conducting a reasonable search that is

2   proportional to the needs of the case in response to this Request."

3       87.   Rhode Island served its Fifth, Sixth, and Seventh Set of Requests for Production of

4   Documents on Defendants on August 2, 2023, August 4, 2023, and September 18, 2023,

5   respectively.   Among other things, these requests sought discovery concerning: (1) documents

6   sufficient to identify the members of Alphabet's Privacy and Data Protection Office ("PDPO");

7   (2) discussions relevant to the allegations of the Complaint at Alphabet's "TGIF" meetings; (3) the

8   basis for the assertions in Defendants' expert report of Anindya Ghose submitted with their

9   opposition to Rhode Island's second motion to certify class; (4) A/B tests performed by Alphabet

10  in the testing of their products; and (5) any documents and communications produced to the SEC,

11  U.S. Attorney's Office for the Southern District of New York, or any other governmental agency

12  or department regarding the facts and events detailed in the October 8, 2018 blog post and *Wall*

13  *Street Journal* article.

14      88.   Defendants served their Responses and Objections on September 1, 2023,

15  September 5, 2023, and October 18, 2023, respectively.   Defendants' objected to every request,

16  including on grounds of relevance, overbreadth, privilege, burden, and cumulativeness.   In response

17  to each request, Defendants stated they "will meet and confer with Plaintiff regarding conducting a

18  reasonable search that is proportional to the needs of the case in response to this Request."

19      89.   After each request for production of documents was served and Defendants'

20  responses and objections received, the parties met and conferred pursuant to Defendants'

21  requirement that they would not conduct a reasonable search until after their self-imposed

22  procedural hurdle.   The parties engaged in various disputes that were not put before the Court,

23  including regarding search terms and custodians for electronically-stored information.   In each of

24  those instances, Rhode Island endeavored to seek responsive materials while moving the Litigation

25  toward a resolution.

26      90.   In total, these requests sought 65 categories of documents and ultimately resulted in

27  the production of over 250,000 pages.   Given the number of defendants present in this Litigation,

28  the necessary tailoring of specific requests to particular parties, and the sheer size of Alphabet

(making it difficult to identify individual custodians on certain issues), Rhode Island expended significant time and expense engaging in meet and confer efforts throughout discovery in attempt to resolve various issues, including negotiations regarding the proper scope of discovery, Defendants' objections and responses to requests, confidentiality designations, and the sufficiency of productions.

    **4.**      **Discovery Dispute Motion Practice, Briefing Regarding the Scope of Discovery, and *Sua Sponte* Discovery Stay**

     **a.**      **Scheduling Depositions of Named Defendants**

91.     On April 22, 2022, Lead Counsel made its intention clear to depose Pichai and Page and offered to schedule their depositions well in advance to avoid conflicts.  On May 10, 2022, in the parties' joint case management statement, Defendants made clear of their position that discovery should occur in stages, with only discovery relevant to class certification commencing first, previewing their position that the depositions of Pichai and Page should not occur.  ECF 94.  On May 11, 2022, Lead Counsel noticed the depositions of defendants Pichai and Page, as well as Alphabet employees Ben Smith and David Thacker.  Lead Counsel engaged in several meet and confers with Defendants over the depositions of Pichai, Page, and Smith, but Defendants were unwilling to schedule their depositions.  On June 17, 2022, the parties submitted a joint discovery letter brief on the issue to Judge White.  ECF 101.  Defendants argued that Pichai, Page, and Smith were protected from depositions under the so-called "apex doctrine."  They argued that because Pichai, Page, and Smith are "apex deponents," Rhode Island had to first exhaust efforts to obtain relevant information from other sources before seeking their depositions.  Defendants further argued that Pichai, Page, and Smith had no unique, first-hard knowledge of the facts of the case.

92.     Rhode Island argued that: (1) the apex doctrine is a made-up doctrine that unjustifiably provides special treatment to those who least need it and is particularly inapt to named defendants in a securities fraud class action like this one where the Ninth Circuit had already determined that the Complaint sufficiently alleged that Page and Pichai were aware of the Three-Year Bug, the Privacy Bug, and the Privacy Bug Memo and decided not to disclose this information; (2) Page and Pichai were personally charged with perpetrating securities fraud, thus their states of

1  mind were directly in issue; and (3) no court had ever applied the apex doctrine to shield individual

2  alleged perpetrator-defendants from being deposed in a §10(b) case.

3        93.  After engaging in further meet and confers to no avail, pursuant to Judge Ryu's June

4  29, 2022 order dismissing without prejudice the joint discovery letter brief filed on June 17, 2022

5  (ECF 106), the parties filed another joint discovery letter brief on the topic of apex depositions on

6  July 15, 2022.  ECF 107.  Defendants reiterated their position that depositions of Pichai, Page,

7  Smith, and (now) Alphabet CFO, Ruth Porat, were premature before briefing Rhode Island's

8  motion to certify class and that there were other means to obtain relevant information that Rhode

9  Island had not exhausted.  Rhode Island argued that Pichai and Page's own states of mind (scienter)

10  were directly at issue in the case, Pichai and Page had first-hand knowledge of other critical issues

11  like the scope of Google's data-security crisis and its response, and that Alphabet's executives

12  should not be able to yield this "new form of 'sword-and-shield' injustice where 'senior controlling

13  officers' use their unique positions of power to commit securities fraud, and then use the same

14  positions to shield themselves from discovery and accountability."  *Id.*

15        94.  On August 11, 2022, Judge Ryu held a hearing on the pending discovery disputes

16  regarding apex depositions and 30(b)(6) depositions.  Judge Ryu denied the joint discovery letter

17  brief regarding apex depositions without prejudice and took the unprecedented step of requiring

18  Rhode Island to build a record by providing facts relevant to the apex deponents "in front of [Judge

19  Ryu] with a sworn declaration."

20        95.  On August 25, 2022, following additional meet and confer efforts, the parties

21  submitted their joint discovery letter brief regarding apex depositions for a third time.  ECF 133.

22  Defendants reiterated their position that depositions of Page, Pichai, and Smith should not proceed

23  because "non-apex discovery should occur first" and that they had no unique knowledge that could

24  not be obtained from other sources.  *Id.*  Rhode Island reiterated that the so-called apex doctrine

25  was a made-up doctrine that was antithetical to the bedrock principle that everyone is equal under

26  the law, and it was particularly inappropriate here, where the Ninth Circuit had already determined

27  the sufficiency of Rhode Island's allegations and Pichai, Page, and Smith were all personally

28

1    involved in the allegations and may have relevant information to which Rhode Island was entitled.

2    *Id.*

3        96.    On August 29, 2022, Judge White issued an order staying all discovery in the case

4    to determine the scope of the case on remand from the Ninth Circuit.  ECF 134.  This *sua sponte*

5    stay lasted approximately six months.

6        97.    Following Judge White's order lifting the discovery stay (ECF 153), the parties

7    again filed a joint discovery letter brief on their dispute concerning Rhode Island's depositions of

8    Pichai, Page, Smith, and Porat on April 21, 2023.  ECF 162.  Defendants agreed to produce Ben

9    Smith for a deposition with no restrictions and Porat for a deposition "for 2.5 hours on the topics of

10   the 'product changes' and other drivers of the first-quarter 2019 revenue deceleration . . . . Plaintiff

11   can seek leave of the Court for a second session . . . upon the necessary showing under the apex

12   doctrine."  *Id.*  Defendants refused to produce Pichai and Page before substantial completion of

13   document discovery in January 2024.  *Id.*  Rhode Island argued that there is no provision in Rule

14   26 regarding "apex depositions" and Defendants had not met their burden for a protective order

15   under Rule 26(c).  *Id.*  Rhode Island also noted that Pichai and Page had direct knowledge about

16   the allegations in the case and that "***most*** of the witnesses Page and Pichai have identified and

17   reserved the right to call at trial regarding multiple critical subjects are supposed apex witnesses,

18   ***including themselves***."  *Id.*  Rhode Island offered to agree to a deposition of Porat starting with a

19   3.5-hour deposition without artificial subject-matter limitations and subject to completing the

20   remaining 3.5 hours upon justified request.  *Id.*

21       98.    On June 22, 2023, Judge Ryu held a hearing regarding the apex deposition dispute.

22   ECF 175.  At the hearing, Judge Ryu acknowledged that the apex doctrine was "sort of a caste

23   system" that "do[es]n't feel entirely fair."  ECF 177 at 8:18-19.  Nevertheless, Judge Ryu applied

24   it, granting defendants Page and Pichai an automatic protective despite no evidentiary showing

25   whatsoever beyond their status as important people.  In an order that followed, Judge Ryu ordered

26   a 3-hour time limit for the deposition of Porat and a strict subject-matter limitation confined to

27   questions related to her knowledge as to product changes and other drivers of the first quarter of

28   2019 revenue deceleration.  *Id.*  Judge Ryu denied Rhode Island's request to depose Porat regarding

the issue of Sarbanes-Oxley certifications she personally signed, finding that the present record did not sufficiently establish whether that discovery could be obtained from other sources. *Id.* Judge Ryu further ordered that Rhode Island could immediately take the depositions of Pichai and Page regarding their states of mind, but critically ordered the parties to further meet and confer on the topics and length of the Pichai and Page depositions, preventing Rhode Island from deposing the two principal defendants in this case without significant restrictions and hurdles that no Court had ever previously applied to the deposition of a named defendant in a case under the PSLRA. *Id.*

99.     On July 6, 2023, Rhode Island moved for relief from Judge Ryu's June 22, 2023 order arguing that Judge Ryu failed to apply the legal standard required for a protective order under Rule 26(c). ECF 185.  On July 20, 2023, Judge White denied Rhode Island's motion. ECF 187. This was two business days before Judge White found himself "disqualified" from a case over which he had presided for nearly five years, offering no further details or explanation. ECF 188.

100.     On September 19, 2023, the parties filed another joint discovery letter brief regarding the topic of apex depositions. ECF 208.  Rhode Island argued that Defendants' status as executives of a large company should not alone relieve them of their burden of proof to establish good cause under Rule 26(c)(1). *Id.*  Defendants argued that they offered to produce Pichai for two hours and Page for 1.5 hours on the court-ordered topics and the parties should continue their meet and confer process. *Id.*

101.     The parties reached a settlement agreement before this dispute could be decided.

### b.     Federal Rule of Civil Procedure 30(b)(6) Deposition

102.     On June 23, 2022, Rhode Island filed a discovery letter brief regarding Alphabet's refusal to schedule and failure to appear for its noticed Rule 30(b)(6) deposition. ECF 104.  Lead Counsel explained that Defendants refused to agree to file a joint discovery letter on the issue, so Lead Counsel filed its own letter.   The dispute arose over weeks of attempting to schedule Alphabet's Rule 30(b)(6) deposition.  Specifically, on April 26, 2022, Lead Counsel first noticed Alphabet's 30(b)(6) deposition, providing Alphabet with six topics to be covered.  Alphabet refused to engage and on May 11, 2022, pursuant to Judge White's Standing Order, Rhode Island identified a date (June 9, 2022) and served the notice of deposition.  After exchanges of emails and several

1  meet and confers on the topic, Alphabet refused to produce a witness to testify on the six topics

2  identified by Lead Counsel.  Rhode Island asked the court to impose sanctions under Rule 37 if

3  Alphabet refused to produce a responsive witness within 14 days of the Court's order.

4       103.  On June 24, 2022, the case was referred to Magistrate Judge Donna M. Ryu for

5  discovery.

6       104.  Alphabet responded to Rhode Island's discovery letter brief on June 24, 2022.  ECF

7  105.  Alphabet argued that Rhode Island failed to adequately negotiate the timing and scope of the

8  noticed deposition, Alphabet is not obligated to produce witnesses on all topics on a single day, and

9  sanctions should not be imposed.

10       105.  On June 29, 2022, Judge Ryu denied without prejudice the pending apex doctrine

11  and 30(b)(6) deposition disputes, noting that if any disputes remain after meaningful meet and

12  confers, the parties may submit new stand-alone joint discovery letters on apex depositions and

13  30(b)(6) depositions.  ECF 106.  Judge Ryu further set out her procedures for responding to

14  discovery disputes.

15       106.  On July 15, 2022, following additional meet and confers, the parties filed a joint

16  discovery letter brief again on the topic of Alphabet's 30(b)(6) deposition.  ECF 108.  Rhode Island

17  argued that Alphabet refused to produce a responsive witness and were simply attempting to

18  unilaterally limit the scope of discovery in the case.  Rhode Island reiterated that Rule 37 sanctions

19  must be imposed on Alphabet for failing to produce a witness.  *Id.*  Defendants argued that Rhode

20  Island was attempting to expand the scope of discovery and Rule 37 sanctions were not warranted.

21  *Id.*

22       107.  On August 11, 2022, Judge Ryu held a hearing on the pending discovery disputes

23  regarding apex depositions and 30(b)(6) depositions.  Judge Ryu denied the joint discovery letter

24  brief without prejudice and told the parties that a "fundamental scoping problem was sort of half

25  buried in your letter and not fleshed out, and that's something that needs to get decided if you can't

26  come to an agreement among yourselves."

27       108.  Now a nearly four-month-old dispute, on August 25, 2022, following additional

28  meet and confer efforts, the parties filed a joint discovery letter brief regarding 30(b)(6) depositions

1    for the third time.  ECF 132.  Rhode Island reiterated that the topics selected for a 30(b)(6)

2    deposition directly tie to the allegations of the Consolidated Amended Complaint, which alleges

3    that the most critical component of Alphabet's business is user trust, and that while "Defendants'

4    data-privacy crisis may have started with Google+, [] the Complaint expressly alleges that

5    [D]efendants' response transcended all products."  *Id.*  Rhode Island further offered to limit the

6    scope of 30(b)(6) depositions to just four topics.  *Id.*  Defendants argued that the Consolidated

7    Amended Complaint's allegations did not go beyond the Google+ product and that Rhode Island

8    could not articulate a connection between requested discovery and its claims.  *Id.*  Defendants

9    contended that "If Plaintiff Wants to Expand the Case Beyond Google+, It Must Seek Leave to

10   Amend."  *Id.*

11                    **c.    Privilege Disputes**

12        109.    On July 22, 2022, Rhode Island filed a joint discovery letter brief regarding

13   Defendants' claim of privilege over the Privacy Bug Memo.  ECF 112.  Rhode Island argued that

14   Defendants produced a deficient privilege log that failed to: "(1) identify everyone who prepared

15   and edited the [Privacy Bug] Memo; (2) identify who had access to or received the [Privacy Bug]

16   Memo; (3) identify to whom the [Privacy Bug] Memo was sent; or (4) provide a sufficiently detailed

17   description to enable the Court or Rhode Island to assess whether the [Privacy Bug] Memo was

18   prepared primarily for business purposes (which appears to be the case, based on *The Wall Street*

19   *Journal* article and the apparent lack of involvement of outside counsel) rather than a primarily

20   legal purpose."  *Id.*  Rhode Island noted that despite not being able to come to an agreement after

21   several meet and confers, "Defendants would rather continue their meet-and-confer charade than

22   simply comply with the Court's privilege-log requirements."  *Id.*  Defendants argued that their

23   privilege log was sufficient and Rhode Island failed to point to specific deficiencies in the privilege

24   log.

25        110.    On July 25, 2022, Judge Ryu denied the discovery letter brief without prejudice and

26   ordered Defendants to provide an amended privilege log by July 29, 2022 that "fully complies with

27   Judge Ryu's standing order."  ECF 114.  Judge Ryu further ordered the parties to continue to meet

28

1   and confer and file a new standalone joint letter by August 5, 2022 that attaches the amended

2   privilege log.  *Id.*

3        111.    Rhode Island and Defendants filed another joint discovery letter brief on August 5,

4   2022 following further meet and confer efforts.  ECF 115.  Rhode Island argued that: (1) Defendants

5   failed to identify all recipients of the Privacy Bug Memo, only identifying those who were furnished

6   the document via Google Docs sharing; and (2) Defendant failed to log all previous versions of the

7   Privacy Bug Memo and authors.  *Id.*  Defendants argued that their privilege log complied with

8   Judge Ryu's standing order, providing the necessary information and Rhode Island was "using this

9   manufactured dispute as a shortcut to seek substantive discovery."  *Id.*

10       112.    On August 29, 2022, following Judge White's order staying discovery in the case,

11   Judge Ryu vacated the hearing over the disputed privilege log.  ECF 135.

12       113.    On September 22, 2023, the parties submitted a joint discovery letter brief regarding

13   Defendants' assertion of attorney-client privilege over the Privacy Bug Memo.  ECF 209.  Rhode

14   Island argued that attorney-client privilege does not apply because the Privacy Bug Memo was

15   created primarily for a business purpose, and even if it was privileged, that privilege was waived

16   by Defendants because they made clear that they would intend to rely on a reliance of counsel

17   defense regarding why Defendants did not disclose the Three Year Bug.  *Id.*  Defendants argued

18   that privilege applies because the Privacy Bug Memo was created to provide legal advice and

19   Alphabet never put the Privacy Bug Memo's legal advice at issue in this case.  *Id.*

20       114.    The parties reached a settlement agreement before this dispute could be decided.

21       **C.    Briefing Concerning the Scope of Discovery and *Sua Sponte* Stay**

22       115.    Over the background of ongoing discovery disputes related to apex depositions,

23   30(b)(6) depositions, and privilege assertions, on August 18, 2022, Defendants filed a request for

24   supplemental case management conference regarding the scope of the case.  ECF 128.  Defendants

25   asserted that following Judge Ryu's comments at the August 11, 2022 hearing regarding the scope

26   of the case, they sought a ruling from Judge White "confirming the scope of claims at issue in this

27   case as being about Google+ and not any other Google product."  *Id.*  Defendants argued that the

28   scope of the case should be limited to only the Google+ product.

116.     The following day, Rhode Island filed its Opposition to Defendants' Request for an Advisory Opinion.  ECF 129.  Rhode Island argued that it is inappropriate for the Court to issue an order where "there is no issue formally before the Court that requires any sort of examination of the scope of the 34-page [Consolidated Amended] Complaint."  *Id.*  Rhode Island further pointed out that the scope of the Consolidated Amended Complaint went well beyond just Google+ and "transcended all products," as Alphabet made significant non-Google+ product privacy changes in response to the events described in the *Wall Street Journal* article.  *Id.*

117.     On August 29, 2022, Judge White stayed the entirety of discovery in the case to resolve "this Court's review of the matter on remand."  ECF 134.  Judge White ordered the parties to provide additional briefing "addressing the scope of the case upon remand that remains for this Court to decide."  *Id.*

118.     Rhode Island filed its brief per the Court's schedule on September 9, 2022.  ECF 137.  Rhode Island argued that the Ninth Circuit's opinion left virtually all aspects of the Consolidated Amended Complaint intact and, in any event, Rhode Island filed a motion to supplement the Consolidated Amended Complaint on September 8, 2022, which should moot the issue regarding the scope of the case.  Further the question on remand from the Ninth Circuit was a narrow one: reconsidering Pichai and Page's liability under Section 20(a).  Rhode Island also asserted that a Special Master would be valuable in this case to help get the Litigation on track.  *Id.*

119.     On September 23, 2022, Defendants filed their response, arguing that from the beginning this case was focused solely on Alphabet's decision not to disclose the Google+ bug and Rhode Island attempted to recast the Litigation as involving data privacy broadly across all Google products.  ECF 140.  Defendants further argued that Rhode Island's motion to supplement the Consolidated Amended Complaint does not broaden the scope of the case to include non-Google+ products and a Special Master was unnecessary in this case.  *Id.*

120.     Rhode Island filed its reply on September 30, 2022, arguing that Defendants failed to respond to the only question the Court posed: what is the scope of the case upon remand that remains for the Court to decide?  ECF 144.  Rhode Island further argued that Defendants ignored large swaths of the Consolidated Amended Complaint's allegations to come to the conclusion that

1    this Litigation is solely about Google+. *Id.* Rhode Island further reiterated the need for a Special

2    Master to facility the just, speedy, and inexpensive disposition of the action. *Id.*

3        121.    On February 28, 2023, Judge White granted Rhode Island's motion to supplement

4    the Consolidated Amended Complaint and lifted the stay on discovery that had been pending for

5    nearly six months. ECF 153.

6        **D.**     **Additional Discovery Efforts**

7        122.    Nothing about discovery was straightforward in this Litigation. Even what would

8    normally be considered routine discovery of email and loose documents required Lead Counsel to

9    confront novel technological and legal challenges. Alphabet uses the Google Suite for email and

10    document creation and storage. The Google Suite is a cloud-based email and document system that

11    is increasingly used in business today. These systems do not rely on attachments to emails, but

12    more routinely uses hyperlinks to cloud-based documents. In fact, Google email requires

13    hyperlinks to be used in lieu of attachments if the attachment is too large.

14        123.    The use of cloud-based documents creates a novel discovery issue in terms of

15    document collection and production. Unlike traditional attachments to email, cloud-based

16    documents attached via hyperlink do not always automatically export along with the cover email

17    upon collection. When applying search terms to email, the search terms will not automatically hit

18    on a document that is hyperlinked within an email, which means missing out on relevant documents

19    where search terms are only in the hyperlinked attachments. Compounding this issue, because there

20    may be no automated way to reverse engineer which emails included hyperlinks to a relevant

21    document found in an independent search of a Google Drive, there would be no way to determine

22    who was sent a link to a relevant document and when or what commentary may have been included

23    in a corresponding email. In addition, when hyperlinked documents are collected with the cover

24    email, it may not be the version of the document that existed at the time the email was sent, even

25    though that version and other earlier versions may still exist with the Google Drive. These are just

26    some of the novel issues that Lead Counsel had to navigate when negotiating discovery with

27    Alphabet. In doing so, Lead Counsel had to conduct extensive research on the available options

28

1    when collecting and producing documents from the Google Suite and consult with internal and
2    external electronic discovery experts.

3         124.    In this Litigation and other unrelated litigations, Alphabet used this practice of
4    hyperlinking, rather than attaching, documents referenced in emails to its strategic advantage to
5    limit its discovery obligations by vehemently resisting the production of hyperlinked documents in
6    the same way that traditional attachments are produced.

7         125.    Lead Counsel's diligent research and use of internal electronic discovery experts
8    uncovered that Alphabet's position on hyperlinks ignored the availability of a tool – Metaspike's
9    Forensic Email Collector – which vendors routinely use to collect Google based hyperlinked
10   documents along with its cover email.  In addition, Lead Counsel found that Alphabet's position
11   was contrary to a discovery approach that Google had taken in an ongoing antitrust litigation where
12   in a January 15, 2021 letter, Google's counsel represented that it was able to "conduct an automated
13   search to identify all links within emails that are linked to shared G Suite documents (Google Docs,
14   Google Sheets, and Google Slides), . . . Google will process and produce the documents
15   corresponding with the email links as though they were separate documents. . . .  [B]oth the parent
16   document and linked-to-document would be produced with sufficient metadata to tie the documents
17   together."  Joint Status Report at 8-9, n.4, *United States v. Google LLC*, No. 1:20-cv-03010-APM
18   (D.D.C. June 16, 2022).  Lead Counsel also consulted with external electronic discovery experts to
19   confirm its understanding of Alphabet's systems and available options.

20        126.    Had Lead Counsel not had internal experts who understood the complicated
21   electronic discovery issues and available solutions and did not have counsel with the sophistication
22   to negotiate with Alphabet about discovery from a system that Alphabet itself created, Lead Counsel
23   may have been unable to overcome the technological challenges and existing contrary case law on
24   this issue and forced to merely accept Alphabet's position that hyperlinked documents should not
25   be produced.

26        127.    Being forced to accept emails or other communications without hyperlinked
27   documents would be detrimental to Rhode Island's discovery efforts.  This would be akin to
28   accepting emails be produced without attachments.  As with traditional attachments, hyperlinked

1   documents add crucial context to the email and vice versa.  Failure to receive hyperlinked

2   documents, along with the emails in which they were hyperlinked, would have rendered the

3   production deficient and hampered Rhode Island's ability to fully understand and utilize the

4   documents produced in discovery.

5       128.    After receiving Alphabet's document production, it was also essential for Lead

6   Counsel to develop a custom workflow to ensure that Alphabet had produced hyperlinked

7   attachments in the agreed upon manner and identify any emails where hyperlinked documents were

8   not produced or where additional versions of a document may be required.  As one court recently

9   recognized, "contemporaneous versions of hyperlinked documents can support an inference

10  regarding 'who knew what, when.'  An email message with a hyperlinked document may reflect a

11  logical single communication of information at a specific point in time, even if the hyperlinked

12  document is later edited.  Thus, important evidence bearing on claims and defenses may be at stake,

13  but the ESI containing that evidence is not readily available for production in the same manner that

14  traditional email attachments could be produced." *In re Uber Techs., Inc. Passenger Sexual Assault*

15  *Litig.*, 2024 WL 1772832, at *2 (N.D. Cal. Apr. 23, 2024).  In early 2024, after Alphabet's

16  production was complete, some of the issues presented by the use of hyperlinks was alleviated when

17  Google changed its posture by altering its technology to allow hyperlinked documents to be

18  collected along with their corresponding cover emails when using Google Vault, however, a third

19  party application is still required to collect the version of the document that existed at the time the

20  email was sent.  *Id*.  These changes, along with other advances sure to come, will allow future

21  litigants to have less barriers to the production of relevant documents from companies who use

22  Google email.

23      **1.    Review and Analysis of Documents Produced in Discovery**

24      129.    Ultimately, Defendants and 15 third parties produced the electronic equivalent of

25  over 275,000 pages of documents.  The size of the production in this case required expending

26  significant time and expense on document hosting, storage, review and analysis.  Lead Counsel

27  employed state-of-the-art Relativity software, which enabled Lead Counsel to search, prioritize,

28  sort, de-duplicate, categorize, highlight, annotate, and tag documents in preparation for mediation,

depositions, motions, summary judgment, and trial.  Lead Counsel also employed artificial intelligence tools to make their review more efficient.  Still, document review in this case was a massive undertaking.  The sheer number of individuals and Alphabet departments involved as well as the complexity underlying Alphabet's business operations required attorneys and support staff to spend thousands of hours in Relativity to review documents, understand them, and then ultimately to identify relevant documents supporting key evidentiary issues.  Furthermore, Lead Counsel also dedicated substantial time in its review to assessing the sufficiency of document production in addition to identifying integral non-party entities, which in turn helped Lead Counsel identify third parties to whom it would issue subpoenas.

### 2.      Interrogatories and Requests for Admission

130.    Rhode Island served interrogatories and requests for admission on Defendants during this Litigation to aid in the identification of relevant documents and to garner evidence in support of its claims.  The topics of these interrogatories and requests for admission included the market efficiency of Alphabet stock and product changes undertaken by Alphabet during the 2018 calendar year.

### 3.      Discovery Taken from Non-Parties

131.    Lead Counsel undertook substantial efforts to obtain relevant evidence from non-parties, including those described below.  In total, Rhode Island served 15 subpoenas for production on third parties located across the United States to obtain evidence needed to prepare this case for trial.  Rhode Island uncovered evidence in the case from these 15 third parties.

### 4.      Fact Depositions

132.    During the course of fact discovery, Rhode Island took two fact depositions of David Thacker (Vice President of Product Management & User Experience at Alphabet) and Ruth Porat (CFO of Alphabet).  Additional deposition notices were served to Ben Smith, Larry Page, Sundar Pichai, and Atanas Vlahov.  Defendants either refused to produce those witness or depositions were scheduled to commence after the date upon which the parties reached a settlement agreement.  Lead Counsel spent hundreds of hours preparing questions and identifying and analyzing documents to use in their examinations both at deposition and trial.  At the time the settlement agreement was

1   reached, Lead Counsel was in the process of analyzing and identifying relevant documents and

2   preparing for the depositions of at least a dozen other individuals, including all named defendants.

3   **5.    Defendants' Discovery**

4   133.   Over the course of the fact discovery period, Rhode Island provided thorough

5   discovery responses.  Rhode Island provided responses to 20 documents requests, affirmatively

6   stating the full extent of its document production, and confirming (after its collection and production

7   of over 160,000 pages of discovery) that it had produced all such materials so described that were

8   locatable after it diligently searched all locations at which such materials might plausibly exist.

9   134.   Rhode Island also responded in great detail to 18 interrogatories on topics that

10   included, among others: (i) Rhode Island's transactions in Alphabet securities; (ii) the information

11   upon which Rhode Island relied in its investment decisions; and (iii) the bases, facts, and statements

12   relating to Rhode Island's contentions (*i.e.*, "contention interrogatories").

13   **E.    Experts**

14   135.   Rhode Island retained experts in the fields of statistics, valuations, and damages,

15   each of whom worked a significant number of hours on this case analyzing the facts and preparing

16   reports.

17   **1.    Professor Jonah B. Gelbach**

18   136.   Rhode Island retained Professor Gelbach, an economist and the Herman F. Selvin

19   Professor of Law at the University of California Berkeley School of Law, to research, analyze, and

20   provide expert opinions on issues relating to loss causation, price impact, and the statistical

21   significance of the alleged stock drops.  Professor Gelbach has researched and written extensively

22   on the use of event studies in securities litigation. *See, e.g.*, Jill E. Fisch & Jonah B. Gelbach, *Power*

23   *and Statistical Significance in Securities Fraud Litigation*, 11 Harv. Bus. L. Rev. 55 (2021);

24   Andrew Baker & Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in*

25   *Securities Litigation*, 5 J. of L., Fin., & Acct. 231 (2020); Jonah B. Gelbach & Jenny R. Hawkins,

26   *A Bayesian Approach to Event Studies for Securities Litigation*, 176 J. of Inst. & Theor. Econ. 86

27   (2020).  Rhode Island utilized Professor Gelbach's expertise in these areas to support both of its

28   motions for class certification.  Professor Gelbach explained that he based his opinions on his

1    expertise, knowledge, and scholarship in the areas of statistical methods, event study econometrics,

2    and securities litigation; a review of case documents and other relevant information; and after

3    conducting various studies.  This information, and an event study constructed by Professor Gelbach,

4    formed the basis of his opinion that Alphabet stock exhibited declines for both classes of stock on

5    October 8-10, 2018 and on April 30-May 1, 2019 that were statistically significant above the 95%

6    level.

7         137.    Professor Gelbach's novel event study played a crucial role in this Litigation.

8    Specifically, in collaboration with Lead Counsel, and based on his extensive research into the field,

9    Professor Gelbach developed an innovative event study to evaluate the statistical significance of

10   the alleged stock drops.  As Professor Gelbach noted in his report, "Professor Ferrell's report suffers

11   from what can best be called contamination bias.  This bias arises from including in his event-study-

12   regression model stock indexes that include companies whose share prices are sensitive, in the same

13   ways that are true for Alphabet, to news about future industry-wide profitability and regulatory risks

14   of internet-related firms.  Including these internet-related firms causes Professor Ferrell's event

15   study model to treat industry-wide effects of Alphabet's bad news as if they instead reflected causes

16   of Alphabet's price changes unrelated to Alphabet's bad privacy news.  By including those internet-

17   related firms in his stock index regressors, Professor Ferrell thereby erroneously treats any industry-

18   wide effects of Alphabet's bad news as a basis for reducing the magnitude of the calculated

19   abnormal returns for Alphabet."  ECF 199-1 at 5.

20        138.    To eliminate this contamination bias, Professor Gelbach created a "'Non-Internet

21   Index' based on those firms in the S&P 500 that can reasonably be thought to be non-internet firms."

22   *Id.* at 36.  Professor Gelbach's index is comprised of over 300 firms that never had an industry code

23   on the internet industry code list.  *Id.*  After performing his event study analysis using the Non-

24   Internet Index, Professor Gelbach found that:

25             (a)     "the evidence in favor of price impact over the three-day period of October

26   8-10, 2018 is strong enough to reject the Ferrell null hypothesis at conventional scholarly levels of

27   statistical significance, including the 5% significance level that Professor Ferrell advocates" (*Id.* at

28   59); and

1    (b)    "for both Alphabet's Class A stock and Class C stock, the Ferrell null

2    hypothesis is overwhelmingly rejected in favor of price impact over the two-day period of April 30

3    and May 1, 2019." *Id.* at 68.

4    139.    In the event the Court determined that the *Basic* presumption applied (as opposed to

5    the *Affiliated Ute* presumption), Professor Gelbach's analysis and opinions would be crucial to

6    responding to Defendants' attempts to rebut the price impact presumption.

7    140.    Lead Counsel also extensively consulted Professor Gelbach on the issues of loss

8    causation and damages.  His analyses helped inform theories to pursue in discovery, alternative

9    calculations of damages given factual proof, and the strengths and weaknesses of the parties'

10    positions on these two elements.  These analyses assisted Rhode Island in negotiating an appropriate

11    settlement.  In addition, Professor Gelbach played a vital role in the development and negotiation

12    of the Plan of Allocation, which governs how claims will be calculated.  Professor Gelbach's

13    services in these proceedings were critical and contributed materially to the benefits achieved for

14    the Settlement Class.

15    **2.    Professor Frank Partnoy**

16    141.    Lead Counsel retained Professor Frank Partnoy as a market efficiency and damages

17    expert.  Professor Partnoy is the Adrian A. Kragen Professor of Law at the UC Berkeley School of

18    Law and he has written extensively on the fields of securities markets and regulation, including

19    finance, accounting, and valuation.  Rhode Island utilized Professor Partnoy's opinions on market

20    efficiency and the ability to prove class-wide damages in its motion to certify class.  Professor

21    Partnoy explained that Alphabet's Class A and Class C stock traded in an efficient market and that

22    damages in this case were capable of class-wide calculation under two methods: (1) the event study

23    method; and (2) the DCF model.

24    142.    Professor Partnoy's DCF model was critical to Rhode Island's argument that

25    damages were capable of class-wide calculation without reliance on market price, which was the

26    linchpin to establishing damages where a conventional approach would have shown none.

27    Specifically, while event studies are often used to estimate damages on a class-wide basis, there

28    was risk that the Court would accept Defendants' argument that an event study could not be used

1    to reliably measure class-wide damages (notwithstanding Professor Gelbach's analysis).  In that
2    event, Professor Partnoy's DCF model would be important to showing that class-wide damages
3    could be calculated.

4        143.    Professor Partnoy explained that "DCF analysis is well-established as the 'gold
5    standard' in valuation," "[a]cademic acceptance of DCF analysis is widespread," and "[c]ourts and
6    experts routinely rely on DCF analysis in numerous contexts, particularly when it is alleged, as in
7    a securities class action, that market prices do not accurately represent 'true' values."  ECF 166-2
8    at 11-12.  "The DCF methodology involves two concepts, each of which is reflected in the price of
9    a stock."  *Id.* at 13.  Those two concepts are:

10        (a)    "First, a stock's price is based on expected future cash flows.  Accordingly,
11    the initial step using the DCF methodology is for experts to project those future cash flows, based
12    on accounting information, industry estimates, internal corporate projections, banker and analyst
13    valuations, or other sources.  These projections are transparent: experts would create spreadsheets
14    showing future cash flow estimates periodically into the future, along with the bases for these
15    estimates."  (*Id.*); and

16        (b)    "The second step in the DCF analysis is to discount the expected future cash
17    flows to obtain their present value.  Discounting and present value are two common and reliable
18    concepts in finance and are widely used by experts in valuing securities.  These calculations also
19    are transparent: experts would estimate the expected return on the stock, an appropriate cost of
20    capital, and then apply this rate of return using a standard mathematical formula to calculate the
21    present value of each expected future cash flow.  The result would be the sum of those present
22    values."  *Id.*

23        144.    Professor Partnoy further explained that "[i]n this case, experts could apply DCF
24    analysis to assess the above three issues [(cash flow projections, terminal value estimates, and
25    discount rate calculations)] as of particular dates, based on publicly available data as well as
26    evidence obtained in this litigation, potentially including management, investor, and analyst
27    assessments and projections."  *Id.* at 15.  As such, Professor Partnoy concluded that "like event
28    study analysis, DCF analysis can address questions about confounding information, and take into

1    account negative non-fraud related information.  Moreover, as with event study analysis, DCF

2    analysis would be class-wide, meaning that it would not differ for individual members of the class."

3    *Id.* at 18.

4         145.    Professor Partnoy's opinion materially contributed to the benefits achieved for the

5    Settlement Class.

6                   **3.    Joseph R. Mason, Ph.D.**

7         146.    Lead Counsel retained Mr. Mason as a damages expert.  Dr. Mason is a Professor

8    of Finance at the Ourso School of Business, Louisiana State University, Fellow at the Wharton

9    School, the University of Pennsylvania, and Senior Advisor at BVA Group LLC.  Dr. Mason holds

10   a Ph.D. and a M.S. in Economics from the University of Illinois at Urbana-Champaign.  Rhode

11   Island utilized Dr. Mason's opinion in support of its first motion to certify class.  Dr. Mason opined

12   that widely accepted financial and economic methods such as event studies and fundamental

13   valuation methods can be used to arrive at damages for every member of the proposed Class using

14   a common technique grounded in Rhode Island's theory of liability.

15   **IV.   LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND
         EXPENSES IS REASONABLE**
16
17         **A.    Lead Counsel's Application for Attorneys' Fees and Expenses Is
                 Reasonable**

18         147.    The Supreme Court has long recognized that "a litigant or a lawyer who recovers a

19   common fund for the benefit of persons other than himself or his client is entitled to a reasonable

20   attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  In

21   a common fund case, the district court can determine the amount of attorneys' fees to be drawn

22   from the fund by employing a "percentage" method.  *See Staton v. Boeing*, 327 F.3d 938, 968 (9th

23   Cir. 2003) (citation omitted).  The Ninth Circuit has established 25% of the common fund as a

24   benchmark for attorneys' fees.  *Id*.  Lead Counsel committed more than 23,000 hours of work and

25   incurred $1,540,059.57 in expenses, as detailed in my declaration (ECF 234-1) ("Robbins Geller

26   Declaration").  Based on the extensive efforts on behalf of the Settlement Class, as described above,

27   Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis, and

28   has requested a fee in the amount of $66,500,000, which is 19% of the Settlement Amount, plus

interest. To be sure, there was nothing "benchmark" about this case. Lead Counsel battled through roadblock after roadblock, including the full dismissal of all claims, appellate litigation all the way up to the Supreme Court, an unprecedented six-month stay of discovery, and Defendants' arguments that the case was worthless.

### 1.    The Requested Fee Is Reasonable

148.    There are several factors that suggest the fee requested is fair, reasonable, and adequate. First is the risk faced by Lead Counsel in pursuing this Litigation, who undertook representation of the Settlement Class on a wholly contingent basis, knowing that the Litigation could last for years, would require substantial attorney time and significant expenses, and provide no guarantee of compensation. Lead Counsel's assumption of this huge contingency-fee risk, and its unwavering tenacity in the face of numerous litigation challenges and risks, as detailed herein, strongly supports the reasonableness of the requested fee.

149.    Lead Counsel committed over 23,000 hours of attorney, accountant, and paraprofessional time and incurred $1,540,059.57 in expenses in the prosecution of the Litigation, as set forth in the Robbins Geller Declaration. Lead Counsel fully assumed the risk of an unsuccessful result. Lead Counsel has received no compensation for its services during the course of the Litigation and has incurred very significant expenses in litigating for the benefit of the Settlement Class. Any fees or expenses awarded to Lead Counsel have always been at risk and are completely contingent on the result achieved. Because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset was that there would be no fee without a successful result, and that such a result would be realized only after a lengthy and difficult effort.

150.    Lead Counsel took on this contingency risk in the face of determined opposition. Alphabet is one of the largest, most powerful, and most tech-savvy companies in the world. Lead Counsel understood that obtaining any positive outcome from such an adversary would be a herculean task. Alphabet put its enormous resources to work by employing three of the highest regarded defense firms in the country and/or locally: (1) Wilson Sonsini Goodrich & Rosati, P.C.; (2) Freshfields Bruckhaus Deringer US LLP; and (3) Swanson & McNamara LLP. For briefing before the Supreme Court, Alphabet brought in Supreme Court specialists, Hogan Lovells, led by

1    Neal Katyal.  And it was not just Alphabet's arguments that Lead Counsel had to respond to.  As

2    detailed above, amicus briefs were filed at the Supreme Court supporting Alphabet's position by

3    the Chamber of Commerce of the United States of America, the Securities Industry and Financial

4    Markets Association, Business Roundtable, and Washington Legal Foundation.   At class

5    certification, Professor Joseph A. Grundfest attempted to file an amicus brief in support of

6    Alphabet, but Lead Counsel successfully argued the brief was barred by Local Rule 7-3(d).

7        151.    Lead Counsel's efforts on appeal have had a lasting impact.  In the three years since

8    the Ninth Circuit first issued its opinion in this case reversing the complete dismissal, it has racked

9    up 425 "Citing References" on Westlaw, including in 70 opinions issued by federal courts across

10   the country and eight Courts of Appeal decisions (including in opinions of three circuits other than

11   the Ninth Circuit).  And in December 2023, the Ninth Circuit heavily relied on its opinion in this

12   case to reverse the complete dismissal of claims brought by investors in Facebook.  Specifically,

13   the Ninth Circuit found that "[a]s in *In re Alphabet*, the shareholders here adequately pleaded falsity

14   as to the statements in Facebook's 2016 10-K that represented the risk of third parties improperly

15   accessing and using Facebook users' data as purely hypothetical."  *In re Facebook, Inc. Sec. Litig.*,

16   87 F.4th 934, 948-49 (9th Cir. 2003).[4]

17

18   [4]      "Our recent decision in *In re Alphabet* is instructive.  We held that falsity allegations were
     sufficient to survive a motion to dismiss when the complaint plausibly alleged that a company's
19   SEC filings warned that risks "could" occur when, in fact, those risks had already materialized. *In
     re Alphabet*, 1 F.4th at 702-05.  This juxtaposition of a "could occur" situation with the fact that the
20   risk had materialized mirrors the allegations in the Facebook scenario.  In its 2017 Form 10-K,
     Alphabet warned of the risk that public concerns about its privacy and security practices "could"
21   harm its reputation and operating results.  *Id.* at 694.  The following year, Alphabet discovered a
     privacy bug that had threatened thousands of users' personal data for three years.  *Id.* at 695.
22   Nonetheless, in its April and July 2018 Form 10-Q filings, Alphabet repeated the 2017 statement
     that public concern about its privacy and security "could" cause harm.  *Id.* at 696.  In the 10-Qs,
23   Alphabet also stated that there had "been no material changes" to its "risk factors" since the 2017
     10-K.  *Id.*  Although news of the privacy bug had not become public at the time of the 10-Qs, we
24   reasoned that the risks of harm to Alphabet "ripened into actual harm" when Alphabet employees
     discovered the privacy bug and the "new risk that this discovery would become public."  *Id.* at 703.
25   The plaintiffs thus "plausibly allege[d] that Alphabet's warning in each Form 10-Q of risks that
     'could' or 'may' occur [was] misleading to a reasonable investor when Alphabet knew that those
26   risks had materialized."  *Id.* at 704.

27        As in *In re Alphabet*, the shareholders here adequately pleaded falsity as to the statements
     in Facebook's 2016 10-K that represented the risk of third parties improperly accessing and using
28   Facebook users' data as purely hypothetical.   The shareholders pleaded with particularity that
     Facebook employees flagged Cambridge Analytica in September 2015 for potentially violating

152.   Even at the time, the importance of the appeal was understood by defense firms. Indeed, major defense firms prepared client memoranda discussing the Ninth Circuit's opinion and recognized that the "Ninth Circuit Decision Highlights Importance of Updating Risk Factors to Address Material Developments, including those relating to Cybersecurity Risks." *See* https://www.whitecase.com/insight-alert/time-revisit-risk-factors-periodic-reports (White & Case discussing the case) (accessed September 19, 2024); *see also* https://www.davispolk.com/insights/client-update/ninth-circuit-revives-alphabet-securities-fraud-lawsuit-undisclosed-social (DavisPolk) (accessed September 19, 2024); https://sle.cooley.com/2021/07/06/hypothetical-risk-factors-misleading/ (Cooley) (accessed September 19, 2024); https://www.mofo.com/resources/insights/210622-de-risking-your-risk-disclosures (Morrison Foerster) (accessed September 19, 2024).  Thus, the benefits provided by Lead Counsel in this case will continue to inure in the future to investors claiming they were harmed by securities fraud.

153.   I have personally conducted and supervised scores of trials, and I am confident that our prosecution team here was well on the way to building a compelling case for trial.  Defendants' counsel also included experienced trial lawyers, and I have no doubt that their team would have been a formidable foe at trial.  This raised Lead Counsel's risk, and there is only a small pool of lawyers who could credibly meet this challenge at trial.  I believe the amount of this Settlement demonstrates that Defendants accurately viewed our prosecution team as being among that select group of plaintiffs' lawyers.  Nevertheless, a 19% fee award is well below the benchmark for fees in the Ninth Circuit.  This below-market rate is a product of Rhode Island's negotiation of its retainer agreement with Robbins Geller.

---

Facebook's terms, that Kogan taught Facebook in November 2015 about the dataset Cambridge Analytica had compiled, and that a Facebook executive told Cambridge Analytica in December 2015 that the firm had violated Facebook's user data policies.  The shareholders also alleged that after Facebook learned in June 2016 that Cambridge Analytica lied in December 2015 about deleting the data derived from Facebook "likes," Cambridge Analytica's chief executive refused to certify that the data had actually been deleted.  These allegations, if true, more than support the claim that Facebook was aware of Cambridge Analytica's misconduct before February 2017, so Facebook's statements about risk management "directly contradict[ed]" what the company knew when it filed its 2016 10-K with the SEC.  *Glazer II*, 63 F.4th at 764."  *Id.*

154. The attorneys' fees sought here are also appropriate if viewed as a multiple of lodestar. The schedules attached as Exhibits A and B to the Robbins Geller Declaration summarize the total time of partners, attorneys, and professional support staff of my firm who were involved in this Litigation, based on their current billing rates. The total number of hours expended on this Litigation by Lead Counsel is 23,026.30 hours. The resulting lodestar is $14,514,240.00, representing a multiplier of approximately 4.58 for the $66,500,000 requested fee. The lodestar cross-check supports the requested fee.

**2.     The Requested Litigation Expenses Is Fair and Reasonable**

155. As detailed in the attached Exhibit C to the Robbins Geller Declaration, Lead Counsel seeks a total of $1,540,059.57 in expenses in connection with the prosecution of this Litigation. These expenses were reasonably and actually incurred by Lead Counsel in connection with commencing and prosecuting the claims against Defendants.

156. From the beginning of the case, Lead Counsel was aware that it might not recover any of its expenses, and, at the very least, would not recover anything until the Litigation was successfully resolved. Lead Counsel also understood that, even if the case was ultimately successful, an award of expenses would not compensate it for the lost use of funds advanced while this Litigation was ongoing – basically an interest-free, no-recourse loan to the Class. Therefore, Lead Counsel was motivated to, and did, take steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the case.

157. The expenses for which Lead Counsel is seeking payment are detailed in Exhibit C to the Robbins Geller Declaration, which identifies the specific category of expense, *e.g.*, expert fees, travel costs, document management, and other costs actually incurred. As set forth therein, these expenses and charges are reflected on the books and records maintained by Robbins Geller, and are prepared from receipts, expense vouchers, check records, and other documents, and are an accurate record of the expenses.

158. A large portion of the expenses for which payment is sought were incurred for professional expert fees. Of the total amount of expenses, $1,335,158.93, was expended on experts in the areas of market efficiency, price impact, damages, and to assist with the Plan of Allocation.

1   The expertise and assistance provided by these experts was critical to the prosecution and successful

2   resolution of this Litigation.

3         159.    In addition, Lead Counsel was required to travel in connection with prosecuting and

4   mediating this matter, and thus incurred the related costs of travel tickets, meals, and lodging.

5   Included in the expense request is $4,466.55 for out-of-town travel expenses necessarily incurred

6   for the prosecution of this Litigation.  Robbins Geller Decl., Ex. E.

7         160.    The other expenses for which payment is sought are the types of expenses that are

8   necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses

9   include, among others, online legal and financial research and filing fees.

10         161.    All of Lead Counsel's litigation expenses for which payment is sought were

11   necessary to the successful prosecution and resolution of the claims against Defendants.  Rhode

12   Island has approved Lead Counsel's request for payment of expenses.  In addition, the Notice

13   apprised Settlement Class Members that Lead Counsel would seek payment of litigation expenses

14   not to exceed $1,750,000, which is less than 1% of the Settlement Amount.  To date, there are no

15   objections to the request for payment of expenses.

16         162.    In view of the complex nature of the Litigation, the Litigation expenses were

17   incurred were reasonable and necessary to pursue the interests of the Settlement Class.

18   Accordingly, Lead Counsel respectfully submits that the expenses are reasonable in amount and

19   should be paid in full.

20         I declare under penalty of perjury under the laws of the United States of America that the

21   foregoing is true and correct.  Executed on September 26, 2024, at San Diego, California.

22

23                                       JASON A. FORGE

24

25

26

27

28